**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RISING MICRO, LLC** | : |
| **950 South Capitol Street, S.E.** | : |
| **Washington, D.C.,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| | : |
| **EXXON MOBIL OIL CORPORATION** | : |
| **3225 Gallows Road** | : |
| **Fairfax, VA 22037-0001** | : |
| | : |
| **Defendant.** | : |
| | : |
| **SERVE:** | : |
| | : |
| **Prentice Hall Corporation** | : |
| **System, Inc.** | : |
| **1090 Vermont Ave., NW** | : |
| **Washington, DC 20005** | : |
| | : |

**Civil Action No.:**

<u>**VERIFIED COMPLAINT WITH JURY DEMAND**</u>

Plaintiff, Rising Micro, LLC ("Rising Micro"), sues defendant Exxon Mobil Oil Corporation ("Exxon") and states:

<u>**Jurisdiction and Venue**</u>

1.       This Complaint is brought against defendant for violations of the Petroleum Marketing Practices Act ("PMPA") (15 U.S.C. §§ 2801 *et seq.*).  This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 15 U.S.C. § 2805.  Diversity jurisdiction also exists pursuant to 28 U.S.C. §1332.

2.       Venue is properly situated in this District pursuant to 28 U.S.C. §1391 and 15 U.S.C. §2805(a).

## Parties

3.        Plaintiff Rising Micro is a Virginia corporation qualified to do business in the District of Columbia. Rising Micro operates a retail motor fuel, convenience store and car wash business at 950 South Capitol Street, S.E., Washington, D.C. (the "Marketing Premises") under the trade name of Capitol Exxon. The Marketing Premises is located in the immediate vicinity of the new baseball stadium, the final lease for which was announced publicly on March 6, 2006. Mahmud Rashid owns the membership interest in Rising Micro.

4.        Defendant Exxon is a New Jersey corporation, with its principal place of business in Fairfax, Virginia. Exxon is, among other things, an international refiner and marketer of petroleum products. In the District of Columbia, Exxon markets its motor fuel pursuant to a franchise distribution system whereby Exxon contracts with purportedly independent franchisees pursuant to three-year franchise agreements. These franchisees lease their retail service station facilities from Exxon and agree to purchase "Exxon" branded motor from Exxon for resale to the motoring public under the "Exxon" trademark.  Plaintiff Rising Micro is an Exxon franchisee at the Leased Marketing Premises as detailed in this Verified Complaint.

## Facts

5.        In or around February 2001, Rising Micro purchased the business of Capitol Exxon from its former owner for approximately $350,000 plus the value of the inventory. At that time, Rising Micro entered into written three-year agreements with Exxon (collectively the "2001 Franchise Agreement") for the lease of the Marketing Premises and the purchase and resale of motor fuel under the "Exxon" trademark. The 2001 Franchise Agreement created a petroleum marketing franchise and franchise relationship between Rising Micro and Exxon, the termination or non-renewal of which was governed by the PMPA.

6.      Exxon renewed its franchise relationship with Rising Micro effective February 1, 2004 pursuant to PMPA Franchise Agreement (the "2004 Franchise Agreement"). The PMPA governs the termination or non-renewal of the 2004 Franchise Agreement. A copy of the 2004 Franchise Agreement is attached and incorporated as **Exhibit A**.

7.      On February 12, 2004, a search warrant was executed at the Marketing Premises related to an investigation of alleged double billed transactions arising out of government-issued "Voyager" credit cards. A marketing representative of Exxon was present at the time of the search, and as a result Exxon was fully aware of the investigation that was being conducted.

8.      In June 2005, at Exxon's insistence, Rising Micro contracted with Butler Capital Corporation for the lease/purchase and installation of new car wash equipment at the Marketing Premises having a value of $95,000.00. Mr. and Mrs. Rashid guaranteed personally the car wash lease, a copy of which is attached and incorporated as **Exhibit B**. Pursuant to the car wash lease, Rising Micro is to make 60 monthly payments of $2,011.15 (later amended to $1,923.27).

9.      Under Rising Micro's operation, Capitol Exxon has received letters and certificates of appreciation from the Council of the District of Columbia, the Metropolitan Police Department, and Van Ness Elementary School. Those certificates and letters are attached and incorporated as **Exhibit C**. Additionally, letters of support, attached and incorporated as **Exhibit D**, have been provided by the District of Columbia Lottery and Charitable Games Control Board and one of Capitol Exxon's vendors, Tropicana.

10.    On January 17, 2006, Mahmud Rashid entered a plea of guilty in this Court to mail fraud, in violation of 18 U.S.C. § 1343. Sentencing is scheduled for June 6, 2006 before the Honorable Richard J. Leon.

11.    By letter dated March 14, 2006 (the "Termination Notice"), attached and incorporated as **Exhibit E**, Exxon notified Rising Micro that it is terminating the franchise and franchise relationship effective March 29, 2006 "based upon [Mahmud Rashid's] guilty plea to a one count information charge in violation of Title 18, United States Code, Section 1343." The Termination Notice further advises that "such a plea is a violation of Articles XIV, Section 14 of your PMPA Franchise Agreement." The Termination Notice further provides that "[p]ursuant to Article 14.1 of the Franchise Agreement and Sections 2802(b)(2)(c), 2802(c)(1) and 2802(c)(12) of the PMPA, Exxon hereby terminates its Franchise Agreement, franchise, and franchise relationship with you..." The Termination Notice states that the termination is "final and irrevocable."

## COUNT I
### (Violation of the PMPA)

12.    Paragraphs 1 through 11 are incorporated by reference as though fully set forth herein.

13.    The relationship between plaintiff Rising Micro and Exxon under the 2004 Franchise Agreement is a petroleum marketing franchise relationship, the termination or non-renewal of which is governed by the PMPA.

14.    Exxon is a "franchisor," and Rising Micro is a "franchisee," as defined by the PMPA. 15 U.S.C. § 2801(4).

15.    Exxon's termination of the franchise relationship is unlawful, and in willful violation of the 15 U.S.C. § 2802 of the PMPA in that:

a.     Exxon cannot show as required by 15 U.S.C. § 2804(a) and (b) that it provided notice of termination 90 days prior to the date on which the termination is to take effect, cannot show that less than 90 days notice of termination is reasonable under the circumstances, and cannot show that notice was given on the earliest date on which furnishing such notification was reasonably practical.

b.     Exxon cannot show that an "event" has occurred under 15 U.S.C. § 2802(b)(2)(C), in that Exxon first acquired actual or constructive knowledge of any purported occurrence as early as February 2004. Exxon is precluded under the express provisions of the PMPA, 15 U.S.C.§ 2802(b)(2)(C)(i) and (ii) from relying upon stale occurrences.

c.     Exxon cannot show that its franchisee has been convicted of any felony involving moral turpitude, and Exxon is precluded from relying on 15 U.S.C. § 2802(c) (12) as a ground for termination.

d.     Exxon cannot show that Rising Micro has committed fraud or misconduct as required for termination pursuant to 15 U.S.C. § 2802(c)(1).

e.     Exxon cannot show that a permissible ground for termination exists under 15 U.S.C. § 2802, nor has any "failure" occurred on the part of Rising Micro, as defined in 15 U.S.C. § 2801(13).

f.     Exxon cannot meet its burden of demonstrating that termination was genuinely "based upon" any PMPA-permitted termination ground or upon any of the purported reasons asserted in the Termination Notice.  Instead, the reasons given for termination, to the extent they are discernible, are pretextual.

g. Exxon is estopped by its conduct from terminating the franchise based upon purported conduct about which Exxon was fully aware when it induced Rising Micro to make a significant multi-year financial investment in the car wash.

28. Exxon's unlawful actions as detailed in this Complaint are in willful violation of the PMPA.

29. If Exxon terminates the franchise and franchise relationship with Rising Micro, Rising Micro will suffer irreparable harm, including the loss of its franchise and business into which significant financial resources, time and hard work have been invested. The business of Capitol Exxon is the sole business and source of livelihood for Rising Micro and the Rashid family.

WHEREFORE, Rising Micro requests relief as follows:

A. Issuing preliminary and final injunctive relief to enjoin the termination of the franchise and franchise relationship;

B. Declaring that the termination of the franchise and Franchise Relationship is unlawful and in violation of the PMPA;

C. Compensatory damages in such amount as may be proved and prejudgment interest;

D. Exemplary damages in such amount as the Court deems appropriate for Exxon's willful violation of the PMPA;

E. Reasonable attorneys' fees and expert witness fees and costs; and

F. Such other and further legal and equitable relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**VERIFICATION**

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of March, 2006 in Bethesda, Maryland.

RISING MICRO, LLC

By: _____
Mahmud Rashid

Respectfully Submitted,

LERCH, EARLY & BREWER, CHARTERED

_____
Harry C. Storm, Bar No. 332981
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, Maryland 20814
(301) 986-1300 telephone
(301) 347-1520 facsimile

7



**ExxonMobil**
*Fuels Marketing*

436 Creamery Way, Suite 300
Exton, Pennsylvania 19341-2556

January 27, 2004

Rising Micro LLC
Exxon Service Station
950 S Capitol Street S E
Washington, DC 20003

**RE: COPY OF CONTRACT
STORE # 25381**

Dear Dealer,

We are writing to you on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). Attached is a copy of the executed franchise agreement effective February 1, 2004 covering the premises situated at.

Exxon Service Station
950 S Capitol Street S E
Washington, DC 20003

If you have any questions, please do not hesitate to call your Territory Manager.

Sincerely,

John Bednash
Area Manager
Mid Atlantic

Enclosures

**EXHIBIT**

A



**ExxonMobil**
*Fuels Marketing*

Date 7/31/03

Dear Exxon Dealer:

Attached please find your new PMPA Franchise Agreement and related documents. Your ExxonMobil representative will be working with you to review and familiarize you with this package.

With the execution of your new PMPA Franchise Agreement, and upon its effective date, you will join many other dealers and distributors who are committed to ExxonMobil's Core Values which form the foundation of a new customer-oriented service station franchise offering that will drive and sustain the best buying experience in the petroleum industry.

Core Values

- To Deliver Quality products our customer trust
- To Employ Friendly, Helpful people
- To Provide Speedy, Reliable Service
- To Provide Clean, Attractive Facilities
- To be an Environmentally Responsible Neighbor

In the attached materials, you will find the ExxonMobil National Standards Handbook which is applicable to your station, including the current Minimum Acceptable Ratings (MARs), that you will need to attain to meet those standards. Your ExxonMobil representative will be working closely with you to ensure that you understand the new standards and support system. If you have not already attained the MARs, your ExxonMobil representative will be assisting you in obtaining help and resources to attain the necessary rating levels. To allow an orderly transition to the new standards, you will have 1 year from the effective date of your new agreement to reach the applicable MARs.

You can count on the support of the entire ExxonMobil team as we launch our new ExxonMobil Fuels Franchise.

Dealer Sales Manager

XOM_Welcome.htm

July 31, 2003

Loc. 25381

Dear RISING MICRO LLC :

You and ExxonMobil Oil Corporation ("ExxonMobil") are currently discussing the possibility of entering into or renewing a PMPA Franchise Agreement (the "Franchise Agreement"). In order for you to fully evaluate whether to enter into the Franchise Agreement, ExxonMobil is willing to disclose to you certain proprietary information, (the "Confidential Information"), subject to the terms set out below.

1. The term "Confidential Information" includes all information disclosed to you by ExxonMobil, including, but not limited to, copies of ExxonMobil's Standards Handbook and copies of the Franchise Agreement, whether that information is in oral form or in written or other visual form, or recorded on tape or other media.

2. You agree to treat the Confidential Information as confidential and you must not disclose it to any third party. You may use the Confidential Information only for the purpose of evaluating whether to enter into the Franchise Agreement with ExxonMobil. The requirements of this paragraph will remain in effect for five (5) years from the date of this letter.

3. ExxonMobil makes no representation or warranty concerning the quality, reliability, or accuracy of the Confidential Information. Any conclusions that you draw from the Confidential Information are at your own risk.

4. The Confidential Information remains the property of ExxonMobil and ExxonMobil may demand its return at any time upon ten (10) days written notice to you. Within five (5) days after receiving such a notice, you shall return all the Confidential Information other than that which is expressly granted by ExxonMobil in this letter.

5. Nothing contained in this letter may be construed as requiring you or ExxonMobil to consummate any transaction, whether related to the Confidential Information or otherwise. Nothing may be construed as granting you any interest in the Confidential Information other than that which is expressly granted by ExxonMobil in this letter.

6. This letter comprises the full agreement between you and ExxonMobil concerning this disclosure of the Confidential Information. This letter supersedes any prior understanding or agreements, regardless of form, between you and ExxonMobil with respect to the Confidential Information. No amendments of the terms of this letter will be valid unless they are made in writing and signed by you and the authorized representatives of ExxonMobil.

If you are in agreement with the above terms, please sign below where indicated and return one copy of this letter to ExxonMobil.

Sincerely,

ExxonMobil Oil Corporation

Agreed and Accepted:

RISING MICRO LLC

**FRANCHISE AGREEMENT PRESENTATION LETTER**


**To: ExxonMobil Oil Corporation**


                                        **RE: LOC# 54 - 25381**


On _OCTOBER 29, 2003_ the PMPA Franchise Agreement effective **FEBRUARY 1, 2004,**

through **JANUARY 31, 2007, for the location at, 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-**

**0000 was presented to me for my review and signature.**


_W.Q W̲_̲          _Howard._
**WITNESS**          **RISING MICRO LLC**


XOM_COVLET1.htm

# SUMMARY OF REAL ESTATE VALUE

Service Station #: 25381
Date: July 31, 2003

Summary:

The Real Estate (land) value used in determining your rent was $1,311,250.

EXPLANATION:

The Real Estate (land) Value used in calculating your rent is described under "Alternate Method of Calculating Real Estate Value" in ExxonMobil's National Rent Guidelines (Attached).

If you wish to challenge the Real Estate (land) Value, please notify your TM within 10 days from the receipt of this summary.

_____
TM's Signature

Date Received by Dealer  *OcToBER  29  2003*

_____
Dealer's Signature

**RENT SCHEDULE**
**TO**
**THE CODO LEASE PROVISIONS OF THE PMPA FRANCHISE AGREEMENT**

This Rent Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil") and **RISING MICRO LLC, 950 S CAPITOL STREET S E, WASHINGTON, DC 20003** ("Franchise Dealer") with a Term beginning on **February 01, 2004** (the "Effective Date").

1.  The Rental Period covered by this schedule is for the period from **February 01, 2004 to January 31, 2007.**

2.  Pursuant to Section 2.1 of the CODO Lease Provisions, the Rent is as follows:

|  |  |  |
|---|---|---|
| 02/01/2004 TO 01/31/2005 | $191,021 | $15,918 |
| 02/01/2005 TO 01/31/2006 | $196,751 | $16,396 |
| 02/01/2006 TO 01/31/2007 | $202,654 | $16,888 |

I acknowledge the receipt and applicability of this Rent Schedule:


_____     10-29-03
Dealer Signature                              Date

# EXXONMOBIL'S NATIONAL RENT GUIDELINES
## (Attachment I)

### *General Provisions*

The Guidelines outline ExxonMobil's National Rent Program and set forth the criteria for how rent will be calculated. The Guidelines are effective on March 1, 2003, but will not be applicable for existing dealers until July 1, 2003 given notice requirements and PMPA renewal lead times. They will replace the guidelines that have been in effect since January 1, 2001, and will remain in effect until changed, revoked or suspended by ExxonMobil. For purposes of the Guidelines, references to ExxonMobil may include Exxon Mobil Corporation, Mobil Corporation, Mobil Oil Corporation, Exxon Company U. S. A., ExxonMobil Fuels Marketing Company, ExxonMobil Oil Corporation, and any subsidiary or affiliate of Exxon Mobil Corporation.

Unless otherwise provided in the guidelines, ExxonMobil may change, suspend or revoke the Guidelines, in whole or in part, upon 90 days written notice. However, except as set forth in the "Additional Rent Increases" section, the Guidelines in effect when a lessee dealer signs its franchise agreement will remain in effect throughout the entire term of a 3-year agreement, the first three years of a 5-year agreement, and during the first five years of a 10-year agreement.

### *Annual Maximum Rent*

Maximum rent is the most ExxonMobil may annually charge a lessee dealer for rent. It is determined by multiplying the total property value by 12% and adding the real property tax. In the case of service station properties with an underlying lease, there will be an exception to the calculation of the Maximum rent such that the Maximum rent will not be less than the annual rent that ExxonMobil pays for any underlying lease and/or annual property tax. The land value is established by an independent third party appraiser selected by ExxonMobil. The value of the land component of the appraisal will be determined using the sales-comparison method and will be based on the highest and best use of the land, regardless of current use or the nature of the underlying estate. The appraiser will also assume that there are no conditions of property, subsoil or structures that are hidden or not apparent that render it more or less valuable. The service station building and improvements will be appraised using the Marshall-Swift evaluation, and values from that evaluation will be added to the appraised value of the land to determine a total property value.  A re-appraisal will occur every three years for those dealers on a 3-year agreement and every five years for those dealers on a 5 or 10-year agreement. Real property tax is the annualized tax most recently paid by ExxonMobil for the service station real estate and improvements.

### *Minimum Rent*

Minimum rent for a lessee dealer operated Exxon or Mobil service station will be established by ExxonMobil from time to time, and in accordance with the Guidelines.  In the event the minimum annual rent exceeds the amount of rent otherwise payable pursuant to the Guidelines, the minimum annual rent shall take precedence.  Effective

March 1, 2003, minimum annual rent will be $78,000. Thereafter, changes to the minimum annual rent will be made pursuant to the Guidelines.

## *Rent Increase Schedule*

Until the maximum rent is reached, rent increases will occur on the franchise anniversary date and when the franchise is renewed. Those increases are as follows:

### Three and Five Year Franchise Agreements

Beginning March 1, 2003, rent increases for all ExxonMobil lessee dealers who sign new three or five-year franchise agreements, or renew three or five-year agreements on or after July 1, 2003, will be as follows:

If the existing contract rent is less than $108,000 per year, the rent will be increased by 12% per year.

If the existing contract rent is equal to or greater than $108,000 but less than $132,000 per year, the rent will be increased by 8% per year.

If the existing contract rent is equal to or greater than $132,000 per year, the rent will be increased by 3% per year.

At the beginning of year four of a five year agreement a rent reopener will occur and the existing rent will be adjusted as necessary, pursuant to the Guidelines and rent schedule then in effect.

### *Ten Year Franchise Agreements*

Rent increases for all ExxonMobil lessee dealers who reach year six of a 10-year franchise agreement, which commenced on or after January 1, 2001, or who renew or sign a new 10-year franchise agreement, will be as follows:

If the existing contract rent is less than $108,000 per year, the rent will be increased 12% per year.

If the existing contract rent is equal to or greater than $108,000 but less than $132,000 per year, the rent will be increased by 8% per year.

If the existing contract rent is equal to or greater than $132,000 per year, the rent will be increased by 3% per year.

In year six, a rent re-opener will occur, and the existing rent will be adjusted pursuant to the Guidelines and rent schedule then in effect.

This rent increase schedule for three, five and ten-year franchise agreements will remain in effect until changed, amended or revoked pursuant to the Guidelines.

### *Rent Increase Schedule – Underlying Lease Properties*

If the current annual franchise rent is less than the annual rent that ExxonMobil pays for the underlying lease and/or property tax, the annual rent paid by the franchise dealer will increase by 12% per year, regardless of the annual contract rent amount, as noted in the aforementioned Rent Increase Schedule. The 12% annual rent increase will continue until the annual rent paid by the franchise dealer is equivalent to the annual rent ExxonMobil pays for the underlying lease and/or property tax.

## *Alternate Method of Calculating Real Estate Value*

In some instances, as set out below, the appraised real estate value may not be used as part of the rent calculation. Instead, ExxonMobil will use an alternate land value calculation, which will be done as follows. Annually, ExxonMobil will determine, for the preceding three years, the average price it has paid nationwide for real estate that will be used as a service station. This price will then be divided by the average projected annual motor gasoline sales for those sites, which will also be determined annually. This produces the Average Land Acquisition Cost (ALAC) multiplier. For the year 2003, the average land acquisition cost is $1,049,000 and average volume is 2,760,500 gallons, which produces an ALAC multiplier of 38 (thirty-eight) cents per gallon.

