# COMPANY OWNED DEALER OPERATED ("CODO")
## LEASE PROVISIONS
### TO
### PMPA FRANCHISE AGREEMENT

This Indenture of Lease and CODO Lease Provisions (collectively, "Lease") are a part of, and incorporated into, the PMPA Franchise Agreement ("Agreement") between ExxonMobil Oil Corporation ("ExxonMobil") and RISING MICRO LLC ("Franchise Dealer") with a Term beginning on FEBRUARY 1, 2004 (the "Effective Date").

### ARTICLE I

### LEASE OF MARKETING PREMISES

1.1   **Lease.** Subject to the terms and conditions of this Lease and the Agreement, ExxonMobil leases to Franchise Dealer, and Franchise Dealer leases from ExxonMobil, the following marketing premises (the "Marketing Premises"):

950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000

which includes the improvements, now or at any time during the Term, located on the Marketing Premises and all equipment listed on the attachment entitled "CODO Lease Schedule" which attachment is incorporated into this Lease. The CODO Lease Schedule may be amended in writing by the Parties from time to time or by ExxonMobil as provided in this Lease.

1.2   Underlying Lease.

    (a)   Franchise Dealer acknowledges:

        (i)   that Franchise Dealer has received notice in writing prior to the commencement of the Term that this Lease, the Agreement and all or a material portion of the Marketing Premises are subject to one or more underlying leases held by ExxonMobil which expire as follows:

        Expiration Date: N/A

        and

        (ii)   that any underlying lease or leases might expire and not be renewed.

    (b)   If any underlying lease expires or is terminated during the Term or any extension of the Term, ExxonMobil may terminate or nonrenew this Lease, the Agreement and the Franchise Relationship as of the date of expiration or termination of the underlying lease. ExxonMobil is under no obligation to seek an extension or renewal of any underlying lease or to exercise any options including any option to renew or purchase. This Section 1.2 may not be construed as a waiver of any other right of termination or non-renewal which ExxonMobil may have.

1.3   Exclusions; Reservations. This Lease:

    (a)   is subject to:

        (i)   any state of facts that an accurate survey might show,

        (ii)   existing or future easements, encumbrances, covenants, restrictions and reservations, if any,

        (iii)   existing or future mortgages or deeds of trust,

        (iv)   any underlying lease or leases,

(v)    the right of ExxonMobil, its Affiliates, ExxonMobil's landlord, if any, and their respective employees, vendors, contractors and representatives to enter the Marketing Premises under this Lease, the Agreement or any related or supplemental agreement, and

(vi)    building restrictions and zoning;

(b)    excludes from the Marketing Premises any prior lease or grant by ExxonMobil;

(c)    reserves to ExxonMobil the rights to use, or grant to other persons the use of, the following portions of the Marketing Premises (the "perimeter"):

(i)    a 10-foot wide strip along the perimeter of the Marketing Premises, or

(ii)    other area or areas, as determined necessary or appropriate by ExxonMobil, for any reasonable use including:

(A)    erecting and maintaining signs,

(B)    installing and maintaining any utilities or storm-water drainage systems,

(C)    providing access for vehicles and pedestrians,

(D)    conducting construction activities, and

(E)    locating, operating and maintaining communication facilities and services (including wireless communication facilities); and

(d)    reserves to ExxonMobil the right, but not the obligation, to exclude from this Lease and the Agreement at any time or from time to time a portion of the Marketing Premises used for a Related Business if Franchise Dealer does not operate, stops operating, or is required by ExxonMobil under the Agreement or any related or supplemental agreement to stop operating, that Related Business at the Marketing Premises. Upon such exclusion:

(i)    Franchise Dealer may use only nonexcluded portions of the Marketing Premises including those structures or improvements on the Marketing Premises designated by ExxonMobil for Franchise Dealer's use in operating the remaining Businesses;

(ii)    ExxonMobil shall reduce the Rent by an amount determined by ExxonMobil to reflect the value of the excluded portion of the Marketing Premises;

(iii)    ExxonMobil, its Affiliates, any lessee or licensee of ExxonMobil or its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors may use the nonexcluded portion of the Marketing Premises for ingress and egress to the excluded portion of the Marketing Premises; and

(iv)    Franchise Dealer shall cooperate fully with ExxonMobil, its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors in operating any business or conducting any activities on the excluded portion of the Marketing Premises including reaching reasonable agreements on utility expenses and other matters of mutual interest.

ExxonMobil's rights under this Section 1.2(d) are in addition to other rights and remedies that ExxonMobil may have in connection with Franchise Dealer's failure to comply with provisions of the Agreement and any related or supplemental agreements including the right to terminate or nonrenew the Agreement, the Franchise and the Franchise Relationship.

1.4    <u>Condition of Marketing Premises and Equipment</u>. FRANCHISE DEALER ACCEPTS THE MARKETING PREMISES AND ALL EQUIPMENT LISTED IN THE CODO LEASE SCHEDULE IN THEIR PRESENT CONDITION, AS IS, WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY AS TO THEIR CONDITION, INTERFERENCE, INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR ANY PURPOSE. ExxonMobil is not responsible or liable to Franchise Dealer, its employees, agents, customers, vendors or contractors for any defect or change in the condition of the Marketing Premises.

1.5    <u>Subordination</u>. This Lease and all rights of Franchise Dealer under this Lease, the Agreement and all related and supplemental agreements are subject and subordinate in all respects to all existing and future:

    (a)   ground leases, overriding leases and underlying leases of all, or any portion of, the Marketing Premises now or hereafter existing;

    (b)   mortgages, which may now or later affect the Marketing Premises, any equipment, fixtures, leases and leasehold estates, whether or not any mortgages also cover property other than the Marketing Premises or leases;

    (c)   each and every advance made or to be made under any mortgages;

    (d)   all renewals, modifications, replacements and extensions of any leases or mortgages; and

    (e)   all spreaders, consolidations and correlation's of any mortgages.

The term "mortgages" includes deeds of trust and other financing agreements. The provisions of this Section 1.5 are self-executing and do not require further documentation. Without limiting the preceding sentence, upon ExxonMobil's request, Franchise Dealer shall sign and deliver any and all documents and take such action, as ExxonMobil may request to evidence any subordination.

1.6   <u>Holding Over</u>. Any holding over by Franchise Dealer does not constitute a renewal or extension of this Lease or the Agreement. ExxonMobil, at its option, may elect to treat a holdover as either a trespass or a tenancy at will. If, under the laws of the state in which the Marketing Premises are located, holding over creates a periodic tenancy, the holding over will, notwithstanding anything in this Section 1.6, create a month-to-month tenancy.

1.7   <u>Subletting</u>.

    (a)   Unless Franchise Dealer receives ExxonMobil's prior express written approval, which approval may be withheld in ExxonMobil's sole discretion, Franchise Dealer may not:

        (i)   sublet or license all or any part of the Marketing Premises;

        (ii)   grant any right to any person to establish or operate a Related Business or any other business at the Marketing Premises including a Co-Brand or Non-ExxonMobil Offering;

        (iii)   except in compliance with Articles XII and XIII of the Agreement, Transfer any Interest in this Lease;

        (iv)   grant any other person a possessory interest in the Marketing Premises;

        (v)   encumber or hypothecate the Marketing Premises; or

        (vi)   grant any person any easement or concession in the Marketing Premises.

    (b)   Any attempt by Franchise Dealer to take any of the actions specified in Section 1.7(a) without ExxonMobil's prior written approval is a default under this Lease and the Agreement and shall be null and void. If ExxonMobil does approve any actions specified in Section 1.7(a), Franchise Dealer shall comply with all conditions and requirements imposed by ExxonMobil on Franchise Dealer in giving the approval.

**ARTICLE II**

**RENT**

2.1 <u>Rent; National Rent Policy</u>. Franchise Dealer shall pay to ExxonMobil rent for the scheduled period as specified in the attachment entitled "Rent Schedule" which is attached and incorporated in this Lease. Dealer shall pay to ExxonMobil rent for the Marketing Premises determined in accordance with ExxonMobil's National Rent Guidelines. (Attachment I) a ExxonMobil's National Rent Guidelines means a written policy adopted by ExxonMobil in good faith and in the ordinary course of business governing the rent to be charged ExxonMobil's lessee franchise dealers, as that policy may be modified by ExxonMobil at any time or from time to time. Except as provided in ExxonMobil's National Rent Guidelines, changes to ExxonMobil's National Rent Guidelines after the Effective Date will not affect the calculation of the Asset-Based maximum Rent under this Lease during the Term. Upon any renewal of the Franchise and Franchise Relationship, the rent, including the Asset-Based Maximum Rent, will be determined in accordance with ExxonMobil's National Rent Guidelines or any successor ExxonMobil policy or program in effect at the time of renewal, or in the case of a 10 year term, at the 5 year re-opener.

2.2 <u>Payment of Rent</u>. Without offset or recoupment, Franchise Dealer shall pay Rent in 4 equal installments throughout the month in which payment is due or upon other timing specified by ExxonMobil in writing. Subject to applicable Laws, ExxonMobil may impose a late payment charge as designated by ExxonMobil from time to time for each Rent payment not received by ExxonMobil when due, which charge is in addition to other remedies available to ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

2.3 <u>Rent and Maintenance Security</u>. Upon request by ExxonMobil, and in addition to any Product Security, Franchise Dealer shall provide and maintain security in a minimum amount equal to two months rental ("Rent and Maintenance Security"). ExxonMobil may use, without prior notice or demand, any or all of the Rent and Maintenance Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to ExxonMobil including indebtedness for failure to pay rent or perform Franchise Dealer's maintenance obligations. If ExxonMobil uses any Rent and Maintenance Security to satisfy all or part of an indebtedness or obligation, Franchise Dealer immediately shall provide ExxonMobil with additional security, as directed by ExxonMobil, to replace the Rent and Maintenance Security. Following non-renewal or termination of the Franchise Relationship between ExxonMobil and Franchise Dealer, ExxonMobil shall return to Franchise Dealer, in accordance with ExxonMobil's procedures then in effect, any remaining portion of the Rent and Maintenance Security not required to satisfy all or any part of any indebtedness or other obligation of Franchise Dealer to ExxonMobil.

2.4 <u>Modifications Upon Renewal</u>. No provision of this Lease or the Agreement may be construed to prevent or limit ExxonMobil's right to modify the terms or conditions of the Agreement, or offer additional or different terms to Franchise Dealer, upon a renewal of the Franchise and Franchise Relationship including ExxonMobil's right to offer any modification or new terms relating to rent.

2.5 <u>Personal Property</u>.

    (a)    All personal property and equipment listed on the CODO Lease Schedule:

        (i)    is subject to the terms and condition of this Lease and the Agreement; and

        (ii)    is to be considered loaned personal property or equipment and, unless expressly specified in the CODO Lease Schedule, is not to be allocated any portion of the Rent under this Article II.

    (b)    Maintenance, repairs or replacement of loaned personal property or equipment by Franchise Dealer does not entitle Franchise Dealer to any abatement of rent. ExxonMobil may at any time or from time to time alter, change, remove or add to the personal property or equipment loaned or leased to Franchise Dealer in ExxonMobil's sole discretion. Franchise Dealer shall not remove from the Marketing Premises any personal property or equipment loaned or leased by ExxonMobil to Franchise Dealer.

**ARTICLE III**

## FRANCHISE DEALER OBLIGATIONS

3.1    Utilities, Taxes and Licenses. In addition to Rent under Article II, Franchise Dealer shall pay:

(a)    all utility charges and other expenses incurred in the operation of the Marketing Premises, except as may expressly be provided otherwise in this Lease; and

(b)    all taxes, fees and charges imposed by governmental authority on the Marketing Premises or its use including business use taxes and license fees, but excluding real and personal property taxes on the land and buildings and on ExxonMobil's equipment unless those real and personal property taxes are to be paid by Franchise Dealer pursuant to any underlying lease between ExxonMobil and Franchise Dealer.

3.2    Agreement Provisions. Franchise Dealer shall comply with all provisions of the Agreement including compliance with the Standards.

3.3    No Liens. Franchise Dealer shall keep the Marketing Premises and any ExxonMobil equipment or other property free of all liens, claims and encumbrances.

3.4    Condemnation. Without limiting any provisions of the Agreement, Franchise Dealer shall comply with all Laws governing condemnation or eminent domain awards. All sums payable by a condemning authority for a taking of any portion of the Marketing Premises, whether payable due to a purchase in lieu of condemnation, a settlement reached after the initiation of condemnation proceedings, a final judgment or otherwise, will be paid to ExxonMobil and Franchise Dealer has no interest whatsoever in those sums; except that Franchise Dealer may receive any sum payable by the condemning authority for loss of goodwill by Franchise Dealer. Franchise Dealer shall notify ExxonMobil promptly upon Franchise Dealer's receipt of any notice, or other communication, of a taking or proposed taking of any portion of the Marketing Premises from any condemning authority. ExxonMobil shall have the right to settle or dispute any condemnation proceedings in its sole discretion. Franchise Dealer may not independently participate in any condemnation proceedings affecting the Marketing Premises, but shall cooperate fully with ExxonMobil in any condemnation proceedings. Franchise Dealer shall sign and deliver any documents, and take other action, requested by ExxonMobil in connection with condemnation proceedings or any settlement of those proceedings.

3.5    Surrender in Good Condition.

(a)    Upon termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship:

(i)    Franchise Dealer immediately shall surrender the Marketing Premises to ExxonMobil in good order and condition; and

(ii)    in addition to any other rights or remedies of ExxonMobil, ExxonMobil may repossess the Marketing Premises and operate the Marketing Premises through ExxonMobil's employees, contractors or agents.

(b)    Upon exclusion of any portion of the Marketing Premises under Section 1.3(d), Franchise Dealer immediately shall surrender the excluded portion of the Marketing Premises to ExxonMobil in good order and condition.

3.6    Business Records. Franchise Dealer shall maintain current, accurate and complete business records, including all records required under Articles IV and V of this Lease.

3.7    Telephones; Devices.

(a)    Unless Franchise Dealer obtains ExxonMobil's prior written consent (which consent ExxonMobil may withhold in its sole discretion), Franchise Dealer shall not place on the Marketing Premises, or permit the placement anywhere on the Marketing Premises of:

(i)    any pay telephones;

(ii)    pay air towers, pay toilets or coin-operated devices;

    (iii)    dispensing devices;

    (iv)    vending machines;

    (v)    merchandising equipment for any products (including beverages, ice, candy or tobacco products);

    (vi)    ice vending or storage machines; or

    (vii)    trailers.

    (b)    If ExxonMobil consents to the placement of any item under Section 3.7(a), Franchise Dealer shall comply with all conditions or requirements that ExxonMobil may impose in giving its consent.

**3.8**    <u>Storage; Parking</u>. Franchise Dealer shall not use, or permit the use of, the Marketing Premises for the rental, storage or parking of any devices, vehicles or equipment. Franchise Dealer shall not place on the Perimeter any property or improvements, including signs, vehicles or structures, without ExxonMobil's prior written consent.

**3.9**    <u>Equipment</u>. Franchise Dealer shall provide and maintain at its sole cost all equipment and personal property necessary for Franchise Dealer's operation of the Businesses which equipment is not supplied by ExxonMobil.

**3.10**    <u>Use</u>. Franchise Dealer shall use the Marketing Premises in compliance with all provisions of the Agreement (including this Lease) and only for operation of the Businesses specified in the Agreement.

**ARTICLE IV**

**MAINTENANCE OBLIGATION**

**4.1**    <u>Allocation of Maintenance Obligations</u>. As provided in this Article IV, each Party shall maintain that equipment and property allocated to it in the schedule entitled "Maintenance Schedule" attached to and incorporated into this Lease. Franchise Dealer also shall maintain any property or equipment located at the Marketing Premises or otherwise used in the Businesses which property or equipment is not specified in the Maintenance Schedule. ExxonMobil reserves the right, in its sole discretion, to periodically add to, change or delete from, the Maintenance Schedule. Franchise Dealer acquires no ownership interest in property or equipment belonging to ExxonMobil, but leased or loaned to Franchise Dealer, because of Franchise Dealer's compliance with Franchise Dealer's maintenance, repair and replacement obligations.

**4.2**    <u>ExxonMobil Obligations</u>.

    (a)    Subject to this Section 4.2 and Section 4.4, ExxonMobil shall repair or replace the equipment and property allocated to it in the Maintenance Schedule as determined by ExxonMobil as necessary to keep them in good operating condition, if the need for any repair or replacement is due to ordinary wear and tear or damage by the elements. ExxonMobil's obligation to repair or replace does not arise unless and until:

        (i)    Franchise Dealer notifies by telephone ExxonMobil's Maintenance Center or designated contractor that the equipment or property is not in good operating condition; and

        (ii)    ExxonMobil determines in its sole discretion (which determination shall be made within a reasonable period of time) that the repair is necessary and is due to ordinary wear and tear or damage by the elements.

    (b)    Franchise Dealer shall:

        (i)    render any damaged or malfunctioning equipment or property harmless;

    (ii)    not use the equipment or property, or permit it to be used, until repaired or replaced; and

    (iii)    take action as may be necessary to make the area safe including posting warnings and preventing access.

(c)    If, within five business days following Franchise Dealer's telephone notification, ExxonMobil does not commence the repairs or replacement or notify Franchise Dealer that ExxonMobil will not make any repairs or replacement, Franchise Dealer shall furnish additional notice in writing to the Marketing Support & Controls Manager of the ExxonMobil business unit responsible for Franchise Dealer's geographic area or an authorized ExxonMobil representative of higher authority. In lieu of any repairs, ExxonMobil may make replacements.

(d)    ExxonMobil is not obligated to make any repairs or replacements under this Article IV, if ExxonMobil has furnished to Franchise Dealer a notice of termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship including termination or non-renewal based on ExxonMobil's determination:

    (i)    to withdraw from a geographic market area;

    (ii)    to convert the Marketing Premises to a use other than the sale of motor fuel;

    (iii)    to materially alter, add to or replace the Marketing Premises;

    (iv)    to sell the Marketing Premises; or

    (v)    that renewal is likely to be uneconomical to ExxonMobil.

(e)    Notwithstanding ExxonMobil's obligations under this Section 4.2, ExxonMobil may, in its sole discretion, elect:

    (i)    not to repair or replace any underground storage tank listed in the CODO Lease Schedule;

    (ii)    remove or abandon in-place that tank in accordance with applicable Law with no further use by Franchise Dealer; and

    (iii)    amend the CODO Lease Schedule to reflect the deletion of the tank or tanks.

(f)    If ExxonMobil exercises its right to remove or abandon any tank under Section 4.2(e), the following applies:

    (i)    ExxonMobil may not exercise its rights under Section 4.2(e) so as to reduce Franchise Dealer's ability to market Products by more than one grade;

    (ii)    ExxonMobil will determine which grade of Products will be eliminated if ExxonMobil exercises its rights under Section 4.2(e); and

    (iii)    the Contract Volumes for that grade of Product will be reduced to reflect the eliminated Product grade.

