## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RISING MICRO, LLC                         :
                                          :
      Plaintiff,                         :
                                          :
      v.                                 :
                                          :          **Civil Action No.:**
                                          :
EXXONMOBIL OIL CORPORATION  :
                                          :
      Defendant.                         :
_____ :

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.    INTRODUCTION

This case arises under the Petroleum Marketing Practices Act ("PMPA" or the "Act"), 15 U.S.C. § 2802 *et seq.*, a federal statute intended to prevent the arbitrary and discriminatory termination of petroleum marketing franchises. Under the PMPA, franchisees such as plaintiff are entitled to preliminary injunctive relief under a relaxed injunction standard designed to benefit the small retailer, and intentionally drawn to facilitate the grant of injunctive relief. *See Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 306 (4th Cir. 1987) ("*Barnes II*"). Such injunctive relief is mandated in this case.

Plaintiff Rising Micro, LLC ("Rising Micro") faces the illegal termination of its "Exxon" motor fuel franchise and business at 950 South Capitol Street, SE, located only blocks from the proposed baseball stadium, which it has operated without material incident for the last 5 years. Defendant ExxonMobil Oil Corporation ("Exxon") has issued a franchise termination notice dated March 14, 2006, with termination effective

March 29, 2006. Exxon bases the termination, which would entitle Exxon to strip

plaintiff summarily of its valuable franchise and business, on the decision of Mahmud

Rashid (the owner of Rising Micro's membership interests) to plead guilty to a one count

information charging, a violation of Title 18, United States Code, Section 1343.

Exxon's action violates the PMPA in a number of ways, and must be enjoined to

maintain the *status quo ante* pending a trial on the merits. First, Exxon does not base the

termination on conduct committed *by the actual franchisee* (in this case, Rising Micro),

as the PMPA expressly requires. Rather, Exxon issued a termination notice purportedly

based on Mr. Rashid's conduct. Mr. Rashid is not the franchisee as that term is used and

understood under the PMPA. Rising Micro has not been convicted of any felony

involving moral turpitude, as required under 15 U.S.C. § 2802(c)(12). Moreover, to the

extent that Exxon relies upon the guilty plea by Mr. Rashid individually, such guilty plea

is not a conviction within the meaning of the Act, and Exxon is otherwise precluded from

relying thereon.

Second, to the extent Exxon attempts to base the termination on conduct other

than a conviction of the franchisee, such conduct is "stale" under the PMPA, as Exxon

acquired actual and/or constructive knowledge of any purported occurrence as early as

February 2004. In the meantime, Exxon required plaintiff to make a significant long term

investment in a new car wash. Exxon is precluded under the express provisions of the

PMPA, 15 U.S.C. § 2802(b)(2)(C)(i) from basing the termination on a stale event, and is

estopped from doing so as well.

Third, Exxon cannot show as required by 15 U.S.C. § 2804 (a) and (b) that it

provided notice of termination 90 days prior to the date on which the termination is to

take effect. Indeed, Exxon provided a mere 15 days. Nor can Exxon show that providing less than 90 days notice of termination is reasonable under the circumstances, and cannot show that notice was given on the earliest date on which furnishing such notification was reasonably practical.

As described below, plaintiff easily satisfies the three elements required under the PMPA's relaxed injunction standard, 15 U.S.C. § 2805(b)(2)(A). Plaintiff will show (i) that the franchise of which it is a party has been terminated, (ii) there exist sufficiently serious questions going to the merits of the termination to make such questions a fair ground for litigation, and (iii) the hardships which would be imposed upon defendant by the issuance of the injunction (if any) pale in comparison to the hardships which will be imposed upon plaintiff if the requested injunctive relief is not granted.

The PMPA's legislative history and the case law interpreting the statute recognize that franchise termination is an "extreme remedy," fundamentally punitive, which Congress intended to restrict to contractual violations that are "so serious as to undermine the entire relationship." *Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d 1159, 1163 (9th Cir. 2002). This is not such a case.[1] Unless otherwise indicated, the facts are supported by the Verified Complaint and the attached exhibits, which are incorporated by reference.

## II.    FACTS

### A.    Background Facts.

In or around February 2001, Rising Micro purchased the business of Capitol Exxon from its former owner for approximately $350,000 plus the value of the inventory.

---

[1]    One must ask why, if the purported conduct about which Exxon complains is so serious, was Exxon not more concerned about it for the last two years, and only acted in haste immediately following the March 6, 2006 signing of the baseball stadium lease?

At that time, Rising Micro entered into written three-year agreements with Exxon (collectively the "2001 Franchise Agreement") for the lease of the Marketing Premises and the purchase and resale of motor fuel under the "Exxon" trademark. The 2001 Franchise Agreement created a petroleum marketing franchise and franchise relationship between Rising Micro and Exxon, the termination or non-renewal of which was governed by the PMPA. Exxon renewed its franchise relationship with Rising Micro in February 2004 pursuant to a new Franchise Agreement (the "2004 Franchise Agreement"). The PMPA governs the termination or non-renewal of the 2004 Franchise Agreement. A copy of the 2004 Franchise Agreement is attached to the Complaint, filed contemporaneously herewith, as **Exhibit A**.