If the appraised real estate value exceeds 125% the average price ExxonMobil has paid for service station property for the previous three years, ExxonMobil will use the MPSI projected motor gasoline volume for that lessee dealer's service station and multiply it by the ALAC multiplier. If there is not an MPSI projected volume for the lessee dealer's service station that is currently representative of the station's volume, ExxonMobil will select the four nearest Exxon or Mobil service stations with similar demographics and physical design. The average motor gasoline volume at these four stations for the previous three years will be used in place of the MPSI projected volume. The lower of the appraised real estate value or the number produced by using the ALAC multiplier will be used for the real estate value component of the lessee dealer's rent calculation. However, in no case will the real estate value component be less than 125% of ExxonMobil's average land acquisition cost.

As appraisals of buildings, equipment and improvements are made, in no event will the depreciated replacement value of these buildings, equipment and improvements be less than 25% of its actual replacement value.

## *Appraisal Challenge*

When a franchise agreement is entered into or renewed, the lessee dealer will receive a summary of the appraisal done for the service station. If the lessee dealer disputes the real estate value set forth in the summary and wants to challenge it, the lessee dealer must provide written notice to its territory manager within 10 days of receipt of the appraisal summary.

ExxonMobil will then provide the lessee dealer with a list of three certified MAI appraisers, from which the lessee dealer will select one to do an appraisal. The lessee dealer must contact the appraiser and obtain, pay for, and furnish the appraisal to ExxonMobil within 45 days of providing written notice of its intent to challenge the real estate value. The lessee dealer also is required to pay a fee of $750 to ExxonMobil to cover the administrative costs associated with the challenge. The $750 must accompany the lessee dealer's written notice to ExxonMobil and is non-refundable.

To be considered by ExxonMobil, the real estate appraisal must be based on the highest and best use of the land regardless of its current use or the nature of the underlying estate. The appraisal must also assume that there are no hidden or unapparent conditions of property, subsoil or structures that render it more or less valuable. Lessee dealer shall promptly furnish documentation and information requested by ExxonMobil to allow it to understand the basis of the appraisal or to confirm that the appraisal meets the stated requirements.

If the variance between ExxonMobil's appraisal and the lessee dealer's appraisal is 10% or less, no change to the real estate value, originally provided by ExxonMobil to the lessee dealer, will be made. If the variance between the two appraisals is greater than 10% but less than 20%, the two appraisals will be averaged. If the variance is 20% or more, ExxonMobil will request and pay for a third appraisal. The third appraisal will be averaged with the previous two appraisals, and the average of the three will be the real estate value used to calculate the lessee dealer's rent.

## _Additional Rent Increases_

### _Government Action_

If the federal government and/or any state or local government agency enacts legislation, regulations, laws or rules, or takes any other action that alters any of the contractual or legal obligations or expectations of ExxonMobil or the lessee dealer, or if a federal or state court of competent jurisdiction takes any action that alters the contractual or legal obligations or expectations of ExxonMobil or the lessee dealer, ExxonMobil may revoke the Guidelines on a nationwide basis, in the affected state or in the affected local area on 30 days written notice. Thereafter, ExxonMobil may calculate and set rent for the affected lessee dealers in any manner it deems fit and in its sole discretion.

## _General Site Redevelopment and Mart and Snack Shop Upgrade Rent Increases_

### _General Site Redevelopment Rent_

If ExxonMobil redevelops any service station on or after March 1, 2003, both the annual and maximum

rent for the service station may be increased based on the amount of any ExxonMobil investment.

Redevelopment includes, but is not limited to, any demolishing, rebuilding or adding to the service station, including any of the following:

- Canopies
- Dispensers/CAT's
- Gasoline/Diesel UG Tanks
- Additional Islands
- Additional Lighting
- Additional Service Station Bay Lifts
- Car Washes, Bay Conversions, Mart and Snack Shop Upgrades
- Marketing/Technology Innovations
- On the Run ® Related Improvements
- Equipment and Improvements that increase sales capacity

Rent will _not_ be increased for non-redevelopment projects such as equipment replacement or improvements associated with routine maintenance and/or upgrades made to existing equipment or improvements at the site. However, the cost to replace or upgrade the equipment will be used to determine the maximum rent.

If the cost of the redevelopment is less than $500,000, the current annual rent will be increased by an amount equal to the cost of the redevelopment multiplied by 12%. This increase will be effective immediately upon completion of the redevelopment, and will stay in effect for a minimum of 12 months. Thereafter, rent will be adjusted on the next franchise anniversary or renewal date and pursuant to the Guidelines.

For a redevelopment which exceeds $500,000 or which requires a lessee dealer to sign a new ten-year franchise agreement, annual rent will be the cost of the redevelopment, the appraised value of all improvements not affected by the redevelopment, if any, and the real estate value multiplied by 8%. The monthly rent is determined by dividing the annual rent by 12. The new rent will be phased in as follows: for the first three months following completion of the redevelopment, no rent will be charged. For the next three months, the monthly rent will be reduced by 50%. Thereafter, the lessee dealer will pay the full monthly rent, and future increases will be made pursuant to the Guidelines.

### _Mart/Snack Shop Upgrade Rental_

Except where self-service is prohibited by law, when an existing Tiger Mart/Market or a Mobil Mart or Snack Shop is redeveloped or upgraded, rent will be the _lower_ of 1) the cost of the redevelopment or upgrade multiplied by 8% plus 8% of the existing property value or 2) the cost of the redevelopment or upgrade multiplied by 8% plus the lessee dealer's then existing annual rent. In markets where self-serve is prohibited by law, the multiplier shall be 5% rather than 8%.

### *Rent for New to Industry Service Stations*

When ExxonMobil opens a New to Industry (NTI) service station, the first year rent will be the total cost associated with building the NTI service station, including land value, multiplied by 8%. The ALAC multiplier does not apply to the rental calculation for NTI's. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

### *Rent for Conversions*

When ExxonMobil brands a service station that is not currently operated or owned by ExxonMobil, the first year rent will be ExxonMobil's total cost of acquiring and/or upgrading the service station, including land value, multiplied by 8%. The ALAC multiplier does not apply to the rental calculation for these sites. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

### *Rent for Dealer to Dealer Conversions*

The first year rent for a dealer who purchases a station from, or receives a station from an existing dealer, and who signs a new ExxonMobil Fuels Franchise Agreement, shall be the greater of the then current minimum rent, the average business unit rent, or the outgoing dealer's rent. Subsequent annual rent increases will be subject to the then current National Rent Guidelines.

### *Company Owned Retail Stores (CORS)*
### *Conversions to a Lessee Dealer Service Station*

First year rent for a Company Operated Retail Store (CORS) conversion to a Lessee Dealer Service Station will be the greater of the minimum rent in effect pursuant to the Guidelines or the average service station rent for the respective business unit where the store is located. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

### *Waiver of Rights*

Except as otherwise provided herein, the Guidelines do not waive or amend any rights or remedies ExxonMobil or the lessee dealers have under the franchise agreement. Further, nothing in the Guidelines prevents the parties from agreeing to changes in the Guidelines by separate written agreement.

RETAILER'S
COPY

DEALER COPY

# PMPA FRANCHISE AGREEMENT

# (CODO AND DOSS)

# BETWEEN

# EXXONMOBIL OIL CORPORATION

# AND

# RISING MICRO LLC

# DATED

10-29-03

# TABLE OF CONTENTS

RECITALS                                                                     5

AGREEMENT                                                                    5

ARTICLE I
GRANT                                                                        6
    1.1    PMPA Franchise Relationship                          6
    1.2    Related Businesses                                   6
    1.3    Related Business Attachments                         7
    1.4    No Exclusive Marketing Rights                        8
    1.5    Term                                                 8

ARTICLE II
PURCHASE AND DELIVERY OF PRODUCTS                                            8
    2.1    Purchase Obligation                                  8
    2.2    Prices                                               8
    2.3    Terms of Payment                                     9
    2.4    Credit; Security                                     9
    2.5    Deliveries                                          10
    2.6    Other Terms and Conditions of Sale                  10
    2.7    ExxonMobil Product Certification                    10
    2.8    Franchise Dealer Product Control; Safeguards        10
    2.9    Effect of Quality Violations; Samples               11
    2.10   Product Quality or Quantity Claims                   11

ARTICLE III
SERVICES BY EXXONMOBIL                                                      11
    3.1    ExxonMobil Services                                 11

ARTICLE IV
PARTICIPATION/ORGANIZATIONAL FORM                                          12
    4.1    Organizational Form; Key Individual                 12
    4.2    Participation in Business; Multi-Unit Operators     12
    4.3    Corporation                                         12
    4.4    Other Business Forms                                13
    4.5    Disclosure of Ownership Interests                   15
    4.6    Waiver                                              15

ARTICLE V
CONFIDENTIALITY                                                            15
    5.1    Confidential Information                            15
    5.2    Examples of Confidential Information; Compelled Disclosures   16
    5.3    Use of Confidential Information                     16
    5.4    Remedy; Survival                                    17

ARTICLE VI
STANDARDS HANDBOOK                                                         17

| | | |
|---|---|---|
| 6.1 | Standards Handbook | 17 |
| 6.2 | Revisions | 17 |
| 6.3 | Minimum Acceptable Ratings | 17 |

**ARTICLE VII**
**PROPRIETARY MARKS** ..... 18

| | | |
|---|---|---|
| 7.1 | Use of Proprietary Marks | 18 |
| 7.2 | Non-Exclusive Use | 18 |
| 7.3 | Ownership of Proprietary Rights | 19 |

**ARTICLE VIII**
**MANAGEMENT AND TRAINING** ..... 19

| | | |
|---|---|---|
| 8.1 | Franchisee Dealer Management | 19 |
| 8.2 | Franchise Management Training | 19 |
| 8.3 | Employee Training | 19 |
| 8.4 | Educational Meetings and Seminars | 20 |
| 8.5 | Training Expenses | 20 |

**ARTICLE IX**
**OPERATIONS** ..... 20

| | | |
|---|---|---|
| 9.1 | Importance of Operational Requirements | 20 |
| 9.2 | Operation of Businesses | 20 |
| 9.3 | Operating Hours | 20 |
| 9.4 | Use of Marketing Premises | 21 |
| 9.5 | Installation of Additional Tanks | 21 |
| 9.6 | Equipment, Fixtures, Signs | 21 |
| 9.7 | Customer Service | 22 |
| 9.8 | Clean, Attractive and Functional Operations | 22 |
| 9.9 | Maintenance Obligations | 22 |
| 9.10 | Compliance with Laws, Covenants and Restrictions | 22 |
| 9.11 | Safety Procedures | 22 |
| 9.12 | Image and Trademark Standards; Promotion Programs | 22 |
| 9.13 | Staffing | 22 |
| 9.14 | Conduct | 22 |
| 9.15 | System Modifications | 23 |
| 9.16 | Retail Credit and Debit Program | 23 |
| 9.17 | Improvements and Investments in Marketing Premises | 24 |
| 9.18 | Technological and Communication Updates | 24 |
| 9.19 | Inspection | 24 |
| 9.20 | Pricing | 24 |
| 9.21 | Environmental Standards | 24 |
| 9.22 | Maintain Inventory | 24 |

**ARTICLE X**
**ADVERTISING, PROMOTION; AND MARKETING** ..... 24

| | | |
|---|---|---|
| 10.1 | General Advertising | 25 |
| 10.2 | Local Advertising Approval | 25 |
| 10.3 | Advertising Contributions | 25 |

**ARTICLE XI**
**INSURANCE** ..... 25

| | | |
|---|---|---|
| 11.1 | Types of Insurance Required | 25 |
| 11.2 | CODO Additional Insurance Clause | 26 |
| 11.3 | DOSS Additional Insurance Clause | 26 |
| 11.4 | Evidence of Insurance | 26 |
| 11.5 | Other Provisions | 26 |

**ARTICLE XII**
**TRANSFER OF INTEREST; SURVIVORSHIP**          27

| | | |
|---|---|---|
| 12.1 | Consent Requirements | 27 |
| 12.2 | Consent to Transfer | 27 |
| 12.3 | Conditions to Transfer | 28 |
| 12.4 | Administrative Fees | 29 |
| 12.5 | Survivorship | 29 |
| 12.6 | Waivers | 30 |
| 12.7 | Assignment by ExxonMobil | 30 |
| 12.8 | Communications with Transferees | 30 |

**ARTICLE XIII**
**RIGHT OF FIRST REFUSAL**          31

| | | |
|---|---|---|
| 13.1 | Right of First Refusal | 31 |
| 13.2 | Transfers to Immediate Family | 32 |

**ARTICLE XIV**
**DEFAULT AND TERMINATION**          32

| | | |
|---|---|---|
| 14.1 | Termination or Non-renewal of Agreement and Franchise Relationship | 33 |
| 14.2 | Right of Termination Due to Governmental Action | 33 |
| 14.3 | Accrued Rights | 33 |
| 14.4 | Remedies of ExxonMobil | 34 |

**ARTICLE XV**
**OBLIGATIONS UPON TERMINATION OR EXPIRATION**          34

| | | |
|---|---|---|
| 15.1 | Termination of Business Operation | 34 |

**ARTICLE XVI**
**TAXES, PERMITS, INDEBTEDNESS**          35

| | | |
|---|---|---|
| 16.1 | Tax, Duty, Fee Due ExxonMobil | 35 |
| 16.2 | Local, State, Federal Taxes and General Indebtedness | 35 |
| 16.3 | Indebtedness Dispute | 35 |
| 16.4 | Permits and Licenses | 35 |
| 16.5 | Notices | 35 |

**ARTICLE XVII**
**INDEPENDENT CONTRACTOR**          35

| | | |
|---|---|---|
| 17.1 | Relationship of the Parties | 35 |
| 17.2 | Public Notification | 36 |
| 17.3 | Other Franchise Dealer Obligations | 36 |

**ARTICLE XVIII**
**INDEMNIFICATION**          36

| | | |
|---|---|---|
| 18.1 | Definition of Losses | 36 |
| 18.2 | Indemnity | 36 |
| 18.3 | Notices; Choice of Counsel | 37 |

| | 18.4 | Remedies | 37 |
| | 18.5 | Defenses | 37 |
| | 18.6 | Recovery Obligations | 38 |
| | 18.7 | Claims against ExxonMobil | 38 |
| | 18.8 | Criminal Act | 38 |
| | 18.9 | Negligence: Willful Misconduct | 38 |

ARTICLE XIX
FAILURE TO PERFORM; ALLOCATION    38
| | 19.1 | General Contingencies; Force Majeure | 38 |
| | 19.2 | Allocation | 38 |

ARTICLE XX
MISCELLANEOUS    39
| | 20.1 | Significance of Terms and Conditions | 39 |
| | 20.2 | Approvals and Consents | 39 |
| | 20.3 | Strict Compliance | 39 |
| | 20.4 | Notices | 40 |
| | 20.5 | ExxonMobil Legal Fees and Costs | 40 |
| | 20.6 | Claims | 40 |
| | 20.7 | Limitation of Liability | 40 |
| | 20.8 | Entire Agreement; Modifications | 40 |
| | 20.09 | Severability and Construction | 41 |
| | 20.10 | Third Party Rights | 41 |
| | 20.11 | Headings | 41 |
| | 20.12 | Joint and Several Obligations | 41 |
| | 20.13 | ExxonMobil Approval | 41 |
| | 20.14 | Terms on Renewal | 41 |

ARTICLE XXI
ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES    41
| | 21.1 | Business Risks | 41 |
| | 21.2 | Representations | 41 |
| | 21.3 | Receipt of Attachments and Disclosures | 42 |
| | 21.4 | Understanding of Agreements; Core Values | 42 |

## PMPA FRANCHISE AGREEMENT

This PMPA Franchise Agreement ("Agreement") between ExxonMobil Oil Corporation ("ExxonMobil"), having an office at 3225 Gallows Road, Fairfax, Virginia 22037 and RISING MICRO LLC ("Franchise Dealer"), having a place of business at 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 ("Marketing Premises"), takes effect on the date specified in Section 1.5.

## DEFINITIONS

A glossary of the terms used in this Agreement is contained in the attachment entitled "Definitions" which is incorporated into this Agreement.

## RECITALS

A.  As the result of the substantial expenditure of time, skill, effort and money, ExxonMobil has developed and owns a unique and distinctive system ("System") for the sale of Exxon-branded products at Exxon Outlets. For purposes of this Agreement, an "Exxon Outlet" means an Exxon-branded retail motor-fuels outlet operated under the System by: (1) ExxonMobil, or any subsidiary or affiliate of ExxonMobil Oil Corporation, or (2) another person who is subject to an agreement with ExxonMobil, an ExxonMobil Affiliate or an ExxonMobil-authorized person allowing the operator of the outlet to sell Exxon motor fuels as an Exxon-branded product.

B.  In developing the System, ExxonMobil has conducted extensive consumer research to determine ExxonMobil's customers' needs and preferences, has conducted extensive analysis of customer-service and franchise retail and operating practices, and, based on this research and analysis and ExxonMobil's marketing strategies, has established the following core values (the "Core Values"):

---

**ExxonMobil's tradition of excellence is aimed at building and maintaining lasting relationships with its customers, the motoring public. In continuing this tradition, the dedication of ExxonMobil and its franchise dealers and distributors to the customer is reflected in these simple commitments:**

· **To deliver quality products that customers can trust.**

· **To employ friendly, helpful people.**

· **To provide speedy, reliable service.**

· **To provide clean and attractive retail facilities.**

· **To be a responsible, environmentally conscious neighbor.**

**Living up to these commitments is the heart of our spirit and purpose. It is the key to delighting our customers and the key to success and prosperity for all dealers, distributors, ExxonMobil and everyone connected with the ExxonMobil System.**

---

C.  The distinguishing characteristics of the System include: (1) supply of Exxon-branded products; (2) certain procedures and methods of Exxon-branded product sales; (3) distinctive appearance, decor, design, trademark and uniform standards; (4) unique and specialized training, management, marketing techniques and materials and socially responsible programs; and (5) advertising and promotional programs - all of which are integral and important to Franchise Dealer, ExxonMobil, and other Exxon Outlets.

D.  ExxonMobil identifies the System by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin ("Proprietary Marks") including the name and mark "Exxon", "the Exxon Tiger logo ", "On the Run", "Exxon Tiger Mart", "Exxon Tiger Market", "Exxon Service", "Exxon Car Wash" and such other names, marks, logos, emblems and indicia as ExxonMobil may from time to time use in connection with the System - all of which are identified by customers as being standards of excellence for Exxon Outlets and products bearing Exxon's trademarks.

E.  ExxonMobil relies upon the personal qualifications of the Franchise Dealer and the Franchise Dealer's commitment to the Core Values (if Franchise Dealer is an individual), or the personal qualifications of the Key Individual and the Key Individual's commitment to the Core Values (if Franchise Dealer is not an individual), in entering into this Agreement with Franchise Dealer.

F.  Upon the following terms and conditions and consistent with the System and the Core Values, ExxonMobil and the Franchise Dealer desire to enter into this Agreement for the retail sale of the Products and for the conduct of the Related Businesses at the Marketing Premises.

The Parties, therefore, agree as follows:

**ARTICLE I**
**GRANT**

1.1  <u>PMPA Franchise Relationship</u>. By this Agreement, ExxonMobil and Franchise Dealer establish a "Franchise" and a "Franchise Relationship" as defined by the Petroleum Marketing Practices Act, 15 U.S.C. Sections 2801-2806 (the "PMPA"). Subject to the terms and conditions of this Agreement:

(a)  ExxonMobil grants Franchise Dealer the right to use those Proprietary Marks specified by ExxonMobil from time to time for use in connection with the sale of the Products at the Marketing Premises;

(b)  Franchise Dealer shall purchase the Products from ExxonMobil for retail sale at the Marketing Premises; and

(c)  ExxonMobil grants Franchise Dealer the right to operate at the Marketing Premises a retail motor-fuels business under the System (the "Motor Fuels Business").

1.2  <u>Related Businesses</u>. Subject to the terms and conditions of this Agreement,

(a)  ExxonMobil grants Franchise Dealer the right to operate at the Marketing Premises only the additional related business(es) initialed by the Parties in Section 1.2(c) (the "Related Businesses"*), and to use in connection with the Related Businesses the Proprietary Marks specified by ExxonMobil from time to time for use in connection with the Related Businesses*. Franchise Dealer acknowledges that Franchise Dealer's operation of the Related Businesses impacts customers' buying experience at the Marketing Premises and customers' perception and acceptance of Exxon-branded products, the System and the Proprietary Marks. Accordingly, Franchise Dealer may operate a Related Business only if Franchise Dealer complies with ExxonMobil's requirements for that Related Business and the attachments referred to in Section 1.3. If Franchise Dealer fails to comply with the requirements for a Related Business, without limiting ExxonMobil's other rights or remedies under applicable Law or under this Agreement or a related or supplemental agreement including termination or non-renewal of this Agreement and the Franchise Relationship, ExxonMobil may require Franchise Dealer to stop operating the Related Business at the Marketing Premises.