4.3    <u>Additional Maintenance Obligations</u>. Franchise Dealer shall:

(a)    at Franchise Dealer's expense and except as expressly provided under Section 4.2, maintain the Marketing Premises and all equipment and property located on the Marketing Premises in good, safe and operating condition and promptly make all necessary repairs or replace with equipment or property of comparable value;

(b)    operate and maintain all emission control equipment including:

    (i)    maintaining the equipment in accordance with the instructions of the manufacturer,

    (ii)    repairing or replacing the equipment, as necessary, and

    (iii)    complying with all applicable Laws relating to operation or maintenance of the equipment;

(c) promptly notify ExxonMobil if Franchise Dealer believes any equipment or property which is ExxonMobil's responsibility under Section 4.2 is not in good operating condition;

(d) implement a maintenance program in accordance with Section 4.4 and Franchise Dealer's obligations under the Maintenance Schedule; and

(e) keep accurate and updated records of all preventive maintenance inspections and of all maintenance performed by Franchise Dealer and show the records to ExxonMobil upon request.

4.4 <u>Maintenance Adjustment</u>.

(a) In lieu of directly meeting its maintenance obligations under Section 4.2, ExxonMobil may, but is not obligated to, issue a credit against Franchise Dealer's rent as a contribution toward Franchise Dealer's maintenance costs (maintenance adjustment) as described in this Section 4.4. Franchise Dealer shall apply the maintenance adjustment for the purpose of, and in accordance with, this Section 4.4. Upon 90 days prior written notice, ExxonMobil may discontinue or adjust the maintenance adjustment at any time. Franchise Dealer's application of the maintenance adjustment creates no ownership interest in Franchise Dealer in any equipment or property belonging to ExxonMobil but loaned or leased to, and maintained, repaired or replaced by, Franchise Dealer.

(b) The amount of the maintenance adjustment is specified in the "maintenance adjustment Schedule" attached to and incorporated into this Agreement. ExxonMobil shall issue the credit against Franchise Dealer's rent twice a year, in January and July by journal entry to Franchise Dealer's account. The first and last maintenance adjustment will be prorated if they relate to periods of less than 6 months.

(c) Franchise Dealer shall apply the maintenance adjustment only to meet ExxonMobil's maintenance obligations under this Article IV except that Franchise Dealer may apply any portion of the maintenance adjustment in excess of the amount of funds needed to meet ExxonMobil's current maintenance obligations to:

 (i) meet future maintenance obligations of ExxonMobil as budgeted under Section 4.4(d);

 (ii) comply with the Standards if any portion of the maintenance is in excess of the amount required under Section 4.4(c)(i); or

 (iii) meet Franchise Dealer's maintenance obligations under this Article IV if any portion of the maintenance adjustment is in excess of the amounts required under Sections 4.4(c) (i) and (ii).

(d) Franchise Dealer acknowledges that the amount of the maintenance adjustment may be more than necessary to pay for maintenance in some 6-month periods and less than necessary to pay for maintenance in other 6-month periods. Franchise Dealer shall budget the maintenance adjustment in a manner designed to balance (approximately) over the Term. Franchise Dealer's budget, as it may be amended as circumstances warrant, is subject to ExxonMobil's reasonable approval.

(e) Franchise Dealer shall perform all maintenance:

 (i) in compliance with all Laws including local building, or other, codes and ordinances; and

 (ii) in a safe and workmanlike manner.

(f) If Franchise Dealer receives the maintenance adjustment and fails to comply timely with Franchise Dealer's obligations under this Section 4.4, after written notice to Franchise Dealer, ExxonMobil may, but is not obligated to, perform Franchise Dealer's obligations under this Section 4.4 and, at ExxonMobil's sole discretion, debit Franchise Dealer's account or offset against amounts owed ExxonMobil or any security held by ExxonMobil (including the Rent Security and Maintenance Security) ExxonMobil's actual cost incurred in performing the obligations. ExxonMobil's rights under this Section 4.4(f) are in addition to any other rights or remedies of ExxonMobil including the termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(g) Without limiting Section 4.4(a) and based on the maintenance expense history of the Marketing Premises, ExxonMobil may adjust the maintenance adjustment from time to time as ExxonMobil determines appropriate.

(h) Nothing contained in this Section 4.4 relieves Franchise Dealer of its obligation to comply, at its sole expense, with its maintenance obligations under any other provision of this Lease and the Agreement including Section 4.3.

**ARTICLE V**

**ENVIRONMENTAL PROTECTION**

5.1 Inventory Reconciliation.

(a) Franchise Dealer acknowledges that the Marketing Premises contain underground tanks for the storage of petroleum products and that the release of the Products into the environment can cause serious damage to property, soil and ground water. To detect tank or piping leaks in order to safeguard the environment and prevent loss to either Franchise Dealer or ExxonMobil, Franchise Dealer shall measure the inventory of all underground storage tanks daily by tank sticking or other ExxonMobil-supplied measurement techniques, and reconcile the measured inventory with meter readings daily. Franchise Dealer shall keep a daily log of all underground tank inventory readings at the Marketing Premises, which shall be available for inspection by ExxonMobil or government authorities as required by applicable Law.

(b) To the extent that other requirements relating to environmental protection, including sampling of monitoring wells, preparing records of reports, or complying with notification requirements, are communicated by ExxonMobil to Franchise Dealer and without limiting Franchise Dealer's obligation to comply with the provisions of this Article V, Franchise Dealer additionally shall fully comply with all such requirements including any environmental Standards.

(c) Franchise Dealer shall maintain all loss, inventory-reconciliation and other environmental records or reports on the Marketing Premises for a period of three years. Franchise Dealer shall also make available these loss records or reports for inspection by ExxonMobil or by government authorities as required by applicable Laws.

(d) If Franchise Dealer fails to properly measure and reconcile inventory, maintain records and perform other environmental protection activities as required by applicable Law, this Lease, the Agreement or any related or supplemental agreements, or as specified by ExxonMobil from time to time, Franchise Dealer waives any and all rights that Franchise Dealer may have against ExxonMobil resulting from any environmental contamination or leakage including any claims for the value of lost Products. This waiver is in addition to other remedies and indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(e) Franchise Dealer shall permit ExxonMobil, its Affiliates and their respective employees, agents and contractors to enter the Marketing Premises at all times to inspect or test for contamination or leakage and conduct any excavation, remediation, monitoring or other activities in connection with any environmental contamination or leakage.

5.2 Notice; Remedy.

(a) Franchise Dealer shall notify ExxonMobil immediately by telephone, confirmed in writing, of any indication or suspicion of environmental contamination or leakage. As required by Laws, Franchise Dealer also shall notify all local governmental authorities of any contamination or leakage. If Franchise Dealer fails to notify ExxonMobil immediately of any indication or suspicion of contamination or leakage, Franchise Dealer waives any and all rights that Franchise Dealer has, or may have, against ExxonMobil resulting from the contamination or leakage including any claims for the value of lost Product. This waiver is in addition to other remedies or indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(b) Upon receipt of Franchise Dealer's notice, ExxonMobil shall use reasonable efforts to repair or otherwise remedy the cause of the leakage and return the Marketing Premises to full operation. Where determined appropriate in its judgment, ExxonMobil shall reduce or eliminate Rent due ExxonMobil during any repair period. ExxonMobil is not liable for lost business or profits, or for incidental or consequential damages arising from or relating to repairs, removal of equipment from service or other actions taken in response to environmental contamination or leakage.

5.3  Compliance With Laws. Franchise Dealer shall comply fully with all applicable Laws including those covering water, soil and air environmental protection and public health and nothing contained in this Lease may be construed to limit Franchise Dealer's obligation to comply with Laws. If Franchise Dealer does not dispose of waste in a proper manner or is not, in ExxonMobil's determination, complying with the requirements of these Laws, ExxonMobil may, but is not obligated to, enter upon the Marketing Premises and take such action as it deems necessary without liability to Franchise Dealer for business loss. Any cost incurred by ExxonMobil shall be paid by Franchise Dealer upon demand. This remedy is in addition to any remedies and indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

5.4  Franchise Dealer's Acknowledgment. Franchise Dealer acknowledges that Franchise Dealer's failure to comply fully with this Article V constitutes a failure to comply with a reasonable and materially significant provision of the Agreement and the Franchise Relationship.

## ARTICLE VI

## ADDITIONAL INDEMNITY AND INSURANCE

6.1  Indemnity. In addition to the other indemnities provided in the Agreement, Franchise Dealer shall defend and indemnify the Indemnitees to the fullest extent permitted by Law for all Losses resulting or arising from:

(a) any failure by Franchise Dealer to notify ExxonMobil of the need for repairs or any failure by Franchise Dealer to otherwise comply with Franchise Dealer's maintenance obligations as set forth in this Lease, the Agreement or any supplemental or related agreement; or

(b) any default or breach of an underlying lease as a result of the acts or omissions of Franchise Dealer.

6.2  Types of Insurance Required. Refer to Article XI of the Agreement for Insurance Requirements.

6.3  Agreement Provisions. The provisions of Article XI or XVIII of the Agreement apply to the insurance and indemnity requirements under this Article VI.

6.4  Use of Proceeds. ExxonMobil may in its sole discretion elect to keep any insurance proceeds in lieu of repairing, replacing or rebuilding the Marketing Premises or any personal property or equipment.

## ARTICLE VII

## REDEVELOPMENT OF MARKETING PREMISES

7.1  ExxonMobil's Redevelopment Right. ExxonMobil may, but shall not be obligated to, redevelop the Marketing Premises at any time and from time to time during the Term. Redevelopment may include altering, reconstructing, remodeling, demolishing or adding to buildings, equipment and facilities, and changing configuration, which may include the elimination or conversion of the service bays or merchandise sales areas. ExxonMobil is under no obligation to undertake any redevelopment. The decision to redevelop, and the nature of any redevelopment, shall be within ExxonMobil's sole discretion.

7.2  Notice. ExxonMobil shall notify Franchise Dealer verbally or in writing at least 30 days prior to the beginning of any demolition or construction.

7.3  Right of Entry. Franchise Dealer shall permit ExxonMobil and its Affiliates and their respective employees, agents, vendors or contractors to enter upon the Marketing Premises for the purpose of making any proposed redevelopment. Franchise Dealer shall fully cooperate with ExxonMobil in any redevelopment of the Marketing Premises.

7.4  Limitation of Liability. ExxonMobil will not be liable to Franchise Dealer for loss, inconvenience or annoyance to Franchise Dealer arising out of or in connection with any redevelopment including any loss, damage to or removal of any or all alterations or improvements previously installed by Franchise Dealer, or any claim by Franchise Dealer for loss of business or profits arising out of the redevelopment.

7.5  Adjustments in Rental and Product Quantities.

(a)  During the period of demolition or construction, ExxonMobil shall reduce the Contract Volumes and the Rent by an amount which, in its sole judgment, will adequately compensate Franchise Dealer for the restrictions in use of the Marketing Premises resulting from the demolition or construction. Upon completion of any redevelopment, ExxonMobil may, for the balance of the Term:

(i)  increase the Contract Volume and minimum purchase requirements specified in Article II of the Agreement and ExxonMobil may amend the Purchase Schedule to reflect the increase; and

(ii)  increase the Rent and the Asset-Based Maximum Rent in accordance with Section 2.5.

(b)  Within 30 days after receipt of notice from ExxonMobil of any Product quantity, minimum purchase or Rent increase, Franchise Dealer may terminate this Agreement by providing written notice to ExxonMobil if the increase is not satisfactory to Franchise Dealer. Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 7.5(b). The effective date of termination shall be 30 days after the date of Franchise Dealer's notice to ExxonMobil. Franchise Dealer shall sign and deliver to ExxonMobil, upon request by ExxonMobil, a mutual termination agreement and other agreements or instruments as requested by ExxonMobil for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

7.6  Franchise Dealer Improvements. Franchise Dealer may not alter or improve all or any part of the Marketing Premises unless ExxonMobil has provided its prior written consent which ExxonMobil may withhold in its sole discretion. If ExxonMobil consents to any improvement or alteration, Franchise Dealer shall comply with:

(a)  all provisions of this Lease, the Agreement and any underlying lease;

(b)  all restrictions, covenants and reservations applicable to the Marketing Premises;

(c)  all applicable Laws including building codes, permit requirements and zoning; and

(d)  any conditions or requirements imposed by ExxonMobil in giving its consent.

Permitted improvements or alterations to the extent funded by Franchise Dealer during the Term may not be included by ExxonMobil in determining the Assessed Value for purposes of determining Rent during the Term if the inclusion would increase Rent above that paid by Franchise Dealer prior to the improvement or alteration. Nothing in this Lease may be construed as preventing ExxonMobil upon any renewal of the Franchise or the Franchise Relationship from including any Franchise Dealer-funded improvements or alterations in determining the Assessed Value for purposes of determining Rent even if inclusion would increase Rent. Any Franchise Dealer-funded improvements or alterations to the Marketing Premises are the sole property of ExxonMobil. Upon ExxonMobil's request, Franchise Dealer shall sign and deliver documentation, and take other action, requested by ExxonMobil to evidence ExxonMobil's ownership in any improvements or alterations.

**ARTICLE VIII**

## CONTRACT VOLUME INCREASES

8.1 <u>ExxonMobil's Right to Increase</u>. If the Term is more than 5 years, ExxonMobil may at any time after the fifth anniversary of the Effective Date increase the Contract Volumes and minimum purchase requirements under Section 2.1 of the Agreement to an amount that ExxonMobil determines to be appropriate for the Marketing Premises. ExxonMobil shall furnish Franchise Dealer with at least 60 days prior written notice of any Contract Volume or minimum purchase requirement increase. ExxonMobil's rights under this Section 8.1 are in addition to other rights of ExxonMobil (including those under Section 7.5) to increase the Contract Volume and minimum purchase requirements under this Lease. Unless Franchise Dealer terminates the Agreement and the Franchise Relationship under Section 8.2, the increase will be effective on the date specified in ExxonMobil's notice of the increase.

8.2 <u>Franchise Dealer's Right to Terminate</u>. If the Contract Volume or minimum purchase requirement increase is unacceptable to Franchise Dealer, Franchise Dealer may terminate the Agreement, the Franchise and the Franchise Relationship by furnishing ExxonMobil with written notice of termination within 30 days following ExxonMobil's notice of increase. Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 8.2. Upon ExxonMobil's request, Franchise Dealer shall sign and deliver to ExxonMobil a mutual termination agreement and other agreements or instruments as may be reasonably requested by ExxonMobil for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

## ARTICLE IX

## EQUIPMENT LEASE

9.1 <u>Leased Equipment</u>. During the Term, ExxonMobil leases to Franchise Dealer, and Franchise Dealer leases from ExxonMobil, for use at the Marketing Premises the personal property and proprietary equipment (the "Leased Equipment") listed in the attachment entitled "Lease Schedule", which is incorporated into this Attachment. Without offset or recoupment, Franchise Dealer shall pay rent to ExxonMobil at the times and in the amounts specified in the Lease Schedule. Franchise Dealer shall pay the rent in any manner specified by ExxonMobil and permitted under Section 2.3 of the Agreement. The lease under this Article IX terminates on the earliest to occur of the following:

    (a)   termination of the Agreement and the Franchise Relationship;

    (b)   expiration of the Term; or

    (c)   Franchise Dealer's default under this Article IX.

9.2 <u>Dealer's Obligations</u>.

    (a)   With respect to the Leased Equipment, Franchise Dealer shall:

        (i)     make no additions or alterations without ExxonMobil's prior written consent;

        (ii)    keep legible and visible all brand names, trademarks and signs of ExxonMobil;

        (iii)   comply with all Laws covering its use;

        (iv)   not do or permit to be done anything prejudicial to ExxonMobil's title to the Lease Equipment;

        (v)    not remove it or deliver it to anyone but ExxonMobil or ExxonMobil's designee;

        (vi)   use it solely for Products at the Marketing Premises;

        (vii)   exercise reasonable care to prevent damage;

(viii)    comply with all provisions of the Agreement (including the Standards) and any related or supplemental agreements; and

(ix)    keep Leased Equipment free from all liens and encumbrances.

(b)    Franchise Dealer, at Franchise Dealer's sole expense, shall:

(i)    pay and discharge any and all taxes, fees and charges imposed by governmental authority on any Leased Equipment while in Franchise Dealer's possession, or upon its use or any business in which it is employed;

(ii)    adequately insure the Leased Equipment in the amount of its replacement value while it is in Franchise Dealer's possession; and

(iii)    maintain the Leased Equipment in good repair and condition and, if necessary, replace the Lease Equipment to ensure that it is fit for its intended use and in accordance with applicable Laws. If Franchise Dealer fails to maintain, repair or replace the Leased Equipment:

(A)    ExxonMobil may, but is not obligated to, maintain, repair or replace it, as ExxonMobil determines, and

(B)    Franchise Dealer promptly shall reimburse ExxonMobil for the costs of any maintenance, repair or replacement performed by ExxonMobil. In addition to any other rights or remedies of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship, ExxonMobil may debit any account of Franchise Dealer or offset any security held by ExxonMobil, in the amount of the costs.

(c)    Franchise Dealer acquires no ownership interest in the Leased Equipment because of Franchise Dealer's compliance with Franchise Dealer's maintenance, repair or replacement obligations.

9.3    <u>Equipment Removal</u>. ExxonMobil reserves the right to remove any Leased Equipment at any time and to replace it with similar equipment. Any replacement equipment will be subject to this Article IX. ExxonMobil may discontinue leasing any Leased Equipment at any time without any obligation to replace it, and ExxonMobil has no obligation to reimburse Franchise Dealer rent paid in advance for discontinued items of Leased Equipment. Upon termination of the lease under this Article IX:

(a)    ExxonMobil may elect, in its sole discretion, to:

(i)    remove the Leased Equipment,

(ii)    have Franchise Dealer remove and return the Leased Equipment to ExxonMobil or ExxonMobil's designee, or

(iii)    direct Franchise Dealer to dispose of the Leased Equipment;

(b)    Franchise Dealer shall bear all removal, site-restoration, transportation and disposal costs relating to the removal, return or disposal of the Leased Equipment;

(c)    ExxonMobil has no obligation to reimburse Franchise Dealer for any rent paid in advance for the Leased Equipment; and

(d)    ExxonMobil may abandon the Leased Equipment without liability or obligation to Franchise Dealer and without limiting any obligations of Franchise Dealer relating to the Proprietary Marks.

9.4    <u>ExxonMobil's Rights in the Equipment</u>. The Leased Equipment at all times is the property of and owned by ExxonMobil, and title to the Leased Equipment is and will remain in ExxonMobil. ExxonMobil's rights relating to the Leased Equipment (including its rights under Section 9.5) will survive any termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

9.5    <u>Right of Entry</u>. In addition to any other right of entry under this Lease or the Agreement, ExxonMobil has the unrestricted right to enter upon the Marketing Premises at any time to inspect or to remove any and all of its property including the Leased Equipment.

9.6    <u>Assignment</u>. Notwithstanding any contrary provision in the Agreement, Franchise Dealer may not assign its rights or delegate its duties under this Article IX, in whole or in part, without ExxonMobil's prior written consent which ExxonMobil may withhold in its sole discretion.