On February 12, 2004, a search warrant was executed at the Marketing Premises related to an investigation of alleged double billed transactions arising out of government-issued "Voyager" credit cards. A marketing representative of Exxon was present at the time of the search, and as a result Exxon was fully aware of the investigation that was being conducted.

In May 2005, at Exxon's insistence, Rising Micro contracted with Butler Capital Corporation pursuant to a multi-year lease/purchase and installation of new car wash equipment at the Marketing Premises having a value of $95,000.00. Mr. and Mrs. Rashid guaranteed personally the car wash lease, a copy of which is attached to the Complaint, filed contemporaneously herewith, as **Exhibit B**.

On January 17, 2006, Mahmud Rashid entered a plea of guilty in this Court to mail fraud, in violation of 18 U.S.C. § 1343. Sentencing is scheduled for June 6, 2006 before the Honorable Richard J. Leon. Two months later, by letter dated March 14, 2006

(the "Termination Notice"), attached to the Complaint as **Exhibit E**, Exxon notified Rising Micro that it is terminating the franchise and franchise relationship effective March 29, 2006 "based upon [Mahmud Rashid's] guilty plea to a one count information charge in violation of Title 18, United States Code, Section 1343." The Termination Notice further advises that "such a plea is a violation of Articles XIV, Section 14 of your PMPA Franchise Agreement." The Termination Notice further provides that "[p]ursuant to Article 14.1 of the Franchise Agreement and Sections 2802(b)(2)(c), 2802(c)(1) and 2802(c)(12) of the PMPA, Exxon hereby terminates its Franchise Agreement, franchise, and franchise relationship with you . . . ." The Termination Notice states that the termination is "final and irrevocable."

## III.    LEGAL STANDARD

### A.    The PMPA

In 1978, Congress enacted Title I of the PMPA to protect petroleum franchisees from arbitrary termination or nonrenewal of their franchises. *See Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 360 (4th Cir. 1986) ("*Barnes I*"). Central to the concern of Congress was the use by franchisors of contract termination as a remedy for contract violations. As the legislative history indicates:

> Commonly the franchisor is able to capitalize on his disparity of bargaining power to obtain great flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized.

S. Rep. No. 731, 9th Cong., 2nd Sess. 18, *reprinted*, 1978 U.S. Code Cong. & Admin. News 873, 875-77. The Act was intended to remedy the disparity of bargaining power between franchisors and franchisees, and to preserve "the competitive influence of

5

independent franchisees in the marketplace." *Roberts v. Amoco Oil Company, 740 F.2d 602, 612 (8th Cir. 1984). See also Ellis v. Mobil Oil Corp.*, 969 F.2d 754, 755 (9th Cir. 1993) (finding "overriding purpose of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship").

As remedial legislation, the PMPA must be construed liberally, consistent with its primary goal of protecting franchisees. *See, Khorenian v. Union Oil Co. of Calif.*, 761 F.2d 533, 535 (9th Cir. 1985), cited with approval in *Barnes II*, 824 F.2d at 305. The PMPA seeks to achieve its goals by "specifically set[ting] forth the permissible grounds for termination or nonrenewal of franchise relationships, and bestow[ing] on federal courts jurisdiction to remedy violations of the Act." *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 332 (11th Cir. 1989), *amended on den. of pet. for reh.*, 893 F.2d 1274 (11th Cir. 1989). Under the PMPA, the termination of a petroleum franchise is barred unless the termination meets specific statutory justifications. *See, Darling v. Mobil Oil Corp.*, 864 F.2d 981, 984 (2nd Cir. 1989). As described in *Bridges Enters. v. Exxon Co. U.S.A.*, 820 F.2d 123, 124 (5th Cir. 1987), "[t]he statute is exclusive: a franchisor may terminate or nonrenew a franchise only if its action is based on a permitted ground, and only if the stringent notification requirements of Section 2804 have been met." *See also Barnes I*, 795 F.2d at 361. Where a franchisor bases its termination on a breach of the agreement, it must be shown that the termination was in fact based on the breach. *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1469 (9th Cir. 1993).

## B.    The PMPA's Strict Notice Requirement.

Under the PMPA, 90 days notice is the statutory norm. *See*, 15 U.S.C. §2804(a). Only in those extreme cases where giving 90 days notice is not reasonable is the

franchisor excused from the 90 day requirement and in that instance, notice is to be given "on the earliest date on which furnishing of such notification is reasonably practicable." 15 U.S.C. §2804(b). Courts have cautioned that "the 90-days notice ordinarily required by the PMPA should not be lightly excused." *Wisser Co. Inc. v. Mobil Oil Co.*, 730 F.2d 54, 60 (2d Cir. 1984). Moreover, the "less than 90 days notice requirement is not an "'all or nothing' requirement that permits no notice at all when 90 days would be unreasonable." *Zipper v. Sun Company, Inc.*, 947 F. Supp. 62, 69 (E.D.N.Y. 1996).