(b)  During the Term, Franchise Dealer shall operate the Related Businesses at the Marketing Premises under the System and shall not operate any other businesses or activities at the Marketing Premises or change, delete or add a Related Business unless agreed in writing by the Parties, which agreement may not be unreasonably withheld. Nothing contained in this Section 1.2 may be construed as limiting or preventing ExxonMobil from changing, deleting or adding:

(i)     a Related Business if this Franchise Agreement is terminated or renewed or upon the termination or renewal of any supplemental or related agreement,

(ii)    any Proprietary Marks used in connection with an Exxon Related Business, or

(iii)   a Related Business as permitted under an agreement relating to that business.

(c)  The Related Businesses permitted under this Agreement consist of the following:

| | Initials | | |
|---|---|---|---|
| | ExxonMobil | Franchise Dealer | |
| 1. | | | On the Run Convenience Store* |
| 2. | _hol_ | _2lm_ · | Exxon Tiger Mart |
| 3. | | | Exxon Tiger Market |
| 4. | | | Exxon Snack Shop |
| 5. | | | Exxon Service |
| 6. | _how_ | _2b_ | Exxon Car Wash |
| 7. | | | Other Exxon Offerings (as specified): |
| 8. | | | Co-Brand or Non-Exxon Offering* (as specified): |

* The On the Run Convenience Store and the use of related Proprietary Marks are available to Franchise Dealer only upon the signing of a separate written agreement with ExxonMobil. Franchise Dealer acknowledges that ExxonMobil does not offer Co-Brand or Non-Exxon Offerings. Franchise Dealer must obtain operating, trademark and other rights to any Co-Brand or Non-Exxon Offering directly from any third party having the authority to grant those rights.

The Related Businesses specified in items 1 through 8 of this Section 1.2(c) are collectively referred to as the "Exxon Related Businesses".

1.3  <u>Related Business Attachments</u>

(a)  In operating Related Business, Franchise Dealer shall comply with those attachments listed below applicable to the Related Businesses, which applicable attachments are incorporated into this Agreement.

1.    Additional Exxon Tiger Mart/Market Provisions
2.    Additional Exxon Service Provisions
3.    Additional Exxon Car Wash Provisions
4.    Additional Exxon Offerings Provisions
5.    Additional Co-Brand/Non-Exxon Offerings Provisions

(b)  If Franchise Dealer leases the Marketing Premises from ExxonMobil, Franchise Dealer shall comply with the attachment entitled "CODO Lease Provisions", which is incorporated into this Agreement (the "CODO Lease Provisions").

(c)  If Franchise Dealer does not lease the Marketing Premises from ExxonMobil, Franchise Dealer shall comply with the attachment entitled "DOSS Additional Provisions" which is incorporated into this Agreement.

(d)  Franchise Dealer acknowledges receipt of all applicable attachments referred to in this Section 1.3.

1.4  <u>No Exclusive Marketing Rights</u>. This Agreement and the Franchise Relationship created by this Agreement do not give Franchise Dealer an exclusive right in any market or geographic area to sell the Products or conduct any of the Related Businesses. At ExxonMobil's sole discretion, it may compete with Franchise Dealer by:

(a)  establishing or continuing at locations of its choice the Exxon Outlets, Mobil Outlets, franchises, enterprises and other related businesses; or

(b)  directly selling Products or operating retail service stations, convenience stores, automotive repair and other services, and other related businesses, at locations of its choice.

1.5  <u>Term</u>. The term of this Agreement is for a fixed period of 3 years, beginning on FEBRUARY 1, 2004 and ending on JANUARY 31, 2007, unless terminated earlier under the provisions of this Agreement (the "Term"). By writing furnished to Franchise Dealer, ExxonMobil may grant temporary extensions of the Term for periods not exceeding 180 days for each extension. An extension is not to be construed as a renewal of this Agreement or of the Franchise Relationship.

**ARTICLE II**
**PURCHASE AND DELIVERY OF PRODUCTS**

2.1  <u>Purchase Obligation</u>.

(a)  Franchise Dealer shall use good-faith and best efforts to maximize the sale at the Marketing Premises of the Products. "Products" means motor fuel which is:

(i)  sold by ExxonMobil with authorization for resale as an Exxon-branded product;

(ii)  sold consistent with that authorization; and

(iii)  specified in the schedule entitled "Purchase Schedule" attached and incorporated into this Agreement (the "Purchase Schedule").

(b)  Without limiting the general requirement that Franchise Dealer maximize Product sales and subject to the terms and conditions of this Agreement, Franchise Dealer shall purchase directly from ExxonMobil, during the term of this Agreement and for delivery at the Marketing Premises, not less than 70% of the monthly and contract-year quantities of the Products specified in the Purchase Schedule (the "Contract Volumes"). The Contract Volumes and the percentage of the Contract Volumes that Franchise Dealer is obligated to purchase directly from ExxonMobil are subject to modification as provided in the CODO Lease Provisions or the DOSS Additional Provisions, whichever is applicable.

(c)  ExxonMobil, in its sole discretion, may sell more than Contract Volumes to Franchise Dealer, but is not obligated to do so. If the first or last month of the Term is not a full month, the Contract Volume for that month is the Contract Volume specified in the Purchase Schedule for the corresponding month, prorated for the number of days in the partial month. All Product sales above the Contract Volume are subject to the terms and conditions of this Agreement.

(d)  DEALER agrees to buy and receive directly from EXXONMOBIL all of the EXXON-branded gasoline/diesel sold by DEALER.

2.2  <u>Prices</u>. For all Products purchased under this Agreement, Franchise Dealer shall pay ExxonMobil the price that is in effect at the time of loading of the delivery vehicle. Unless otherwise specified by ExxonMobil in writing, prices are prior to taxes and are subject to change by ExxonMobil at any time and without notice.

2.3  <u>Terms of Payment</u>. Except to the extent ExxonMobil extends credit to Franchise Dealer under Section 2.4, Franchise Dealer shall:

(a)  pay all amounts due ExxonMobil under this Agreement in U.S. currency in the manner specified by ExxonMobil; and

(b)  pay for Products and services prior to delivery and provision of services.

The method of payment specified by ExxonMobil may include ExxonMobil's Electronic Settlement Program, Automated Direct Debit System, certified check, bank or other financial-institution check or any other method as ExxonMobil may designate from time to time. ExxonMobil may charge, and Franchise Dealer shall pay, fees as ExxonMobil may from time to time specify and as are permitted by Law, for any late payments, for any checks or bank or other financial-institution debits that are not honored by Franchise Dealer's bank or other financial institution or are otherwise returned or reversed by Franchise Dealer's bank or financial institution. If, as a result of any un-honored checks or debits, ExxonMobil revokes or does not extend credit to Franchise Dealer, ExxonMobil may also charge, and Franchise Dealer shall pay, fees as ExxonMobil may from time to time specify and as are permitted by Law, which fees are determined by ExxonMobil to recoup its costs and expenses in administering Franchise Dealer's payments under this Agreement. Cash discounts, if any, do not apply to taxes, freight charges or container charges. ExxonMobil may withhold, setoff or recoup any amount

due and owing Franchise Dealer or held by ExxonMobil on behalf of Franchise Dealer under this Agreement, any related or supplemental agreement or any other agreement between the Parties from or against any amount owed by Franchise Dealer to ExxonMobil.

2.4    Credit; Security.

    (a)   In its sole discretion, ExxonMobil may extend credit to Franchise Dealer on terms and conditions as specified by ExxonMobil, and ExxonMobil may modify the terms and conditions of credit, or revoke credit, at any time or from time to time. If requested by ExxonMobil, Franchise Dealer shall provide to ExxonMobil and maintain security sufficient to secure payment for one or more loads of Product in such amounts and forms as ExxonMobil may specify in its sole discretion ("Product Security"), including a letter of credit or cash deposit.

    (b)   ExxonMobil may use, without prior notice or demand, any or all of the Product Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to ExxonMobil including indebtedness arising from purchases under this Agreement. If ExxonMobil uses any Product Security to satisfy all or any part of any indebtedness or obligation, Franchise Dealer immediately shall provide ExxonMobil with additional security, as directed by ExxonMobil, to replace the Product Security used by ExxonMobil. Following non-renewal or termination of the Franchise Relationship between ExxonMobil and Franchise Dealer, ExxonMobil shall return to Franchise Dealer, in accordance with ExxonMobil's procedures then in effect, any remaining portion of the Product Security not required to satisfy all or any part of any indebtedness or other obligation of Franchise Dealer to ExxonMobil.

    (c)   At ExxonMobil's request at any time during the Term, Franchise Dealer shall sign and deliver to ExxonMobil a Security Agreement, Financing Statement, Mortgage, Deed of Trust or other documentation, as ExxonMobil may reasonably specify, to establish or perfect ExxonMobil's security interest in the Product Security. By written notice to ExxonMobil and payment of any outstanding sums, Franchise Dealer may elect to reduce or discontinue any credit extended to it under this Section 2.4. Upon such election and payment or if ExxonMobil reduces or revokes credit, Franchise Dealer's obligation to furnish ExxonMobil with Product Security or documentation to establish or perfect Product Security will be reduced to the extent that any Product Security exceeds any continuing credit extended by ExxonMobil and any outstanding sums owed to ExxonMobil.

    (d)   If Franchise Dealer defaults in the payment of any obligation or indebtedness to ExxonMobil (including any indebtedness arising from purchases under this Agreement) or otherwise fails to comply with any credit terms imposed by ExxonMobil, ExxonMobil may without notice or demand, in addition to any other rights it may have (including termination or non-renewal of this Agreement and the Franchise Relationship):

        (i)   immediately suspend deliveries of all Products; and

        (ii)   apply any Product Security which Franchise Dealer may have given to ExxonMobil to the payment of the indebtedness or obligation.

2.5    Deliveries. ExxonMobil will deliver Products to the Marketing Premises on terms and conditions as specified by ExxonMobil in its sole discretion from time to time. Franchise Dealer shall take all actions necessary to facilitate the receipt of deliveries, including prompt removal of snow and ice from all fill cap areas. ExxonMobil may, but is not obligated to, make single deliveries of Product of less than its standard delivery quantity as specified by ExxonMobil from time to time. Franchise Dealer shall participate in and comply with ExxonMobil's Product delivery programs and policies in effect from time to time including ExxonMobil's Inventory Management System. If Franchise Dealer fails to comply with or participate in ExxonMobil's delivery program or policy, without limiting any other remedies available to ExxonMobil, Franchise Dealer shall pay to ExxonMobil a reasonable charge imposed in accordance with ExxonMobil's delivery policy or program to recover administrative or delivery costs resulting from Franchise Dealer's noncompliance with the program or policy. Franchise Dealer shall accept delivery of Product whether or not Franchise Dealer or anyone else representing Franchise Dealer is on the Marketing Premises to receive the delivery. Franchise Dealer shall pay for all Product delivered.

2.6    Other Terms and Conditions of Sale. Franchise Dealer shall use the dispensing and storage facilities that are owned by ExxonMobil or bear the ExxonMobil name or Proprietary Marks only for the storage or sale of the Products. Franchise Dealer shall purchase and resell the Products, and use the Proprietary Marks, brand names and packaging that are marketed and used by ExxonMobil as determined by ExxonMobil. ExxonMobil may, at any time, add new products or change the grade, specifications, characteristics or delivery package, brand name or other distinctive designation of any Product sold by ExxonMobil under this Agreement, and the Products so added or changed are subject to this Agreement. ExxonMobil may discontinue the sale of any Product without affecting other rights or obligations of ExxonMobil and Franchise Dealer under this Agreement. Only ExxonMobil has the right to determine what ExxonMobil products will be offered at the Marketing Premises.

2.7    ExxonMobil Product Certification. ExxonMobil certifies that, at the time of delivery, the Products delivered by it will comply with the following:

(a)    all fuel requirements under applicable Laws in effect at the time of delivery in the area of the Marketing Premises including requirements relating to octane, oxygen content, Reid Vapor Pressure, cetane rating, sulfur content, aromatic content, dye content, benzene content, emission reduction percentages for volatile organic compounds or nitrogen oxides and other regulated components or characteristics of a motor fuel or motor-fuel additive ("Fuel Requirements").

2.8    Franchise Dealer Product Control; Safeguards. Franchise Dealer shall exercise the highest degree of care and diligence in handling, storing, selling and using Products delivered to the Marketing Premises. Franchise Dealer shall not cause or allow any contamination, mixing or adulteration of any Products. Franchise Dealer shall not sell, or offer for sale, from the Marketing Premises, Products which are contaminated or adulterated or fail to meet the Fuel Requirements or Unleaded Gasoline Requirements. ExxonMobil may refuse to make Product deliveries into any tank until in ExxonMobil's judgment quality problems are corrected. Franchise Dealer also shall:

(a)    protect Product from adulteration, mixing or contamination by water or other substances;

(b)    comply with the provisions in the CODO Lease Provisions or DOSS Dealer Additional Provisions, whichever is applicable, and the environmental Standards;

(c)    inspect all storage tanks daily for water accumulation; where automated water readings are used, a manual stick reading shall be performed and recorded at least monthly to confirm the accuracy of the automated reading

(d)    comply with any procedures developed by ExxonMobil from time to time to safeguard the integrity of all fuels being marked;

(e)    comply with all Fuel Requirements;

(f)    immediately notify Territory Manager by telephone, and confirm in writing,

(i)    any suspicion that Product is contaminated, mixed or adulterated or fails to meet the Fuel Requirements or the Unleaded Gasoline Requirements,

(ii)    if water exceeds 3/4 inch depth in any tank

(iii)    any governmental testing or sampling of Products at the Marketing Premises, or

(iv)    any suspicion that any Product has been released to the environment from any tank, line or other source at the Marketing Premises;

(g)    If requested, provide ExxonMobil with the results of any test of Product conducted by or for the Franchise Dealer and permit ExxonMobil to conduct tests as ExxonMobil may determine; and

(h)    upon any suspicion of adulteration, mixing, contamination or noncompliance with Fuel Requirements , take such action as ExxonMobil may direct.

(i)    ensure that the fuel filters, specified by ExxonMobil for use at CODO sites, are used for all products dispensed. For DOSS non-lessee, fuel filters used by Franchise Dealer must meet industry standards;

(j)    where blending dispensers are utilized, use blending ratios as directed by ExxonMobil.

(k)    immediately stop sales of any product whose storage tank contains 2 inches of water or more.

2.9    Effect of Quality Violations; Samples. Franchise Dealer acknowledges that the sale of quality products the customer can trust is one of Franchise Dealer's fundamental commitments and obligations under this Agreement. Franchise Dealer's failure to comply with the obligations under Section 2.8 constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship. Franchise Dealer permits ExxonMobil, its employees, agents and contractors to enter the Marketing Premises at all reasonable times to obtain Product samples and review all Franchise Dealer's documents and records relating to compliance with Section 2.8.

2.10    Product Quality or Quantity Claims. ExxonMobil is not liable to Franchise Dealer for any defect in quality (including failure to meet the requirements under Section 2.7), or shortage in quantity, of any Products delivered, unless:

(a)  Franchise Dealer gives ExxonMobil notice of the claim of quality defect or shortage in quantity or disputes or disagreements regarding the prices charged for the price of product within 96 hour after delivery.

(b)  Franchise Dealer provides ExxonMobil and all federal or state regulatory agencies, including their designated sub-contractors, with reasonable opportunity to inspect the Products and take test samples.

## ARTICLE III
## SERVICES BY EXXONMOBIL

3.1  ExxonMobil Services. ExxonMobil shall make available to Franchise Dealer, or assist Franchise Dealer in obtaining, the following:

(a)  Standard plans, specifications, equipment, decor and signs identified with Exxon Outlets as ExxonMobil makes available to all franchise dealers from time to time.

(b)  Initial franchise-management training and ongoing training in the System as ExxonMobil makes available to all franchise dealers from time to time (including training on standards, methods, procedures and techniques) at times and places designated by ExxonMobil.

(c)  Standards Handbooks, as ExxonMobil makes available to all franchise dealers from time to time.

(d)  Periodic individual or group advice, consultation and assistance, rendered by personal visit, telephone, voicemail, facsimile, newsletter, bulletin or other means of communication, made available from time to time as ExxonMobil may deem necessary or appropriate.

(e)  Merchandising, marketing and other data and advice as ExxonMobil may from time to time develop for distribution to all franchise dealers and determine in its sole discretion to be helpful in the operation of the Marketing Premises.

(f)  Other services as ExxonMobil may develop and offer to all franchise dealers.

## ARTICLE IV
## PARTICIPATION/ORGANIZATIONAL FORM

4.1  Organizational Form; Key Individual.

(a)  Except as provided in Section 4.4(a), Franchise Dealer must be in the form of an individual, or a corporation meeting the requirements of Section 4.3, and may not take any other form including a partnership or trust.

(b)  If Franchise Dealer is in a form other than an individual, Franchise Dealer shall comply with the requirements of Sections 4.3 or 4.4, whichever is applicable, and shall designate an individual as the key individual (the "Key Individual") who must:

   (i)  be reasonably acceptable to ExxonMobil and have received ExxonMobil's prior written approval;

   (ii)  meet the requirements of a key individual under this Article IV;

   (iii)  meet all of ExxonMobil's normal requirements for a key individual as may be in effect from time to time including ExxonMobil's normal requirements for a franchise dealer under Section 12.3(a); and

   (iv)  satisfactorily attend and complete all training programs required from time to time by ExxonMobil for franchise dealers or key individuals. The Parties shall designate the Key Individual on the signature page of this Agreement or by separate written agreement.

4.2  Participation in Business; Multi-Unit Operators.

(a)  Franchise Dealer acknowledges that ExxonMobil has entered into this Agreement with Franchise Dealer in reliance on Franchise Dealer's or the Key Individual's personal qualifications and commitment to the Core Values.

(b)    Franchise Dealer or Key Individual may own or operate more than one Exxon and/or Mobil Outlet only if the Franchise Dealer or Key Individual is authorized by ExxonMobil in writing under ExxonMobil's Multi-Unit Policy in effect from time to time. A Franchise Dealer or Key Individual is a "Multi-Unit Operator" if the Franchise Dealer or the Key Individual, separately or collectively:

     (i)    owns or operates more than one Exxon and/or Mobil Outlet;

     (ii)    is the franchise dealer for more than one Exxon and/or Mobil Outlet; or

     (iii)    is the key individual for more than Exxon and/or Mobil Outlet.

(c)    If Franchise Dealer or Key Individual is not a Multi-Unit Operator, the franchise dealer or key individual must devote good-faith and best efforts to the day-to-day operation and management of the Related Businesses.

(d)    If Franchise Dealer or Key Individual is a Multi-Unit Operator, the Franchise Dealer or Key Individual must devote good-faith and best efforts to the day-to-day operations and management of the Related Businesses at all of the Exxon/Mobil Outlets where he or she is the franchise dealer, the key individual or the owner or operator.

4.3    <u>Corporation</u>. If Franchise Dealer is a corporation, the Key Individual must comply with the following requirements:

     (a)    if Franchise Dealer is an CODO Dealer, have legal and beneficial ownership of at least 51% of the outstanding voting stock or other ownership interests in the Franchise Dealer, unless:

         (i)    ExxonMobil consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time, and

         (ii)    Franchise Dealer and the Key Individual comply with all requirements and conditions under that policy;

     (b)    the Key Individual must be the officer of the Franchise Dealer with authority and responsibility for the operation and management of the Businesses; and

     (c)    the Key Individual must be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

Franchise Dealer represents and warrants that the Key Individual has, and at all times will have, the ownership, responsibility and authority required in this Section 4.3(a) and, upon request by ExxonMobil from time to time, shall furnish to ExxonMobil supporting documentation reasonably satisfactory to ExxonMobil.

     (d)    Franchise Dealer shall confine its activities to the establishment and operation of the Related Businesses or, if Franchise Dealer is a Multi-Unit Operator, Franchise Dealer shall confine its activities to the establishment and operation of the Related Businesses at all its Exxon Outlets, unless:

         (i)    ExxonMobil consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

         (ii)    Franchise Dealer complies with all requirements and conditions under that policy.