**ARTICLE X**

**<u>MISCELLANEOUS</u>**

10.1    <u>Agreement Provisions</u>. Except as expressly provided otherwise in this Lease or in the Agreement, the provisions of the Agreement apply to this Lease. Any termination or non-renewal of the Agreement, the Franchise and Franchise Relationship will automatically operate to terminate this Lease.

10.2    <u>Definitions; Construction</u>.

    (a)    Terms used in this Lease have the meaning indicated in this Lease or the Agreement.

    (b)    Unless expressly provided otherwise, any determination made by ExxonMobil under this Lease will be in ExxonMobil's sole discretion when acting in good faith and in the normal course of business.

    (c)    All consents or approvals on behalf of ExxonMobil under this Lease must be by an authorized representative of ExxonMobil.

    (d)    Unless indicated as a reference to provisions of the Agreement, references in this Lease to Sections and Articles are to those contained in this Lease.

10.3    <u>Time of Essence</u>. Time is of the essence in the performance of Franchise Dealer's obligations (including payment of Rent), and the exercise of Franchise Dealer's rights, under this Lease.

I acknowledge the receipt and applicability
of these CODO Lease Provisions:

RISING MICRO LLC

**CODO LEASE SCHEDULE**
**TO**
**CODO LEASE PROVISIONS**
**OF PMPA FRANCHISE AGREEMNT**

This CODO Lease Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil"), and **RISING MICRO LLC, 950 S CAPITOL STREET S E, WASHINGTON, DC 20003** ("Franchise Dealer") with a beginning on **February 01, 2004** (the "Effective Date").

Pursuant to Section 1.1 of the CODO Lease Provisions to the PMPA Franchise Agreement, dated **OCT 29 -** , 20**03** the Marketing Premises leased by ExxonMobil to Dealer include the improvements and equipment listed on the attached or below, for which Dealer acknowledges receipt. DEALER ACCEPTS THE IMPROVEMENTS AND EQUIPMENT IN THEIR PRESENT CONDITION, AS IS, WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THIER CONDITION OR FITNESS FOR ANY PURPOSE.

| Quantity | Item Description |
|---|---|
| 1 | ALARM SYSTEM |
| 1 | CAR WASH UNIT TUNNEL |
| 1 | COMPRESSOR AIR |
| 1 | DISPENSER ELECTRONIC |
| 5 | DISPENSER ELECTRONIC |
| 1 | DISPENSER MECHANICAL |
| 1 | DISPENSER MECHANICAL |
| 2 | DISPENSOR-G/SITE-VERIFON |
| 1 | DRAINAGE SYSTEM |
| 1 | FURNITURE-OFFICE |
| 1 | MISC ENVIRONMENTAL EQUIP |
| 1 | MODULAR BLDG CONVENIENCE |
| 1 | MODULAR CANOPY |
| 6 | PUMP ISLAND |
| 1 | SAFE FREE STANDING |
| 3 | SIGN ANCILLARY |
| 2 | SIGN BULLETIN BOARD PRIC |
| 2 | SIGN POLE |
| 2 | SIGN-MAJOR ID |
| 1 | TANK MONITORING SYSTEM |
| 1 | TANKS 10000 GAL |
| 4 | TANKS 8000 GAL |
| 2 | VACUUM CLEANER ISLAND TY |
| 6 | VAPOR RECOVERY STAGE 2 R |

I acknowledge the receipt and applicability of this CODO Lease Schedule:

**RISING MICRO LLC**

XOM_OGLLEASE.htm

**MAINTENANCE ADJUSTMENT SCHEDULE**
**TO**
**THE CODO LEASE PROVISIONS**
**OF THE PMPA FRANCHISE AGREEMENT**

This Maintenance Adjustment Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil"), and RISING MICRO LLC , 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 ("Franchise Dealer") with a Term beginning on FEBRUARY 1, 2004 (the "Effective Date").

Pursuant to Section 4.4(b) of the CODO Lease Provisions to the PMPA Franchise Agreement, the amount of Franchise Dealer's maintenance adjustment is set forth below.

| | | | |
|---|---|---|---|
| **STATION #:** | 25381 | **BUSINESS UNIT:** | 54 |
| **DEALER NAME:** | RISING MICRO LLC | | |
| **STATION ADDRESS:** | 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 | | |
| **ANNUAL MAINTENANCE ADJUSTMENT:** | $3,696.00 | | |

| MONTH PAYABLE | MAINTENANCE ADJUSTMENT AMOUNT |
|---|---|
| JULY, 2004 | $1,848.00 |
| JANUARY, 2005 | $1,848.00 |
| JULY, 2005 | $1,848.00 |
| JANUARY, 2006 | $1,848.00 |
| JULY, 2006 | $1,848.00 |
| JANUARY, 2007 | $1,848.00 |

EXXONMOBIL MAY DISCONTINUE OR ADJUST THE MAINTENANCE ADJUSTMENT IN ACCORDANCE WITH THE CODO LEASE PROVISIONS.

ExxonMobil will not notify dealer in cases where the maintenance adjustment is increased.

I acknowledge the receipt and applicability of this maintenance adjustment Schedule:



_____
RISING MICRO LLC

**MAINTENANCE SCHEDULE**
**TO**
**THE CODO LEASE PROVISIONS**
**OF THE PMPA FRANCHISE AGREEMENT**

LOC: 54 - 25381

**Repair/Replacement Responsibility and Discretionary/Non-discretionary Guidelines for Service Station Maintenance**

This Maintenance Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corportation ("ExxonMobil") and RISING MICRO LLC , 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 ("Franchise Dealer") with a Term beginning on FEBRUARY 1, 2004 (the "Effective Date").

Pursuant to Section 4.1 of the CODO Lease Provisions to the PMPA Franchise Agreement, dated *OCT 29 - 2003* the allocation of maintenance obligations is as follows:

Legend:

D       Dealer responsibility
EM      ExxonMobil responsibility
EM*     Joint responsibility. ExxonMobil is responsible for 90% of the cost of the work scope and the Dealer for a 10% deductible. The dealer may incur a maximum of $1,000 in deductible payments for any given calendar year.
MCC     Call Maintenance Call Center
POS     Call Houston POS Help Desk

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| **I. BUILDING, CANOPY, AND CAR WASH** | | | | |
| **A. STRUCTURE** | | | | |
| Cabinets | D | D | | |
| Canopy | EM | EM | MCC | 1 |
| | | | | 2 |
| Doors | | | | |
| Overhead | D | EM* | MCC | |
| Walkthrough | D | D | | |
| Electrical | | | | |
| Above ground (incl. replace. of int./ext. bulbs & ballasts) | D | D | | |
| Below ground (req. excavation) | EM | EM | MCC | |
| Panels/upgrades | D | EM or D | MCC | 3 |
| Extermination | (Dealer is responsible for extermination) | | | 1 |
| Floor tile and walk-off mats | D | D | | |
| Glass | D | D | | |
| Gutters & downspouts, bldg. (incl. clean-outs) | D | D | | |
| Locks (incl. manual and electric on all doors) | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Painting & washing | D | D | | 4 |
| Pass-through drawer | D | D | | |
| Plumbing | | | | |
|     Backflow devices (incl. certif.) | D | D | | |
|     Fixtures | D | D | | |
|     Sink, toilets, urinals, faucets, stoppages of faucets, flush mechanisms, floats, valves, etc. | | | | |
|     Floor drains (Dlr. resp. for clean-outs) | EM | EM | MCC | |
|     Water Piping | | | | |
|         Above ground | D | D | | |
|         Below ground (req. excavation) | EM | EM | MCC | |
| Restroom exhaust fans | D | D | | |
| Roofs | D | EM* | MCC | |
| Sewer system | | | | |
|     Holding tanks (Dlr. resp. for pump-outs) | EM | EM | MCC | |
|     Main sewer line (Dlr. resp. for blockages) | EM | EM | MCC | |
|     Septic System (Dlr. resp. for pump-outs) | EM | EM | MCC | |
| Shelving | D | D | | |
| Walls | | | | |
|     Non-structural repairs | D | D | | |
|     Structural repairs | EM | EM | MCC | |
| Window frames | D | D | | |
| B. EQUIPMENT | | | | |
|     Air conditioner | | | | |
|         Unit/condenser | D | EM* | MCC | |
|         Ducts | D | D | | |
|     Car vacuum (car wash and bay) | D | D | | |
|     Car wash equipment | D | D | | |
|     Car wash reclaim pits (Dlr. resp. for clean-outs) | EM | EM | MCC | |
|     Cigarette intrusion detectors | D | D | | |
|     Cigarette racks (incl. installation) | D | D | | |
|     Fire extinguishers (incl. recharging & inspec.) | D | D | | |
|     Fire suppression systems (Dlr. resp. for inspec.) | D | EM | MCC | |
|     Furnace, oil tanks, heaters, heat pumps (Dlr. resp. for filter replacements) | D | EM* | MCC | |
|         Ducts | D | D | | |
|     Lockbox | D | D | | |
|     Refrigeration equipment | | | | |
|         Chest freezer, reach-in cooler | | | | |
|             ExxonMobil owned | D | EM | MCC | |
|             Dealer owned | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Ice maker and ice dispenser | D | D | | |
| Walk-in cooler/condenser | D | EM* | | |
| Restroom furnishings | D | D | | |
| Coat hooks, mirrors, shelves, soap dispensers, toilet tissue dispensers, towel dispensers, etc | | | | |
| Safes and autobanks (incl. recombinations and lock changes) | D | D | | |
| Store accessories | D | D | | |
| Coffee makers, juice and soda dispensers, cup dispensers, ice dispensers, microwaves, etc. | | | | |
| Snackshop/Bay Planning | D | D | | |
| Customer record desk, lubritory backwall, overhead tire racks, salesroom backwall and module, stools, utility room shelving, etc. | | | | |
| Waste baskets | D | D | | |
| Water cooler/fountain | D | D | | |
| Water heater | D | D | | |
| **II. SERVICE & DISPENSING EQUIPMENT** | | | | |
| Air compressor | D | EM | MCC | |
| Air Piping | EM | EM | MCC | |
| Above Ground | D | D | | |
| Below Ground (Req. Excavation) | EM | EM | MCC | |
| Air/water tower and islanders (incl. hoses, chucks, nozzles, and bibs) | D | D | | |
| Cash register/console (combination unit)/printer | D | D | | |
| Console (separate unit) | EM | EM | MCC | |
| Credit card imprinter | D | D | | |
| Dispensers | | | | |
| Round/electric/MPD (incl. filter replacement) | EM | EM | MCC | |
| CATS/CRINDS | EM | EM | POS | 5 |
| Hoses, nozzles, swivels, retractors, breakaway cables, and price signs required by law | D | D | | |
| Calibrations | EM | EM | MCC | |
| Express Lube drain with articulating arm (not portable) and repl. of funnel, quart oil cans, and ATF can opener | D | D | | |
| Intercoms (self-serve) | D | EM | MCC | |
| Leak detectors | EM | EM | MCC | |
| Leak monitoring and secondary containment systems | EM | EM | MCC | |
| Lifts (Dlr. resp. for maint./repl. of oil) | D | EM | MCC | 6 |
| Lube equipment | D | D | | |
| Piping in front of walls (visible) | D | D | | |
| Piping behind walls | EM | EM | MCC | |
| Monitoring wells | EM | EM | MCC | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| POS terminal | EM | EM | POS | 5 |
| Submersible pumps | EM | EM | MCC | |
| Sump and grease traps (Dlr. resp. for clean-outs) | EM | EM | MCC | |
| Tanks: product, waste oil, and fuel oil | | EM | MCC | |
|    Fill boxes (incl. covers, caps, tags, painting) | EM | EM | MCC | |
|    Fill locks | D | D | | |
|    Overfill containment | EM | EM | MCC | |
|    Piping (lines) | EM | EM | MCC | |
|    Product switch (called in by District to correct imbalance problem) | | | MCC | |
|    Underground storage tanks | EM | EM | MCC | |
|    Test tanks/lines | | | MCC | |
|    Water/sludge pump out | | | MCC | |
| Waste oil and product tank gauge sticks, and water paste | D | D | | |
| Water cans or buckets | D | D | | |
| Work benches, gondolas, and desks | D | D | | |
| **III. SIGNAGE** | | | | |
|    A. ID signs (up to 25 feet off the ground) | D | EM | MCC | 7 |
|    Hi-rise signs (over 25 feet off the ground) | EM | EM | MCC | |
|    B. Dealer-owned signs (Price, snaplock, service, merchandise, IMU, POS, stamp and restroom signs, dealer name plates) | D | D | | |
|    C. ExxonMobil-owned signs | | | | 7 |
|       Building/canopy legends, pegasus discs, IDU's | D | EM | MCC | |
|       Decals and no smoking signs | D | D | | |
| **IV. ISLAND AND YARD** | | | | |
|    Air piping | | | | |
|       Above ground | D | D | | |
|       Below ground (req. excavation) | EM | EM | MCC | |
|    Asphalt (Dlr. resp. for sealcoating) | | | | |
|       Potholes | D | | | |
|       Repaving/skin coat | | EM | MCC | |
|    Concrete | | | | |
|       Patching | D | | | |
|       Island/drive mat replacement | | EM | MCC | |
|    Driveway signal system and hoses | D | D | | |
|    Electrical (Area light fixtures and poles, disc island lights, low level lights, other light fixtures, canopy uplights and downlights) | | | | 8 |
|       Above ground | D | EM | MCC | |
|       Below ground (req. excavation) | EM | EM | MCC | |
|    Fence | D | D | | |
|    Landscaping and planting | D | D | | |
|    Security equipment (cameras, mirrors, etc.) | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Sprinklers (incl. winterizing) | D | D | | |
| Tire racks, portable | D | D | | |
| Water piping | | | | |
|    Above ground (incl. faucets and bibs) | D | D | | |
|    Below ground | EM | EM | MCC | |
| Water well | D | EM | MCC | |
| Yard drain (Dlr. resp. for clean-outs) | EM | EM | MCC | |
| **V. MISCELLANEOUS** | | | | |
|    Divestments | EM | EM | MCC | |
|    Environmental | | | | |
|       Spills, leaks, clean up, make safe, product recovery | EM | EM | MCC | |
|       Vapor recovery piping system | EM | EM | MCC | |

I acknowledge the receipt and applicability of this Maintenance Schedule:

_____

RISING MICRO LLC

1 Dealer is responsible for preventative maintenance including, but not limited to, gutter/drain clean-outs, panel replacement and securing, replacement of missing screws, and caulking. Dealer is responsible for notifying ExxonMobil of excessive pigeon waste. ExxonMobil is responsible for removal of pigeon waste.

2 Dealer is responsible for notifying TM if a security enclosure or a walk-through door involving bullet-resistant glass needs replacement. The Dealer is also responsible for the replacement of weatherstripping on overhead and walk-through doors.

3 Upgrades to the electrical service and replacement of existing services will fall into the following schedule of responsibility:

1) Upgrades to existing services should be performed with building/configuration modifications.

a) ExxonMobil is responsible for upgrading the service at stations where ExxonMobil performed a capital project and failed to update the service accordingly.

b) If the need for upgrade is the result of the dealer/sal-op manager having increased the electrical demands at the location, the dealer/sal-op station is responsible for updating the service.

2) Unusual circumstances will be investigated with ExxonMobil making the final decision.

3) ExxonMobil is responsible for replacing worn out electrical services.

4 ExxonMobil is responsible for painting canopy if and only if canopy cannot be power washed. Canopy painting is discretionary maintenance and subject to District Approval after power washing has been attempted.

5 Call Houston POS Help Desk 800-231-1122 for software questions/problems.

6 ExxonMobil is responsible for the purchase and installation of a single post semi-hydraulic lift. The Dealer may have a dual-post lift installed, but will pay the incremental cost of installing the dual-post instead of the single-post lift. The Dealer may also purchase and install an above-ground lift; ExxonMobil would be responsible for the removal of the existing in-ground lift.

7 Dealer is responsible for the resecuring and relamping of all signs, the pinning of a rotating sign, and the replacement of lamps and ballasts in ID signs, price signs, pegasus discs, and legends. ExxonMobil is responsible for the replacement of bulbs, ballasts and fixtures in Hi-rise ID signs.

8 Dealer is responsible for replacement of lamps and ballasts, and ExxonMobil is responsible for replacement of light fixtures and poles due to normal wear and tear.

**MAINTENANCE AND INFORMATION SERVICES AGREEMENT**
**For Electronic Point of Sale Terminal and Related Equipment**

THIS AGREEMENT DATED **OCT 29, 2003** between ExxonMobil Oil Corporation ("ExxonMobil") having an office at 3225 Gallows Road, Fairfax, Virginia 22037, and RISING MICRO LLC ("System User") having a place of business at 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000 ("Marketing Premises").

**ARTICLE I-DEFINITIONS**

The following terms, when capitalized in this Agreement, have the meanings set forth below:

1.1 **"Effective Date"** means the date of this Agreement.

1.2 **"Equipment"** includes the Point-of-Sale ("POS") Terminals, Electronic Cash Registers ("ECRS"), Customer Activated Terminals ("CATS") and Hand Activated Terminals ("HATS") set forth in Attachment A of this Agreement.

1.3 **"POS Program"** means ExxonMobil's proprietary system designed to process credit, debit and prepaid cash transactions.

**ARTICLE II-PARTICIPATION**

2.1 **Acknowledgment**. System User acknowledges that a ExxonMobil Representative has fully described to System User ExxonMobil's POS Program, which will enable System User to electronically authorize and process credit, debit and prepaid card transactions under ExxonMobil's Retail Credit Card Program in accordance with ExxonMobil's Credit Card Instructions as modified from time to time ("Instructions"). As a participant in the POS Program, System User understands that System User must comply with these Instructions.

2.2 **Discontinuance of POS Program**. System User agrees that ExxonMobil may modify, amend or discontinue its POS Program or any portion of the POS Program at ExxonMobil's sole discretion.

2.3 **Warranties**. ExxonMobil does not warrant or guarantee the Equipment.

**ARTICLE III-MAINTENANCE, INSTALLATION & TRAINING**

3.1 **Maintained Equipment-Lease Locations**. ExxonMobil agrees to maintain the ExxonMobil authorized Equipment set forth in Attachment A for use by System User to access the ExxonMobil POS Program at the Marketing Premises. System User shall pay for the services at rate set forth in Attachment A. System User agrees that Attachment A may be amended from time to time by ExxonMobil.

3.2 **Maintained Equipment- Non-Lease Location**. For locations where ExxonMobil does not own or have a long term lease interest in the marketing premises, System User agrees to maintain the Equipment if System User furnishes ExxonMobil with written evidence on or before the Effective Date that System User or its designated contractor is certified and qualified by the original Equipment Vendor to perform such service during the term of this Agreement. System User shall provide such evidence to ExxonMobil on the Effective Date of this Agreement. If System User fails to furnish the evidence on or before the Effective Date, ExxonMobil shall perform the maintenance services and System User shall pay for such services at the rates set forth in Section 3.3.