### C.    The PMPA's Prohibition on the Termination of Franchises Based on Stale Claims.

As set forth above, a 90-day termination notice is the norm. Where, however, a franchisor elects to proceed under § 2804(b) to provide less than 90 days notice upon the occurrence of an "event", section 2802(b)(2)(C)(ii) of the PMPA explicitly requires that the occurrence on which the termination is based cannot be "more than 60 days prior to the date on which notification of termination . . . is given." Thus, the PMPA explicitly prohibits franchisors from declaring emergencies, and avoiding the 90 day statutory norm over stale occurrences about which they have been aware for some time.

### D.    The PMPA's Liberal Injunctive Standard.

As part of the general scheme for protecting franchisees, the PMPA "establishes a liberal standard for the issuance of a preliminary injunction." *Lyons v. Mobil Oil Corp.*, 526 F.Supp. 961, 968 (D. Conn. 1981); *Khorenian*, 761 F.2d at 535. That relaxed injunction standard "was designed to benefit the small retailer" and the Act was "intentionally drawn to facilitate the grant of injunctive relief." *Barnes II, supra*, 824 F.2d at 306. In *Mobil Oil Corp. v. Vachon*, 580 F. Supp. 153, 156 (D. Mass. 1983), the court carefully explained the applicable injunction standard:

Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if –

(A) the franchisee shows -
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party is not renewed, and
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

The PMPA, therefore, **does not require a showing of irreparable harm.** Even if irreparable harm were a requirement, however, the mere loss of a franchise has been found "irreparable." *See Stenberg v. Checker Oil Co.*, 573 F.2d 921 (6th Cir. 1978); *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1304 (D. Minn. 1979); *Mils Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971); *Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. 109, 116 (E.D. Wis. 1980). **Nor does the franchisee have to show a probability of success on the merits. He need only show some "reasonable chance of success" on the merits.** *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 116 (E.D. Mich. 1978).

The franchisee, in the language of the statute, must present a case which raises "sufficiently serious questions going to the merits" of the case. The courts must also look at the balance of the hardships. If there is less hardship imposed upon the franchisor than upon the franchisee by granting the injunction, the court must consider this state of affairs in evaluation of the necessity for injunctive relief. It is a point in the franchisee's favor. *See Gilderhus v. Amoco Oil Co.*, *supra*, at 1304; *Daniels v. Dilmar Oil Co.*, 502 F.Supp. 178, 181 (D.S.C.1980); *Wojciechowski, supra* at 112. Judged by this liberal standard,

plaintiff is clearly entitled to the relief it seeks.

## IV.    **LEGAL ARGUMENT**

In the present case, Exxon's Termination Notice unequivocally states that the franchise will be terminated on March 29, 2006. *See,* **Exhibit E** to the Complaint. Moreover, there is no serious question about the balance of hardships, which clearly favors plaintiff under 15 U.S.C. § 2085(b)(2)(B).    Plaintiff will lose a valuable investment, and the business and franchise which it has operated for many years.    In contrast, any injury to Exxon will be minimal to non-existent. This is not a case where the dealer has failed to pay monies owed, or committed an act where there is a risk of incurring further debt. Accordingly, the only genuine issue for purposes of this motion is whether there exist "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. § 2805(b)(2)(A)(ii).    As set forth in detail below, such serious questions are present related to both the grounds for the termination, and the notice related to those grounds.

### A.    **Serious Questions Going To The Merits Exist Regarding The Substantive Basis For the Termination.**

An injunction should issue because serious questions going to the merits exist regarding the reasons for termination proffered by Exxon.    Exxon is required to demonstrate the "occurrence of an event which is relevant to the franchise relationship and as a result of which . . . termination is reasonable . . . ." 15 U.S.C. § 2802(b)(2)(C). Upon a trial of the merits, however, Exxon (which shoulders the burden of proof under 15 U.S.C. § 2805(c)), will be unable to show <u>any</u> such "occurrence," let alone the type required to support a lawful termination under the Act.    Thus, there are serious questions

going to the merits regarding the presence of a legally cognizable "occurrence of an event" and whether any such occurrence of an event justifies a termination.

> 1.    **Exxon Cannot Show The "Occurrence of an Event" As Required Under Section 2802(b)(2)(C) Because Rising Micro is The Franchisee, Not Mahmud Rashid, and Thus the Franchise May Not Be Terminated For Occurrences Attributable to Mahmud Rashid.**

Serious questions going to the merits exist in this case because Exxon is impermissibly basing the termination of Rising Micro's franchise on an occurrence attributable to Mahmud Rashid who is, both as a matter of law and fact, not the franchisee. Under the PMPA, the term "franchisee," is defined to mean a "retailer or distributor" who under a franchise is permitted to use a trademark in connection with the sale, consignment or distribution of motor fuel. 15 U.S.C. § 2801(4). In this case, Rising Micro is the franchisee; Mr. Rashid is not. *See,* 2004 Franchise Agreement.