     (e)    Franchise Dealer shall furnish ExxonMobil, at ExxonMobil's request from time to time, documentation as specified by ExxonMobil in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.3. Without limiting the immediately preceding sentence, ExxonMobil may request, and Franchise Dealer shall furnish ExxonMobil with, copies of Franchise Dealer's Articles of Incorporation, Bylaws and other governing documents, and any other documents ExxonMobil may reasonably request (including shareholder agreements relating to the Franchise Dealer). Franchise Dealer shall promptly notify ExxonMobil of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with any provision of this Section 4.3.

     (f)    The transfer of any voting stock or other ownership interests in Franchise Dealer is subject to Articles XII and XIII.

(g) The Key Individual must provide ExxonMobil, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to ExxonMobil. If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, ExxonMobil may require additional personal guarantees to be furnished ExxonMobil by one or more individuals who:

   (i) are specified by ExxonMobil; and

   (ii) directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

(h) EXXONMOBIL'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY SHAREHOLDER OF A CORPORATE FRANCHISE DEALER.

### 4.4   Other Business Forms.

(a) Franchise Dealer must be an individual, a corporation, or a limited liability company meeting the requirements of Section 4.3, and may not take any other business form including a partnership or trust unless:

   (i) the Franchise Dealer was in a business form other than an individual, a corporation or limited liability company meeting the requirements of Section 4.3 prior to; or

   (ii) ExxonMobil permits another business form under an applicable written policy as may be in effect and Franchise Dealer complies with all requirements and conditions under that policy. (See Form of Organization Policy).

(b) If Franchise Dealer is authorized under Section 4.4(a) to be in a business form other than an individual, a corporation or a limited liability company meeting the requirements of Section 4.3, the Key Individual must comply with the following requirements:

   (A) if Franchise Dealer is a CODO Dealer, have legal and beneficial ownership of at least 51% of the ownership interests in the Franchise Dealer, unless:

      (1) ExxonMobil consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time; and

      (2) Franchise Dealer and the Key Individual comply with all requirements and conditions under that policy.

   (B) be Franchise Dealer's manager, managing partner or other person with authority and responsibility for the operation and management of the Businesses; and

   (C) be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

   Franchise Dealer represents and warrants that the Key Individual has, and at all times will have, the ownership, responsibility and authority required in this Section 4.4(b) and, upon request by ExxonMobil, shall furnish to ExxonMobil supporting documentation reasonably satisfactory to ExxonMobil.

   (i) Franchise Dealer shall furnish ExxonMobil, at ExxonMobil's request, documentation as specified by ExxonMobil in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.4. Without limiting the immediately preceding sentence, ExxonMobil may request, and Franchise Dealer shall furnish ExxonMobil with, copies of its partnership agreement, trust agreement and other documents as ExxonMobil may request relating to Franchise Dealer's ownership, operation and organization. Franchise Dealer shall promptly notify ExxonMobil of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with the provisions of this Section 4.4.

   (ii) Franchise Dealer shall maintain a current list of all shareholders, general and limited partners, beneficiaries or other legal and beneficial owners of Franchise Dealer and shall furnish the list to ExxonMobil. Without limiting Section 4.4(b)(i), Franchise Dealer shall promptly notify ExxonMobil of any changes in ownership and furnish ExxonMobil with information relating to any owners as ExxonMobil may reasonably request.

    (iii)   Franchise Dealer shall confine its activities to the establishment and operation of the Businesses or, if Franchise Dealer owns or operates more than one Exxon/Mobil Outlet, Franchise Dealer shall confine its activities to the establishment and operation of the Businesses at all its Exxon/Mobil Outlets; unless:

        (A)   ExxonMobil consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

        (B)   Franchise Dealer complies with all requirements and conditions under that policy.

    (iv)   The Key Individual must provide ExxonMobil, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to ExxonMobil. If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, ExxonMobil may require additional personal guarantees to be furnished to ExxonMobil by one or more individuals who:

        (A)   are specified by ExxonMobil; and

        (B)   directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

    (v)   The transfer of any ownership interest in Franchise Dealer is subject to Articles XII and XIII.

    (vi)   EXXONMOBIL'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING CONTAINED IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY OTHER PERSON HAVING AN OWNERSHIP INTEREST IN FRANCHISE DEALER. IF FRANCHISE DEALER IS A PARTNERSHIP, THE FRANCHISE RELATIONSHIP IS ONLY WITH THE PARTNERSHIP AS CONSTITUTED ON THE DATE OF THE ORIGINAL FRANCHISE RELATIONSHIP WITH EXXONMOBIL.

  (c)   This Article IV does not prevent Franchise Dealer, if an individual, from entering into a partnership, forming a corporation or using another business form that does not comply with Section 4.3 or 4.4 and is solely established to assist Franchise Dealer in managing and operating the Businesses, but:

    (i)   the Franchise Dealer remains the sole franchisee under this Agreement and is responsible for all obligations of Franchise Dealer under this Agreement; and

    (ii)   the partnership, corporation or other business form has no rights under this Agreement including any Franchise or Franchise Relationship with ExxonMobil.

4.5   <u>Disclosure of Ownership Interests</u>. Franchise Dealer represents and warrants that Franchise Dealer has disclosed to ExxonMobil in writing all information pertaining to any direct or indirect ownership interest Franchise Dealer or the Key Individual may have in the franchise, business or operation of any Exxon Outlet or any other motor-fuel outlet or convenience-store business ("Ownership Interest") including location of the site(s), business name (s), brand of motor fuels and the extent and nature of the Ownership Interest. Franchise Dealer's obligation of disclosure under this Section 4.5 continues during the Term. Upon acquisition of an Ownership Interest, Franchise Dealer shall promptly disclose in writing to ExxonMobil information relating to the Ownership Interest. For purposes of this Section 4.5, an Ownership Interest includes:

  (a)   the direct or indirect ownership by Franchise Dealer or the Key Individual of a beneficial interest in a Exxon Outlet, other motor-fuel outlet or convenience-store business, where legal title is held in the name of another person or entity; and

  (b)   direct or indirect ownership by Franchise Dealer or the Key Individual of shares in a corporation where that corporation or any subsidiary corporation has a legal or beneficial interest in an Exxon Outlet, other motor-fuel outlet or convenience-store business.

4.6   <u>Waiver</u>. ExxonMobil's receipt of any documentation or information will not be a waiver by ExxonMobil of any requirements under this Article IV or of its right at any time to require full compliance with these requirements.

**ARTICLE V**
**CONFIDENTIALITY**

5.1  <u>Confidential Information.</u> Franchise Dealer acknowledges that ExxonMobil, its Affiliates and their respective employees, contractors and agents will be disclosing and transmitting to Franchise Dealer certain confidential and proprietary information ("Confidential Information") in connection with the System and the operation of the Related Businesses. Accordingly, Franchise Dealer shall:

(a)  treat and maintain Confidential Information as confidential;

(b)  subject to Section 5.3, use Confidential Information only for the operation of the Businesses under this Agreement; and

(c)  restrict disclosure of Confidential Information to only those managers, employees, contractors or agents who are directly connected with the performance of work and who require knowledge of the Confidential Information. Franchise Dealer shall use reasonable efforts to require its managers, employees, contractors or agents to comply with the provisions of this Section.

5.2  <u>Examples of Confidential Information; Compelled Disclosures.</u>

(a)  Confidential Information includes, but is not limited to:

(i)  information, records, knowledge, techniques, and know-how in any form relating to the System or the Related Businesses including the Standards Handbook;

(ii)  ExxonMobil training materials and materials relating to the recruiting and management of employees and contractors;

(iii)  ExxonMobil marketing strategies, technologies, programs, policies, procedures and methods of doing business;

(iv)  information relating to ExxonMobil, its Affiliates or their respective franchisees, contractors and vendors;

(v)  information which ExxonMobil designates in writing from time to time as confidential or proprietary;

(vi)  information relating to Product or additive formulation; and

(vii)  information described in this Section 5.2(a) disclosed by ExxonMobil on the Intranet or by any other electronic-transmission or data-communications system.

(b)  Confidential Information does not include information:

(i)  Franchise Dealer can demonstrate that was not:

(A)  acquired directly or indirectly from ExxonMobil or its Affiliates, or

(B)  subject to confidentiality obligations on the part of the source that provided the information;

(ii)  at the time of disclosure was a part of the public domain; or

(iii)  after the time of disclosure becomes a part of the public domain through publication or communication by a person (other than Franchise Dealer, its officers, directors, owners, employees, contractors or agents) who is not subject to a confidentiality obligation.

(c)  Confidential Information is not excluded under Section 5.2(b) merely because it is embraced by more general information in the public domain or in Franchise Dealer's possession. Information consisting of a combination of features or information is not excluded under Section 5.2(b) merely because individual features or information are in the public domain or in Franchise Dealer's possession, but only if the combination is in the public domain or in Franchise Dealer's possession.

(d)  Franchise Dealer may disclose Confidential Information to the extent required by a legally binding order or governmental directive if Franchise Dealer has given ExxonMobil:

(i)  prompt notice of the order or directive; and

(ii)  reasonable opportunity to challenge the order or directive or protect the confidentiality of any disclosed Confidential Information.

5.3   <u>Use of Confidential Information</u>. During the Term and for a period of two (2) years after the expiration or termination of the Franchise Relationship, Franchise Dealer may not, either directly or indirectly, for itself, or on behalf of or in conjunction with any other person, partnership or corporation, use any Confidential Information for purposes other than operating the Businesses under this Agreement. Nothing contained in this Section 5.3 may be construed to limit Franchise Dealer's obligations under Sections 5.1(a) and (c).

5.4   <u>Remedy; Survival</u>. Franchise Dealer acknowledges that any failure to comply with the requirements of this Article V will cause ExxonMobil irreparable injury. The provisions of this Article V will survive the termination or expiration of this Agreement and apply to all Confidential Information disclosed or transmitted to Franchise Dealer during the Franchise Relationship, whether prior to, during or after the Term.

**ARTICLE VI**
**STANDARDS HANDBOOK**

6.1   <u>Standards Handbook</u>. For the reasons acknowledged by Franchise Dealer under Section 9.1, Franchise Dealer shall comply with the standards (the "Standards") contained in ExxonMobil's National Standards Handbook ("Standards Handbook"). Franchise Dealer acknowledges that:

    (a)   compliance with the Standards, and any revisions under Section 6.2, may require the expenditure of reasonable sums of money by Franchise Dealer;

    (b)   the Standards are in addition to other obligations and requirements of Franchise Dealer under this Agreement; and

    (c)   compliance with the Standards does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

6.2   <u>Revisions</u>. ExxonMobil may, from time to time, revise the contents of the Standards Handbook. The revision may include implementing new or modified requirements for the System or any Business. Franchise Dealer shall comply with standards as revised. The revisions to the Standards Handbook are effective upon receipt of written notice to Franchise Dealer, unless a later date is specified by ExxonMobil.

6.3   <u>Minimum Acceptable Ratings</u>.

    (a)   ExxonMobil may, but is not obligated to, establish by written policy minimum acceptable ratings ("Minimum Acceptable Ratings") for the Standards contained in the Standards Handbook.

    (b)   If ExxonMobil establishes Minimum Acceptable Ratings, Franchise Dealer shall conduct the Businesses to achieve the Minimum Acceptable Ratings. The method for determining and measuring compliance with the Standards and calculating any ratings will be determined by ExxonMobil and set out in the Standards Handbook or other written materials furnished by ExxonMobil. ExxonMobil may add, delete or change Minimum Acceptable Ratings at any time upon not less than 90 days' written notice to Franchise Dealer.

    (c)   Franchise Dealer acknowledges that:

        (i)   Franchise Dealer's failure to achieve the Minimum Acceptable Rating for any Standard constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship;

        (ii)   over time the Standards and any Minimum Acceptable Ratings may be raised; and

        (iii)   while it is critical that Franchise Dealer achieve the Minimum Acceptable Ratings, this does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

    (d)   Nothing contained in this Section 6.5 prevents or limits ExxonMobil from:

        (i)   requiring full compliance with any Standard for which ExxonMobil has established a Minimum Acceptable Rating,

        (ii)   lowering or raising the Minimum Acceptable Rating for any Standard or group or category of Standards.

## ARTICLE VII
## PROPRIETARY MARKS

7.1    Use of Proprietary Marks. In using the Proprietary Marks, Franchise Dealer shall:

(a)    Use only the "Exxon" mark and such other Proprietary Marks as are designated in writing by ExxonMobil for Franchise Dealer's use, and use them only in the manner authorized and permitted by ExxonMobil.

(b)    Use the Proprietary Marks only for the operation of the Motor-Fuels Business and the Exxon Related Businesses and only at the Marketing Premises and in advertising for the Motor-Fuels Business and the Exxon Related Businesses conducted at the Marketing Premises, and not use the Proprietary Marks for any other purpose or in any manner which may confuse or deceive the public.

(c)    Not mix any other products with the Products or contaminate or adulterate the Products in any way, and not use the Proprietary Marks or Exxon signs in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products.

(d)    Keep legible and visible all Exxon signs and all Proprietary Marks on Exxon pumps, containers and equipment at any time located on the Marketing Premises, and use those pumps, containers and equipment solely for the Products.

(e)    Except as permitted in writing by ExxonMobil, not use the Proprietary Marks as part of franchise dealer's corporate or other name, including a DBA.

(f)    Comply with ExxonMobil's instructions in filing and maintaining requisite trade name or fictitious name registrations, and sign and deliver to ExxonMobil any consents necessary for the registration of ExxonMobil's corporate name in the state where Franchise Dealer conducts the Businesses.

(g)    Sign and deliver to ExxonMobil any documents deemed necessary by ExxonMobil or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(h)    On the effective date of the termination or non-renewal of the Franchise Relationship immediately stop using the Proprietary Marks and ExxonMobil's color scheme, trade dress, service marks, logos, slogans and advertising and promptly return to ExxonMobil all advertising and promotional materials in Franchise Dealer's possession.

(i)    If ExxonMobil requires Franchise Dealer to stop, or Franchise Dealer otherwise stops, operating any Related Business, Franchise Dealer shall immediately stop using the Proprietary Marks and ExxonMobil's color scheme, trade dress, service marks, logos, slogans and advertising relating to the affected Related Business and promptly return to ExxonMobil all advertising and promotional materials relating to that Related Business in Franchise Dealer's possession.

7.2    Non-Exclusive Use. Franchise Dealer's right to use the Proprietary Marks under this Agreement is non-exclusive. Without limiting the immediately preceding sentence, ExxonMobil may:

(a)    grant other rights and franchises for the Proprietary Marks;

(b)    use the Proprietary Marks for any purpose; and

(c)    develop and establish other systems for the same or similar Proprietary Marks, or any other proprietary marks, and grant rights or franchises relating to any marks without providing Franchise Dealer any rights to those marks.

7.3    Ownership of Proprietary Rights. Franchise Dealer acknowledges that ExxonMobil is the sole and exclusive owner of the Proprietary Marks and no ExxonMobil act or failure to act will give Franchise Dealer any ownership interest or right in the Proprietary Marks. All goodwill resulting from the use of the Proprietary Marks by Franchise Dealer inures to the benefit, and is the property, of ExxonMobil. ExxonMobil may, at any time, change any Proprietary Marks and ExxonMobil's color schemes, trade dress, service marks, logos, slogans and advertising used in connection with the Products or any Business and substitute any trademark, service mark, trade name or service name for use in connection with the System. In case of any change, Franchise Dealer shall use the Proprietary Marks, color schemes, trade dress, service marks, logos, slogans and advertising as changed. Nothing contained in this Section 7.3 obligates Franchise Dealer to pay to ExxonMobil any compensation received by Franchise Dealer for goodwill in connection with the Franchise Dealer's Transfer of an Interest in the Franchise in compliance with Articles XII and XIII.

## ARTICLE VIII
## MANAGEMENT AND TRAINING

8.1   <u>Franchise Dealer Management</u>.

    (a)   Franchise Dealer shall use, and cause the Key Individual to use, sound business practices by using a total quality management approach in managing the Businesses and shall maintain high standards of retail service-station operations as provided in Article IX.

    (b)   Unless otherwise provided by applicable ExxonMobil written policy, a Franchise Dealer is not required to hire a manager if franchise dealer is the owner, franchise dealer or key individual for 2 stores or less. HOWEVER, for each additional store, franchise dealer is required to hire a manager.

    For example, if Franchise Dealer operates five Exxon/Mobil Outlets, Franchise Dealer shall employ at least three Managers.

    Each Manager must be qualified and experienced in operating the Businesses located at the Exxon/Mobil Outlets, must attend initial and ongoing training as required by ExxonMobil from time to time, must have authority to act on behalf of Franchise Dealer in the conduct of day-to-day business at the Exxon/Mobil Outlets and must meet other reasonable qualifications as established by ExxonMobil from time to time. Franchise Dealer shall furnish ExxonMobil with written notice specifying each Manager and the Exxon/Mobil Outlets for which the Manager has authority and responsibility and shall notify ExxonMobil in writing of any change in Managers or in their respective responsibilities or authority.

8.2   <u>Franchise Management Training</u>. Prior to Franchise Dealer's commencement of operation ( the effective date of the franchise agreement of the Businesses, the following persons must attend, complete and pass, to ExxonMobil's satisfaction, an initial franchise management training program which may include written, computer-based, and/or home-study courses, as required by ExxonMobil from time to time:

    (a)   if Franchise Dealer is an individual, Franchise Dealer;

    (b)   if Franchise Dealer is not an individual, the Key Individual; and

    (c)   each Manager and any other owner, contractor or employee of Franchise Dealer who is, or subsequently becomes, actively involved in the management of the Motor-Fuels and related Businesses, if any.

8.3   <u>Employee Training</u>. Franchise Dealer shall cause its sales associates and other non-management employees and contractors to satisfactorily complete all training including basic and advanced training, refresher courses, and technical or business seminars, as ExxonMobil may require from time to time. Training may include written, computer-based and home-study courses.

8.4   <u>Educational Meetings and Seminars</u>. Franchise Dealer acknowledges that, in order to continue to meet customer needs and preferences and customer expectations of excellence for Exxon Outlets and Exxon-branded products, it is critical for Franchise Dealer, any Key Individual, any Manager and Franchise Dealer's management employees and contractors to keep abreast of current System developments and new procedures or programs which ExxonMobil deems, in its reasonable judgment, to be of major importance to the operation of the Businesses. Franchise Dealer shall attend and participate in, and shall cause any Key Individual, any Manager and any person described in Section 8.2(c) to attend and participate in, all local, regional or national educational meetings and seminars that ExxonMobil may conduct from time to time.

8.5   <u>Training Expenses</u>. Franchise Dealer shall pay, or cause its employees, contractors or any Key Individual to pay, all expenses incurred by Franchise Dealer, its employees, contractors or a Key Individual in connection with Franchise Dealer's fulfilling its obligations under Sections 8.2, 8.3 and 8.4 including costs and expenses of transportation, lodging, meals, wages and employee benefits. Franchise Dealer shall also pay to ExxonMobil or any ExxonMobil-designated third party reasonable fees or charges that ExxonMobil may impose from time to time to recover costs and expenses incurred by ExxonMobil or the third party relating to any training or meetings under this Article VIII including but not limited to, the cost of materials, production cost of videos, audio tapes, CD-Rom's, diskettes or manuals and costs relating to staff and meeting space.

## ARTICLE IX
## OPERATIONS

9.1    <u>Importance of Operational Requirements</u>. Franchise Dealer acknowledges that operation of the Marketing Premises and the Related Businesses in accordance with this Article IX and in compliance with the Standards is:

    (a)    reasonable and of material significance to the Franchise and Franchise Relationship; and

    (b)    of critical importance to Franchise Dealer, ExxonMobil and other Exxon Outlets in order to:

        (i)    meet the commitments contained in the Core Values and meet customer needs and preferences and customer expectations of excellence for the System, Exxon Outlets and Exxon-branded products,

        (ii)    maintain uniform and high operating standards,

        (iii)    increase demand for, and customer loyalty to, the services and products sold at all Exxon Outlets, and

        (iv)    protect the reputation and goodwill associated with the Proprietary Marks.

9.2    <u>Operation of Related Businesses</u>. Franchise Dealer shall operate the Businesses in strict conformity with the methods, procedures, standards and specifications as ExxonMobil may prescribe from time to time in writing including the Standards. Without limiting the general requirements of the immediately preceding sentence, the specific requirements of this Article IX also apply.