3.3 **Maintenance and Information Services**. As payment for ExxonMobil providing satellite and telephone line access and maintaining the Equipment, System User agrees to pay ExxonMobil monthly Maintenance and Information Services fees for the Equipment as set forth in Attachment A. All fees and charges are payable monthly and in advance. ExxonMobil may, at any time during the term of this Agreement, increase Maintenance and Information Services Fees by giving System User not less than 30 days' prior written notice. If ExxonMobil exercises its option to increase fees, System User may terminate this Agreement by providing ExxonMobil with written notice prior to the effective date of the increase in fees.

3.4    **ExxonMobil's Obligations**. ExxonMobil will repair and maintain all Equipment covered by this Agreement. ExxonMobil's maintenance and repair obligations do not include the cost of providing or paying for appropriate electric current. ExxonMobil's repair and maintenance obligations arise only when a repair is required as a result of ordinary wear and tear or defects in material or workmanship and if System User notifies ExxonMobil that the Equipment is not in good operating condition. Any repairs or maintenance, which are determined in ExxonMobil's sole discretion, arising as the result of (i) damage by accident, negligence, abuse or misuse; or (ii) operation for which the Equipment was not intended; or (iii) any alteration or modification of the dedicated power source, telephone connecting line, or satellite equipment; or (iv) acts of God, fire, explosion, strike, serious and adverse weather conditions, civil or public disturbance, riots, governmental regulations or requirements shall be at the expense of System User.

3.5    **System User's Specific Maintenance Obligations**. System User agrees to replace at its expense and as required, Terminal ribbons, batteries, battery chargers and paper except for CO-65 forms, and System user agrees to pay for recurring local electric charges. System User shall allow ExxonMobil to make such changes in both User owned and ExxonMobil owned Equipment, and software as ExxonMobil deems necessary.

3.6    **Installation Obligations and Telephone Line and Satellite Expenses**.

    A.    **ExxonMobil-Owned Lease Line or Satellite POS Equipment**. ExxonMobil will arrange for the installation and connection of the required telephone line or satellite equipment to the Equipment located at the marketing Premises, and ensure that the Equipment is in operable condition. ExxonMobil will pay for installation of POS Terminal(s) and for site preparation, including an appropriate dedicated A/C power outlet at locations where ExxonMobil owns or has a long term Lease interest in the real property. System User shall bear the expense for site preparation at all other locations. ExxonMobil will pay for recurring charges for the telephone or satellite line connecting the Equipment to ExxonMobil's system.

    B.    **ExxonMobil-Owned Auto-dial Equipment**. System User agrees to arrange for and pay the costs of installation of the necessary telephone line. ExxonMobil will connect the telephone lines to the Equipment located at the Marketing Premises and ensure the Equipment is in operable condition. ExxonMobil will pay for site preparation, including an appropriate dedicated A/C power outlet at locations where ExxonMobil owns or has a long term Lease interest in the real property. System User shall bear the expense for site preparation at all other locations. System User will pay for the recurring local telephone line expense.

    C.    **System User Owned POS Equipment**. ExxonMobil will arrange for installation of the necessary telephone line or satellite equipment and connect the Terminal(s) to the lines. System User will pay all installation costs of the POS equipment. ExxonMobil will pay for site preparation costs at those locations where ExxonMobil has an ownership or long term Lease interest in the real property or improvements. System User will pay all site preparation expenses at any other location. ExxonMobil will pay for recurring charges for the telephone line or satellite connecting the Terminal(s). Only System User owned equipment which has been previously approved by ExxonMobil may be connected to and access the ExxonMobil System/Network. System User will be responsible for acquiring any necessary PIN Pads.

3.7    **Training**. Prior to installation of the POS equipment, System User will receive operating instructions from ExxonMobil and shall be required to complete all necessary training programs approved by ExxonMobil. System User pays for all lodging, meals and transportation expenses to and from the training site. ExxonMobil will maintain a "Help Desk" to answer any day-to-day questions regarding the operation of the POS system.

## ARTICLE IV-SYSTEM USER'S GENERAL OBLIGATIONS

4.1    **General Obligations**. With respect to the Equipment, System User shall (a) make no additions or alterations; (b) make no movement or rearrangement of the Terminal(s); (c) comply with all applicable credit/debit card policies covering use of the Terminal(s); (d) comply with all laws and regulations applicable to the use of the Terminal(s); (e) do or permit to be done nothing prejudicial to any title or ownership interest ExxonMobil may have in the Terminal(s) or equipment; (f) not remove the ExxonMobil owned Terminal(s) or deliver the Terminal(s) to anyone but ExxonMobil or ExxonMobil's representative; (g) not sell a System User owned Terminal(s) without first removing and returning to ExxonMobil any ExxonMobil owned software contained in said Terminal(s); and (h) exercise the degree of care necessary to prevent damage to the terminals and other related equipment; (i) grant access to the premises to allow ExxonMobil authorized maintenance representatives to perform their obligations under this agreement

4.2    **Indemnity**. System User agrees to indemnify and hold ExxonMobil harmless against all losses and claims (including those of the parties, their agents and employees) for death, personal injury or property damage arising out of the use of or conditions of the Terminal(s) and related equipment.

## ARTICLE V-TERM AND TERMINATION

5.1 **Term**. The term of this Agreement shall begin on the later of FEBRUARY 1, 2004, or the date the POS equipment is installed and operational and shall end on JANUARY 31, 2007, unless terminated earlier as provided in this Agreement.

5.2 **Termination by System User**. Notwithstanding Section 5.1 of this Article, System User may terminate this Agreement at any time provided that System User gives ExxonMobil 90 days' advance written Notice of its desire to terminate this Agreement.

5.3 **Termination by ExxonMobil**. Notwithstanding Section 5.1 of this Article, this Agreement shall automatically terminate (a) on the Effective Date of any termination or nonrenewal of any PMPA Motor Fuels Franchise Agreement, or PMPA Distributor Franchise Agreement, or PMPA Franchise Agreement between the parties; (b) in the event System User elects not to participate in the ExxonMobil Credit/Debit Card Program at the Marketing Premises; (c) in the event that System User's participation in the ExxonMobil Credit/Debit Card Program is terminated by ExxonMobil; (d) in the event that ExxonMobil withdraws from electronic point-of-sale credit/debit card processing in System User's area; or (e) ExxonMobil discontinues the POS Program as outlined herein. In addition, ExxonMobil reserves the right to terminate this Agreement, in the event of any default by System User or failure of System User to meet any performance criteria established by ExxonMobil from time to time or for any other reason if ExxonMobil gives System User 90 days' advance written notice of the termination. In the event of termination of the Agreement, ExxonMobil may terminate System User's access to the POS network system. ExxonMobil also reserves the right to terminate maintenance on any POS hardware or software if it or any part(s) become unsupported by ExxonMobil's maintenance providers. At which time, ExxonMobil will give System User 90 days advance notice to either contract for their own maintenance service, replace the equipment with approved hardware or software, or remove the equipment from the POS network system. On the Effective Date of any termination of the Agreement, ExxonMobil may also remove ExxonMobil owned Terminal(s), equipment and software without liability and without obligation for any restoration of the Marketing Premises or damage incidental to such removal.

5.4 **Performance Criteria**. Notwithstanding any other provision in this Agreement, ExxonMobil reserves the right to remove any ExxonMobil owned Terminal(s), at any time and cancel this Agreement under the terms of Section 5.3 in the event that the System User processes fewer than the minimum credit and debit transaction volumes per dealer equipment via the POS system in any given calendar month during the Term of this Agreement as follows:

| | |
|---|---|
| CATS | 1200 transactions per month |
| Other lease line or satellite terminals | 1000 transactions per month |
| Auto-dial terminals | 400 transactions per month |

or in the event that the System User processes fewer than 80% of all credit and debit card transactions with said Terminal(s) in any given calendar month during the Term of this Agreement.

## ARTICLE VI-MISCELLANEOUS

6.1 **Replacement of ExxonMobil-owned Equipment**. ExxonMobil reserves the right to remove ExxonMobil owned POS Terminal(s) at any time and to replace same with similar or different equipment

6.2 **Force Majeure**. ExxonMobil shall not be responsible for or liable to system User for any loss or damage due to down-time of the Terminal(s) and related equipment because of repair or maintenance or due to failure of connecting telephone lines or satellite to ExxonMobil Oil Corporation's equipment.

6.3 **Assignments**. Any assignment of this Agreement without ExxonMobil's express written consent shall be void.

6.4 **Notices**. All notices shall be in writing and shall be delivered personally (to an officer or manager in ExxonMobil) or sent by registered or certified mail to the parties at the addresses specified in the paragraph immediately preceding Article I of this Agreement. Notice by mail shall be deemed given on the date such notice is deposited in the United States mail, postage prepaid and properly addressed. This instrument contains the entire agreement covering the subject matter and supersedes any and all prior understandings or dealings between the parties relative to this subject matter.

6.5 **Amendments**. No modification of the Agreement shall be binding on ExxonMobil unless in writing and signed by ExxonMobil's Business Unit Manager or such authorized representative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

WITNESS:

ExxonMobil Oil Corporation

By: _____

RISING MICRO LLC
SYSTEM USER:

By: _____

**ATTACHMENT A**
**POS MONTHLY FEE SCHEDULE**

| *Single Cash Register (Integrated)* | *Dealer Fees Monthly ($)* |
|---|---|
| POS Terminal Maintenance | $110 |
| Outside Speedpass (per MPD) | $5 |
| Inside Speedpass (per indoor unit) | $5 |
| Pay at the Pump (per MPD) | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Dual Cash Register (Integrated)* | *Dealer Fees Monthly ($)* |
|---|---|
| POS Terminal Maintenance | $160 |
| Outside Speedpass (per MPD) | $5 |
| Inside Speedpass (per indoor unit) | $5 |
| Pay at the Pump (per MPD) | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Low End – Stand Alone Credit Card Terminal (DataCard 840 with VSAT Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Low End – Stand Alone Credit Card Terminal (DataCard 840 with Dial-up Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (dial-up network access) | $70 |

| *Low End – Stand Alone Credit Card Terminal (DataCard 640 with Dial-up Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (dial-up / network access) | $70 |

## ExxonMobil's Multi-Unit Program Policy:

ExxonMobil has developed the Grow With ExxonMobil program as a tool to help build the strong and highly motivated franchise dealer system we need to meet competitive conditions and the needs of our customers. This program identifies qualified existing Exxon and Mobil franchise dealers interested in operating additional Exxon or Mobil CODO service stations. The following applies to existing Exxon/Mobil DOSS and CODO franchise dealers who seek to obtain an Exxon/Mobil CODO service station (the "additional CODO station").

### Criteria

To be eligible as a candidate for the additional CODO station and subject to applicable law, the candidate is required to meet each of the following criteria (the "Multi-Unit Criteria"):

- The candidate has the financial capability to operate the additional CODO station. Dealer will need to meet, among other criteria, ExxonMobil's current working capital and cash flow criteria and to have been in good financial standing with Mobil and other creditors for at least 18 months prior to the grant of the additional franchise.
- If a candidate operates more than two service stations, the candidate has or will employ trained and qualified service station managers at each service station.
- The candidate has the franchise business experience and management competencies to manage the additional CODO station.
- The candidate is in full compliance with all requirements and obligations under existing franchise agreements.
- The candidate consistently meets or exceeds annual gasoline volume objectives for each service station.
- All Exxon/Mobil service stations operated by the candidate meet an acceptable rating, as determined by ExxonMobil, for standards under ExxonMobil's current National Standards Handbook.
- The candidates business plan for all service stations meet ExxonMobil's marketing and property development strategies for the franchise system and the respective sites and marketing areas.
- The candidate continues to meet ExxonMobil's current franchise-dealer criteria requirements.

### Multi-Unit Pool

Franchise dealers interested in an additional CODO station will be allowed to preliminarily qualify under the Multi-Unit Criteria. Preliminarily qualified candidates will be placed in a pool for possible selection as franchise opportunities arise. If placed in a pool, a candidate will need to continue to meet the Multi-Unit Criteria and additional information may be required from time to time to continue eligibility.

### Competitive Business

In granting franchises for additional CODO stations:

- The existence of a competitive business interest will be a major factor in selecting multi-unit candidates for an additional CODO station.
- Existing DOSS dealer multi-unit candidates that are exclusively Exxon/Mobil branded or have positioned Exxon/Mobil as their number 1 brand will be preferred over similarly qualified candidates who have positioned Exxon/Mobil lower in their hierarchy.
- In determining eligibility under the Multi-Unit Criteria, all direct and indirect interests of a

XOM_MultiUnitPolicy.htm

franchise dealer in Mobil and/or competitive brand service stations will be considered.

**Other Limitations**

- Franchise dealers who do not meet the Multi-Unit Criteria will not be given the opportunity to operate an additional CODO station. Franchise dealers grandfathered under any previous policy will continue to be grandfathered; however, only existing service stations are grandfathered and the franchise dealer may not replace or add additional service stations without qualifying under this policy.
- ExxonMobil reserves the right to limit the number of additional CODO stations for which franchise dealers may qualify.

ExxonMobil may change this policy as may be appropriate to address changes in market conditions or ExxonMobil's marketing strategies. This policy is not intended to give any franchise dealer the right to obtain an additional franchise, which ExxonMobil reserves the right to grant in its sole discretion. ExxonMobil also reserves the right to require the franchise dealer to provide additional information not contained or provided for in the Multi-Unit Dealer Application.

Dear Exxon and Mobil Retailer:

We wanted to make you aware of some changes between your existing Exhibit B/Schedule B-1 in your current lease or Franchise agreement and the new Schedule B-1 that you will be adhering to in your new ExxonMobil agreement.  Listed below are the differences between the Heritage Exxon Exhibit B and the new ExxonMobil Schedule B-1:

| Specification | Exxon Exhibit B | XOM B-1* |
|---|---|---|
| Canopy painting, excluding columns | Dealer | XOM |
| Fence replacement | XOM | Dealer |
| Overhead doors | XOM | 90/10 |
| Carwash heaters | XOM | 90/10 |
| MPD filter changes | Dealer | XOM |
| MPD meter calibrations | Dealer | XOM |
| Asphalt skincoats | Dealer | XOM |
| Concrete replacement > 10'x10' | Dealer | XOM |
| Total HVAC replacements | XOM | 90/10 |
| Piping in walls | Dealer | XOM |
| Pigeon waste | Dealer | XOM |
| Walk-in-cooler condenser | Dealer | 90/10 |
| Security replacements | XOM | Dealer |
| Tidel drop safes replacement | XOM | Dealer |
| Roof replacement | XOM | 90/10 |

If your are a Heritage Mobil retailer, the following points summarize the differences between your existing Schedule B-1 and the new ExxonMobil Schedule B-1:
- Piping (non exposed) inside walls is now XOM repsonsibility

Please note that these changes will not take place until you are under the new ExxonMobil agreement.  If you have any questions, please feel free to contact your territory manager.

Sincerely,


Michael Roman, Dealer Franchise Group


Enclosure

**TRANSFER AND SURVIVORSHIP POLICY**

Preamble

This policy is adopted pursuant to Articles XII and XIII of ExxonMobil's Fuels Franchise dealer PMPA Franchise Agreements (the "Franchise Agreement") and applies to ExxonMobil dealers and distributors governed by those agreements ("Franchisees"). Consistent with ExxonMobil's requirements and developments in the law and in the relevant business environment, this policy is intended to provide additional flexibility to individual Franchisees and the owners of Franchisee business organizations to support estate and business-continuity planning.

A. Designation of Successors.

   1.   This Paragraph A is adopted in accordance with Section 12.5(c) of the Franchise Agreements.

   2.   If a Franchisee is an individual, the Franchisee may designate, as the successor or alternate successor upon the Franchisee's death under Section 12.5(a), an individual who is qualified and meets the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors. Subject to the following provisions, a designated successor of an individual Franchisee need not be a spouse or adult child.

   3.   Subject to minimum ownership requirements applicable to CODO Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may designate, as a successor or an alternate successor upon the death of such individual under Section 12.5(b), one or more individuals who meet the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors and, if a successor is to become the Key Individual, meets the qualifications and conditions and requirements provided or contemplated by the Franchise Agreement applicable to a Key Individual. Except with respect to CODO Franchisees to which minimum ownership requirements apply, 51% ownership interest in a non-individual Franchisee will not be a condition to a Key Individual's designation of a successor or to a transfer to that designated successor under Sections 12.5(b) and 13.2 (b) of the Franchise Agreement. Subject to the following provisions, a designated successor of a Key Individual owning an Interest in a non-individual Franchisee need not be a spouse or adult child under Sections 12.5 (b) and 13.2 (b).

   4.   As a condition to any Transfer to a designated successor, an individual Franchisee, Key Individual or other Transferor must comply with all applicable laws governing or affecting survivorship or succession. Upon designating a successor, an individual Franchisee, Key Individual or other Transfer must obtain all consents, assignments of rights, releases or waivers from any persons having rights or claims under such laws including, but not limited to, state community property and succession laws. An individual Franchisee, Key Individual or other Transferor must indemnify and defend ExxonMobil against any such rights or claims (and, upon ExxonMobil's request, must furnish ExxonMobil with a written indemnification agreement in form and substance specified by ExxonMobil) and, upon ExxonMobil's request, also must provide documentation sufficient in ExxonMobil's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained including, without limitation, providing an opinion of counsel acceptable to ExxonMobil.

   5.   Subject to Paragraph A.4 above and all conditions and requirements provided or contemplated by the Franchise Agreement and subject to prior written notice to ExxonMobil:

       (a)   an individual Franchisee may assign the Franchise Agreement during the Franchisee's lifetime to that individual properly designated as the Franchisee's successor under the preceding provisions of this Paragraph A; and

       (b)   subject to minimum ownership requirements applicable to CODO Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may transfer the Interest during their lifetime to that individual or those individuals properly designated as their successor or successors under the preceding provisions of this Paragraph A. Except with respect to CODO Franchisees to which minimum ownership requirements apply, the requirement in Section 12.2(d) of the Franchise Agreement that a Key Individual not transfer less than 51% ownership in a non-individual Franchisee will not apply.

6. A transferee, whether as a successor upon the death of any Franchisee, Key Individual or other Transferor or as a transferee under Paragraph A.5 above, must meet all conditions and requirements of this policy and all conditions and requirements provided or contemplated by the Franchise Agreement at the time of such succession or other Transfer. Such conditions and requirements include, among others, providing personal guarantees, demonstrating that the successor or other transferee meets all then required applicable Key Individual or Franchise Dealer qualifications, attending training and signing any applicable agreement or agreements. To be effective, all designations must be in writing on such forms as ExxonMobil may designate from time to time and must be furnished to the Contracts Services Supervisor, 436 Creamery Way, Suite 300 Exton, PA 19341, or such other person as ExxonMobil may indicate in writing from time to time.

B. <u>Transfers to Trusts.</u>

1. This Paragraph B is adopted in accordance with Section 12.5(c) of the Franchise Agreement and applies only to those Franchisees that are corporations.