Exxon impermissibly seeks to conflate the activities of Mr. Rashid with those of Rising Micro, the franchisee. Indeed, the Termination Letter, which begins "Dear Mahmud Rashid" explicitly states that "[t]his decision is based upon *your* guilty plea to a one count information charge in violation of Title 18, United States Code, Section 1343." (Emphasis supplied). Nowhere in the Termination Letter, though, does Exxon refer to any event or occurrence attributable to Rising Micro. Indeed, Exxon cites in the Termination Letter §§ 2802(c)(1) and 2802(c)(12) of the PMPA, which provide as grounds for a valid termination, respectively, that the <u>franchisee</u> (1) commit fraud or criminal misconduct, or (2) be convicted of a felony involving moral turpitude.[2] Thus,

---

[2]    Among the occurrences that provide valid grounds for a terminations, section 2802(c)(1) refers to "fraud or criminal misconduct by the *franchisee* relevant to the operation of the marketing premises." (Emphasis supplied). Section 2802(c)(12) refers to

Exxon has based its termination on a provision requiring a conviction of the *franchisee*, i.e., Rising Micro, which indisputably did not occur here. In the context of the PMPA, Mahmud Rashid and Rising Micro are legally distinct entities vis-à-vis Exxon, and may not be randomly substituted for the other where doing so is expedient to Exxon.

This distinction is critical, as the PMPA treats only the "franchisee" as the actual party to the franchise contract. *See, Khan v. State Oil Co.*, 907 F.Supp. 1202, 1206 (N.D. Ill. 1995) (holding that because corporation was not the franchisee, it could not state claim against franchisor for alleged violation of the PMPA), *rev'd on other grounds,* 93 F.3d 1358 (7th Cir. 1996); *Joy v. B.P. Products North America, Inc.*, 332 F. Supp.2d 1084, 1087 (N.D. Ill. 2004) (granting preliminary injunction, holding "there has to be some evidence of franchisee culpability").[3]   In this case, granting an injunction is appropriate given that Exxon has not cited any occurrence attributable to Rising Micro.

In addition, serious questions going to the merits further exist because Exxon's reliance on Section 2802(c)(12), which refers to the "conviction" of the franchisee is entirely misplaced. This purported basis is premature at best, as a guilty plea does not become final until a sentence is imposed. *See,* Fed. R. Crim. P. 32(d). Without a final guilty plea, there can be no judgment of conviction. *See id.* Accordingly, Exxon may not rely on § 2802(c)(12) as the basis for termination, because a guilty plea is not equivalent to a "conviction." *See, U.S. v. Douglas*, 974 F.2d 1046, 1048 n.2 (9th Cir. 1992) (citing Federal Rules of Criminal Procedure for the rule that "a guilty plea does not become final

---

the "conviction of the *franchisee* of any felony involving moral turpitude" among the occurrences that may trigger a valid terminations.

[3]     *See also, Akparewa v. Amoco Oil Co.*, 138 Md. App. 351, 371-72 (2001) (corporation lacked standing, under state version of the PMPA, to sue for violation of statute).

and may be withdrawn for any fair or just reason before sentence is imposed."). Indeed, at least one Circuit Court has upheld a trial court's grant of a preliminary injunction in a PMPA case where the franchisee "entered a guilty plea but ha[d] yet to be sentenced on a felony charge." *See, Kohanoff v. Arco Products Co.*, 77 F.3d 480 (9th Cir. 1996). The facts in the instant case, however, are even stronger than in *Kohanoff* as unlike the situation here, the guilty plea in that case was entered by the actual franchisee.

Plaintiff is aware of *Lewis v. Exxon Corp.*, 716 F.2d 1398 (D.C. Cir. 1983) and *Camina Services, Inc. v. Shell Oil Co.*, 816 F. Supp. 1533 (S.D. Fl. 1992), both of which are easily distinguishable. First, *Lewis* stands only for the unremarkable proposition that a conviction need not be upheld on appeal before it can serve as the basis for a termination under 15 U.S.C. § 2802(c)(12). That limited point of law is not before this Court, as there has not even been a judgment of conviction (much less an appeal), because Mr. Rashid has not been sentenced yet. *See,* Fed. R. Crim. P. 32(d). In this regard, *Lewis* actually *supports* plaintiff, as it holds that "conviction" means the "judgment entered upon the verdict or plea." 716 F.2d at 1399. Again, using that definition, there has been no "conviction" in this case because no judgment has yet been entered against Mr. Rashid.

*Camina Services*, in which the Court attributed the criminal wrongdoing of an individual to the corporate franchisee also does not apply here. After the district court correctly noted that the term "franchisee" is defined as a "retailer <u>or</u> distributor," who under a franchise is permitted to use a trademark in connection with the sale of motor fuel, *see,* 816 F. Supp. at 1538 (emphasis supplied), the Court erroneously assumed that the plaintiff in the case was a distributor and not a retailer. Even though the plaintiffs in

*Camina Services* were retailers, the Court then applied the PMPA's definition of "affiliate" (15 U.S.C. § 2801(15)), which applies only to a distributor, not a retailer, to find that the individual in question "controlled" the franchisee.[4] Thus, the district court only arrived at its conclusion through incorrectly labeling the "retailer" a "distributor," and then compounded its error by using the term "affiliate" to link the individual to the corporate franchisee. In this case, however, Rising Micro is plainly a "retailer," *see,* 15 U.S.C. § 2801(7), and the "affililate" concept has no applicability. *Carmina Services* was wrongly decided and is not applicable here in any event.