9.3    <u>Operating Hours</u>.

    (a)    In accordance with ExxonMobil's National Hours of Operation Policy as in effect from time to time and subject to applicable Laws, Franchise Dealer shall keep the Marketing Premises open for the retail sale of the Products for the following hours as indicated:

        (i)    ☑ 24 hours, 7 days per week; or

        (ii)    _____ Other as specified below:
           Monday - Friday:          _____ a.m. to _____ p.m.
           Saturday:                     _____ a.m. to _____ p.m.
           Sunday & Holidays:_____ a.m. to _____ p.m.

    (b)    Subject to applicable Laws, Franchise Dealer shall prominently and clearly post the operating hours at the Marketing Premises. During the Term and except as provided in Section 9.3(c), operating hours may be modified only by written agreement of the Parties. Upon any renewal of the Franchise Agreement, operating hours will be determined in accordance with ExxonMobil's National Hours of Operation Policy in effect at that time.

    (c)    If the Term is more than 5 years, ExxonMobil may modify the operating hours under Section 9.3(a) at any time after the fifth anniversary date of this Agreement as may be required to address changes in circumstances affecting the Marketing Premises. ExxonMobil shall provide Franchise Dealer with written notice of the new operating hours. The new hours will take effect on the later of:

        (i)    any date to which the Parties agree; or

        (ii)    if the operating hours were not the result of a mutual determination by the Parties, but not less than 60 days following the date the dealer receives the notice.

9.4    <u>Use of Marketing Premises</u>. Franchise Dealer shall:

    (a)    use the Marketing Premises solely for the operation of the Businesses;

    (b)    keep the Motor-Fuels Business open and in normal operation for the periods specified in Section 9.3;

    (c)    refrain from using, or permitting the use of, the Marketing Premises for any other purpose or activity at any time; and

    (d)    not allow the use of the Marketing Premises in connection with any purpose prohibited by Law, covenant, condition or restriction.

9.5 <u>Installation of Additional Tanks</u>. Subject to applicable Laws, Franchise Dealer may install on the Marketing Premises additional tanks, dispensers or equipment for storing, selling or dispensing motor fuel other than Exxon Products with ExxonMobil's express written approval, after written application by Franchise Dealer to ExxonMobil, which approval may not be unreasonably withheld. Upon receipt of Franchise Dealer's application, ExxonMobil shall provide Franchise Dealer with a written statement of the procedures, requirements, conditions and limitations governing Franchise Dealer's installation and use of the additional tanks and equipment. This statement may impose requirements which are necessary or appropriate in ExxonMobil's sole discretion to address the following:

(a)   protect the integrity of ExxonMobil's Proprietary Marks, image and System;

(b)   provide for appropriate customer safety and access to facilities;

(c)   maintain an appropriate appearance of the Marketing Premises; and

(d)   provide safeguards for environmental protection and acceptable means to respond to potential environmental or other liability or costs.

If, after review of the statement, Franchise Dealer elects to go forward with the installation and ExxonMobil consents to the proposed installation, Franchise Dealer shall sign and deliver to ExxonMobil, prior to beginning any construction or other activities related to the installation, a written agreement (in form and substance acceptable to ExxonMobil) incorporating ExxonMobil's procedures, requirements, conditions and limitations. Dealer shall bear all installation costs including any environmental remediation and disposal costs incurred during or as a result of the installation and operation of the additional tanks, dispensers and equipment and any costs incurred in modifying or improving the Marketing Premises.

9.6 <u>Equipment, Fixtures, Signs</u>. Franchise Dealer shall install and use in and about the Marketing Premises only such equipment, fixtures, furnishings, interior and exterior signs and other items as strictly conform to the Standards and specifications in the Standards Handbooks or are otherwise permitted by ExxonMobil in writing from time to time.

9.7 <u>Customer Service</u>. Franchise Dealer shall provide, and ensure that Franchise Dealer's employees and contractors are in approved uniform, provide, prompt, fair, courteous and efficient service to customers. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the customer-service Standards. If applicable Laws prohibit self-serve and mini-serve operations, Franchise Dealer also shall provide the services normally associated with a full-serve service station including voluntarily washing windshields and checking oil levels. Dealer shall manage the franchise so as to minimize customer complaints. Dealer shall promptly investigate any customer complaint received and shall make such adjustments as are reasonable and appropriate. Customer complaints arising out of credit card transactions shall be subject to the provisions of ExxonMobil's Credit Card Instructions.

9.8 <u>Clean, Attractive and Functional Operations</u>. Franchise Dealer shall maintain the Marketing Premises and all adjacent areas in clean, attractive and functional condition at all times. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the Standards governing clean, attractive and functional operations.

9.9 <u>Maintenance Obligations</u>. Subject to the provisions of the CODO Lease Provisions or DOSS Additional Provisions, as applicable, Franchise Dealer shall undertake, at its expense, all maintenance and make all repairs, replacements, alterations and additions as may be required to maintain the Marketing Premises in good repair and condition including periodic cleaning, landscaping, repainting and repairs, replacing obsolete signs, equipment and fixtures, and complying with the Standards.

9.10 <u>Compliance with Laws; Covenants and Restrictions</u>. Franchise Dealer shall operate and maintain the Marketing Premises and the Businesses in compliance with all applicable Laws including those concerning the environment, hazardous substances or waste, toxic substances, right to know and occupational safety and health. Franchise Dealer shall comply with all applicable covenants, conditions or restrictions applicable to the operation and maintenance of the Marketing Premises and the Businesses. Franchise Dealer shall also comply with the Americans with Disability Act and relevant or related state and local statutes.

9.11 <u>Safety Procedures</u>. Without limiting Franchise Dealer's status and obligations as an independent businessperson under Article XVII, Franchise Dealer shall implement and maintain procedures for safe operation of the Marketing Premises and the Businesses including safe cash handling and employee training. ExxonMobil and Franchise Dealer expressly acknowledge that Franchise Dealer has sole responsibility for the security of all persons at the Marketing Premises including Franchise Dealer's customers, contractors and employees at the Marketing Premises. Nothing contained in this Agreement is to be construed as:

(a)   an assumption by ExxonMobil of any duty owed by Franchise Dealer to any person including any customer, contractor or employee of Franchise Dealer; or

(b)  giving ExxonMobil the right to control Franchise Dealer's provision of security measures employed by Franchise Dealer at the Marketing Premises.

9.12  Image and Trade Mark Standards; Promotion Programs. Franchise Dealer shall use and display sales, marketing and promotional materials provided by ExxonMobil from time to time, in the manner and for the time periods designated by ExxonMobil. Franchise Dealer shall ensure that all stationery, signage and other printed materials used in connection with the Businesses bear the Proprietary Marks in the form, colors, location and manner prescribed by ExxonMobil. Subject to applicable Laws, Franchise Dealer shall participate fully in all ExxonMobil national promotional programs including point-of-purchase programs. Without limiting the preceding provisions of this Section 9.12, Franchise Dealer shall comply with the image and trademark Standards.

9.13  Staffing. Franchise Dealer shall hire and maintain a competent, conscientious and trained staff (including a Manager if required under this Agreement) and shall take all steps necessary to ensure that Franchise Dealer's employees preserve good customer relations and comply with ExxonMobil's requirements for dress and appearance as ExxonMobil may prescribe from time to time in writing. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with all personnel and customer-contact Standards.

9.14  Conduct.

(a)  Franchise Dealer and its employees, contractors and agents shall not engage or cooperate in, any conduct that:

(i)  reflects unfavorably on the reputation of Franchise Dealer, ExxonMobil or the System;

(ii)  impairs the goodwill associated with the Proprietary Marks including conduct which jeopardizes Franchise Dealer's good relations with customers and creditors of the Businesses or ExxonMobil's relationship with its contractors or vendors; or

(iii)  constitutes a deceptive or unfair trade practice under applicable Laws.

(b)  Franchise Dealer shall cooperate, and shall ensure that its employees, vendors, contractors and agents cooperate, fully with ExxonMobil and its employees, vendors and contractors in the performance of Franchise Dealer's obligations or the exercise of ExxonMobil's rights under this Agreement and any related or supplemental agreements. Franchise Dealer shall not permit on the Marketing Premises:

(i)  any consumption of intoxicating beverages;

(ii)  the sale or use of illegal drugs or drug paraphernalia; or

(iii)  the sale of any pornographic material or other material that ExxonMobil in its judgment determines may be offensive to the general public.

(iv)  the sale of tobacco and/or alcohol products to underage customers as prescribed in any local, state or federal regulation.

(c)  Franchise Dealer will notify ExxonMobil within 5 business days, in writing, at the Customer Service Center address noted in 20.4(i) of any Notices of Violation received from local, state or federal authorities, concerning the sale of tobacco and/or alcohol to minors.

9.15  System Modifications. Franchise Dealer acknowledges and agrees that ExxonMobil, in its sole discretion, may modify or vary aspects of the System with respect to any Franchise Dealer or Exxon Outlet or group of Franchise Dealers or Exxon Outlets based on conditions or circumstances that ExxonMobil determines appropriate including local site conditions, state or local Laws, property use restrictions, sales potential, demographics, local economic conditions, competition and local business practices. Franchise Dealer further acknowledges that ExxonMobil has no obligation to disclose or offer the same or similar modifications or variances to Franchise Dealer.

9.16  Retail Credit and Debit Program. For so long as ExxonMobil offers to Franchise Dealer the opportunity to participate in ExxonMobil's Retail Credit or Debit Program ("Program"), Franchise Dealer shall comply with the Program, as it may be amended by ExxonMobil from time to time.

(a)  If Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals including the requirement that Franchise Dealer take reasonable precautions to prevent sales to unauthorized persons, ExxonMobil may, in addition to any other remedy that may be available to it including termination or non-renewal of this Agreement and the Franchise Relationship, take any one or more of the following actions as it deems necessary or appropriate in its sole discretion:

      (i)     charge back to Franchise Dealer's account the amount of any credit or debit transaction and any Losses incurred by ExxonMobil;

      (ii)    on notice to Franchise Dealer, impose special terms and procedures on Franchise Dealer's participation in the Program; or

      (iii)   on notice to Franchise Dealer, exclude Franchise Dealer from participation in the Program.

   (b)   Franchise Dealer is in default of this Agreement if:

      (i)     Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals; or

      (ii)    Franchise Dealer fails to pay promptly any charge to Franchise Dealer's account resulting from non-compliance.

Franchise Dealer shall, upon ExxonMobil's request, immediately return to ExxonMobil any manual credit card imprinter and electronic credit card point of sale terminal leased to Franchise Dealer by ExxonMobil.

9.17   <u>Improvements and Investments in Marketing Premises</u>. If Franchise Dealer is a DOSS, Franchise Dealer shall make improvements and investments in the Marketing Premises as required in the DOSS Dealer Additional Provisions.

9.18   <u>Technological and Communication Updates</u>. Franchise Dealer acknowledges that the use of current technology and communications systems in the operation of the Businesses is of critical importance in meeting customer needs and preferences and adjusting to competitive conditions. Franchise Dealer further acknowledges that technology and communications systems are expected to change over time requiring periodic addition, replacement or updating of equipment or systems used in the Businesses. Accordingly, Franchise Dealer shall:

   (a)   as required by ExxonMobil in Franchise Dealer's marketing area, install and maintain in good operating condition, at Franchise Dealer's expense:

      (i)     a facsimile machine for sending and receiving written communications, and

      (ii)    equipment that allows access to the Internet, e-mail or other electronic- transmission or data-communications system designated by ExxonMobil;

   (b)   as required by ExxonMobil in Franchise Dealer's marketing area, subscribe at Franchise Dealer's expense to a voicemail system for transmitting and receiving telephonic communications, as designated by ExxonMobil from time to time; and

   (c)   make other expenditures or investments as may be reasonably required in writing by ExxonMobil from time to time to update equipment, technology and communications systems at the Marketing Premises including the addition, replacement or updating of point of purchase equipment, pump dispensing technology, credit and cash processing equipment and software. ExxonMobil will provide Franchise Dealer with reasonable notice specifying the required expenditures or investment and any specifications or requirements necessary to assure uniformity and compatibility with the System.

9.19   <u>Inspection</u>. At all reasonable times, Franchise Dealer shall permit ExxonMobil or its contractors, employees and agents to enter and inspect the Marketing Premises and the Business operations to determine compliance with this Agreement. Franchise Dealer shall cooperate fully with ExxonMobil and its contractors, employees and agents in conducting any inspection and shall render assistance as may be reasonably requested. Upon notice from ExxonMobil of any deficiencies detected in an inspection, Franchise Dealer promptly shall take such steps as may be necessary to correct the deficiencies including the temporary closing of the Marketing Premises if so directed by ExxonMobil.

9.20   <u>Pricing</u>. Franchise Dealer shall determine its own retail prices, pricing policies and discounting policies in accordance with applicable Laws. ExxonMobil may, from time to time, communicate with Franchise Dealer about prices and periodically may counsel Franchise Dealer on retail pricing. Franchise Dealer is not required to accept any pricing suggestions of ExxonMobil.

9.21   <u>Environmental Standards</u>. Franchise Dealer shall comply with all environmental Laws and shall conduct the Businesses in an environmentally conscientious manner with due regard for the health and safety of the surrounding community. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Article II and the environmental standards.

9.22   <u>Maintain Inventory</u>. Franchise Dealer shall maintain an inventory of Products sufficient to serve customers during the hours specified in Section 9.3.

**ARTICLE X**
**ADVERTISING, PROMOTION, AND MARKETING**

10.1    General Advertising. Franchise Dealer shall comply with the requirements of all ExxonMobil advertising, promotional and marketing programs including requirements relating to graphics, concepts, materials, placement and media. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Standards in the Standards Handbook relating to advertising, promotional and marketing programs.

10.2    Local Advertising Approval. Franchise Dealer shall obtain ExxonMobil's prior approval of all advertising, promotional and marketing activities by Franchise Dealer in its local market area. Franchise Dealer shall submit to the Territory Manager (TM) for its prior approval (except with respect to prices to be charged) Franchise Dealer's proposal for all local advertising, promotional and marketing plans and samples of all local advertising materials not prepared or previously approved by ExxonMobil or its designated contractors or agents. If ExxonMobil does not furnish Franchise Dealer with notice withholding approval within 30 business days after the date of receipt of the proposal by ExxonMobil, the proposal will be deemed approved. If any plans or materials previously approved by ExxonMobil are later disapproved, Franchise Dealer shall discontinue their use promptly upon notice from ExxonMobil.

10.3    Advertising Contributions. Subject to applicable Laws, ExxonMobil may, in good faith and the normal course of business, establish a regionally-focused media advertising contribution program to fund regional advertising incremental to ExxonMobil's historical advertising levels for promoting the Exxon brand in one or more Key Markets (the "Contribution Program").

If ExxonMobil establishes a Contribution Program, it will be developed in consultation with ExxonMobil's National Dealer Business Improvement Council. Upon consultation with a regional advertising steering committee consisting of ExxonMobil-designated franchisees and ExxonMobil personnel, ExxonMobil will control and direct all advertising under the Contribution Program, including location, media, content and extent of any advertising under the Contribution Program.

Franchisees' contributions will be collected in Key Markets and allocated for advertising in those markets. All contributions under the Contribution Program may be collected by ExxonMobil and paid to one or more ExxonMobil-designated third parties who will administer the program. Franchise Dealer's contributions will be nonrefundable. The Contribution Program will not create a trust or fiduciary relationship. The contributions may be spent in the year of contribution or any subsequent year and may be applied against any costs or expenses associated with the Contribution Program including administrative costs.


**ARTICLE XI**
**INSURANCE**

11.1    Types of Insurance Required.

During the time this agreement is in effect, in addition to any other insurance or surety bonding required by LAWS, Franchise Dealer will carry and maintain in force with companies satisfactory to ExxonMobil , solely at Franchise Dealer's expense, insurance satisfactory to ExxonMobil as follows:

(a)    Comprehensive/Commercial General Liability Insurance or Garage Liability insurance including, but not limited to, coverage for the sale of motor fuel, operation of retail motor fuel stores, premises operations, products, completed operations, contractual liabilites, with a minimum combined single limit of $1,000,000 providing coverage for injury, death or property damage resulting from each occurrence.

(b)    In the event Franchise Dealer has alcoholic beverages for sale at any location, a limit of $1,000,000 will be obtained to include coverage for liabilities arising out of the dispensing or selling of alcoholic beverages including, without limitation, any liabilities by a dram shop or alcoholic beverages control act.

(c)    Business Auto Liability insurance coverage for operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death or property damage resulting from each occurrence.

(d) Garagekeepers' Legal Liability insurance (if PREMISES includes service bays) including, but not limited to, coverage for fire, theft, riot, vandalism, and collision with limits of at least $50,000 for each occurrence.

(e) Fire Legal Liability Insurance for an amount of at least the full replacement cost of FIXTURES and EQUIPMENT on PREMISES.

(f) Workers Compensation and Employers Liability Insurance, or similar social insurance, for all Franchise Dealers employees engaged in performing services where required by laws which may be applicable to Franchise Dealers employees with a waiver of all rights of subrogation and/or contribution against ExxonMobil where such waiver is permitted by law.

(g) Environmental impairment insurance coverage with at least limits of $1,000,000 on a continuous and uninterrupted basis insuring Franchise Dealer for environmental legal liabilities arising out of, or in any manner associated with, related to, Franchise Dealers use of, and/or presence on the PREMISES if any TANK SYSTEM is installed on PREMISES, in whole or in part, by anyone other than ExxonMobil or a contractor hired by ExxonMobil.

(h) ExxonMobil periodically may reasonably require Franchise Dealer to carry additional types of insurance coverages and amounts, including modifications to existing insurance under this Article.

(i) Each policy of insurance described in this Article 11.1 shall cover ExxonMobil as additional insured (except Workers Compensation and Employers Liability) and shall be primary as to all other policies which may provide coverage.

11.2  <u>CODO Additional Insurance Clause.</u>

Types of Insurance Required:

(a) plate glass insurance acceptable to ExxonMobil, in an amount sufficient tot replace all plate glass and security glazing with like plate glass and security glazing in the event of loss or damage;

(b) fire and extended coverage insurance in an amount sufficient to cover Franchise Dealers inventory and equipment, with a waiver of subrogation against ExxonMobil.

11.3  <u>DOSS Additional Insurance Clause.</u>

In addition to any other insurance required under the Agreement, the DOSS Franchise Dealer shall also obtain and maintain coverage for:

(a) property insurance for the replacement value of all ExxonMobil property located at the Marketing premises including the Leased Equipment and other Exxon signs and equipment with ExxonMobil named as the mortgagee to the extent of its property, monetary and security interest.

11.4  <u>Evidence of Insurance.</u>

Prior to the date of this Agreement and any time upon request by ExxonMobil, Franchise Dealer shall have its insurance carrier(s) furnish to the requester certified copies of the required insurance policies, and/or certificates of insurance specifying the types and amounts of coverage in effect, expiration dates, confirmation that each policy complies with the requirements of Article 11.1 Specifying that no insurance shall be cancelled or materially changed during the time this Agreement is in effect without ten (10) calendar days prior written notice to the requester.

11.5  <u>Other Provisions.</u>

Nothing in this Article 11 in any way limits or waives Franchise Dealer's legal or contractual responsibilities to ExxonMobil or others.

**ARTICLE XII**
**TRANSFER OF INTEREST; SURVIVORSHIP**

12.1  <u>Consent Requirements</u>. Franchise Dealer acknowledges that the rights and duties of Franchise Dealer are personal to Franchise Dealer, and that ExxonMobil has granted this Franchise in reliance on the qualifications, business skills, financial capacity and personal character of Franchise Dealer or, if Franchise Dealer is not an individual, of the Key Individual. Accordingly, Franchise Dealer shall obtain ExxonMobil's express prior written consent as a condition precedent to the sale, assignment or transfer (collectively, the "Transfer") of any of the following (collectively, an "Interest"):

(a)  any interest in this Agreement and any supplemental or related agreements, the Franchise, the Franchise Relationship and any lease, right or license granted under this Agreement or any supplemental or related agreements;

(b)  any direct or indirect ownership interest of the Key Individual or any other person in Franchise Dealer; or

(c)  all or substantially all of the assets of any of the Businesses.

Except as specifically provided in this Article XII, any Transfer, not having the express prior written consent of ExxonMobil is null and void and constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant requirement of this Agreement and the Franchise Relationship. Any Transfer of an Interest is also subject to ExxonMobil's rights under Article XIII.