2. An individual who owns shares in a corporate Franchisee may transfer those shares to a trust subject to the following:

    a. The trust must be established and maintained primarily for estate planning purposes.

    b. The Franchisee corporation must continue to meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, without limitation, those relating to the appointment of a qualified Key Individual acceptable to ExxonMobil.

    c. On behalf of the trust (but not in their personal capacities), its trustee or trustees (if more than one) must furnish ExxonMobil, and maintain in full force and effect, a continuing, unconditional guarantee in accordance with Article IV of the Franchise Agreement.

    d. If the trust is a revocable living trust, the grantor of the trust must be a trustee of the trust.

    e. If the shares are those of a Key Individual of a Franchisee subject to minimum ownership requirements applicable to CODO Franchisees, at least 51% of the Franchisee's shares must be held by one or more trusts, one of the trustees of each of which must be the Key Individual.

    f. Upon distribution of the shares to the trust's beneficiaries, the distribution must meet all conditions and requirements provided in or contemplated by the Franchise Agreement relating to transferees including, without limitation, meeting Key Individual ownership requirements applicable to CODO Franchisees and providing required guarantees.

    g. As a condition to transferring shares to a trust, the Transferor must comply with all applicable laws governing or affecting survivorship or succession and must obtain all consents, assignments of rights, releases or waivers from any person having rights or claims under such laws including, but not limited to, state community property and succession laws. The Key Individual or other Transferor must indemnify and defend ExxonMobil against any such rights or claims (and, upon request by ExxonMobil, must furnish ExxonMobil with a written indemnification agreement in form and substance specified by ExxonMobil) and, upon ExxonMobil's request, also must furnish ExxonMobil with documentation sufficient in ExxonMobil's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained, including, but not limited to, providing an opinion of counsel acceptable to ExxonMobil.

    h. Prior to any Transfer to a trust, the Franchisee must notify ExxonMobil in writing of the proposed transfer at the following address: Contract Services Supervisor, 436 Creamery way, Suite 300, Exton, PA 19341.

3. Subject to the conditions and requirements of Paragraph B.2. above, a Key Individual or other individual owning shares in a corporate Franchisee may designate a testamentary trust as a successor under Section 12.5 (b) of the Franchise Agreement.

4. Nothing contained in this policy is intended to allow any Franchisee to Transfer to a trust any Interest in a Franchise Agreement or in the franchise relationship established by such agreement.

C. <u>Employee Incentive Transfers.</u>

1. This Paragraph C applies to those Franchisees that are corporations.

2. Pursuant to a formal written employee incentive compensation plan of which the Franchisee has furnished ExxonMobil with a copy and subject to minimum ownership requirements applicable to CODO Franchisees, a corporate Franchisee may issue its shares to its employees, provided that the shares issued under such plan may not exceed in the aggregate 20% of the Franchisee's total outstanding shares.

D.  <u>General Provisions</u>.

1.  Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2.  Transfers pursuant to and complying with this policy and made for the purposes contemplated by this policy will not be subject to ExxonMobil's prior consent or its right of first refusal under the Franchise Agreement.

3.  This policy is effective April 1, 1998, and applies only to Franchisees under a Franchise 2000 or ExxonMobil's Fuels Franchise form Agreement. To take advantage of this policy, Franchisees under other Exxon or Mobil form agreements must enter into a ExxonMobil Fuels Franchise form Agreement.

4.  ExxonMobil may change this policy at any time. Any change to this policy will not invalidate Transfers of shares made in accordance with this policy prior to the change. ExxonMobil, however, may impose additional or different requirements or conditions applicable to shares of corporate Franchisees transferred to a trust under this policy.

## FORM OF ORGANIZATION POLICY

Preamble

This policy is adopted pursuant to Article IV of ExxonMobil's Fuels Franchise form dealer PMPA Franchise Agreements (the "Franchise Agreement") and applies to Exxon dealers governed by those agreements ("Franchisees"). It is intended to provide additional flexibility regarding the form and ownership of Franchisee business organizations consistent with ExxonMobil's requirements and developments in the law and in the relevant business environment.

A. LLC Policy.

    1.  This Paragraph A is adopted in accordance with Section 4.4(a)(ii) of the Franchise Agreement.

    2.  A dealer or distributor governed by a Franchise Agreement and meeting the requirements of this policy may take the form of a limited liability company ("LLC").

    3.  The LLC Franchisee must meet each of the following requirements:

        a.  must be validly organized and existing under one of the following: (i) the laws of the state in which the franchised service station is located, if a dealer; (ii) the laws of the state in which the Franchisee has its principal place of business, if a distributor; or (iii) the laws of another state, if such LLCs in that state are recognized, and the Franchisee has qualified to do business, under the laws of a state referred to in Paragraph 3.a.(i) or (ii).

        b.  must have a date of dissolution on or after the expiration date of the Franchise Agreement.

        c.  must provide ExxonMobil with a current copy of its Articles of Organization and its most recent annual state filing (or equivalent documentation acceptable to ExxonMobil) certified by the Secretary of State or other relevant authority of the state in which the LLC is organized. These documents must confirm the LLC's status consistent with the matters specified in Paragraphs 3.a. and b. above and must also demonstrate consistency with the following: (i) the person or persons signing the Franchise Agreement, representation letters and other documents on behalf of the Franchisee have the requisite authority to bind the Franchisee; and (ii) the Key Individual has the authority and responsibility required under the Franchise Agreement.

    4.  The Franchisee and its Key Individual and members must meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, among others, providing personal guarantees, representation letters and other documentation as ExxonMobil may specify.

    5.  This policy allowing LLC Franchisees applies only to Franchisees in those states with respect to which ExxonMobil has conducted a prior evaluation of the relevant statutes and prepared applicable administrative guidelines for reviewing LLC documentation and status. While all states in which ExxonMobil has franchise operations are expected eventually to be covered by this policy, initially, this policy applies to Franchisees in the states of California, Arizona, Massachusetts, Nevada, and Connecticut. Contact Services Supervisor, Room H-10, 436 Creamery Way, Suite 300, Exton, PA 19341, Should be consulted to obtain a current list of applicable states.

B. Key Individual Ownership Requirements for Multi-Unit Franchise Dealers.

    1.  This Paragraph B is adopted in accordance with Sections 4.3(a)(i) and 4.4(b)(i)(A) of the dealer Franchise Agreement.

    2.  If a Franchise Dealer has applied for and been qualified by ExxonMobil as a Multi-Unit Dealer under ExxonMobil's Multi-Unit Policy, the Key Individual for that Franchise Dealer will not be required to have any ownership interest in the Franchisee Dealer.

C. Guarantee Cap.

    1.  The liability to ExxonMobil of a person furnishing ExxonMobil with a written guarantee pursuant to Article IV of the Franchise Agreements for any single occurrence giving rise to private third party claims and related Losses will be limited to $5 million. This limit is subject to that person or the Franchisee having obtained and maintained in full force insurance that has minimum limits of $5 million per occurrence that meets the requirements of Article XI of the Franchise Agreement (including, but not limited to, naming ExxonMobil as an additional insured) and actually covers and provides compensation for such claims and related Losses up to that limit.

2. This limitation of liability does not apply to liability or other Losses other than those arising from private third party claims and, without limitation, expressly excludes: (a) any Losses that ExxonMobil or an Indemnitee may incur arising out of the Franchisee's or a guarantor's breach of the Franchise Agreement or a guarantee; (b) any Losses that ExxonMobil may suffer arising out of any tortious act or omission committed by a Franchisee, its employees, agents or contractors, or its guarantor against ExxonMobil or any Indemnitee; (c) any Losses of ExxonMobil or any Indemnitee related to damage to, or destruction or loss of, the property of ExxonMobil or an Indemnitee; or (d) any fines, penalties, clean-up costs, payments or liability to or assessed or ordered by any governmental authority. This limitation of liability also does not apply to any Losses resulting from the Franchisee's gross negligence or willful misconduct.

3. This Paragraph C does not apply to guarantees requested or required by ExxonMobil for purposes other than meeting the requirements of Article IV including, but not limited to, guarantees required by ExxonMobil as security for product or equipment purchases, Conversion Costs, Improvement Funds or ExxonMobil or third-party loans.

D. <u>General Provisions.</u>

1. Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2. This policy is effective April 1, 1998, and applies only to Franchisees under a ExxonMobil Fuels Franchise form PMPA Agreement. To take advantage of this policy, franchisees under other Exxon form agreements must enter into a ExxonMobil Fuels Franchise form Franchise Agreement.

3. ExxonMobil may change this policy at any time. Any changes to Paragraph A of this policy will not affect the status of any LLC Franchisee that enters into a PMPA franchise relationship with ExxonMobil in accordance with this policy prior to the change, except ExxonMobil may impose additional requirements or conditions relating to such LLC Franchisees.

## PURCHASE MONEY SECURITY AGREEMENT

This Security Agreement (hereinafter "Agreement") is made and entered into this **29 TH** day of **OCT** _____**2003**_____, by and between ExxonMobil Oil Corporation (hereinafter "SECURED PARTY"), a corporation organized under the laws of New York, having offices at 3225 Gallows Road, Fairfax, VA, 22037 and RISING MICRO LLC (hereinafter "DEBTOR") a Limited Liability Company organized under the laws of DC having offices at 950 S CAPITOL STREET S E , WASHINGTON , DC , 20003-0000.

### WITNESSETH:

WHEREAS, DEBTOR may from time to time desire to purchase goods described more particularly below from SECURED PARTY; and

WHEREAS, SECURED PARTY may from time to time desire to sell such products to DEBTOR according to the following terms and conditions;

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE ONE
### GRANT OF SECURITY INTEREST

1.1 DEBTOR hereby grants to SECURED PARTY a security interest under Article 9 of the Uniform Commercial Code in and to the following Collateral:

> all present and after-acquired inventory of ExxonMobil Oil Corporation products (including, but not limited to, oils, greases, lubricants, motor fuels, fuel oil, and gasoline), returned and repossessed inventory items and all accounts, chattel, paper, contract rights, documents, instruments and similar evidence of payment rights with respect to that inventory and all products and other proceeds thereof, (hereinafter "Collateral")

to secure:

(a) payment when due of the purchase price of the inventory items of the Collateral and interest, costs and expenses arising therefrom or related thereto; and

(b) performance of all of DEBTOR's obligations stated herein; and

(c) payment of all advance by and costs of SECURED PARTY in auditing, servicing and enforcing the debts and obligations of DEBTOR hereby secured and in preserving, handling, protecting, collecting, foreclosing, disposing and otherwise realizing on the Collateral.

1.2 It is the express intention of the DEBTOR that the continuing grant of this security interest remain as security for payment and performance of DEBTOR's obligations, whether now existing or hereinafter incurred by future advances, sales or otherwise.

**ARTICLE TWO**
**PERFECTION OF SECURITY INTEREST**

2.1 DEBTOR will, at the request of SECURED PARTY, make, execute and deliver all such additional and further financing statements, assignments and instruments as SECURED PARTY may require to perfect, continue, renew or more completely vest in and assure to SECURED PARTY its rights in or to the Collateral hereunder, and the proceeds thereof. DEBTOR will pay the cost of any such filings desired by SECURED PARTY.

2.2 DEBTOR shall make appropriate entries on its books and records disclosing SECURED PARTY's security interest in the Collateral.

**ARTICLE THREE**
**WARRANTIES**

3.1 DEBTOR represents and warrants that:

   (a) DEBTOR is now the owner of presently existing items of the Collateral and will be the owner of after-acquired and created items of the Collateral, and

   (b) the Collateral is now, and hereafter will be, free and clear of all liens and security interests of any nature whatsoever other than the security interest herein granted to SECURED PARTY and except for a security interest or interests previously granted to SECURED PARTY and

   (c) the inventory items of the Collateral are and, unless a written notice of change in location is given to SECURED PARTY, will be located only at the places of business shown on Exhibit A attached hereto, and

   (d) DEBTOR is duly organized and in good standing in the State of District of Columbiaand

   (e) DEBTOR's principal place of business will be at the above address and DEBTOR keeps all records relating to accounts only at such principal place of business, and

   (f) all information furnished to SECURED PARTY concerning DEBTOR or the Collateral will be true and correct in all material respects at the time furnished and will be supplemented as necessary so that it continues to be true and correct in all material respects, and

   (g) DEBTOR will promptly notify SECURED PARTY in writing of (I) any change in its name, identity or organizational structure; (II) any addition to, change in or discontinuance of its places of business as shown in Exhibit A; and (III) any change in the location of its principal place of business or of the office where it keeps its records relating to accounts, and

   (h) DEBTOR will not grant a security interest in the Collateral to any person without the prior written consent of SECURED PARTY, and

   (i) DEBTOR will not use or permit any person to use the collateral in a manner prohibited by law, or in violation of any contract of insurance, or in any manner inconsistent with this Agreement.

3.2 This Agreement, the security interest granted herein and the warranties, covenants and agreements made herein, shall bind DEBTOR and DEBTOR's successors and assigns and inure to the benefit of SECURED PARTY and its successors and assigns.

## ARTICLE FOUR
## INSURANCE AND TAXES

4.1   When so requested by SECURED PARTY, DEBTOR will procure and maintain, at no expense to SECURED PARTY, insurance satisfactory to SECURED PARTY on inventory items of the Collateral and affix to the policies loss payable clauses satisfactory to SECURED PARTY. DEBTOR shall provide proper evidence of such insurance to SECURED PARTY. In the event of failure to provide insurance as herein provided, SECURED PARTY may procure such insurance and DEBTOR shall pay to SECURED PARTY, on demand, the cost thereof.

4.2   DEBTOR will pay promptly when due all taxes and assessments upon the Collateral, except for taxes and assessments contested by DEBTOR in good faith by appropriate proceedings. At its option, SECURED PARTY may pay or discharge at any time any taxes, liens, security interests or other encumbrances levied or placed on the Collateral. SECURED PARTY shall pay for the maintenance and preservation of the Collateral if SECURED PARTY reasonably believes that such payment is necessary to preserve the value or priority of its security interest in the Collateral. Any costs SECURED PARTY incurs under this Section 4.2 shall be charged to DEBTOR and DEBTOR agrees to pay such costs.

## ARTICLE FIVE
## USE AND INSPECTION OF COLLATERAL

5.1   DEBTOR shall have the right to sell and use the inventory items of the Collateral in transactions which are in the ordinary course of DEBTOR's business for which adequate consideration is paid prior to DEBTOR's default under this Agreement.

5.2   DEBTOR will at all reasonable times allow SECURED PARTY, by or through its nominees, to examine, inspect and make extracts from DEBTOR's books and records and to inspect and verify the Collateral under reasonable procedures either directly with account debtors or by other methods. DEBTOR will furnish to SECURED PARTY at least once each calendar year and more often if reasonably requested by SECURED PARTY its balance sheet and statement of income and expenses prepared in accordance with generally accepted accounting principles that are consistently applied. At all times DEBTOR will furnish to SECURED PARTY such other statements and information as SECURED PARTY may reasonably request relating to DEBTOR's ability to pay and perform the debts and obligations hereby secured.

5.3   DEBTOR will keep all items of the Collateral (a) free from any adverse lien, security interest or encumbrance except as noted above; and (b) in good condition and will not waste or destroy any of the same.

## ARTICLE SIX
## DEFAULT BY DEBTOR

6.1   DEBTOR shall be in default hereunder and any or all debts and obligations secured hereby shall, at the option of SECURED PARTY, become immediately due and payable upon the occurrence of any of the following events of default:

(a)   DEBTOR fails or refuses to pay any principal, interest or expenses due to SECURED PARTY when due; or

(b)   SECURED PARTY does not have a first priority purchase money security interest in and to the inventory items of the Collateral; or

(c)   DEBTOR fails or refuses to keep, observe, or perform any covenant of this Agreement or any other agreement between DEBTOR and SECURED PARTY; or

(d)   Any representation, warranty, or information made or provided by DEBTOR to SECURED PARTY proves to be materially false or misleading; or

(e)   A significant part of the Collateral is lost, substantially damaged or destroyed; or

(f)   There is a material adverse change in DEBTOR's business condition or affairs, financial or otherwise, which in SECURED PARTY's sole judgment impairs the prospects that DEBTOR will pay and perform its debts and obligations to SECURED PARTY in a timely manner; or

(g)  DEBTOR terminates its business, or any insolvency, receivership, reorganization, or liquidation proceedings are started by or against DEBTOR; or

(h)  DEBTOR fails to pay the full amount of any tax, fee or assessment due and owing to any federal, state, or local governmental authority.

6.2  Upon the occurrence of any such event of default, and at any time thereafter, SECURED PARTY shall have the rights and remedies of a SECURED PARTY under the Uniform Commercial Code in addition to the rights and remedies provided herein or in any other between DEBTOR and SECURED PARTY. To the extent permitted by applicable law, SECURED PARTY may require DEBTOR to assemble the Collateral and make it available to SECURED PARTY at a place designated by SECURED PARTY. To the extent permitted by applicable law, the requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, at least five (5) business days prior to the time of the sale or disposition.

6.3  Should DEBTOR default under this Agreement, DEBTOR shall pay to SECURED PARTY on demand any and all reasonable out-of-pocket expenses, including legal expenses and reasonable attorney fees (incurred at trial or on appeal) incurred or expended by SECURED PARTY (a) to collect or to attempt to collect DEBTOR's debts and obligations; (b) to protect or to enforce the rights of SECURED PARTY hereunder; or (c) to protect, store, maintain, or liquidate the Collateral.

6.4  Should DEBTOR default under this Agreement or under any other agreement with SECURED PARTY, (a) DEBTOR shall assign its accounts to SECURED PARTY, and (b) SECURED PARTY may at any time take possession of the Collateral and notify account debtors that their accounts have been assigned by DEBTOR to SECURED PARTY and that payments thereon shall be made to SECURED PARTY.

6.5  Upon request of SECURED PARTY, DEBTOR shall so notify such account debtors and will indicate on all billings to such account debtors that the accounts are payable to SECURED PARTY. Any payments on accounts thereafter received by DEBTOR shall be held in trust for SECURED PARTY and turned over to SECURED PARTY daily in the exact form in which they are received together with a collection report in form satisfactory to SECURED PARTY.

6.6  Should DEBTOR default under this Agreement, SECURED PARTY shall have the right to collect, compromise, endorse, sell or otherwise deal with the Collateral or the products or proceeds thereof in its own name or that of DEBTOR.

## ARTICLE SEVEN
## MISCELLANEOUS PROVISIONS

7.1  SECURED PARTY shall not be deemed to have waived any of its rights hereunder or under any other agreement or writings signed by DEBTOR unless such waiver is in writing and signed by SECURED PARTY. No delay or omission on the part of SECURED PARTY in exercising any of its rights shall operate as a waiver of such rights or of any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

7.2  SECURED PARTY's rights and remedies, whether evidenced hereby or by any other writings, shall be cumulative and may be exercised singularly or concurrently.