As set forth above, serious questions going to the merits are raised by Exxon's failure to attribute a terminable offense to the franchisee, as opposed to Mr. Rashid.[5]

---

[4]     Indeed, the only places the term "affiliate" appears in the entire PMPA is in the definition of a "refiner" and a "distributor," not in the definition of "retailer." *See,* 15 U.S.C. § 2801(5), (6) and (7). This conscious distinction cannot be ignored.

[5]     Plaintiffs are also entitled to investigate whether the reasons stated by Exxon are pretextual. *See, e.g., Reyes v. Atlantic Richfield Co.,* 12 F.3d 1464, 1469 (9th Cir. 1993); *Brownstein v. Arco Petroleum Products Co.,* 604 F.Supp. 312, 315 (E.D. Pa. 1985) (pretextual terminations not permitted). *Gilderhus v. Amoco Oil Co.,* 470 F.Supp. 1302, 1305 (D. Minn. 1979) (granting preliminary injunction where evidence showed Amoco's termination was motivated by retaliatory considerations, i.e., engaging Amoco in litigation and that the franchisor was simply looking for an excuse to terminate); *Munno v. Amoco Oil Co.,* 488 F. Supp. 1114, 1118 (D. Conn. 1980) (explaining that "because of the potential for sham determinations – determinations actually based on impermissible motives but outwardly justified in terms of the statutory requirements – Congress was also moved to consider additional protection for franchisees"). Here, given its long-standing knowledge of the occurrences upon which it bases this termination, Exxon's sudden decision to terminate Rising Micro's franchise in the days immediately following the signing of the lease for a new baseball stadium on the same block as the Station, which dramatically increased the value of the real estate is, at a minimum, extremely curious.

       **2.**      **Exxon is Precluded From Basing Termination on an Occurrence About Which It has Known for Two Years and Where it Induced Rising Micro to Expend a Large Sum of Money on a Car Wash After Learning of that Occurrence.**

In this case, Exxon has based the termination, in part, on 15 U.S.C. § 2802(c)(1), which states that "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" provides lawful grounds for termination. In addition to the fact that, as set forth above, Exxon may not rely on this ground for termination because Mahmud Rashid is not the franchisee, Exxon is further precluded from relying on this provision for at least two separate reasons.

First, as set forth above, section 2802(b)(2)(C)(ii) of the PMPA explicitly requires that the occurrence on which the termination is based cannot be "more than 60 days prior to the date on which notification of termination . . . is given." In this case, Exxon was unquestionably aware of the accusation of fraud or criminal misconduct by Mahmud Rashid as on February 12, 2004 a search warrant was executed at the Station in the presence of an Exxon representative. Thereafter, on information and belief, Exxon was informed of the ongoing investigation into the then-alleged criminal activities at the Station. Thus, even though Exxon was well aware of the activities (i.e. fraud or criminal misconduct) purportedly justifying termination as early as March 2004, it waited until March 2006 to terminate Rising Micro, and then did so by giving less than 90 days notice.

Any reliance by Exxon on Section 14.1(c)(i)(B) of the Franchise Agreement, which purports to allow termination for the "fraud or criminal misconduct of the Key Individual relevant to the operation of Marketing Premises" would be entirely misplaced.

If Exxon is relying on this Section, it is plainly alleging a violation of the franchise agreement under § 2802(b)(2)(A)[6], *see*, Termination Letter ("Such a plea is a violation of Articles XIV, Section 14.1 of your PMPA Franchise Agreement"). Thus, Exxon is claiming that the alleged "fraud and criminal misconduct" violate the franchise agreement, not that there has been a violation of § 2802(b)(2)(C), which refers to the "occurrence of an event" as the necessary trigger for termination. This distinction is critical because Exxon may not rely on a violation of § 2802(b)(2)(A), which it is alleging, where such basis was not included in the Termination Letter. *See, Svela v. Union Oil Co. of California*, 807 F.2d 1494 (9th Cir. 1987) (holding that grounds not included in the notice may not be relied upon later); *N.I. Petroleum Ventures Corp., v. Gles, Inc.*, 331 F. Supp.2d 251, 258 (D. Del. 2004) ("a franchisor may not defend a termination or non-renewal with reasons not disclosed in the notice letter."). Moreover, even if this alleged violation could be read as a violation of § 2802(b)(2)(A) (which it cannot), as set forth above, this alleged violation is stale, as the acts constituting the fraud and criminal misconduct took place several years ago, which Exxon plainly knew about.[7]

Second, and related, Exxon is equitably estopped from terminating Rising Micro's franchise on the ground of fraud or criminal misconduct where it renewed the franchise

---

[6]    Section 2802 (b)(2)(A) permits a termination for a "failure of the franchisee to comply with any provision of the franchise."

[7]    Nor may Exxon rely on a purported violation of Section 14.1(c)(i)(D) of the franchise agreement, which permits termination for the "conviction of the Key Individual for any felony involving moral turpitude." First, this would also be an alleged violation of the franchise agreement under § 2802 (b)(2)(A), of which Exxon did not give notice. Second, as set forth above, there has been no conviction because Mr. Rashid has not yet been sentenced. Third, to the extent that this provision purports to impose an obligation on the franchisee more strict than that permitted by the PMPA, by allowing the conviction of the Key Management Person, as opposed to the conviction of franchisee under § 2802(c)(12), the PMPA bars such a provision. *See, N.I. Petroleum Ventures Corp., v. Gles, Inc.*, 331 F. Supp.2d, *infra*.

and required Rising Micro to invest in a $95,000 car wash on the Station premises, even after Exxon became aware of the accusations of criminal wrongdoing at the Station.