If Franchise Dealer, the Key Individual or any other person with an Interest in Franchise Dealer (the "Transferor") intends to Transfer an Interest, the Franchise Dealer shall furnish ExxonMobil with written notice of the Transferor's intent, which notice must be at least 90 days prior to any proposed Transfer. Franchise Dealer shall furnish to ExxonMobil all information and take all actions, and cause the Transferor and any proposed transferee to furnish to ExxonMobil all information and take all actions, as may be reasonably required by ExxonMobil to review the proposed Transfer including all documents and actions referred to in this Article XII. ExxonMobil is not obligated except as otherwise provided by law, to review or respond to any Transfer until:

(i)  all required information is received by ExxonMobil; and

(ii)  all required actions are taken by Franchise Dealer or the Transferor.

12.2  <u>Consent to Transfer</u>. ExxonMobil may not unreasonably withhold its consent to a Transfer of an Interest, except that ExxonMobil may, in its sole discretion, require any or all of the following as conditions of its consent:

(a)  Franchise Dealer shall pay:

(i)  all indebtedness, monetary obligations and all other outstanding obligations to ExxonMobil, its Affiliates or any financial institutions or other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement. Without limiting the preceding general requirements of this Section 12.2(a), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans or ExxonMobil reimbursement agreements; and

(ii)  all indebtedness to contractors or vendors that have furnished services or goods to the Marketing Premises.

(b)  If the Interest is that of the Key Individual, the proposed transferee must be designated as the Key Individual, must meet the requirements of Sections 12.2(e)(ii) and (e)(iii) and must furnish a guarantee pursuant to Article IV.

(c)  Except as otherwise provided by law, the Transferor must sign and deliver to ExxonMobil a general release in form and substance satisfactory to ExxonMobil, of any and all claims against ExxonMobil and its Affiliates and their respective officers, directors, shareholders, employees, and agents, in their corporate and individual capacities, including claims arising under applicable Laws.

(d)  Franchise Dealer may not Transfer less than all Interest in this Agreement, all supplemental and related agreements, the Businesses and assets relating to the Businesses. A Key Individual may not Transfer less than 51% of the total ownership interest in the Franchise Dealer unless:

(i)  ExxonMobil expressly allows the Transfer under an applicable written policy as may be in effect from time to time; and

(ii) the Key Individual and the Franchise Dealer comply with all requirements and conditions under that policy.

(e) Franchise Dealer may not Transfer an Interest to any person except to an individual, a corporation meeting the requirements of Section 4.3 or to another business form permitted under and meeting the requirements of Section 4.4. If a Transfer of an Interest in Franchise Dealer is to a corporation meeting the requirements of Section 4.3 or is the Transfer of an Interest in Franchise Dealer that is another business form permitted under Section 4.4, the following applies:

(i) If Franchise Dealer is another business form permitted under Section 4.4(a)(i), the Transfer may only be to a person holding, and known by ExxonMobil at the time of formation of the original Franchise Relationship to have held, an ownership interest in the other business form.

(ii) A new Key Individual must be designated on the signature page of the assignment agreement or other document reasonably requested by ExxonMobil. The Franchise Dealer, transferee and new Key Individual must comply with Article IV.

(iii) The new Key Individual must be reasonably acceptable to ExxonMobil, meet the requirements of Article IV and meet all of ExxonMobil's normal requirements for a Key Individual as may be in effect from time to time including ExxonMobil's normal requirements for a franchise dealer under Section 12.3(a).

(iv) If Franchise Dealer is not an individual, the term "Transfer" additionally includes any change in ownership of an Interest in Franchise Dealer:

(A) by will, bequest or applicable Laws governing descent;

(B) by merger, consolidation or operation of Law; or

C) by the foreclosure, attachment, execution or sale of any Interest that is used as collateral or security for financing, but does not include any pledging, mortgaging, hypothecating, granting of a security interest or encumbering of such property in order to secure bona fide financing from a financial institution if:

(1) the pledging, mortgaging, hypothecating, granting of a security interest or encumbering does not:

(I) result in the foreclosure, attachment, execution or sale of such property,

(II) cover any property of ExxonMobil including any interest of ExxonMobil in equipment, fixtures or improvements, and

(III) if Franchise Dealer is a CODO Dealer, cover the Marketing Premises, and

(2) Franchise Dealer furnishes ExxonMobil prior written notice of such pledging, mortgaging, hypothecating, granting of a security interest or encumbering.

12.3 <u>Conditions to Transfer</u>. If a Transfer, alone or together with other previous, simultaneous or proposed Transfers, will have the effect of transferring financial or management control of Franchise Dealer or the Franchise, ExxonMobil may require, in its sole discretion and in addition to any other conditions, any or all of the following as conditions of its approval except as otherwise provided by law:

(a) The transferee must demonstrate to ExxonMobil's satisfaction that the transferee meets ExxonMobil's then-current requirements for new franchise dealers under the System; including requirements relating to credit, financial capability, business and personal qualifications, business experience and training.

(b) The transferee must sign and deliver to ExxonMobil an agreement, in form and substance acceptable to ExxonMobil, to assume all obligations of the Franchise Dealer under this Agreement and all supplemental and related agreements.

(c) The transferee must complete, and cause its Managers and management and non-management employees to complete, to ExxonMobil's satisfaction, such initial and refresher training as ExxonMobil may require.

(d) Franchise Dealer must not be in default of this Agreement or any supplemental or related agreement.

12.4    <u>Administrative Fees</u>. Prior to any Transfer, Dealer or the transferee of any Interest shall pay to ExxonMobil a non-refundable administrative fee in connection with each Transfer in an amount to be specified by ExxonMobil. The Administrative Fee compensates ExxonMobil for costs and expenses incurred with Transfers. Without limiting ExxonMobil's right to change the fee, the fee in effect on the effective date of this Agreement is $6,000, except if the Transfer results in the transferee becoming a Multi-Unit Operator, the Franchise Dealer or the transferee shall pay an administrative fee of $3,500.00. Franchise Dealer shall also pay to ExxonMobil administrative fees from time to time imposed by ExxonMobil which are in connection with changes in Franchise Dealer's operations, name or business structure, result in administrative costs or expenses to ExxonMobil and are in an amount determined by ExxonMobil to recoup those costs and expenses.

12.5    <u>Survivorship</u>.

(a)    If Franchise Dealer is an individual, the provisions of this Section 12.5 apply. Franchise Dealer may, by written notice to ExxonMobil, designate his or her qualified spouse or adult child to succeed Franchise Dealer as franchisee upon Franchise Dealer's death. Franchise Dealer also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies. If Franchise Dealer has no living spouse or adult children, Franchise Dealer may designate another qualified individual as successor. Franchise Dealer shall comply with all applicable Laws governing survivorship or succession subject to the provisions of any policy which ExxonMobil may have in effect. A designated successor must:

(i)    meet all ExxonMobil's requirements for a franchise dealer that are in effect at the time of succession and are applicable to the Businesses;

(ii)    attend and complete all training requirements applicable to a franchise dealer at the time of succession; and

(iii)    must sign and deliver to ExxonMobil a written agreement or agreements, in form and substance acceptable to ExxonMobil, assuming all obligations and liabilities of the Franchise Dealer under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses.

(b)    If Franchise Dealer is a corporation meeting the requirements of Section 4.3 and the Key Individual has legal and beneficial ownership of at least 51% of the outstanding voting shares or other ownership interests in the Franchise Dealer, the provisions of this Section 12.5(b) apply. The Key Individual of a Franchise Dealer covered by this Section 12.5(b) may, by written notice to ExxonMobil, designate his or her qualified spouse or adult child to succeed the Key Individual upon the Key Individual's death. That Key Individual also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies. If that Key Individual has no living spouse or adult children, the Key Individual may designate another qualified individual as successor. That Key Individual shall comply with all applicable laws governing survivorship succession. A designated successor must:

(i)    meet all of ExxonMobil's requirements for a Key Individual that are in effect at the time of succession and are applicable to the Businesses;

(ii)    attend and complete all training requirements applicable to a Key Individual at the time of succession;

(iii)    furnish to ExxonMobil a personal guarantee pursuant to Section 4.3(g); and

(iv)    cause Franchise Dealer to comply with all obligations under Section 4.3 including furnishing to ExxonMobil any documentation requested by ExxonMobil under Section 4.3(d).

(c)    By express written policy, ExxonMobil may, but is not obligated to, allow Franchise Dealer or the Key Individual to designate persons as successors in addition to those specified in Sections 12.5(a) and (b). Designation of any additional persons will be subject to those terms and conditions as may be specified in that policy.(See Transfer & Survivorship Policy).

12.6    <u>Waivers</u>.

(a)    ExxonMobil does not waive any claims or rights under this Agreement or any related or supplemental agreements, including any right to demand strict compliance with any terms of those agreements by any Transferor or transferee or any rights in connection with any future Transfers, if:

(i)    ExxonMobil consents to any proposed Transfer; or

(ii)    ExxonMobil fails to exercise its right to purchase any Interest of a Transferor under Article XIII.

(b)    ExxonMobil does not consent to any Transfer by:

    (i)    acceptance of any money;

    (ii)   any course of dealing; or

    (iii)  any interviews, counseling, correspondence or other communications with any proposed transferee including communications under Section 12.8.

(c)   No Transfer of an Interest or consent to a Transfer may be construed as releasing or discharging:

    (i)    any Franchise Dealer from any obligation or liability arising out of this Agreement or any supplemental or related agreement; or

    (ii)   a Key Individual from his or her obligations under any guarantee.

12.7   <u>Assignment by ExxonMobil</u>. This Agreement shall inure to the benefit of ExxonMobil, its successors, and assigns. ExxonMobil may transfer or assign all or part of its rights or interest in this Agreement, or delegate all or part of its duties or obligations under this Agreement, without restriction, to any person or entity. Upon any assignment or delegation by ExxonMobil, ExxonMobil's assignee or delegatee will be substituted for ExxonMobil with respect to all assigned rights or interests and to all delegated duties and obligations and ExxonMobil will be released from any delegated duties and obligations.

Franchise Dealer acknowledges that:

(a)   an assignment or delegation by ExxonMobil may impact Franchise Dealer's rights and obligations under this Agreement to the extent that an assignee or delegatee has policies or programs that differ from ExxonMobil's policies and programs;

(b)   this impact is contemplated by the Parties under this Agreement; and

(c)   Franchise Dealer, the Key Individual and any other person with an Interest in Franchise Dealer hereby waives any claim for constructive termination or claim for damages.

12.8   <u>Communications with Transferees</u>. ExxonMobil may communicate directly with any prospective transferee. Franchise Dealer expressly consents to ExxonMobil, its Affiliates, contractors or vendors disclosing to the prospective transferee any information or projections requested by the prospective transferee including information relating to the Marketing Premises, the Businesses, this Agreement or any related or supplemental agreements. Franchise Dealer releases ExxonMobil, its Affiliates, contractors and vendors, and their respective directors, officers, employees and agents from any claims, losses or liability of Franchise Dealer resulting from any disclosure made by ExxonMobil in good faith. Nothing contained in this Section 12.8 is intended to obligate ExxonMobil to provide any information or projections to a prospective franchisee.


**ARTICLE XIII**
**RIGHT OF FIRST REFUSAL**


13.1   <u>Right of First Refusal</u>.

(a)   In connection with the proposed Transfer of an Interest, ExxonMobil shall have the right to meet the offer of any transferee which offer is acceptable to the Transferor of the Interest and acquire the Interest on the same terms and conditions as those contained in the transferee's offer. If the offer relates to an Interest in Franchise Dealer and Franchise Dealer owns property or businesses unrelated to this Agreement and the Businesses, Franchise Dealer shall offer to sell to ExxonMobil only that property (including any interest in the Marketing Premises and property related to the Businesses) and those businesses (including the Businesses) which are related to this Agreement or any supplemental or related agreements (the "Covered Interests"). The offer must not be more than the value of that consideration attributed to the Covered Interests in the proposed transferee's offer.

(b)   No later than 90 days before the proposed sale or closing date, Franchise Dealer or other Transferor must furnish to ExxonMobil:

    (i)    if the proposed transferee's offer relates to an Interest in Franchise Dealer and if Franchise Dealer owns property or businesses other than the Covered Interests, a written offer to sell ExxonMobil the Covered Interests in accordance with Section 13.1(a), or

(ii)   if Section 13.1(b)(i) does not apply, a copy of the proposed transferee's offer,

which will be a binding offer (the "Offer") by the Transferor or Franchise Dealer to ExxonMobil on the terms and conditions of the Offer. The Offer must be bona fide, in writing and contain all terms and conditions of the proposed Transfer. Franchise Dealer also shall furnish ExxonMobil with such additional information relating to the Interest, the Transferor, the proposed Transfer, the proposed transferee, the Interest and the Covered Interests, as ExxonMobil may reasonably request in order to evaluate the offer or review the proposed Transfer under Article XII and ensure compliance with this Article XIII.

(c)   Upon receipt of the Offer and all requested information, ExxonMobil will have 60 days (unless otherwise required by law) within which to evaluate the Offer, and to advise in writing Franchise Dealer or any other Transferor whether ExxonMobil exercises its right to acquire the Interest or the Covered Interests, whichever is applicable. An Offer that includes the exchange of other property interests for any Interest or Covered Interests may be accepted by ExxonMobil by substituting for that other property payment of an amount equal to the fair-market value of that other property but not more than the value attributed to that other property in the Offer. Franchise Dealer shall provide ExxonMobil with full access to Franchise Dealer's books and records if the Offer:

(i)   includes an exchange of property; or

(ii)   is an offer by Franchise Dealer to sell the Covered Interests at fair-market value as required under Section 13.1(a).

(d)   If ExxonMobil chooses to exercise its right of first refusal under this Article XIII, closing and the effective date of any termination of this Agreement as provided below in this Section 13.1(d) will be the proposed sale or closing date:

(i)   specified in the proposed transferee's offer if the Offer is that of a proposed transferee; or

(ii)   as agreed by ExxonMobil and Franchise Dealer if the Offer is an offer by Franchise Dealer to sell the Covered Interests. The closing will take place at ExxonMobil's offices. At closing, Franchise Dealer shall deliver to ExxonMobil documentation satisfactory to ExxonMobil conveying good, marketable and clear title to all property subject only to reasonable liens and conditions expressly provided in the Offer. If the Interest or Covered Interests subject to the offer includes Franchise Dealer's Interests in this Agreement and the Franchise Relationship, this Agreement and all related and supplemental Agreements will terminate on the sale or closing date, subject to any obligations or liability of Franchise Dealer or the Key Individual to ExxonMobil accrued prior to termination or which survive termination, and Franchise Dealer shall sign and deliver to ExxonMobil, at least 7 business days prior to the sale or closing date, a binding mutual termination agreement in form and substance acceptable to ExxonMobil.

(e)   If ExxonMobil does not exercise its right under this Section 13.1 with respect to any Interest, ExxonMobil shall:

(i)   notify Franchise Dealer in writing of its decision;

(ii)   review the proposed Transfer in accordance with Article XII; and

(iii)   notify Franchise Dealer as to whether ExxonMobil consents to the Transfer and as to which conditions will apply to the Transfer.

(f)   If ExxonMobil notifies Franchise Dealer that ExxonMobil consents to the Transfer, the Franchise Dealer or other Transferor of the Interest may proceed with the Transfer of the Interest only in accordance with the terms and conditions in the proposed transferee's offer constituting, or giving rise to, the Offer. Franchise Dealer shall provide ExxonMobil with documentation satisfactory to ExxonMobil that the Transfer was completed in accordance with the proposed transferee's offer.

(g)   ExxonMobil's rights under this Article XIII will apply to each offer by a transferee to Transfer an Interest and include any material renegotiations or material modifications of all or any part of an offer. Each offer (including any material renegotiation or modification of any offer) is a separate offer entitling ExxonMobil to its rights under this Section 13.1.

(h)   Except as otherwise provided by law, if any transferee fails to meet any requirements or conditions under Article XII including ExxonMobil's then-current requirements for new franchise dealers, ExxonMobil, in addition to withholding its consent to the Transfer and in lieu of exercising its rights under this Section 13.1 may, consistent with applicable Laws, substitute another transferee who meets those requirements and conditions and who accepts and is able to meet the terms and conditions of the Offer.

(i)   ExxonMobil's failure to exercise its purchase rights under this Section 13.1 on one or more occasions:

(i)    does not affect ExxonMobil's rights under this Section 13.1 on other occasions whether or not involving the same Interest;

(ii)    does not constitute ExxonMobil's consent to the Transfer of an Interest; and

(iii)    does not preclude ExxonMobil's right to substitute a transferee under Section 13.1(h).

13.2    <u>Transfers to Immediate Family</u>. ExxonMobil's purchase rights under Section 13.1 do not apply to the following Transfers:

(a)    if Franchise Dealer is an individual, Franchise Dealer's Transfer of all Franchise Dealer's Interests under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses, to:

(i)    Franchise Dealer's qualified spouse or adult child; or

(ii)    a corporation with respect to which the Franchise Dealer or the Franchise Dealer's spouse or adult child qualifies as the Key Individual.

(b)    if Franchise Dealer is a corporation and the Key Individual holds legal and beneficial ownership of at least 51% of the outstanding voting stock and other ownership interests in the Franchise Dealer, a Transfer by the Key Individual of all the Key Individual's Interests in Franchise Dealer to a spouse or adult child who qualifies as a Key Individual.

The Transfers referred to in this Section 13.2 are subject to all other provisions of this Agreement including the provisions of Articles IV and XII. This Section 13.2 does not authorize any Transfer that is merely a means or device to Transfer an Interest to a person other than as described in this Section

## ARTICLE XIV
## DEFAULT AND TERMINATION

14.1    <u>Termination or Non-renewal of Agreement and Franchise Relationship</u>. ExxonMobil may terminate or nonrenew this Agreement, the Franchise and the Franchise Relationship between ExxonMobil and Franchise Dealer as follows:

(a)    in accordance with the applicable provisions of the PMPA if the PMPA then applies to this Agreement; or

(b)    if the PMPA no longer applies to this Agreement:

(i)    for breach of any provision of this Agreement, or

(c)    if Franchise Dealer is not an individual, also:

(i)    upon the occurrence of an event with respect to the Key Individual that would be grounds for termination or non-renewal under the PMPA if the event had instead occurred to an individual Franchise Dealer including:

(A)    the death of the Key Individual,

(B)    the fraud or criminal misconduct of the Key Individual relevant to the operation of the Marketing Premises,

(C)    the continuing severe physical or mental disability of the Key Individual of at least three months' duration which renders the Key Individual unable to contribute to the proper operation of the Marketing Premises,

(D)    the conviction of the Key Individual for any felony involving moral turpitude, and

(E)    a declaration of bankruptcy or a judicial determination of insolvency of any guarantor referred to in Sections 4.3(e) or 4.4(b)(v).

(F)    the knowing failure of the Key Individual to comply with any Laws relevant to the operation of the Marketing Premises;

(ii)    the dissolution or winding-up of Franchise Dealer,

(iii)  upon the withdrawal or change of interest of any partner, if a partnership, or

(iv)  upon loss of Franchise Dealer's rights under applicable Law to conduct the Businesses.

Upon any termination or non-renewal, Franchise Dealer shall comply with the provisions of Article XV and with ExxonMobil's normal post-termination procedures as furnished in writing to Franchise Dealer from time to time.

14.2  <u>Right of Termination Due to Governmental Action</u>. Either Party may terminate this Agreement upon not less than 180 days' prior written notice to the other Party if any federal, state or local governmental action results in the adoption or imposition of Laws that:

(a)  significantly alter the reasonable expectations of the Parties at the time of entering into this Agreement including the expectation that Franchise Dealer will be obligated to pay rent as specified in the CODO Lease Provisions (if Franchise Dealer leases the Marketing Premises from ExxonMobil) or purchase the Products from ExxonMobil in accordance with Section 2.1;

(b)  result in the imposition of an obligation upon ExxonMobil to install or construct equipment, facilities or improvements on the Marketing Premises and, in ExxonMobil's sole judgment, the cost of such installation would be uneconomical to ExxonMobil; or

(c)  modify in any way the present relationship of ExxonMobil's exploration, production, supply, transportation, refining or marketing functions.

14.3  <u>Accrued Rights</u>. Any termination or non-renewal is subject to ExxonMobil's accrued rights.