7.3  Upon request of SECURED PARTY, at any time, DEBTOR will (a) promptly as accounts arise deliver to SECURED PARTY lists and copies of said accounts; and (b) if deemed necessary in the reasonable judgment of SECURED PARTY to preserve the value or priority of the security interest herein granted, deliver to SECURED PARTY promptly upon receipt all contracts, other chattel paper and instruments and assign or endorse them to SECURED PARTY as it may request to evidence SECURED PARTY's rights hereunder.

7.4  No change or modification of this Agreement shall be effected or become effective unless in writing and signed by both DEBTOR and SECURED PARTY.

7.5  The parties agree that:

(a)  No verbal agreements or understandings of any kind have been entered into; and

(b)  This writing is intended by the parties as a final expression of their agreement and is also intended as a complete and exclusive statement of the terms of their agreement.

7.6  Should any provision hereof be finally determined to be inconsistent with or contrary to applicable law, such provision shall be deemed amended or omitted to conform therewith without affecting any other provision hereof or the validity of this Agreement.

7.7  The headings contained in this Agreement are intended solely for the convenience of the parties and shall have no effect in law or in equity upon the construction or interpretation of any provision of this Agreement or the performance thereof.

IN WITNESS WHEREOF, the parties have caused their respective authorized representatives to execute this Agreement.

RISING MICRO LLC                          ExxonMobil Oil Corporation

By: _____            By: _____

Title: __PRESIDENT_____             Title: __FSA_____

**EXHIBIT A**

**Locations of Inventory of Borrower**

| NUMBER AND STREET | CITY | COUNTY | STATE | ZIP |
|---|---|---|---|---|
| 950 S CAPITOL STREET S E | WASHINGTON | DISTRICT OF COLUMBIA | DC | 20003-0000 |

## KEY INDIVIDUAL GUARANTY

This Guaranty is given by RISING MICRO LLC , whose address is 950 S CAPITOL STREET S E , WASHINGTON , DC 20003-0000 ("Guarantor") on **OCT 29** , 20 **03**

### RECITALS

A.   ExxonMobil Oil Corporation ("ExxonMobil") is prepared to enter into a PMPA Franchise Agreement, and certain related or supplemental agreements (collectively, "Franchise Agreement") with RISING MICRO LLC ("Franchise Dealer") with respect to certain marketing premises located at 950 S CAPITOL STREET S E , WASHINGTON , DC 20003-0000.

B.   Under the Franchise Agreement, if the Franchise Dealer is not an individual, then the Franchise Dealer must designate a Key Individual who must, among other things, provide ExxonMobil, and maintain in full force and effect during the term of the Franchise Agreement, a continuing, unconditional personal guarantee of all of the Franchise Dealer's payment and performance obligations under the Franchise Agreement.

C.   The Franchise Dealer has designated Guarantor as the Key Individual under the Franchise Agreement. Guarantor is willing to serve as the Key Individual and to guarantee all of the Franchise Dealer's payment and performance obligations under the Franchise Agreement according to the terms set forth below.

D.   This Guaranty is given in consideration of ExxonMobil and the Franchise Dealer entering into the Franchise Agreement and is not considered a separate or independent transaction.

In consideration of the Recitals set forth above, and other good and valuable consideration, the receipt and sufficiency of which Guarantor acknowledges, Guarantor and Franchise Dealer give ExxonMobil the following guaranty:

1.   Statement of Guaranty; Indemnity

   A.   Guarantor unconditionally guarantees the full, prompt, complete and satisfactory performance of all of the terms, conditions and obligations (whether they are obligations of payment or performance) of the Franchise Dealer under the Franchise Agreement (the "Franchise Dealer's Obligations") as that agreement and all related and supplemental agreements may be amended, extended or renewed from time to time. If ExxonMobil and Franchise Dealer renew the Franchise Agreement or their Franchise Relationship, this Guaranty will be a continuing guaranty of the Franchise Dealer's Obligations under the renewed agreement, as it is renewed in each instance, and a separate guaranty for the renewed agreement will not be necessary.

   B.   Guarantor also agrees to indemnify and defend ExxonMobil, its Affiliates and their respective successors and assigns from any and all liability, damages, loss and other expenses (including court costs and attorney's fees) that arise from: (i) the Franchise Dealer's failure to perform the Franchise Dealer's Obligations; (ii) the Franchise Dealer's breach of its representations and warranties under the Franchise Agreement; and (iii) Guarantor's default under, or failure to comply promptly with, any of the provisions of this Guaranty.

   C.   This Guaranty is made without limitation as to amount. Guarantor's obligations and liabilities under this Guaranty are not affected by:

      i.    the genuineness, validity, regularity or enforcement of any of the Franchise Dealer's Obligations;

      ii.   the existence, validity, enforceability, perfection, or extent of any collateral for the Franchise Dealer's Obligations;

      iii.  the exchange, surrender, release or substitution of any collateral for the Franchise Dealer's Obligations; or,

      iv.   any other circumstance relating to any of the Franchise Dealer's Obligations that may vary the risk of Guarantor or that might otherwise constitute a defense to this Guaranty.

D.  The liability of the Guarantor under this Guaranty is absolute and direct, and not conditional or contingent. Without limiting the generality of the immediately preceding sentence, ExxonMobil has no obligation, as a condition to exercising its rights under this Guaranty, to first: (i) pursue or enforce any remedies it has, whether against the Franchise Dealer, or any other person or entity, arising under the Franchise Agreement, or otherwise; or (ii) pursue, execute, foreclose or take other action against any collateral for any of the Franchise Dealer's Obligations including, without limitation, any deed of trust, mortgage, security or deposits held by or on behalf of ExxonMobil.

E.  To the extent that the Franchise Dealer's Obligations are for the payment of money, this Guaranty is a guaranty of payment, not one of collection.

2.  Duration

This Guaranty is irrevocable and will continue in force until all of the Franchise Dealer's Obligations (including, without limitation, indebtedness) have been satisfied and until the Franchise Dealer's liability to ExxonMobil under the Franchise Agreement has been completely discharged. This Guaranty will be reinstated if at any time any payment by the Franchise Dealer is rescinded or must otherwise be returned by ExxonMobil for any reason including, but not limited to, the bankruptcy, insolvency or reorganization of the Franchise Dealer. Guarantor is not discharged from liability under this Guaranty as long as any claim by ExxonMobil against the Franchise Dealer remains outstanding.

3.  Modification of Franchise Agreement or Changes in Status

A.  If ExxonMobil and the Franchise Dealer modify the Franchise Agreement according to its terms, or if ExxonMobil unilaterally modifies the Franchise Agreement according to its terms, such modification will not release Guarantor from Guarantor's liability under this Guaranty and this Guaranty will apply to any additional obligations of the Franchise Dealer under such modifications.

B.  This Guaranty will not be affected or impaired by any change in the relationship between Guarantor and the Franchise Dealer or by any voluntary or involuntary liquidation, dissolution, sale of assets, insolvency, reorganization, bankruptcy or filing for bankruptcy by the Franchise Dealer.

C.  Guarantor's liability under this Guaranty will not be affected or impaired by any course of dealing or negotiations between ExxonMobil and the Franchise Dealer during the term of the Franchise Agreement or by any waiver, compromise, forbearance, extension or release that is either granted or deemed to be granted by ExxonMobil to the Franchise Dealer under the Franchise Agreement (except for those that are covered by paragraph 3.A. above). Without limiting the generality of the immediately preceding sentence, Guarantor agrees that ExxonMobil may, from time to time without notice to or consent by Guarantor:

   i.   extend the time of payment or performance of any or all of the Franchise Dealer's Obligations;

   ii.  extend the time of exchange, surrender or deposit of any collateral for the Franchise Dealer's Obligations;

   iii. renew any of Franchise Dealer's Obligations and receive and accept any instruments for the payment of money, including, but not limited to, notes, bills, checks, and trade acceptances made, accepted, extended, renewed or delivered by Franchise Dealer; and,

   iv.  accelerate the maturity or time for performance of the Franchise Dealer's Obligations, without in any way releasing or discharging Guarantor from Guarantor's obligations under this Guaranty.

4.  Waiver of Notices

Guarantor waives any and all notices that are actually required or are deemed to be required under the Franchise Agreement or this Guaranty, including, but not limited to:

A.  Notice of ExxonMobil's acceptance of or reliance on this Guaranty;

B.  Notice of any extension of time for the payment or performance of any of the Franchise Dealer's Obligations;

C.  Notice of acceleration of the maturity or time for performance of the Franchise Dealer's Obligations;

D.  Notice of presentment, demand for payment or performance, notice of dishonor, notice of nonpayment or nonperformance, protest, notice of protest, notice of any sale of collateral, and all other forms of notice whatsoever concerning the Franchise Dealer's Obligations; and

    E.   Notice of any defaults by or disputes with the Franchise Dealer concerning the Franchise Agreement or the Franchise Dealer's Obligations.

5.   Enforcement of Franchise Agreement and Guaranty

    A.   ExxonMobil may (but is not required to) join Guarantor in any action or proceeding that ExxonMobil commences against the Franchise Dealer concerning the Franchise Agreement. ExxonMobil may recover against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor, without any requirement that ExxonMobil first assert, prosecute or exhaust any remedy or claim against the Franchise Dealer.

    B.   ExxonMobil may enforce its rights under this Guaranty in such proceedings and in such manner as ExxonMobil considers necessary or desirable.

    C.   No waiver of ExxonMobil's rights under this Guaranty is effective unless it is in writing and signed by ExxonMobil. Any such waiver is effective only with respect to the specific matter involved and does not impair the rights of ExxonMobil or the obligations of Guarantor to ExxonMobil in any other respect or at any other time.

    D.   To the extent permitted by law, each remedy of ExxonMobil is cumulative and is in addition to any other remedy given under this Guaranty or the Franchise Agreement, or that either now exists or will exist at law or in equity.

6.   Subrogation Rights and Waiver of Suretyship Defenses

Guarantor will not exercise any rights that Guarantor may acquire by way of subrogation until all of the Franchise Dealer's Obligations, whether actual or contingent, and Guarantor's obligations and liabilities to ExxonMobil have been paid in full. If Guarantor receives any amount in violation of the preceding sentence, Guarantor must hold such amount in trust for the benefit of ExxonMobil and must pay such amount to ExxonMobil at the earliest opportunity. Guarantor waives any and all suretyship defenses to its obligations under this Guaranty.

7.   Assignment

    A.   Guarantor must not assign this Guaranty or delegate Guarantor's obligations under this Guaranty without the prior written consent of ExxonMobil. Any attempted assignment or delegation that does not comply with the provisions of this paragraph is void and of no legal effect.

    B.   ExxonMobil may assign, in whole or in part, this Guaranty (as part of an assignment of the Franchise Agreement or otherwise) and any of its rights under this Guaranty to one or more assignees. Any assignee may enforce the provisions of this Guaranty, to the extent transferred, as though the assignee were a party to this Guaranty.

    C.   Any assignment of the Franchise Agreement by the Franchise Dealer will not affect Guarantor's obligations under this Guaranty.

8.   Miscellaneous

    A.   Definitions - Unless they are otherwise defined in this Guaranty, capitalized terms have the meanings given to them in the Franchise Agreement.

    B.   Headings - The headings of the numbered paragraphs of this Guaranty are for convenience of reference only and do not affect the meaning or construction of any provision of this Guaranty.

    C.   Severability - If any provision of this Guaranty is finally determined to be inconsistent with, contrary to or unenforceable under applicable law, such provision will be deemed amended or omitted to conform with such applicable law without affecting any other provision or the validity or enforceability of this Guaranty.

    D.   Successors - This Guaranty is binding on the heirs, representatives, successors and permitted assigns of Guarantor.

By signing below, Guarantor consents to be bound by the terms and conditions of this Guaranty.

_____

[Name of Key Individual]

MAHMUD   RASHID

7/31/03

ExxonMobil Oil Corporation
3225 Gallows Road
Fairfax, Virginia 22037-0001

**REPRESENTATIONS AND WARRANTIES
CONCERNING PROPOSED PMPA
FRANCHISE AGREEMENT – CODO-DEALER**

Dear ExxonMobil Manager:

We, RISING MICRO LLC , whose form of organization is a Limited Liability Company ("Franchise Dealer") and MAHMUD PASHA ("Key Individual"), refer to the proposed PMPA Franchise Agreement dated OCT 29 ,2003 between ExxonMobil Oil Corporation ("ExxonMobil") and Franchise Dealer ("Franchise Agreement"). Under Article IV of the Franchise Agreement, Franchise Dealer must designate a key individual who meets the requirements set forth in Article IV of the Franchise Agreement at all times throughout the term of the Franchise Agreement.

Franchise Dealer has designated Key Individual to serve as the key individual under the Franchise Agreement. Franchise Dealer and Key Individual acknowledge that Key Individual must meet the requirements as a prerequisite to ExxonMobil's entering into the Franchise Agreement with Franchise Dealer. The following representations, warranties and agreements are provided with the understanding that ExxonMobil may rely on them in entering into the Franchise Agreement with Franchise Dealer.

By signing below and as an inducement for ExxonMobil to enter into the Franchise Agreement with Franchise Dealer and accept Key Individual as the key individual, Franchise Dealer and Key Individual represent, warrant and agree as follows:

1.  Franchise Dealer has designated Key Individual as the key individual under Article IV of the Franchise Agreement, and, if Key Individual ceases to be Franchise Dealer's key individual under the Franchise Agreement at any time, Franchise Dealer shall promptly designate a new key individual acceptable to ExxonMobil and approved by ExxonMobil in writing.

2.  Key Individual meets, and during the term of the Franchise Agreement shall comply with and will continue to meet, all terms, conditions and requirements applicable to a key individual from time to time including, but not limited to, all matters referred to in this letter.

3.  Key Individual and Franchise Dealer acknowledge and agree that ExxonMobil's franchise relationship is exclusively with the Limited Liability Company that is the Franchise Dealer. Nothing in the Franchise Agreement or these Representations and Warranties will be construed as creating any franchise or franchise relationship with the Key Individual or any of the members, managers or other individuals associated with the Limited Liability Company franchise dealer.

4.  Key Individual is a member, a manager or both of the Limited Liability Company ("L.L.C.") who is the Franchise Dealer, and Key Individual has direct responsibility for, and the authority over, Franchise Dealer's management and operation of the Businesses that are the subject of the Franchise Agreement.

5.  Key Individual is authorized by Franchise Dealer to represent and bind Franchise Dealer in all matters arising under the Franchise Agreement and all supplemental and related agreements including, but not limited to, all matters relating to the Businesses that are the subject of the Franchise Agreement.

6.  Except as expressly allowed under the Franchise Agreement, Franchise Dealer's activities are confined to the establishment and operation of the Businesses that are the subject of the Franchise Agreement or, if Franchise Dealer is a Multi-Unit Operator under the Franchise Agreement, Franchise Dealer's activities are confined to the establishment and operation of the Businesses at all Franchise Dealer's Exxon Outlets (as defined in the Franchise Agreement).

7.  All documents provided to ExxonMobil are current and represent the organizational structure, management structure, manager authority and member rights of Franchise Dealer as of the date of this letter.

8.  Franchise Dealer is duly organized and validly existing as a Limited Liability Company in the State where the premises are located.

9.  Franchise Dealer is authorized to do business and is in good standing under the laws of the State or States in which the Franchise Agreement will be performed.

10. Franchise Dealer has the corporate power and authority to enter into the Franchise Agreement, to perform its obligations under the Franchise Agreement, to consummate the transactions contemplated by the Franchise Agreement and to make the representations and warranties in this letter.

11. Franchise Dealer's signing, delivery and performance of the Franchise Agreement and this letter has been duly authorized by all required actions, authorizations and formalities of the Franchise Dealer.

12. If the facts underlying the representations contained in the preceding six paragraphs should change, the Franchise Dealer or the Key Individual shall notify ExxonMobil within five working days of the change.

By signing below, Franchise Dealer and Key Individual also acknowledge that any breach of these representations, warranties and agreements will constitute a breach of the Franchise Agreement and provide grounds for termination or nonrenewal of the Franchise Agreement and Franchise Relationship between ExxonMobil and Franchise Dealer.

Sincerely,


_____              MAHMUD   RASHID
Franchise Dealer                     _____
                                     Key Individual


By:  _____


Its:  PRESIDENT
      _____

**June 11, 2002**

**Test-Out Procedure for Survivorship (Subject to Applicable State Law) :**

The following only applies if survivor has not been formally trained and/or if survivor has not worked for at least one year with the original dealer:

**Non OTR Dealer:**

The Performance & Support Manager or TM will contact the survivor 2 months after survivor has assumed management of the location. The PSM or TM will send the new dealer a pre-test and arrange a time to meet within the next six months. At the meeting of the dealer and training director, dealer will be given the test (this is the "pre-test"), and must receive a passing score of 70%. If the dealer passes the test they must attend Business Operations training at the CORE within the next 6 months. If the dealer fails the exam, the dealer must retake the test within one month.

**OTR Dealer:**

The same format applies to an OTR dealer with the exception that the dealer must attend Business Operations and Convenience Retailing at the CORE within one year of passing the test in the field. In addition, to satisfy the TSW component of training the dealer must pass the TSW Pre-Test prior to attending the CORE.

**Alternative Format for Pre-Designated Survivors:**

Alternatively, for those dealers who have planned their succession and have a pre-designated survivor who has worked for at least one year with the existing dealer at a non-OTR facility, the following will apply:

1. The "pre-test" will be administered once, every three years, to the designated survivor and kept as part of the survivorship documentation in the existing dealer's file. The pre-designated survivor must receive a passing score of at least 70% for any test taken, and will have had to be an active manager at the existing dealer's site for at least one year in order to meet these alternative requirements.

2. As long as the pre-designated survivor meets the requirements in #1 above, then no training at the CORE will be required.

For pre-designated survivors at OTR facilities, those individuals can schedule formal Business Operations training and formal OTR training at the CORE at the earliest possible time (prior to the death or incapacitation of the existing dealer). Once they have completed both formal programs they will have been deemed to meet the training requirement to operate the site.

# Equipment Lease (Short Form)

DATE: 06/15/2005

**To: Butler Capital Corporation**

Customer No. C33945

Agreement No. L57483

**A. EQUIPMENT DESCRIPTION** (including all present and future replacements, substitutions additions, attachments and accessories)

(1) Refurbished 45 Autec Soft Touch Carwash with Poly Flex and greaseless bearings. New BOB - 20 blowers. Includes all attachments and accessories.