The unpublished decision of *Filiaga v. Chevron U.S.A., Inc.*, No. 89-4098 (10th Cir. 1990), attached hereto as Exhibit 1, is instructive in this regard. In *Filiaga*, Chevron claimed that it was entitled to terminate the franchise pursuant to 15 U.S.C. § 2802(c)(4) on the ground that it lost its underlying ground lease to the marketing premises. Filiaga (the dealer) argued that Chevron was equitably estopped from relying upon that ground for termination, as Chevron had represented to both Filiaga and to a representative of the SBA, prior to the commencement of the relationship, that the franchise would continue to be renewed for at least ten years. On the basis of these assurances, Filiaga "applied for and was granted a $45,000 SBA loan, secured by his home, other real property, his car and all his personal property." Slip Op. at 2. Filiaga claimed that "Chevron's negligent misrepresentations should estop Chevron from asserting compliance with the PMPA as a total defense. *Id.* Chevron claimed that PMPA totally preempted the equitable estoppel claim and the district court agreed, granting Chevron summary judgment.

The Tenth Circuit reversed, rejecting the preemption argument and holding that "[t]he legislative history of the Act [PMPA] supports the view that equitable estoppel should be considered even in the face of compliance with the Act." Slip Op. at 5. The Court noted that the legislative history was concerned about statements made by the franchisor regarding the continuing nature of the franchise,[8] and that Congress left to "the courts the task of resorting to traditional principles of equity to maximize attainment of

---

[8]     The legislative history provides that the reasonable expectations of franchisees that the relationship will be a continuing one are "often the result of, and fostered by, statements and actions of the franchisor." Senate Report at 876.

the competing statutory objectives . . . ."  Slip Op. at 5, *quoting* Senate Report at 901.
*See also, Wesley v. Mobil Oil Corp.*, 513 F.Supp. 227, 230 (E.D. Pa. 1981) (also
recognizing applicability of estoppel in a PMPA termination context).

Here, Exxon should be equitably estopped from terminating the franchise given
that even after learning about the serious charges leveled against Mr. Rashid, Exxon
insisted, on penalty of termination, that it purchase a brand new car wash.

### 3.    Exxon's Failure to Give 90 Days Notice Creates a Factual Issue Regarding the Reasonability of the Notice Provided.

Where a franchisor elects to proceed under § 2804(b) to provide less than 90 days
notice upon the occurrence of an "event", section 2802(b)(2)(C)(ii) of the PMPA
explicitly requires that the occurrence on which the termination is based cannot be "more
than 60 days prior to the date on which notification of termination . . . is given."
Moreover, in determining the reasonableness of less than 90 days' notice, the issue of
"reasonableness" is necessarily an issue of fact.  *See, Roberts v. Amoco Oil Co.*, 740 F.2d
602, 606 (8th Cir. 1984) (In discussing another section of the PMPA, court found that the
legislative history of PMPA suggests that Congress intended to favor franchisees by
treating "reasonableness" determination as an issue of fact). The term "reasonable" in the
PMPA has been interpreted to mean that which is "just, fair or proper." *Doebereiner v.
Sohio Oil Co.*, 880 F.2d 329, *as amended on denial of rehearing*, 893 F.2d 1275 (11th
Cir. 1990).

In this case, factual questions abound regarding when Exxon became aware of the
fraud and or criminal misconduct it alleges in the Termination Letter, and whether given
that knowledge, it was reasonable to provide less than 90 days notice.  As set forth above,

Exxon was well aware of the allegations against Mahmud Rashid over two years before it moved to terminate the franchise. Because courts have cautioned that "the 90-days notice ordinarily required by the PMPA should not be lightly excused," *Wisser Co. Inc. v. Mobil Oil Co.*, 730 F.2d 54, 60 (2d Cir. 1984), serious questions going to the nature of the reasonableness of Exxon giving less than 90 days notice exists here, and an injunction should issue.

## V.    CONCLUSION

Under the PMPA's relaxed standard, there are serious questions going to the merits of this case, making such questions a fair ground for litigation. In addition, the balance of hardships with regard to the granting or denial of the injunction greatly favors the plaintiffs. As a result, an injunction should be issued to preserve the franchise relationship pending a trial on the merits.

Respectfully Submitted,

LERCH, EARLY & BREWER, CHARTERED

_____
Harry C. Storm, #332981
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814
301-986-1300(Telephone)
301-347-1520 (Fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction will be served with the Complaint.

_____
Harry C. Storm

578747v1

18

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**FILED**
United States Court of Appeals
Tenth Circuit

JUL 20 1990

ROBERT L. HOECKER
Clerk

FASI M. FILIAGA,                                )
                                                )
          Plaintiff-Appellant,                  )
                                                )
v.                                              )     No. 89-4098
                                                )   (D.C. No. 88-NC-096S)
                                                )       (D. Utah)
CHEVRON U.S.A., INC.,                           )
                                                )
          Defendant-Appellee.                   )

---

ORDER AND JUDGMENT*

---

Before TACHA, SETH, Circuit Judges, and BROWN,** District Judge.