14.4  <u>Remedies of ExxonMobil</u>. If Franchise Dealer defaults on any obligation contained in this Agreement or any related or supplemental agreement, ExxonMobil may, but is not obligated to, exercise any or all of the following remedies, whether or not ExxonMobil exercises its right to terminate or nonrenew:

(a)  suspend all deliveries of Products to Franchise Dealer until the default is corrected or remedied; or

(b)  apply any sums or security (including the Product Security) furnished by Franchise Dealer to ExxonMobil under this Agreement or any related or supplemental agreement to the payment of any indebtedness. Franchise Dealer immediately shall provide additional security, as directed by ExxonMobil, to replace the sums or security applied by ExxonMobil.

ExxonMobil's rights and remedies under this Agreement are distinct, separate and cumulative, and no one of them, whether or not exercised by ExxonMobil, is in exclusion of any others under this Agreement or any related or supplemental agreement, or at Law or in equity.

### ARTICLE XV
### OBLIGATIONS UPON TERMINATION OR EXPIRATION

15.1  <u>Termination of Business Operation</u>. Upon the termination or non-renewal of this Agreement, the Franchise and the Franchise Relationship, Franchise Dealer's rights under this Agreement and all related and supplemental agreements terminate, and Franchise Dealer shall stop all operation of the Motor-Fuels Business and the Related Businesses and all use of the Proprietary Marks and the System. In particular, and without limiting the general requirements of the preceding provisions of this Section 15.1, Franchise Dealer shall:

(a)  Immediately stop operating the Motor-Fuels Business and the ExxonMobil Related Businesses and at no time after termination or non-renewal represent Franchise Dealer, directly or indirectly, as a current or former Exxon franchise dealer.

(b)  Immediately and permanently stop using, in any manner whatsoever, any Confidential Information, the ExxonMobil name and all signs, advertising, materials, displays, stationery and forms containing the Proprietary Marks.

(c)  Promptly pay:

      (i)    all sums owing to ExxonMobil and its Affiliates and to all financial institutions and other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement. Without limiting the preceding general requirements of this Section 15.1(c), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans and ExxonMobil reimbursement agreements; and

      (ii)   if Franchise Dealer leases the Marketing Premises from ExxonMobil, all indebtedness to contractors or vendors that have furnished goods or services to the Marketing Premises.

(d)   Immediately return to ExxonMobil all ExxonMobil signs and other personal property of ExxonMobil. Franchise Dealer grants, and shall cause any other person in possession of the Marketing Premises to grant, to ExxonMobil a non-revocable license to enter the Marketing Premises to remove Exxon signs and property. Franchise Dealer shall bear all removal, site-restoration and transportation costs relating to the removal of Exxon signs and equipment under this Section 15.1(e).

## ARTICLE XVI
## TAXES, PERMITS, INDEBTEDNESS

16.1   Tax, Duty, Fee Due ExxonMobil. Franchise Dealer shall pay to ExxonMobil any present or future governmental charges imposed on ExxonMobil (including any tax, duty, fee or other charge imposed by governmental authority) and calculated on any basis, including by volume, cost or receipts, which is on or measured by (1) this Agreement or any related or supplemental agreement; (2) the Products; (3) the raw materials or constituent materials from which the Products are derived; or (4) the importation, refining, manufacture, sale, use, possession, transportation, handling or disposal of any raw or constituent materials, or the Products. Franchise Dealer shall pay all governmental charges to ExxonMobil unless they are included by ExxonMobil in the price of the Products or unless Franchise Dealer pays the charge directly to the applicable governmental authority.

16.2   Local, State, Federal Taxes and General Indebtedness. Franchise Dealer shall pay when due all governmental charges imposed on Franchise Dealer (including withholding, unemployment and sales taxes, fees and other charges imposed by governmental authority), and all accounts and indebtedness incurred by Franchise Dealer in the conduct of the Businesses.

16.3   Indebtedness Dispute. Notwithstanding any dispute by Franchise Dealer of its liability to pay any governmental charges under Section 16.2, Franchise Dealer shall not permit a tax sale, foreclosure or seizure by levy or execution or similar writ or warrant, or any attachment, lien or encumbrance by a creditor or governmental authority, of or on the Marketing Premises, any Business or any improvements, equipment or fixtures on the Marketing Premises.

16.4   Permits and Licenses. Franchise Dealer shall timely obtain and comply with all permits, certificates or licenses necessary for the full and proper conduct of the Businesses, including licenses to do business, fictitious name registration, underground storage tank permits and licenses, sales tax permits and fire clearances. Franchise Dealer shall pay all fees or charges relating to these permits, certificates and licenses.

16.5   Notices. Franchise Dealer shall notify ExxonMobil in writing within 5 days of:

      (a)   the commencement of any action, suit or proceeding,

      (b)   the issuance of any writ, injunction or award or of a decree of any court, agency, or other governmental authority, or

      (c)   any indebtedness, event or occurrence,

which may adversely affect the operation or financial condition of the Businesses, the Franchise Dealer, the Key Individual or the Marketing Premises.

## ARTICLE XVII

(e)    any environmental contamination or occurrence as follows:

    (i)    unless Section 18.2(e)(ii) applies, any environmental contamination or occurrence in whole or in part arising out of the operation of the Marketing Premises during any period when Franchise Dealer was or is in possession of the Marketing Premises or arising out of any act or omission of Franchise Dealer or any Related Party, or

    (ii)    if Franchise Dealer and all Related Parties have no interest in the storage tanks, lines or dispensing equipment located at the Marketing Premises and have no interest in the underlying estate of the Marketing Premises (excluding only a lease from ExxonMobil in accordance with the CODO Lease Provisions or the DOSS Additional Provisions), any environmental contamination or occurrence in whole or in part arising out of any act or omission of Franchise Dealer or any Related Party;

(f)    Use of PREMISES by Franchise Dealer, its agents, contractors, and/or employees;

(g)    Purchase, delivery, receipt, storage, dispensing, or sale of motor fuel not bought from ExxonMobil;

(h)    Installation, existence, use, or removal of any TANK SYSTEM, in whole or part, not owned by ExxonMobil, and the delivery of products into or out of that TANK SYSTEM;

(i)    Defective condition of PREMISES whether due to any latent or patent defect,

(j)    failure by Franchise Dealer to comply with Franchise Dealer's maintenance obligations under this agreement or any related or supplemental agreement including any agreement relating to a Related Business ("Failure" shall include any reasonable delay);

(k)    Acts or omissions, whether occuring on or off PREMISES, of any person(s) including, without limitation, Franchise Dealer, its agents, contractors, employees and/or any third parties, and excepting only ExxonMobil, its agents, and/or employees, even if such acts or omissions, by whomever committed, constitute CRIMINAL ACT (as defined in Section 18.8)

(l)    activities of third parties acting on behalf of or pursuant to any joint venture, partnership, co-branding arrangement, sublease, license or other agreement with, Franchise Dealer with respect to the Marketing Premises, management of the Franchise or conduct of the Businesses;

(m)    claims by creditors of Franchise Dealer or any Related Party;

(n)    failure by Franchise Dealer to obtain or keep current the amounts and types of insurance required by this Agreement or to comply with the terms and conditions of the insurance obtained; or

(o)    Failure by Franchise Dealer, its agents, contractors, and/or employees, to fully comply with:

    (i)    Any LAWS, Standards; or

    (ii)    Any provisions, covenant, or requirement of this Agreement; or

(p)    Liens or claims of any contractors, subcontractors, suppliers, material men, workers, other persons or entities (excepting only ExxonMobil), its agents, contractors, and/or employees) relating to PREMISES.

18.3    <u>Notices; Choice of Counsel</u>. Franchise Dealer shall promptly notify ExxonMobil of any Proceeding. If ExxonMobil is or may be named as a party in the Proceeding, ExxonMobil may elect (but is not obligated) to undertake the defense or settlement of the Proceeding with counsel of ExxonMobil's choice. If ExxonMobil does not elect to undertake the defense or settlement of the Proceeding, Franchise Dealer shall use counsel acceptable to ExxonMobil. If Franchise Dealer fails to use counsel acceptable to ExxonMobil or if ExxonMobil, in its discretion, determines that a conflict of interest exists between ExxonMobil and Franchise Dealer in the defense of the Proceeding, ExxonMobil may engage counsel of its choice to separately represent it in the Proceeding. No undertaking or separate representation of counsel by ExxonMobil under this Section 18.3 in any manner limits or waives Franchise Dealer's obligation to indemnify and defend, or pay for the defense of, ExxonMobil.

18.4    <u>Remedies</u>. With respect to any Proceeding, ExxonMobil may, at any time and without notice, in order to protect persons or property or the reputation or goodwill of ExxonMobil or others, consent or agree to any settlement or remedial or corrective action as ExxonMobil deems expedient, if, in ExxonMobil's sole judgment, there are reasonable grounds to believe that:

(a)    any of the acts or circumstances enumerated in Section 18.2 have occurred; or

(b)    any act or omission of Franchise Dealer or any Related Party may result directly or indirectly in future damage, injury or harm to any person or any property.

18.5    Defenses. All Losses incurred under this Article XVIII shall be chargeable to and paid by Franchise Dealer, regardless of any actions, activities or defenses undertaken by the Indemnitees, or subsequent success or failure of any actions, activities or defenses.

18.6    Recovery Obligations. Under no circumstances will Indemnitees be obligated to seek recovery from third parties or mitigate their Losses in order to maintain a claim against Franchise Dealer. Any Indemnitee's failure to pursue a recovery or mitigate a Loss will in no way reduce the amounts recoverable by that Indemnitee from Franchise Dealer.

18.7    Claims against ExxonMobil. Franchise Dealer represents and warrants that Franchise Dealer has no knowledge of any claim by Franchise Dealer or any Related Party against the Indemnitees on the date of this Agreement except for any claims disclosed by Franchise Dealer in a written schedule initialed by the Parties and attached to this Agreement. Franchise Dealer's obligation to disclose claims includes the disclosure of claims of which Franchise Dealer would have acquired knowledge upon reasonable inquiry or the exercise of due diligence.

18.8    Criminal Act. "CRIMINAL ACT" as used in the Agreement means any act(s) or omission(s) having the nature of crime. CRIMINAL ACT does not require proof of arrest, the filing of criminal charges, formal criminal processing, indictment, or conviction.

18.9    **Negligence; Willful Misconduct. Notwithstanding the terms of 18.2 it is the intention of the parties that Franchise Dealer will fulfill its obligations set forth in Section 18.2 even if ExxonMobil, its agents and/or employees are jointly or concurrently negligent and/or jointly or concurrently act with willful misconduct, but not if ExxonMobil, its agents, and/or employees are solely negligent and/or solely act with willful misconduct.**


### ARTICLE XIX
### FAILURE TO PERFORM; ALLOCATION


19.1    General Contingencies; Force Majeure.

   (a)    ExxonMobil is not liable for any consequences to Franchise Dealer, including loss, damage or demurrage due to any delay or failure in performance, arising out of any cause beyond ExxonMobil's reasonable control including:

      (i)    Governmental Action: compliance with any action, order, direction, request or control of any governmental authority or person purporting to act for any governmental authority; or

      (ii)    Force Majeure: interruption, unavailability or inadequacy of the supply of the Products or of any facility of production, manufacture, storage, transportation, distribution or delivery, for any reason, including wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, or weather conditions.

   (b)    ExxonMobil shall not be required to remove any cause or replace the affected source of supply or facility if ExxonMobil determines the action would involve additional expense or a departure from its normal practices.

   (c)    Franchise Dealer is not liable for failure to receive Products if Franchise Dealer is prevented from receiving and using them in Franchise Dealer's customary manner by any cause beyond Franchise Dealer's reasonable control.

19.2    Allocation.

   (a)    If there is, or ExxonMobil determines there may be, a shortage of supplies, for whatever reason, so that ExxonMobil is or may be unable to meet the demands of some or all of its customers, ExxonMobil may allocate to and among its retail dealers those quantities of Product that ExxonMobil determines it has available for distribution to that class of trade, or subgroup within that class of trade, from any specific terminal or point of supply. ExxonMobil's plan of allocation must not unreasonably discriminate between Franchise Dealer and ExxonMobil's other retail dealers that are in Franchise Dealer's class of trade or subgroup within that class of trade and are supplied by the same terminal or point of supply. ExxonMobil is not required to make up any deliveries or quantities omitted as a result of any cause or allocation under this Article XIX including deliveries or quantities omitted by ExxonMobil in allocating Products among its retail dealers under this Section 19.2, and ExxonMobil is not liable for any damages or losses in connection with those omitted deliveries or quantities.

(b)  If any allocation occurs, the Contract Volumes will be adjusted to reflect the allocation. In all situations of perceived or actual supply shortages, ExxonMobil may join or comply with any voluntary or non-mandatory price, supply, allocation or delivery restriction systems or programs designed or supported by any governmental authority. Any decision or determination made by ExxonMobil under this Article XIX will be made in ExxonMobil's sole discretion when acting in good faith in the ordinary course of business.

## ARTICLE XX
## MISCELLANEOUS

20.1  <u>Significance of Terms and Conditions</u>.

(a)  FRANCHISE DEALER ACKNOWLEDGES THE SIGNIFICANCE OF EACH TERM AND CONDITION AND THAT ANY BREACH OF THE TERMS AND CONDITIONS IS SUBSTANTIAL. THE PARTIES ALSO ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO THE PMPA, AND NOTHING CONTAINED HEREIN IS INTENDED TO REDUCE THE RIGHTS OF EITHER PARTY UNDER THAT LAW.

(b)  Franchise Dealer has expressly acknowledged in this Agreement that the failure to meet certain obligations constitutes a failure to comply with a reasonable and materially significant provision of this Agreement or the Franchise Relationship. These acknowledgments may not be construed as intending that other provisions, which are not so acknowledged, are not reasonable and materially significant provisions of this Agreement and the Franchise Relationship.

20.2  <u>Approvals and Consents</u>. If this Agreement requires the prior approval or consent of ExxonMobil, Franchise Dealer shall make a timely written request to ExxonMobil for its approval or consent, and any approval or consent must be obtained in writing. ExxonMobil makes no warranties or assurances upon which Franchise Dealer may rely, and assumes no liability or obligation to Franchise Dealer by:

(a)  providing any waiver, approval, consent, or suggestion to Franchise Dealer in connection with any approval or consent; or

(b)  reason of any neglect, delay or denial of any request.

20.3  <u>Strict Compliance</u>. Subject to the PMPA, ExxonMobil's rights at any time to:

(a)  demand strict compliance with any obligation or condition under this Agreement or any related or supplemental agreement, or

(b)  exercise any rights or remedies in connection with Franchise Dealer's default under this Agreement or any related or supplemental agreement,

are not waived or impaired by:

(i)  ExxonMobil's failure to exercise any right under this Agreement or any supplemental or related agreement,

(ii)  ExxonMobil's failure to insist upon strict compliance by Franchise Dealer with any obligation or condition in this Agreement or any supplemental or related agreement,

(iii)  any course of dealing of the parties or any trade practice or practice of the Parties at variance with this Agreement or any related or supplemental agreement,

(iv)  ExxonMobil's waiver of any prior default, whether or not similar, or

(v)  ExxonMobil's delay, forbearance or failure to exercise any power or right arising out of default by Franchise Dealer under this Agreement or any related or supplemental agreement.

20.4  <u>Notices</u>. Unless otherwise expressly provided in this Agreement, all notices, communications and delivery of information must be in writing and must be:

(a)  if to ExxonMobil:

    (i)    posted by registered or certified mail, return receipt requested, to the following address and directed to the attention of the U.S. Customer Support Manager:

> ExxonMobil Fuels Marketing, U.S. Customer Service
> 436 Creamery Way, Suite 300
> Exton, PA 19341-2556

(b)  if to Franchise Dealer

    (i)    delivered to the Marketing Premises; or

    (ii)   posted by registered or certified mail, return receipt requested, to the address specified in the preamble to this Agreement.

Where commercially reasonable, ExxonMobil may also communicate or deliver information to Franchise Dealer by electronic or telephonic means including those means of communication specified in Section 9.18

ExxonMobil may change the address for delivery of notices to it by furnishing written notice pursuant to this Section 20.4. Notice is deemed furnished on the first to occur of the following:

(a)  if made by personal delivery, the date the notice is personally delivered;

(b)  if made by registered or certified mail, three (3) business days after the date the notice is deposited in the United States mail, postage prepaid, and properly addressed; or

(c)  if made by ExxonMobil using electronic or telephonic communications, upon receipt by Franchise Dealer.

20.5    <u>ExxonMobil Legal Fees and Costs</u>. Franchise Dealer will promptly reimburse ExxonMobil on demand for all costs, fees (including attorneys and expert witness fees), and expenses incurred by ExxonMobil in enforcing it's rights or remedies under this agreement.

20.6    <u>Claims</u>. All claims by Franchise Dealer whether or not arising out of this agreement are barred unless asserted by the commencement of a lawsuit naming ExxonMobil as a defendant in a court of competent jurisdiction within 12 months after the event, act or omission to which the claim relates.

20.7    <u>Limitation of Liability</u>. ExxonMobil is not liable to Franchise Dealer or any other person for:

(a)  prospective profits or special, incidental, indirect, punitive or consequential damages in any circumstances arising out of the subject matter of this Agreement or ExxonMobil's acts or omissions relating to that subject matter; or

(b)  claims under Section 2.10 in excess of Franchise Dealer's purchase price of the Products to which the claims relate.

20.8    <u>Entire Agreement; Modifications</u>. This Agreement, (including the attachments and addenda, if any, which are incorporated for all purposes) contains the entire Agreement and understanding between Franchise Dealer and ExxonMobil pertaining to the covered subject matter, and supersede all prior agreements relating to that subject matter. There are no binding oral representations, stipulations, warranties, or "understandings" relating to this Agreement that are not fully set out in this Agreement. Except for those permitted to be made unilaterally by ExxonMobil under this Agreement, no amendment, change or variance from this Agreement is binding on either Party unless agreed in writing by the Franchise Dealer and ExxonMobil's authorized representative.

20.9    <u>Severability and Construction</u>. Except as otherwise expressly provided in this Agreement, each provision, and portion of any provision, of this Agreement is severable. If, for any reason, a provision or portion of any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the invalidity or unenforceability will not affect the validity or enforceability of any other provision or portion of a provision. The unaffected provisions, and portions of provisions, will remain in full force and effect.

20.10   <u>Third Party Rights</u>. Except as otherwise expressly provided in this Agreement, no person or entity not a party to this Agreement has any rights or remedies under this Agreement.

20.11   <u>Headings</u>. All headings in this Agreement are intended solely for convenience and do not affect the meaning or construction of any provision of this Agreement.

20.12  Joint and Several Obligations. All acknowledgments, representations, warranties and obligations of Franchise Dealer under this Agreement are made by, and binding on, all those signing this Agreement jointly and severally as Franchise Dealer.

20.13  ExxonMobil Approval. This Agreement is not binding on ExxonMobil until approved and signed on ExxonMobil's behalf by ExxonMobil's authorized representative.

20.14  Terms on Renewal. Nothing in this Agreement is to be construed as preventing ExxonMobil, upon renewal of the Franchise Relationship, from offering Franchise Dealer terms and conditions in good faith and the normal course of business which differ from or are in addition to those in this Agreement, including terms and conditions relating to the Related Businesses or other businesses which may be operated at the Marketing Premises.

**ARTICLE XXI**
**ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES**

21.1 <u>Business Risks</u>. Franchise Dealer represents and warrants that it has conducted an independent investigation of the Related Businesses and recognizes that the related businesses involve business risks and that its success will be largely dependent upon the ability of Franchise Dealer as an independent businessperson. ExxonMobil expressly disclaims the making of, and Franchise Dealer represents that it has not received, any representation, warranty or guarantee, express or implied, as to the potential volume, profits or success of the Businesses covered by this Agreement.

21.2 <u>Representations</u>. Franchise Dealer represents and warrants that it has no knowledge of any representation or warranty by ExxonMobil or any ExxonMobil Affiliate or their respective officers, directors, shareholders, employees, agents or contractors concerning the Businesses that is contrary to the terms of this Agreement or the documents referred to in this Agreement. Franchise Dealer represents and warrants that:

    (a)    ExxonMobil has made no representation or warranty to Franchise Dealer that Franchise Dealer will earn or is likely to earn a positive return on any investment made by Franchise Dealer;

    (b)    the Franchise includes no right of exclusivity;

    (c)    ExxonMobil has made no representation or warranty that it will buy back or otherwise accept from Franchise Dealer any Products, supplies or equipment purchased or leased by Franchise Dealer in connection with the Businesses;

    (d)    Franchise Dealer has made no misrepresentation in applying for the Franchise or entering into this Agreement; and

    (e)    if Franchise Dealer is a corporation:

        (i)    Franchise Dealer is duly organized and validly existing,

        (ii)    Franchise Dealer is authorized to do business and in good standing under the laws of the state of its incorporation and under the laws of any state in which this Agreement is to be performed,

        (iii)    Franchise Dealer has the corporate power and authority to enter into this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, and

        (iv)    Franchise Dealer's signing, delivery and performance of this Agreement has been duly authorized by all required corporate action.