**B. EQUIPMENT LOCATION:** Street Address: 950 S. Capitol Street

City: Washington    County: _____    State: DC    Zip: 20003-

**C. TERM AND RENT SCHEDULE**

| | | | |
|---|---|---|---|
| Initial Term | No. of Rentals | First Rent Due Date ....... 8/15/05 | PrePaid Rental - Last _____ Months |
| 60 | 60 | Monthly Rent............... $ 2,011.15 | Security Deposit = _____ Months |
| | | Plus State Use Tax........ $ 0.00 | Security Deposit........ $ 4,022.30 |
| RENT DUE MONTHLY IN ADVANCE | | Total Monthly Payment. $ 2,011.15 | Purchase Option..... $ 1.00 |

**D. ADDITIONAL PROVISIONS**

**E. TERMS AND CONDITIONS**

1. I the undersigned Lessee ("I, me, we, us our") hereby lease from you as Lessor ("you, your") the above described personal property ("Equip"). I have requested you to purchase the Equip from the supplier and to arrange for delivery to me at my expense. You will own and have title to it including any replacements, substitutions, additions, attachments and accessories. I have no right, title or interest to it except as set forth herein. THIS LEASE IS IRREVOCABLE AND NON CANCELLABLE for the term and for Rent shown above. My obligation to pay Rent will not be subject to abatement, reduction, set-off, defense, counterclaim or recoupment by reason of any claims I may have against you, the supplier or manufacturer of the Equip or against any person for any reason whatsoever.

2. **LEASE COMMENCEMENT, ACCEPTANCE.** Rent payments will begin upon the First Rent Due Date which I authorize you to set but which will be on either the 1st or 15th of the month closest to the date of delivery of the Equip. Thereafter, Payments are to be made on the same day each month. MY UNCONDITION OBLIGATION TO PAY ALL RENTALS DUE UNDER THIS NON CANCELLABLE LEASE is confirmed upon your receipt of a signed Delivery Acceptance (if requested by you) or 10 days after delivery if I did not previously give you notice of non acceptance. If I do not accept, you will keep my deposit or prepaid rent to offset your expenses.

If within 90 days from the date you order the Equip, the same has not been delivered, installed and accepted, you may on 10 days written notice to me terminate this Lease and your obligations to me.

3. **RENT PAYMENTS.** During the lease term, I will pay total Rent equal to the number of rentals times the monthly Rent plus tax. PrePaid Rent or Security Deposit is due when I sign this Lease. You may charge me a partial or interim rental payment for the time between the delivery of the Equip, and the First Rent Due Date.

4. **NO WARRANTIES/AGENCY.** I acknowledge that you make no warranties expressed or implied, including merchantability, condition or fitness of the Equip for any particular purpose. I agree not to make any claim against you for any damages whether consequential, direct, special or indirect. You have no obligation to install, maintain or service the Equip. If it's unsatisfactory in any way I will make claim solely against the supplier or manufacturer.

5. **LESSEE'S WAIVERS; LIMITATIONS.** I agree that this Lease shall be considered under the Uniform Commercial Code, Article 2A as a "Finance Lease", since you are neither the supplier nor the manufacturer of the Equip and you did not participate in the selection of the Equip or the supplier or the manufacturer. I hereby waive any and all rights and remedies conferred upon me by sections 2A-508 through 2A-522 of the Uniform Commercial Code including, but not limited to, my rights to (i) cancel or repudiate this Lease; (ii) reject or revoke acceptance of the Equipment; and (iii) the right to reject tender of the Equip. In the event that I am adjudged to be entitled to revoke acceptance of the Equip, I will indemnify you for all payments made by you to the supplier of the Equip at the highest legal rate.

I HAVE BEEN INFORMED THAT I MAY HAVE RIGHTS UNDER THE CONTRACT EVIDENCING YOUR PURCHASE OF THE EQUIP WHICH YOU ASSIGN TO ME TO ENFORCE IN MY NAME AND AT MY EXPENSE, AND I HAVE BEEN ADVISED TO CONTACT THE SUPPLIER FOR A DESCRIPTION OF SUCH RIGHTS.

**This Agreement is subject to the further terms and conditions set forth on Page 2 which are made a part hereof, and we acknowledge that we have read this Agreement, and have received a copy.**

Butler Capital Corporation (LESSOR)
P. O. Box 677
Hunt Valley, MD 21030
(410) 771-9600 Voice    (410) 771-9614 Fax

ACCEPTED: _____

DATE: _____

| LESSEE / OBLIGOR |
|---|
| Rising Micro, LLC T/A Capitol Exxon |
| BY: X _____ (SEAL) |
| PRINT NAME: Mahmud Rashid |
| TITLE: Member |

D-01-01    C33945    L57483    06/15/2005    Page 1 of 2

EXHIBIT

B

In the event this Lease is determined not to be a lease, then your retention of title to the Equip shall be construed to be and I hereby grant to you a security interest in the Equip, and in the proceeds thereof, cash and non-cash and insurance proceeds.

**6. LOCATION, USE, REPAIR AND RETURN.** I will keep the Equip at the location shown and not remove or make alterations or substitutions to it without your written consent; use it in compliance with all applicable laws; maintain it at my expense in good repair; allow you to inspect it and to attach ID labels. At the end of the Lease if I do not purchase the Equip as specified in Section 16, I will, at my expense, immediately return it with all manuals, accessories, substitutions, replacements, software (including disks and manuals) and all other materials originally supplied with it, in as good a condition as when I received it, ordinary wear and tear excepted, by delivering it, properly packed and crated to a place or carrier you specify. In addition, I agree to pay you a restocking fee equal to five (5%) percent of the Equip.'s original cost to you no later than 30 days after the lease ends.

**7. ASSIGNMENT, ENCUMBRANCE.** I CANNOT sell, transfer, sublease or assign this Lease or the Equip. You CAN transfer, assign or sell it. The assignee will have all your rights and benefits but NONE of your obligations and will not be subject to any claims, defenses or setoffs I may have against you. I MAY NOT permit any lien or encumbrance to attach to the Equip. You MAY mortgage or encumber the Equip without notice to me.

**8. INDEMNITY.** I agree to indemnify and hold you harmless against and from any and all losses, claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorney's fees, arising out of, connected with or resulting from the Equip including without limitation its selection, manufacture, delivery, possession, use, operation, return, loss or damage.

**9. LOSS AND DAMAGE.** I bear all risks of Equip damage or loss, neither of which relieves me of my obligations to you. I will promptly notify you of any Equip loss and will, at your option and my expense: (a) repair it to good working order; or (b) pay you the amounts specified in Section 19(b) whereupon you will transfer title to me "as is/where is" and without warranties.

**10. INSURANCE.** I will fully insure the Equip for liability and damage or loss in such amounts and coverages as you require, and name you as additional insured and loss payee and provide that you receive 30 days advance notice of any cancellation or material change to the insurance. If, at any time, I fail to provide you with acceptable evidence of insurance then you may buy it and I will immediately pay you its full cost plus 10% to cover your administrative costs.

**11. FINANCIAL INFORMATION.** I will promptly provide current financial statements, tax returns or other financial information as you may request.

**12. LATE FEE.** To offset your administrative costs, I will pay a late fee of 10% (with a minimum fee of $25) of any Rent not paid when due. In addition, I will pay 1.5% per month on all Rents more than 30 days past due. In no event, however, shall late fees exceed the maximum lawful charges.

**13. TAXES.** I will pay when due, either directly, or to you as you may direct, all taxes, fees, fines, penalties or other charges INCLUDING PROPERTY TAX relating to this Lease or the Equip that are now or hereafter imposed by any government authority. You do not have to contest any taxes, fines, or penalties. I will pay estimated property taxes with each monthly Rent payment or annually as you may direct.

**14. CROSS DEFAULT.** A default under any agreement with you, whether now existing or hereafter created, shall be deemed a default under all agreements.

**15. SECURITY DEPOSIT.** I hereby grant you a security interest in any security deposits you may hold from us as security for the return of the Equip in the condition provided for by Section 6 and to reimburse you for any sums paid by you on the account of any of my obligations to you. You may hold such security deposits without interest and may comingle them with your other funds.

**16. PURCHASE OPTION.** I must give you written notice, no less than 90 days before the Lease ends, of my intent to purchase or return the Equip. If I am not in default and have paid all amounts due hereunder, I may purchase it for the purchase option price shown on Page 1, plus tax. If the option is Fair Market Value (FMV) you will use your best judgment as to FMV. If I do not agree, you will hire an appraiser at my expense, whose valuation will be binding. I must pay the option price at least 30 days before the Lease ends. You will then transfer title to me "AS IS/ WHERE IS without warranties of any kind.

**17. RENEWAL.** If I do not give you the required written notice or do not purchase or return the Equip as required herein, this Lease will automatically renew for 12 months at a Rent equal to the average monthly Rent required to be paid during the prior 12 months.

**18. DEFAULT.** Each of the following is a default under this Lease:
(a) I refuse, without good cause, to accept delivery of the Equip.
(b) I fail to pay any Rent or other amount when it is due.
(c) I breach or fail to perform under any warranty, agreement or obligation under this Lease or any other agreement with you and this failure continues for 10 days after you have notified me of it.
(d) I become insolvent, I dissolve or am dissolved or I enter into a merger or consolidation cease doing business as a going concern or I assign my assets for the benefit of my creditors or enter (voluntarily or involuntarily) any bankruptcy or reorganization proceeding.

(e) I, or any guarantor of this Lease, who is a natural person, die(s).
(f) Any guarantor of this Lease does not perform its obligations under the guaranty, or becomes subject to one of the events in (d) above.
(g) You deem yourselves insecure for any reason.

**19. REMEDIES.** If a Default occurs you may, without further notice to me and in your sole discretion, do one or more of the following, which shall be cumulative, concurrent and in addition to any other remedy available to you at law or in equity:
(a) Cancel or terminate this Lease or any other agreement I may have with you.
(b) Require me to immediately pay you, as compensation for loss of your bargain and not as a penalty, a sum equal to (1) the present value of all unpaid Rent for the remainder of the Lease term plus the present value of your residual interest in the Equip (each discounted at 5% per year compounded monthly) plus (2) all other amounts due or that may become due hereunder.
(c) Require me to deliver the Equip to you as set forth in Section 6.
(d) Repossess the Equip WITHOUT COURT ORDER and I will not make any claim against you for damages, trespass or any other reason.

If you take possession of the Equip, you may sell or otherwise dispose of it with or without notice at a public or private sale, and apply the net proceeds (after you have deducted all costs related to Equip disposition or sale) to the amounts I owe you. If, by law, notice of sale is required I agree that 10 days notice is reasonable notice. I will remain responsible for any amounts that are due after you have applied such net proceeds. I agree to pay you (1) all expenses you incur in connection with the enforcement of any of your remedies, (2) reasonable attorney's fees of 25% of all sums due, and all expenses and costs of collection and (3) interest on all sums due to you from the date when they become due until paid, at the rate of 1.5% per month but only to the extent permitted by law.

**20. CONFESSED JUDGMENT.** At any time after a default, I hereby authorize and empower any attorney or clerk of any court of record within the United States of America to appear for me in any court in one or more proceedings or before any clerk thereof, and confess judgment against me without prior notice or opportunity for prior hearing, in favor of you for an amount equal to the then unpaid balance due to you by me plus costs of suit and attorney's fees of twenty five percent (25%) of such unpaid balance.

**21. JURISDICTION, AUTHORITY.** This Lease will be deemed to have been made in Baltimore County, Maryland regardless of the order in which it was signed. Its interpretation and performance will be governed by the jurisdiction of State and Federal courts in Maryland. For all matters relating to enforcement of this Lease or any other dispute relating to it, I hereby consent to the personal jurisdiction of the Courts of the State of Maryland, and the person signing this Lease on my behalf warrants that he/she has full authority to bind me to such consent. Service of process, if necessary, may be accomplished pursuant to the Maryland Rules of Procedure. I specifically waive any defense in any action instituted within the State of Maryland based upon personal jurisdiction of the Maryland Courts, providing service is accomplished in accordance with the rules of said Courts.

**22. NOTICES.** All notices shall be given in writing by the party sending it and shall be effective if given personally, sent via US Mail, private delivery service or fax to the address or phone numbers herein, or to such address or phone number as you or I may hereafter provide.

**23. UCC FILINGS.** I authorize you to file a copy of this Lease as a financing statement and appoint you and your agents as my attorney-in-fact to execute and file, on my behalf financing statements covering the Equip which shall be sufficient as a financing statement under the Uniform Commercial Code, plus any amendments thereto and to sign on my behalf any other documents needed to confirm, establish, reestablish, continue, perfect protect or insure your interest in the Equip.

**24. OTHER RIGHTS.** Any delay or failure by you to enforce any default or right reserved to you or to require my performance of any of the terms, covenants or provisions hereof, at any time designated, will not be a waiver of any such default or right to which you are entitled, nor will it in any way affect your right to enforce such provisions thereafter. You may exercise all remedies simultaneously, pursuant to the terms hereof, and any such action will not operate to release me until the total Rent and all other amounts due hereunder have been paid. All your rights and indemnities will survive the termination of this Lease. If more than one Lessee has signed this lease, each of us agree that our liability is joint and several.

**25. SEVERABILITY.** If any provisions or remedy provided in this Lease becomes invalid under any applicable law, such provision shall be inapplicable and deemed omitted, but the remaining provisions including remaining default remedies shall be given effect in accordance with the manifest intent hereof.

**26. NO MODIFICATIONS, ENTIRE AGREEMENT WAIVER.** This Lease contains the entire agreement between you and I and is not binding on you until you sign it. No Provisions Or Terms Of This Lease May Be Waived Or Modified except in writing signed by your authorized officer. I agree, however, that you are authorized without notice to me, to supply missing information or correct obvious errors in this Lease. No waiver by you of any provision hereof shall constitute a waiver of any other matter.

# Amendment
# Rental Schedule

Agreement No. ___L57483_____          DATE:_3/20/06_

**TO:**      **Butler Capital Corporation**

**FROM:**    **Rising Micro, LLC T/A Capitol Exxon**

This Amendment is attached to and made a part of the above referenced Agreement, which is hereby amended as follows:

TERMS OF RENTAL:

As of the Effective Date below, the Remaining Unpaid Rentals are amended to be as follows:

__3/15/06__   Effective Date (Date Amended Rentals Begin)

__54__        Remaining Rentals

Amended Monthly Rental      $__1,923.27_

Plus State Use Tax          $___N/A___.

Total Monthly Payment       $__1,923.27_

**All other terms and conditions of the Agreement remain in full force and effect.**

| LESSEE |
| --- |
| **Rising Micro, LLC T/A Capitol Exxon** |
| BY: **X** _____ |
| TITLE: ____Member_____ |

# Butler Capital Corporation

**INVOICE**    L57483                                   FAX

AGREEMENT NO:  L57483

DATE:  06/15/2005

LESSEE/ OBLIGOR:     Rising Micro, LLC
                     T/A Capitol Exxon
                     950 S. Capitol Street
                     Washington, DC  20003-

================================================================

| EXPLANATION | AMOUNT |
|---|---|

================================================================

ADVANCE RENTALS / PAYMENTS: LAST

USE TAX (IF APPLICABLE):

FIRST MONTH RENTAL / PAYMENT                        0.00

USE TAX (IF APPLICABLE):

SECURITY DEPOSIT                                  4,022.30

DOCUMENTATION FEE                                  300.00

OTHER – UCC Filing Fees                            130.00

(- LESS)

DEPOSIT TO VENDOR

DEPOSIT TO BUTLER CAPITAL CORPORATION              0.00

                                       =================

TOTAL DUE NOW                          $     4,452.30

================================================================
**TERMS ARE PAYABLE UPON RECEIPT UNLESS OTHERWISE NOTED**
================================================================

PLEASE REMIT PAYMENT TO:

BUTLER CAPITAL CORPORATION
P.O. Box 677
HUNT VALLEY, MARYLAND  21030-0677

D-02-01                    C33945     L57483     06/15/2005



**Butler Capital**

*Equipment Financing and Leasing*

## ☒ REQUEST FOR FEDERAL TAX IDENTIFICATION NUMBER

Company Name: _Rising Micro, LLC_

Federal ID/EIN # _____

## ☒ REQUEST FOR COPY OF DRIVER'S LICENSE
### (***<u>NOTE</u>:  Copy must contain SIGNATURE***)

**As a requirement for funding, please attach a copy of the Driver's License for the following Document Signer(s):**

_Mahmud Rashid_

_____

**We also require a copy of Driver's License for the following Personal Guarantor(s):**

_Flora Rashid_

_____

## ☐ REQUEST FOR CONTACT INFORMATION

Customer Contact Name:_____
Home Ph:_____  Home Fax:_____
Bus. Ph:_____  Bus Fax:_____
Cell:_____

Guarantor/Other:_____
Home Ph:_____  Home Fax:_____
Bus. Ph:_____  Bus Fax:_____
Cell:_____

Guarantor/Other:_____
Home Ph:_____  Home Fax:_____
Bus. Ph:_____  Bus Fax:_____
Cell:_____

# Insurance Binder Request

Agreement No.  L57483

## IMMEDIATE ATTENTION PLEASE

**To:** _NATION WIDE_

Insurance Agent
_WY MON  LYNCH._

Agency
_SUITE # 204_

Address _6103 BALTIMORE AVE_
_RIVERDALE - MD - 20737_

City                State                Zip

Phone ( _301_ ) - _927_ - _6070_

Fax   ( _301_ ) - _927_ - _5303_

Your Insured listed below is financing / leasing new equipment through us.

<u>WE MUST HAVE INSURANCE COVERAGE</u> in place that names us as a Loss Payee and Additional Insured.

Please provide us with a certificate of insurance as follows:

| YOUR INSURED | LOSS PAYEE/ ADDITIONAL INSURED |
|---|---|
| Rising Micro, LLC<br>T/A Capitol Exxon<br>950 S. Capitol Street<br>Washington            DC  20003- | Butler Capital Corporation<br>P.O. Box 677<br>Hunt Valley, MD 21030-0677<br>Phone        (410) 771-9600<br>Fax          (410) 771-0898<br>Attention: _Kim Guerra_ |

EQUIPMENT TO BE INSURED:
(1) Refurbished 45 Autec Soft Touch Carwash with Poly Flex and greaseless bearings. New BOB - 20 blowers.  Includes all attachments and accessories.

EQUIPMENT LOCATION:          950 S. Capitol Street
                              Washington, DC  20003

INSURABLE  VALUE          $___95,000.00___  or  $_____

EFFECTIVE DATE OF INSURANCE      _____

# Interim Interest / Rent

Agreement No. __L57483_____            DATE:___06/15/2005____

**TO:**          **Butler Capital Corporation**

**FROM:**      **Rising Micro, LLC**                        **T/A Capitol Exxon**

This Amendment is attached to and made a part of the above referenced Agreement, which is hereby amended as follows:

( X )       A daily interim rent of $__67.04_____ will be charged on our lease

        ☐ in the case of payments in advance, from the period dating from the date of delivery of the Equipment to the first scheduled due date on the Agreement,

        ☒ in the case of payments in arrears, for the number of days from the date of delivery of the Equipment to the first due date on the Agreement in excess of thirty (30) days.

        The interim rent is due in full on demand.

(   )        A daily interim interest of $_____ will be charged on our Note

        ☐ in the case of payments in advance, from the period dating from settlement to the first scheduled due date on the Agreement

        ☐ in the case of payments in arrears, for the number of days from the date of settlement to the first due date on the Agreement in excess of thirty (30) days.

        The interim interest is due in full on demand.