     **Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

---

     This case comes to us on appeal of summary judgment entered in favor of defendant Chevron U.S.A., Inc. Plaintiff Fasi Filiaga claims that Chevron violated the provisions of Title I of the Petroleum Marketing Practices Act, 15 U.S.C.

---

*     This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3.

**EXHIBIT**

**1**

§§ 2801-2806 (1982)(the PMPA or the Act), when it did not renew its five-year-old franchise with Filiaga. We reverse and remand to the district court for further proceedings.

Filiaga asserts that Chevron's marketing agent made negligent representations to Filiaga and to a loan officer of the Small Business Administration (SBA) before Filiaga entered the franchise relationship. The agent allegedly told Filiaga and the SBA that the franchise would continue to be renewed to at least ten years' duration. Allegedly on the basis of these representations, Filiaga applied for and was granted a $45,000 SBA loan, secured by his home, other real property, his car and all his personal property. Filiaga argued below and reasserts here that Chevron's agent's negligent misrepresentations should estop Chevron from asserting compliance with the PMPA as a total defense.

Chevron counters this claim by asserting that compliance with the PMPA preempts all common law claims and theories tangential to the termination or nonrenewal of a franchise, including equitable estoppel. Chevron maintains that it did not violate any of the provisions of the PMPA when it notified Filiaga of its decision not to renew his franchise at the expiration of the ground lease underlying the franchise. Chevron's defense relies on two provisions of the PMPA: (1) section 2802(c)(4), which specifically acknowledges that loss of the underlying ground lease by the franchisor is a legitimate reason to terminate or decline renewal; and (2) section 2804, which sets forth an explicit notice procedure. The district court, acting upon a magistrate's

2

recommendation, agreed with Chevron and entered summary judgment in its favor.

We review this grant of a motion for summary judgment under the same standard employed by the trial court:

> Under Rule 56(c), summary judgment is proper only if it is apparent from the record that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment, and the court must review the record in the light most favorable to the opposing party.

Ewing v. Amoco Oil Co., 823 F.2d 1432, 1437 (10th Cir. 1987).

The parties do not dispute the facts underlying Chevron's stated rationale for abandoning the franchise or the notification procedure which Chevron utilized. The term of Filiaga's first Dealer Lease and Dealer Supply Agreement was June 1, 1983, through May 31, 1986 (the first agreement). This agreement was renewed by another Dealer Lease and Dealer Supply Agreement which expired June 30, 1988 (the second agreement), the date on which Chevron's ground lease expired. Although Chevron had an option to renew the ground lease for an additional ten years, it chose not to do so, allegedly because of the age of the building, the market share of retail gasoline sales in the franchise's geographical area, and Chevron's long range retail marketing plans for that area.[1] Both the first and the second agreements expressly stated that Chevron

---

[1] Merely having an option to renew an underlying ground lease does not obligate the franchisor to do so. See Lugar v. Texaco, Inc., 755 F.2d 53, 56 (3d Cir. 1985); S. Rep. No. 731, 95th Cong., 2d Sess. 3, reprinted in 1978 U.S. Code Cong. & Admin. News 873, 896.

3

had the right to terminate the agreements, subject to notice provisions, if its underlying ground lease terminated. The second agreement was also accompanied by a letter dated January 20, 1986, which informed Filiaga that the ground lease for his station expired June 30, 1988. Subsequently, on February 2, 1988, Filiaga received written notification of Chevron's intent not to renew his franchise agreement and the reason for nonrenewal. All of these actions were conducted pursuant to and in compliance with the PMPA's franchise nonrenewal provisions.

However, we disagree with the district court's decision that there is no merit in Filiaga's argument that equitable estoppel prevents a franchisor from claiming a complete defense through compliance with the PMPA. While Chevron relies on section 2806 of the Act for authority that Filiaga's estoppel claim is preempted, other courts have gone beyond the PMPA when warranted by equitable considerations. See Wesley v. Mobil Oil Corp., 513 F. Supp. 227, 230-31 (E.D. Pa. 1981); cf. Baldauf v. Amoco Oil Co., 553 F. Supp. 408, 417 (W.D. Mich. 1981), aff'd, 700 F.2d 326 (6th Cir. 1983)(examining promissory estoppel claim but rejecting it under the facts of the case); Wojciechowski v. Amoco Oil Co., 483 F. Supp. 109, 115 (E.D. Wis. 1980)(same).

This circuit has articulated the intent of Congress in the PMPA when we stated in Ewing v. Amoco Oil:

> [O]ne of Congress' primary purposes in enacting the PMPA was to protect franchisees against arbitrary and discriminatory terminations or nonrenewals. A longstanding franchisee has a legitimate expectation that the franchise relationship will be a continuing

4

one.   The statute  is  thus  directed   in   part   at
"protecting the buildup of goodwill by those individuals
who have invested time and money into the operation of a
franchise."