21.3 <u>Receipt of Attachments and Disclosures</u>. Franchise Dealer represents and warrants that it received a copy of the complete Agreement, the schedules and attachments to the Agreement, and any supplemental and related disclosures required by applicable Law.

21.4 <u>Understanding of Agreements; Core Values</u>. Franchise Dealer represents and warrants that it has read and understands this Agreement, any attachments, and any related or supplemental agreements, and that ExxonMobil has accorded Franchise Dealer ample time and opportunity to consult with advisers of Franchise Dealer's own choosing about the potential benefits and risks of entering into this Agreement. Franchise Dealer represents and warrants that Franchise Dealer understands and agrees with the Core Values and shall operate the Businesses and the Marketing Premises in a manner so as to meet the commitments contained in the Core Values.

Signed by the Parties.

Witness:                              ExxonMobil Oil Corporation

_____             By: _____

                                      Title: _____


Witness:                              RISING MICRO LLC

_____             By: _____

                                      Title: __PRESIDENT._____


                                      (For Franchise Dealers that are
                                      corporations or other permitted
                                      business forms) Franchise Dealer
                                      designates the following person as the
                                      Key Individual:


                                      __MAHMUD    RASHID__
                                      Print Name

### ATTACHMENT TO
### PMPA FRANCHISE AGREEMENT
### DEFINITIONS

| | |
|---|---|
| "Affiliate" | means a corporation that controls, is controlled by or under common control with, another corporation. |
| "Agreement" | has the meaning indicated in the preamble and includes all schedules, attachments, definitions and recitals to this Agreement. |
| "authorized representative of ExxonMobil" | means the Marketing Support & Controls Manager of the ExxonMobil business unit responsible for Franchise Dealer's geographic area or an authorized ExxonMobil representative of higher authority, or an authorized person in ExxonMobil's U.S. Customer Service Center (or other successor group) as designated by ExxonMobil. |
| "business day" | means any day, except weekends and ExxonMobil-recognized holidays. |
| "Co-Brand or Non-ExxonMobil Offering" | means the Co-Brand or Non-ExxonMobil Offering specified in Section 1.2. |
| "CODO Dealer" | means for the purpose of this Agreement Franchise Dealer, if ExxonMobil owns, leases or otherwise has the right to grant the use or possession of the Marketing Premises and ExxonMobil Leases, or offers to lease, the Marketing Premises to the Franchise Dealer in accordance with the CODO lease Provisions. |
| "CODO Lease Provisions" | has the meaning indicated in Section 1.3(b). |
| "Confidential Information" | has the meaning indicated in Article V. |
| "Contract Volumes" | has the meaning indicated in Section 2.1. |
| "Contribution Program" | has the meaning indicated in Section 10.3. |
| "Core Values" | has the meaning indicated in Recital B. |
| "Covered Interests" | has the meaning indicated in Section 13.1(a). |
| "day" | means calendar day. |
| "DOSS Dealer" | means Franchise Dealer, if Franchise Dealer is not CODO Dealer for purposes of the Agreement. |
| "DOSS Additional Provisions" | has the meaning indicated in Section 1.3(c). |
| "ExxonMobil" | Means ExxonMobil Oil Corporation, as identified by in the opening paragraph of this Agreement. |
| "failure" | has the meaning indicated in Section 18.2(g). |
| "Fuel Requirements" | has the meaning indicated in Section 2.7(a). |
| "Franchise" | has the meaning indicated in Section 1.1. |
| "Franchise Dealer" | has the meaning indicated in the preamble. |
| "franchise dealer" | means a person that operates an Exxon Outlet under a franchise agreement with ExxonMobil. |
| "Franchise Relationship" | has the meaning indicated in Section 1.1. |
| "includes" | means "includes, but is not limited to,". |
| "including" | means "including, but not limited to," |
| "Indemnitees" | has the meaning indicated in Section 18.2. |
| "individual" | means a single natural person. |
| "Interest" | has the meaning indicated in Section 12.1. |
| "Key Individual" | has the meaning indicated in Section 4.1(b). |
| "key individual" | means an individual, with respect to a franchise dealer, who meets the definition of the Key Individual. |
| "Key Market" | means a geographic area designated by ExxonMobil from time to time as a key market for the retail sale of the Products. |

| | |
|---|---|
| "Laws" | means laws, case law, rules, regulations and orders of governmental authority, whether federal, state or local, with jurisdiction over the Parties, property or this Agreement. |
| "legal fees and costs" | includes court costs, expert and attorneys' fees and disbursements (including reasonable allocated costs of in-house counsel and staff) whether or not incurred pursuant to litigation. |
| "Losses" | has the meaning indicated in Section 18.1. |
| "Manager" | has the meaning indicated in Section 8.1(b). |
| "Minimum Acceptable Rating" | has the meaning indicated in Section 6.3. |
| "Exxon Outlet" | has the meaning indicated in Recital A. |
| "Exxon Related Business" | has the meaning indicated in Section 1.2(c). |
| "Motor-Fuels Business" | has the meaning indicated in Section 1.1(c). |
| "Multi-Unit Operator" | has the meaning indicated in Section 4.2. |
| "Offer" | has the meaning indicated in Section 13.1(b). |
| "Ownership Interest" | has the meaning indicated in Section 4.5. |
| "Party" | means ExxonMobil and Franchise Dealer and their successors and assigns as permitted by this Agreement. |
| "person" | means any natural person or any corporation, company, partnership, joint venture or other form of organization. |
| "PMPA" | has the meaning indicated in Section 1.1. |
| "Proceeding" | has the meaning indicated in Section 18.2. |
| "Product Security" | has the meaning indicated in Section 2.4. |
| "Products" | has the meaning indicated in Section 2.1. |
| "Program" | has the meaning indicated in Section 9.16. |
| "Proprietary Marks" | has the meaning indicated in Recital D. |
| "Purchase Schedule" | has the meaning indicated in Section 2.1 |
| "Related Business" | has the meaning indicated in Section 1.2. |
| "Related Party" | has the meaning indicated in Section 18.2. |
| "Standards" | has the meaning indicated in Section 6.1. |
| "Standards Handbooks" | has the meaning indicated in Section 6.1. |
| "System" | has the meaning indicated in Recital A. |
| "Term" | has the meaning indicated in Section 1.5. |
| "Transfer" | has the meaning indicated in Section 12.1. |
| "Transferor" | has the meaning indicated in Section 12.1. |
| "Unleaded Gasoline Requirements" | has the meaning indicated in Section 2.7(b). |

All references in this Agreement to the masculine, neuter or singular are to be construed to include the masculine, feminine, neuter or plural, where applicable.

**PURCHASE SCHEDULE (3 Year Term)**
**TO**
**PMPA FRANCHISE AGREEMENT**

This Purchase Schedule is a part of, and incorporated into, the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil") and RISING MICRO LLC , 950 S CAPITOL STREET S E , WASHINGTON , DC 20003-0000 ("Franchise Dealer") with a term beginning on FEBRUARY 1, 2004 (the "Effective Date").

1. Subject to the provisions of the Agreement, the monthly and yearly Contract Volume are as follows:

| Month | GASOLINE Contract Year 1 | 2 | 3 | Month | DIESEL* Contract Year 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|
| JANUARY | 200000 | 200000 | 200000 | JANUARY | 0 | 0 | 0 |
| FEBRUARY | 200000 | 200000 | 200000 | FEBRUARY | 0 | 0 | 0 |
| MARCH | 200000 | 200000 | 200000 | MARCH | 0 | 0 | 0 |
| APRIL | 200000 | 200000 | 200000 | APRIL | 0 | 0 | 0 |
| MAY | 200000 | 200000 | 200000 | MAY | 0 | 0 | 0 |
| JUNE | 200000 | 200000 | 200000 | JUNE | 0 | 0 | 0 |
| JULY | 200000 | 200000 | 200000 | JULY | 0 | 0 | 0 |
| AUGUST | 200000 | 200000 | 200000 | AUGUST | 0 | 0 | 0 |
| SEPTEMBER | 200000 | 200000 | 200000 | SEPTEMBER | 0 | 0 | 0 |
| OCTOBER | 200000 | 200000 | 200000 | OCTOBER | 0 | 0 | 0 |
| NOVEMBER | 200000 | 200000 | 200000 | NOVEMBER | 0 | 0 | 0 |
| DECEMBER | 200000 | 200000 | 200000 | DECEMBER | 0 | 0 | 0 |
| Contract Year Total | 2400000 | 2400000 | 2400000 | Contract Year Total | 0 | 0 | 0 |

2. A "contract year" means a 12-month period beginning on the Effective Date or any anniversary of the Effective Date.

I acknowledge the receipt and applicability of this Purchase Schedule:

_____

RISING MICRO LLC



**ADDITIONAL EXXON TIGER MART/EXXON TIGER MARKET/EXXON SNACK SHOP PROVISIONS**
**TO**
**PMPA FRANCHISE AGREEMENT**

These Additional Exxon Tiger Mart/Exxon Tiger Market/Exxon Snack Shop Provisions ("Attachment") are part of, and incorporated into, the PMPA Franchise Agreement (the "Agreement") between ExxonMobil Oil Corporation ("ExxonMobil") and RISING MICRO LLC , 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 ("Franchise Dealer") with a Term beginning on FEBRUARY 1, 2004 (the "Effective Date").

**ARTICLE I**
**COMPLIANCE WITH AGREEMENTS AND PROGRAMS**

1.1    <u>Applicability</u>. If Exxon Tiger Mart, Exxon Tiger Market or Exxon Snack Shop is specified under Section 1.2(c) of the Agreement as a permitted Related Business, this Attachment applies. A "Exxon Tiger Mart" means a convenience store operated by Franchise Dealer under the System at the Marketing Premises under the designation "Tiger Mart". "Exxon Tiger Market" means a convenience store operated by Franchise Dealer under the System at the Marketing Premises under the designation "Tiger Market". "Exxon Snack Shop" means a convenience store operated by Franchise Dealer under the System at the Marketing Premises under the designation "Snack Shop".

1.2    <u>Compliance with Agreements.</u>

(a)    Subject to Section 1.2(c), Franchise Dealer shall conduct the Exxon Tiger Mart, Exxon Tiger Market or Exxon Snack Shop business (the "Tiger Mart/Tiger Market/Snack Shop Business") in compliance with all applicable agreements including:

(i)    any agreement relating to the Tiger Mart/Tiger Market/Snack Shop Business between Franchise Dealer and ExxonMobil or a ExxonMobil Affiliate for:

(A)    the construction, alteration or improvement of all or a portion of the Marketing Premises for use as a Tiger Mart, Tiger Market or Snack Shop,

(B)    the purchase or lease of related equipment, fixtures or other property for use in the Exxon Mart/Snack Shop Business, or

(C)    any services provided by ExxonMobil, its Affiliate or its designee in connection with the Tiger Mart/Tiger Market/Snack Shop Business; and

(ii)    any agreement

(A)    that is:

(1)    between Franchise Dealer and ExxonMobil or a ExxonMobil Affiliate, or

(2)    between Franchise Dealer and a financial institution or other person pursuant to an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished consideration including any inducement, guarantee or credit enhancement, and

(B)    under which:

(1)    Franchise Dealer has borrowed funds for:

(a)    the construction, improvement or alteration of all or part of the Marketing Premises for use as a Tiger Mart, Tiger market or Snack Shop, or

(b)    the purchase of equipment, fixtures or other property for use in the operation of the Tiger Mart/Tiger Market/Snack Shop Business; or

(2)    Franchise Dealer has leased any equipment, fixtures or other property for use in the Tiger Mart/Tiger Market/Snack Shop Business; and

(iii)    any agreement for services or the purchase of merchandise for use in the Tiger Mart/Tiger Market/Snack Shop Business pursuant to an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished any consideration including any purchase commitments, inducement, guarantee or credit enhancement.

(b) Franchise Dealer shall operate the Tiger Mart/Tiger Market/Snack Shop Business at the Marketing Premises and may not delegate operation, or Transfer any rights in the Tiger Mart/Tiger Market/Snack Shop Business, to any other person except in compliance with Articles XII and XIII of the Agreement. Franchise Dealer may not Transfer its rights under this Attachment except in connection with a Transfer if its Interests in the Agreement.

(c) Franchise Dealer shall operate the Tiger Mart/Tiger Market/Snack Shop Business in compliance with all provisions of the Agreement and all related and supplemental agreements. Unless expressly indicated otherwise in writing by ExxonMobil, the provisions of the Agreement control over any contrary provision in any agreement relating to the Tiger Mart/Tiger Market/Snack Shop Business.

## ARTICLE II
## BUSINESS OPERATIONS

2.1 <u>Operation of Exxon Tiger Mart, Tiger market or Exxon Snack Shop.</u> In accordance with the Agreement and this Attachment, Franchise Dealer shall operate at the Marketing Premises a Exxon Tiger Mart, Tiger Market or Exxon Snack Shop, whichever is specified in Section 1.2 of the Agreement. Franchise Dealer shall use advertising and signs using those Proprietary Marks designated by ExxonMobil from time to time for use in the Tiger Mart/Tiger Market or Snack Shop Business. ExxonMobil, it its sole discretion, may determine the color, size and design of all signs and promotional materials for the Tiger Mart/Tiger Market/Snack Shop Business.

2.2 <u>Compliance with Core Values and Standards.</u> Franchise Dealer acknowledges that the operation of the Tiger Mart/Tiger Market/Snack Shop Business impacts customers' buying experiences at the Marketing Premises and customers' perceptions and acceptance of Exxon-branded products, the System and the Proprietary Marks. Accordingly, Franchise Dealer's operation of the Tiger Mart/Tiger Market/Snack Shop Business is subject to Franchise Dealer complying with all requirements contained in this Attachment and the Agreement, including Section 9.15 of the Agreement. Without limiting any other requirement in this Attachment or the Agreement, Franchise Dealer shall operate the Exxon Mart/Snack Shop Business in a manner so as to meet the commitments contained in the Core Values and in compliance with the Standards relating to the Marketing Premises including those contained in the ExxonMobil Standards Handbook as may be in effect from time to time.

2.3 <u>Failure to Comply.</u>

(a) Franchise Dealer acknowledges that the failure to meet its obligations under this Attachment constitutes a failure to comply with a reasonable and materially significant provision of the Agreement and the Franchise Relationship. If Franchise Dealer fails to comply with any requirements for the Tiger Mart/Tiger Market/Snack Shop Business under this Attachment or the Agreement, without limiting ExxonMobil's other rights or remedies under applicable Law or under the Agreement, any related or supplemental agreement or any other agreement relating to the Tiger Mart/Tiger Market/Snack Shop Business, ExxonMobil may, by written notice, require Franchise Dealer to stop operating the Tiger Mart/Tiger Market/Snack Shop Business.

(b) If ExxonMobil requires Franchise Dealer to stop operating the Tiger Mart/Tiger Market/Snack Shop Business under this Section 2.3 or if Franchise Dealer's rights under this Attachment terminate under Section 3.1 of this Attachment, in addition to any other obligations under the Agreement, Franchise Dealer shall:

(i) immediately stop operating the Tiger Mart/Tiger Market/Snack Shop Business at the Marketing Premises;

(ii) immediately, and permanently stop using, in any manner whatsoever, any Confidential Information, the Tiger Mart/Tiger Market/Snack Shop trade dress and Proprietary Marks and all signs, logos, slogans, advertising, materials, displays, stationery and forms containing those Proprietary Marks or relating to the tiger Mart/Tiger Market/Snack Shop Business;

(iii) promptly pay:

(A) all sums owing to ExxonMobil, any ExxonMobil Affiliates and any financial institution or other person that has loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished any consideration including any agreement referred to under Sections 1.2(a)(ii) or (iii) of this Attachment. Without limiting the preceding general requirements of this Section 2.3(b)(iii), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans and ExxonMobil reimbursement agreements relating to the Tiger Mart/Tiger Market/Snack Shop Business, and

     (B)   if Franchise Dealer leases the Marketing Premises from ExxonMobil, all indebtedness to contractors or vendors that have furnished goods or services in connection with the Tiger Mart/Tiger Market/Snack Shop Business; and

  (iv)  immediately return to ExxonMobil all Exxon signs and other personal property of ExxonMobil relating to the Tiger Mart/Tiger Market/ Snack Shop Business. Franchise Dealer grants, and shall cause any other person in possession of the Marketing Premises to grant, to ExxonMobil a non-revocable license to enter the Marketing Premises to remove Exxon signs and property relating to the Tiger Mart/Tiger Market/Snack Shop Business. Franchise Dealer shall bear all removal, site-restoration and transportation costs relating to the removal of these Exxon signs and equipment.

2.4  <u>No Property Interests</u>. Franchise Dealer's right to operate the Tiger Mart/Tiger Market/Snack Shop Business neither creates for, nor conveys to, Franchise Dealer any ownership, leasehold or possessory interest in the Marketing Premises. If Franchise Dealer leases the Marketing Premises from ExxonMobil, Franchise Dealer's right to occupy the Marketing Premises, or any portion of the Marketing Premises, arises only out of and is subject to the "CODO Lease Provisions" attachment to the Agreement. If Franchise Dealer does not lease the Marketing Premises from ExxonMobil, Franchise Dealer's right to occupy the Marketing Premises arises out of the Franchise Dealer's ownership of the underlying premises or out of leasehold or contractual arrangements between Franchise Dealer and the owner of the premises.

2.5  <u>Compliance with Plan-O-Grams</u>. If ExxonMobil at any time or from time to time establishes a program with respect to the Tiger Marts/Tiger Markets/Snack Shop Business specifying merchandise layouts, selections and presentations (a "Plan-O-Gram"), Franchise Dealer shall conduct its Tiger Mart/Tiger Market/Snack Shop Business in compliance with Plan-O-Grams applicable to the configuration of Franchise Dealer's Tiger Mart/Tiger Market/Snack Shop Business.

2.6  <u>Location; Relationship to System</u>. Franchise Dealer acknowledges that:

  (a)  the Agreement and this Attachment do not confer any right to operate the Tiger Mart/Tiger Market/Snack Shop Business at any location other than the Marketing Premises; and

  (b)  the Tiger Mart/Tiger Market/Snack Shop Business is part of the System and is designed to be operated only in connection with a Motor-Fuels Business and not as an independent business.

**ARTICLE III**
**MISCELLANEOUS**

3.1  <u>Agreement Provisions</u>. Except as expressly provided otherwise in this Attachment or in the Agreement, the provisions of the Agreement apply to this Attachment. Any termination or nonrenewal of the Franchise and Franchise Relationship will automatically operate to terminate Franchise Dealer's rights under this Attachment and any right to conduct the Tiger Mart/Tiger Market/Snack Shop Business at the Marketing Premises.

3.2  <u>Definitions</u>.

  (a)  Terms used in this Attachment have the meaning indicated in this Attachment or the Agreement.

  (b)  Unless indicated as a reference to provisions of the Agreement, references in this Attachment to Sections and Articles are to those contained in this Attachment.

I acknowledge the receipt and applicability of these
Additional Exxon Tiger Mart/Tiger Market/Snack Shop Provisions:

_____

RISING MICRO LLC

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
**Tuesday, June 25, 1996**

**AGENCY:** Department of Energy.

**ACTION:** Notice.

---

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d) (1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, for State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

*B. Lack of Good Faith Efforts*

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

*C. Mutual Agreement To Terminate the Franchise*

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

*D. Withdrawal From the Market Area*

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. §2802(b) (E).

*E. Other Events Permitting a Termination*

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking

into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*B. Manner and Contents of Notice*

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

*A. Trial Franchises*

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

*B. Interim Franchises*

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

**Further Discussion of Title I-Definitions and Legal Remedies**

**I. Definitions**

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

*B. Franchise Relationship*

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

*C. Franchisee*

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel.

*D. Franchisor*

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*E. Marketing Premises*

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

*F. Leased Marketing Premises*

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

*G. Fail to Renew and Nonrenewal*

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
**Marc W. Chupka,**
Acting Assistant Secretary for Policy.