**All other terms and conditions of the Agreement remain in full force and effect.**

LESSEE/OBLIGOR
**Rising Micro, LLC**
**T/A Capitol Exxon**

BY: **X** _____

PRINT NAME: _Mahmud Rashid_____

TITLE: _Member_____

# Direct Draft Notice (Required)

**TO:**  Rising Micro, LLC
        T/A Capitol Exxon                         **Date:**  06/15/2005

**FROM:**       **Butler Capital Corporation**

As a condition of our financing to you, **we require a direct draft** (ACH) payment
method.  On or about the monthly due date we will draft the payment from your bank
account.

Complete and sign the attached Direct Draft Authorization form.

Attach a voided check for the account you wish to use for the direct draft.

If you do not attach a check we will draft the same account you used for your
deposit to us.

Return the completed and sign form with the rest of the financing paperwork.

Direct draft is a convenient way to make your monthly payments – you do not need to
w
r



C33945        L57483        06/15/2005

# Guaranty (Individual) Absolute, Unconditional and Continuing

Obligor: **Rising Micro, LLC** _____ T/A Capitol Exxon _____

TO: **Butler Capital Corporation** GUARANTOR: _____ Flora Rashid _____ C# 33945 _____ DATE: 06/15/2005

1. **Unconditional Guaranty.** To induce you to provide or continue to provide credit (which shall include loans or leases or both) to the above named Obligor at such times, in such amounts, on such terms, and with or without security, as you in your discretion may see fit, without notice to or consent from me, I hereby absolutely and unconditionally guarantee (a) the prompt, punctual and full payment of all obligations, indebtedness and liabilities of Obligor to you, of every kind and nature, whether direct, indirect, contingent, primary, secondary, alone, joint with any other person, due, to become due, advanced in the future, now existing, hereafter created, principal, interest, expense payments, enforcement and liquidation costs, and/or attorneys' fees and expenses; and (b) the performance of all other terms, covenants and conditions required to be kept, observed or performed by Obligor pursuant to any instrument, document or other agreement previously, simultaneously or hereafter entered into by Obligor and delivered to you (collectively, the "Obligations"). I undertake and agree to perform all of the foregoing terms, covenants and conditions notwithstanding that the Obligations may be void or voidable as against Obligor or any of Obligor's creditors, including a trustee in bankruptcy of Obligor, for any reason whatsoever, including, without limitation, failure by any person to file or record any document or to take any other action to make the Obligations enforceable in accordance with the terms thereof. This Guaranty shall continue to be effective or be reinstated, as the case may be, if, at any time, any payment is rescinded or must otherwise be returned by you upon the insolvency, bankruptcy or reorganization of Obligor or otherwise, all as though such payment had not been made. My obligations under this Guaranty are independent of the obligations of Obligor. A separate action may be brought and prosecuted against me whether an action is brought against Obligor or whether Obligor is joined in any such action.

2. **Acts by Butler.** I authorize you, without notice to me or my further consent, and without in any way affecting or impairing my liability under this Guaranty, from time to time to: (a) change the amount, time or manner of payment of the Obligations; (b) change or waive strict compliance with any of the terms, covenants, conditions or provisions of the Obligations; (c) amend, renew, extend, modify, change or supplement the Obligations; (d) assign all, or any portion, of the Obligations, in which event this Guaranty will inure to the benefit of your assignee; (e) consent to Obligor's assignment of the Obligations or to the sublease of all, or any portion, of the equipment covered by the Obligations; (f) receive and hold security for the payment of this Guaranty or the performance of the Obligations, and exchange, enforce, waive, release and otherwise impair such security; and (g) apply such security and direct the order or manner of sale thereof as you in your discretion may determine.

**This Guaranty is subject to the further terms and conditions set forth on Page 2 which are made a part hereof, and I hereby acknowledge that I have read this Guaranty, including the terms set forth on Page 2.**

IN WITNESS WHEREOF, I have executed this instrument under seal, as of the date set forth above.

WITNESS:

X _____

PRINT NAME: MOHAMMAD R. HAQUE

STREET: 20 PEERL DR

CITY, STATE/ZIP: STAFFORD VA 22556

INDIVIDUAL GUARANTOR:

By X _____

Flora Rashid

27 Raleigh Lane

Washington     DC     20003-

( ) IF CHECKED, THE GUARANTOR'S SIGNATURE **MUST** BE NOTARIZED BELOW.

State of _____, City/County of _____, to wit:

On this _____ day of _____, 20___, before me, the undersigned, a Notary Public in and for the aforesaid jurisdiction, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the above instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof, I have hereunto set my hand and official seal.

_____          My commission expires: _____

Notary Public

# Guaranty (Individual) Absolute, Unconditional and Continuing

**3.    Waivers by Guarantor.** I waive any right to require you to: (a) proceed against Obligor; (b) proceed against any equipment covered by the Obligations or any other security held by you; (c) pursue any other remedy in your power; or (d) notify me of any default by Obligor in the payment or performance of the Obligations. I waive any defense arising by reason of any disability or any counterclaim or right of set-off or other defense of Obligor, any lack of authority of Obligor with respect to the Obligations, the invalidity, illegality or lack of enforceability of the Obligations or any provision thereof from any cause, your failure to acquire title to the equipment covered by the Obligations or to perfect or maintain perfection of any interest therein, or the cessation of the liability of Obligor for any cause whatsoever, or your delay or failure to exercise any of your rights and remedies against Obligor, under the Obligations or with respect to the equipment covered by the Obligations or any other collateral or security for the Obligations or this Guaranty. Until the payment and performance of all Obligations, I (a) have no right of subrogation against Obligor; (b) waive any right to enforce any remedy which you now have or may hereafter have against Obligor; and (c) waive any benefit of, and any right to participate in, any security you may now or hereafter hold. I waive all presentments, demands for performance, notices of nonperformance, protests, notices of dishonor, and notices of acceptance of this Guaranty. I waive the benefit of any statute of limitations affecting my liability under this Guaranty or the enforcement thereof.

**4.    Subordination.** I hereby subordinate the payment and the time of payment of all obligations, indebtedness and liabilities of Obligor to me, of every kind and nature (the "Subordinated Indebtedness"), to the payment and performance in full of all of the Obligations. Until all of the Obligations are paid and performed, I shall not receive any payment or distribution on account of the Subordinated Indebtedness, but if I do receive any such payment or distribution, whether voluntary or involuntary, and whether or not under any state or federal bankruptcy or other insolvency proceedings, then I agree and direct that any such payment or distribution shall be paid or delivered directly to you for application to the Obligations (whether due or not and in such order and manner as you may elect). If I receive any such payment or distribution, I will deliver it to you, and until so delivered, it shall be held in trust by me as your property. As further assurance of the authorization herein given, I agree to execute and deliver to you any power of attorney, assignment, endorsement or other instrument as you may request to enable you to enforce any claims upon the Subordinated Indebtedness and to collect and receive any payment or distribution with respect to the Subordinated Indebtedness.

**5.    Financial Reports.** I will promptly furnish to you such financial statements and other information concerning my financial condition as you may, from time to time, require.

**6.    Maryland Law; Consent to Maryland Jurisdiction.** I agree that this Guaranty and the rights and obligations of both of us under this Guaranty shall in all respects be governed by, and construed in accordance with, the laws of the State of Maryland. I agree that any action or proceeding arising out of or relating to this Guaranty may be commenced in any court in the State of Maryland or in the District Court of the United States for the District of Maryland and agree that a summons and complaint commencing an action or proceeding in any such court shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to me at my address set forth below, or as I may provide in writing from time to time, or as otherwise provided under the laws of the State of Maryland. I further agree that if I ever institute an action against you, such action must be commenced in the courts of the State of Maryland or the United States District Court for the District of Maryland.

**7.    Default.** Any of the following events constitutes a default under this Guaranty: (a) I fail to pay any amount due under this Guaranty upon your demand or fail to carry out any of my agreements set forth in this Guaranty; (b) any information contained in any financial statement, application or other document I give to you in connection with this Guaranty is substantially and materially inaccurate; (c) any petition under federal bankruptcy law or similar federal or state statute is filed by or against me; (d) any application is made for the appointment of a receiver or custodian for me; (e) I make a general assignment for the benefit of creditors; or (f) I become insolvent. If a default should occur under this Guaranty and such default is thereafter waived by you, such waiver shall be limited to the particular default so waived and only to the extent such waiver is made by you in writing.

No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

**8.    Remedies; Confession of Judgment.** Upon a default under this Guaranty, you may declare an amount equal to the then unpaid balance of the Obligations to be immediately due and payable by me, whether or not the same is due and payable by Obligor at that time. Your books and records showing the amount due by Obligor shall be binding upon me for the purpose of establishing such amount and shall be prima facie proof thereof. I agree to pay interest on the Obligations from the date demanded by you until the date paid at the annual rate of eighteen percent (18%). I agree to pay reasonable attorneys' fees and all other costs and expenses which you may incur in the enforcement of this Guaranty, whether or not suit is filed. At any time thereafter, I hereby authorize and empower any attorney or clerk of any court of record within the United States to appear for me in any court in one or more proceedings or before any clerk thereof, and confess judgment against me, without prior notice or opportunity for prior hearing, in favor of you for an amount equal to the then unpaid balance due to you by Obligor or me plus interest, costs of suit and attorneys' fees of twenty-five percent (25%) of such unpaid balance, hereby waiving and releasing, to the extent permitted by law, all errors and all rights of exemption, appeal, stay of execution, inquisition and extension upon any levy on real estate or personal property to which I may otherwise be entitled under the laws of the United States or of any state or possession of the United States now in force or which may hereafter be passed.

**9.    Notices.** Any notice to me shall be conclusively deemed to have been received by me and to be effective on the day on which delivered to me at my address set forth above (or at such other address as I may specify to you in writing), or, if sent by certified mail, on the third business day after the day on which mailed, addressed to me at such address.

**10.    Continuing Guaranty.** This is my continuing Guaranty of all Obligor's Obligations to you and shall remain in full effect until you receive my written notice of termination (sent to you certified mail return receipt requested), which notice shall not release or affect my liability or obligations to you under this Guaranty with respect to any Obligations theretofore created or any extensions thereof.

**11.    Waiver of Jury Trial. I WAIVE ANY RIGHT TO A TRIAL BY JURY OF ALL CLAIMS, DEFENSES, COUNTERCLAIMS AND SUITS OF ANY KIND ARISING FROM OR RELATING TO THIS GUARANTY.** I acknowledge that this is a waiver of a legal right and that I make this waiver voluntarily and knowingly. I agree that all such claims, defenses, counterclaims and suits shall be tried before a judge, and not a jury.

**12.    General.** If more than one person guarantees Obligor's Obligations, then (a) each of us shall be jointly and severally liable for the Obligations under this Guaranty; (b) whenever used in this Guaranty, the terms "I" and "me" shall include each guarantor, jointly and severally with all other guarantors; and (c) you may (without notice to or consent of any other guarantor and with or without consideration) release, compromise, settle with and proceed against any guarantor and any security and collateral given by such guarantor without affecting, impairing, lessening and releasing the obligations of any other guarantor. This Guaranty shall inure to the benefit of you, your successors and assigns and shall be binding upon my heirs, administrators, and executors. This Guaranty may not be waived, modified or otherwise terminated, except in a writing signed by the party against which the enforcement of the waiver, release or termination is sought. If any term of this Guaranty shall be held to be invalid, illegal or unenforceable, the remainder of this Guaranty and any other application of such term shall not be affected thereby. The paragraph headings of this Guaranty have been inserted for convenience only and shall not modify, define, limit or expand the express provisions of this Guaranty.



**CAPITOL EXXON**
GROCERY ACCOUNT

68-7403 478
510
4010412460

860

DATE 06-28-05

PAY TO THE
ORDER OF   BUTLER   CAPITAL ——— | $4452-30

FOUR THOUSAND FOUR HUNDRED FIFTY TWO 30/100   DOLLARS

**First Market Bank®**
P.O. Box 6768, Richmond, VA 23230

MEMO   REFUNDABLE DEPOSIT
FOR CAR WASH (2 PAYMENTS)

⑇051074030⑇0860 4010412460⑈

COUNCIL OF THE DISTRICT OF COLUMBIA

WASHINGTON, D. C. 20004

(202) 724-8072

SHARON AMBROSE
Councilmember—Ward 6

July 22, 2004

Mahmud and Flora Rashid
950 South Capitol Street, SE
Washington DC 20003

Mahmud and Flora Rashid,

I want to extend my sincere thanks to you for your contributions to the welfare of our community. Thanks especially for your steadfast support of our police and the departments' first responders. Public safety is so important to the quality of community life. These officers work long and hard, often under very difficult circumstances, so the friendship and support you offer to them is a great contribution. I appreciate your continuing support of the First District Police Department's public safety initiatives in Ward 6 and your community service contributions. It is truly heartwarming to know that there are business owners like yourselves who are out there trying hard to make a positive difference. Time and time again, Capitol Exxon is at the forefront whenever there is a need.

Of special note is your dedication to the young people in Southeast. Our future lies with the youth of today, and therefore, your efforts to assist the students at VanNess Elementary School are greatly appreciated. Your generous support, which has resulted in books and supplies, have made a substantive contribution toward enabling students, teachers, and the staff in achieving their goals. And, you have always stepped forward to make it possible for students to participate in extra-curricular programs and enrichment activities.

On behalf of all the citizens of Ward 6, I commend you again for your community spirit and generosity.

Sincerely,

Sharon Ambrose
Councilmember, Ward 6

EXHIBIT

C

tabbies®

# Metropolitan Police Department



Hereby presents this Certificate to

## *Capitol Exxon*

In grateful appreciation for your contribution to the

## *First District and its community activities*

January – December, 2002

_Skip Coburn_
Citizens Advisory Council

_Thomas F. McGuire, Commander_
*First District, Metropolitan Police Dept.*

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**METROPOLITAN POLICE DEPARTMENT**

Mr. And Mrs. Rashid
C/o Exxon Gas Station
950 South Capitol St. SE
Washington, D.C. 20003

Dear Mr. and Mrs. Rashid,

As the commanding officer of the First District, Metropolitan Police Department, I want express my gratitude and appreciation for your support of our activities and efforts over the years. Your generosity and commitment to the local community has helped fulfill the goals and endeavors of the First District, as well as broaden the horizons of children in the local community.

Thank you for your past support, and I look forward to working with you in our continuing community partnership.

Should you have any questions or concerns, you can contact me directly, or you may contact Lieutenant Haselden of my staff on (202) 727-4588.

Sincerely,

Thomas E. McGuire
Commander
First District



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

Rosa R. Anderson
Principal

---

**Van Ness Elementary School**

5th and M Streets, SE
Washington, D.C. 20003
Telephone: 202-698-3818

May 12, 2004

Exon Station
South Capitol St. SE
Washington, D.C.

Dear Mr. and Mrs. Rashid,

The Van Ness Elementary School family is extremely grateful for your support of our students for the past four years. You have both been extremely generous and without your support, the students of Van Ness Elementary School would not have been able to attend field trips and to participate in many activities and programs at the school. Because of your community spirit, the students and staff of our school will always be grateful and have a warm place in our hearts for both of you. Without your kindness the school would not have been able to provide students support in reaching academic goals.

The entire Van Ness School Family appreciates your generosity. We thank you most sincerely and look forward to your continued kindness of our school community.

Sincerely,

Rosa M. Anderson
Principal

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
D.C. LOTTERY AND CHARITABLE GAMES CONTROL BOARD
2101 MARTIN LUTHER KING, JR. AVENUE, S.E., 5TH FLOOR
WASHINGTON, D.C. 20020-5731

May 19, 2004

To Whom It May Concern:

I have been acquainted with Rising Micro LLC trading as Capitol Exxon 905 South Capitol Street, S.E. since February 2001 when they were licensed as a D.C. Lottery agent. The owners Mohammed & Flora Rashid have been extremely reliable lottery agent. The review of their account shows that there have been no instances of late operators, a review of their account shows that there have been no instances of late payments or financial problems. Nor have received any customer complaints relating to their lottery sales. If I can be of further assistance please feel free to contact me @ (202) 645-7952.

Sincerely,

Jeffrey R. Anderson
Licensing Manager

EXHIBIT

D

# Tropicana

Tropicana Products
4501-B Auth PL.
Suitland, Md. 20746

To whom it may concern,

I have had a business relationship with Flora and Mahmouc Rashid for the past 3 years. I find that they are extremely good business owners and are a staple in the Southeast Washington community.

In my dealings with them, I have never had any problems with them concerning payments, products, etc. They are very easy to work with and a joy to be around.

That store location has grown and improved tremendously ever since they took over.
I wish them continued success.

Sincerely,

Rodney McMillian
District Sales Manager
Tropicana Products Balt/Wash
(301)343-8357

# ExxonMobil
### *Fuels Marketing*

3225 Gallows Road
Fairfax, VA 22037-0001

March 14, 2006

**HAND DELIVERED**

Rising Micro LLC
Exxon Service Station
950 S Capitol Street S E
Washington, DC 20003

LOCATION - **25381**
NOTICE OF TERMINATION:
WIRE FRAUD

Dear Mahmud Rashid.:

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). ExxonMobil is terminating your PMPA Franchise Agreement and franchise relationship with ExxonMobil, effective March 29, 2006 . This decision is based upon your guilty plea to a one count information charge in violation of Title 18, United States Code, Section 1343. Such a plea is a violation of Articles XIV, Section 14.1 of your PMPA Franchise Agreement ("Franchise Agreement"). All of these provisions are reasonable and of material significance to your franchise relationship with ExxonMobil.

Article XIV of the Franchise Agreement provides that ExxonMobil may terminate the Franchise Agreement, franchise, and franchise relationship pursuant to applicable provisions of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et. seq. (the "PMPA").

Your failure to comply with the provisions of the Franchise Agreement set forth above provides grounds for termination of your Franchise Agreement, franchise, and franchise relationship under the PMPA. Pursuant to Article 14.1 of the Franchise Agreement and Sections 2802(b)(2)(c), 2802(c)(1) and 2802(c)(12)of the PMPA, ExxonMobil hereby terminates its Franchise Agreement, franchise, and franchise relationship with you, along with all related supplemental agreements, effective March 29, 2006. This decision is final and irrevocable.

**EXHIBIT**

tabbies

*E*

- 2 -

Please remove your personal property from the premises immediately.

A copy of the summary statement of Title I of the PMPA, as prepared by the Department of Energy, is enclosed.

Very truly yours,

John Bednash
Area Manager
Mid Atlantic

Enclosure:  PMPA Summary Statement

cc:  R. Alexandrowicz
     E. Beck
     E. Robichaud

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
**Tuesday, June 25, 1996**

**AGENCY:** Department of Energy.
**ACTION:** Notice.

---

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d) (1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

**I. Reasons for Termination**

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

## A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, for State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

## B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

## C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

## D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. §2802(b) (E).

## E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:
(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
(2) You declare bankruptcy or a court determines that you are insolvent.
(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires

possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain.  If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises.  If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical.  Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I-Definitions and Legal Remedies

## I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

*B. Franchise Relationship*

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
**Marc W. Chupka,**
Acting Assistant Secretary for Policy.