823   F.2d at 1438 (quoting Brewer v. Exxon Corp., 626 F. Supp. 76,

79 (E.D. Tenn. 1985)).  See also  Sandlin  v.  Texaco  Refining  &

Marketing Inc., 900 F.2d 1479, 1480-81 (10th Cir. 1990).

The  legislative  history  of  the Act supports the view that

equitable estoppel should  be  considered  even  in  the  face  of

compliance with the Act.  For example, the Senate report states:

> [O]ften  the reasonable expectations of the parties to a
> motor fuel franchise are that the relationship will be a
> continuing one.  This expectation by the franchisee, in
> particular, is often the result of, and  fostered  by,
> statements  and actions of the franchisor.  As a result,
> non-renewal of a motor fuel  franchise  relationship  at
> the  expiration of its term can be almost as punitive as
> termination of  the  franchise  during  its  term.   The
> reasonable  expectations  of the franchisee, rather than
> any definitive contract rights, are destroyed.

S. Rep. No. 731, 95th Cong., 2d Sess. 3, reprinted in  1978  U.S.

Code  Cong.  & Admin. News 873, 876 (the Senate report).  It would

be anomalous  for  us  to  interpret  the  statute  as  preempting

equitable  protection  from  this  very  destruction of reasonable

expectation.  Furthermore, the  legislative  history  goes  on  to

state:

> It  is clear that no single statutory principle would be
> flexible  enough  to  deal  with  so  wide  a  range  of
> potential  conflicts.   Therefore,  the  [PMPA] leaves to
> the  courts  the  task  of  resorting  to  traditional
> principles  of  equity  to  maximize  attainment  of  the
> competing statutory  objectives  consistently  with  the
> supremacy clause of the Constitution and the purposes of
> the Federal legislation.

Senate report at 901 (commenting on PMPA § 2806).

We are persuaded that compliance with the provisions of the PMPA was not intended by Congress to insulate the franchisor from equitable considerations and therefore hold that the district court must examine Filiaga's claim of equitable estoppel.

In granting summary judgment in favor of Chevron, the district court acknowledged that there are disputed issues of material fact relating to Filiaga's claim of equitable estoppel. Although that court described these disputes as "frail," nevertheless, they also render summary judgment inappropriate because, taken in the light most favorable to Filiaga, they present material issues for resolution by the trier of fact.

Filiaga asserts in his complaint and his affidavit that, before Filiaga entered into the first agreement, George Fotes, a marketing representative of Chevron, assured Filiaga in the presence of Filiaga's wife that Chevron would renew the franchise documents to accommodate a franchise arrangement of at least ten years' duration. Relying on this information, Filiaga applied for a $45,000 loan from the SBA. The SBA would not approve the loan for a franchise of less than a ten-year duration. In his answers to interrogatories, Filiaga listed Allen Ferre, the SBA loan officer who handled Filiaga's loan, as a witness, stating that Ferre would testify that while he had no recollection of a particular communication with a Chevron representative, he would not ordinarily have approved a ten-year loan on a three-year lease without confirmation of the franchisor's commitment to a ten-year franchise relationship. Filiaga also testified in deposition that he called Fotes to request that Fotes contact the SBA to give it

6

the necessary assurance. The SBA called Filiaga to notify him of approval of his loan within a day or two after Filiaga called Fotes.

Fotes disputes Filiaga's account of their interactions. Instead, Fotes stated in his affidavit that he informed Filiaga that the dealership would be discontinued if Chevron did not renew the ground lease and that nonrenewal was a possibility. Fotes also denies assuring Filiaga or any other entity or person that Filiaga would be granted any particular tenure in the subject property beyond the expiration of the initial ground lease term in 1988.

According to the deposition testimony of the regional retail manager in charge of Filiaga's franchise area, the particular regional marketing analysis which dictated Chevron's abandonment of Filiaga's station was not begun until a year after the first agreement was executed. At the time Filiaga and Chevron entered the first agreement, Chevron's long-term marketing plans were made on the basis of each individual location's performance rather than larger geographic area market analysis. However, this same supervisor stated that even under the previous station-by-station long range planning, there had been inferences in the file that it was probably not a long-term site.

The record also reveals that Filiaga attempted to purchase the property and improvements prior to expiration of the ground lease, but was unsuccessful in his attempts to do so. Chevron first quoted a "ballpark estimate" of $100,675 for the purchase of the improvements on the property, a price sufficiently high that

it prohibited Filiaga from obtaining financing. Later Chevron amended that purchase price down to $36,000, but by that time, still prior to his receipt of the ninety-day notification, another party, whom Filiaga claims was another Chevron dealer, had allegedly obtained an option to purchase or lease the underlying property. Chevron denies any association with this third party in conjunction with the property prior to the expiration of Chevron's ground lease on June 30, 1988.

This brief recitation of disputed facts from the district court record of the parties' preliminary discovery, truncated by the order granting summary judgment, indicates that this case is not appropriate for summary judgment. While we express no opinion as to the eventual outcome of the case, there are several significant issues which await resolution by the trier of fact.

The judgment of the United States District Court for the District of Utah is REVERSED and REMANDED for further proceedings consistent with this opinion.

ENTERED FOR THE COURT
PER CURIAM

8