## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RISING MICRO, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No: 1:06-CV-00572-GK |
| EXXON MOBIL CORPORATION, | ) |
| Defendant. | ) |

### DEFENDANT EXXON MOBIL CORPORATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The narrow legal issue presented in this case is whether, under applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 *et. seq.*, defendant Exxon Mobil Corporation ("ExxonMobil") properly terminated plaintiff Rising Micro, LLC's ("Rising Micro") PMPA franchise based on the guilty plea of Mahmud Rashid, Rising Micro's President and sole owner, to wire fraud. Because Rising Micro cannot demonstrate any serious questions regarding ExxonMobil's compliance with the PMPA, Rising Micro's request for a preliminary injunction should be denied.[1]

None of the pertinent facts in this case are in dispute. Mr. Rashid operates an Exxon-brand service station in Washington, D.C. through a limited liability company named Rising Micro. Mr. Rashid is the sole owner of Rising Micro, as well as its President. On January 17, 2006, Mr. Rashid pled guilty in this Court to wire fraud, admitting to fraudulently double-charging employees of the D.C. Government with respect to motor fuel purchases at the D.C. station for a period of three years. Thus, Mr. Rashid admitted to (1) committing a felony

---

[1] Although Rising Micro's motion is styled as a request for a temporary restraining order and a preliminary injunction, only the request for preliminary injunctive relief is before this Court. ExxonMobil extended the effective date of Rising Micro's termination to May 2, mooting the need for a temporary restraining order.

involving moral turpitude; and (2) engaging in fraudulent and criminal misconduct with respect to the operation of his service station.  Under §§ 2802(b)(2)(C), (c)(1) and (c)(12) of the PMPA, ExxonMobil's termination of Rising Micro's franchise was therefore indisputably proper.

Seeking to avoid the serious consequences of Mr. Rashid's conduct and enjoin ExxonMobil's termination, Rising Micro raises a series of meritless arguments that are contrary to law and logic.  Rising Micro claims that Mr. Rashid's conviction is not a conviction of the "franchisee" (because Rising Micro is nominally the party with whom ExxonMobil has contracted) and that his guilty plea is not a "conviction" because Mr. Rashid has not yet been sentenced.  Yet courts have rejected both arguments in nearly identical circumstances.  *See Atlantic Richfield Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir. 1987) (franchise held by corporation may be terminated under PMPA where sole shareholder is convicted of a crime involving moral turpitude); *Alexander v. Exxon Co., U.S.A.*, 949 F. Supp. 1248, 1252-53 & n.4 (M.D.N.C. 1996) ("A knowing, voluntary, and intelligent guilty plea to an offense conclusively establishes elements of offense and material facts necessary to support conviction").

Likewise unavailing are Rising Micro's attacks on ExxonMobil's notice of termination.  The notice was not "stale"; ExxonMobil terminated Rising Micro within 60 days of Mr. Rashid's conviction (the event that provided the grounds for the termination), as § 2802(b)(2)(C)(ii) of the PMPA requires.  The claim that ExxonMobil had prior knowledge of Mr. Rashid's pervasive fraudulent acts – by virtue of the execution of a search warrant at Rising Micro's station – is devoid of evidentiary support and, in any event, is irrelevant and insufficient as a matter of law. *See Nassau Boulevard Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 362-63 (2d Cir. 1989) (franchisor's knowledge of allegation of criminal misconduct by franchisee and arrest of franchisee did not constitute actual or constructive knowledge under § 2802(b)(2)(C)(ii)); *Boatright v. Exxon Co., U.S.A.*, Bus. Franchise Guide (CCH) ¶ 9535, at 20,794-95 (franchisor's knowledge of criminal investigation of franchisee was irrelevant where termination was based on conviction, not investigation).

Nor was ExxonMobil required to give Rising Micro 90 days' notice of termination. The PMPA expressly permits a franchisor to give less than 90 days' notice when it would not be reasonable for the franchisor to give 90 days' notice. PMPA, § 2804(b)(1). Here, the serious situation presented by Mr. Rashid's conviction for wire fraud warranted the 15 days' notice that ExxonMobil provided. Indeed, courts have upheld less than 90 days' notice in similar circumstances. *See Alexander*, 949 F. Supp. at 1253-54 (upholding termination on 39 days' notice where franchisee convicted of felony involving moral turpitude); *Glenside West Corp. v. Exxon Co., U.S.A. (Glenside West II)*, 761 F. Supp. 1118, 1130 (D.N.J. 1991) (upholding immediate termination where franchisee convicted of felony involving moral turpitude).

Finally, Rising Micro's two non-statutory arguments – that ExxonMobil should be equitably estopped from exercising its statutory right to terminate and that the termination was "pretextual" – should be rejected. Section 2806 of the PMPA explicitly preempts inconsistent state law, and courts have ruled that estoppel claims with respect to termination are preempted for this reason. *See Camina Servs., Inc. v. Shell Oil Co.*, 816 F. Supp. 1533, 1538-39 (S.D. Fla. 1992) (promissory estoppel claim preempted). Rising Micro also offers no evidentiary support to establish any of the elements of an estoppel. As to the claim that Mr. Rashid's guilty plea was a "pretext" and that ExxonMobil had some other, more nefarious motive for terminating Rising Micro, the PMPA precludes any inquiry into ExxonMobil's "motive" or "good faith" where termination is based on misconduct by the franchisee, as it was here. *See Smoot v. Mobil Oil Corp.*, 722 F. Supp. 849, 856-57 (D. Mass. 1989).

## STATEMENT OF FACTS

### A.    Franchise Relationship Between ExxonMobil and Rising Micro

On October 29, 2003, ExxonMobil and Rising Micro entered into a PMPA Franchise Agreement with respect to the Exxon-brand service station located at 950 South Capitol Street, S.E., Washington, D.C., 20003 ("D.C. station"), for a three-year term commencing on February 1, 2004 and ending February 1, 2007. (*See* Decl. of John Bednash ("Bednash Decl."), ¶ 4 &

exh. 1 thereto) (attached hereto as Exhibit A).  Rising Micro operated the D.C. station as an Exxon franchisee, leasing the station from ExxonMobil and purchasing Exxon-branded gasoline from ExxonMobil for resale at the station premises.  (*Id.* ¶ 4 & n.1).

ExxonMobil recognizes that some franchisees prefer to incorporate, rather than operating their business in an individual capacity (*e.g.*, as a sole proprietorship).  Because ExxonMobil depends on the personal qualifications of its franchisees in entering into a franchise relationship with them (*id.*, exh. 1 thereto, p. 6), ExxonMobil imposes certain requirements on corporate franchisees.  (*Id.*, exh. 1 thereto, Sections 4.1, 4.3).  Specifically, those franchisees must designate a Key Individual, to whom ExxonMobil may look for day-to-day operation of the service station and performance of the franchisee's contractual obligations.  Towards that end, Section 4.3 of the Franchise Agreement requires that the Key Individual must

- have at least 51% of the ownership interest in the corporation, unless ExxonMobil consents in writing to a lesser interest;

- be the officer with "authority and responsibility for the operation and management of" the business;

- be "authorized to represent and bind" the corporation "in all matters arising under" the Franchise Agreement and all supplemental agreements;

(*Id.*, exh. 1 thereto, Section 4.3(a)-(c); *see also id.* Section 4.1(b) (requiring that Key Individual attend required ExxonMobil training programs and meet ExxonMobil requirements regarding credit, financial capability, business and personal qualifications, business experience and training)).  So significant is the role of the Key Individual that the Franchise Agreement expressly provides, in the Recitals, that ExxonMobil "relies upon . . . the ***personal qualifications of the Key Individual*** and the Key Individual's commitment to the Core Values (if Franchise Dealer is not an individual), in entering into this Agreement."  (*Id.*, exh. 1 thereto, p. 6 (emphasis added)).

Rising Micro was a corporate franchisee – specifically, a limited liability company (LLC) formed in Virginia.  (*Id.*, exhs. 2-3 thereto).  Mahmud Rashid is the sole owner and President of Rising Micro.  (*Id.; see also id.*, exh. 1 thereto, p. 40).  Mr. Rashid executed the Franchise

Agreement, as well as all of the supplemental agreements, on behalf of Rising Micro, in his capacity as President. (*Id.*, exh. 1 thereto; *see also* Complaint (Dkt. 1), exh. A thereto). In its Franchise Agreement with ExxonMobil, Rising Micro designated Mr. Rashid as the Key Individual. (Bednash Decl., exh. 1 thereto, p. 40) (Exh. A).

### B.    Mr. Rashid's Guilty Plea

On January 17, 2006, Mr. Rashid pled guilty to one count of wire fraud, a violation of 18 U.S.C. § 1343. *See United States v. Rashid* ("Criminal Case"), Case No. 1:05-cr-00259-RJL (D.D.C.), Statement of the Offense ("Rashid Stmt.") (Dkt. 10) (attached hereto as Exhibit B). Mr. Rashid's plea was knowing and voluntary; he was represented by counsel; and he acknowledged "I am pleading guilty because I am in fact guilty." (*See* Sept. 18, 2005 K. Wainstein Letter to M. Peterson ("Plea Terms Letter") at 6) (attached hereto as Exhibit C). As part of the plea, Mr. Rashid stipulated to a detailed written summary of his criminal conduct.[2] (*See* Rashid Stmt. at 1) (Exh. B).

Employees of the D.C. Water and Sewer Authority and the D.C. Public Works agencies purchased motor fuel at the D.C. station. (*Id.* at 1). To make their purchases, those employees used the Voyager Fleet Card (VFC) program, which is a "fuel and maintenance credit card system for large organizations with hundreds of vehicles." (*Id.*). The VFC program provided a single commercial account for those agencies, and cards were issued to individual drivers or vehicles in connection with that program. (*Id.* at 2). To enhance security and prevent fraud, there were certain restrictions on the use of VFC card; for example, drivers were required to input a personal identification number (PIN) each time the card is used. (*Id.*).

Fuel purchase transactions at the D.C. station were processed outside at the pump or inside the station at the register. (*Id.*). In both instances, a computer point-of-sale terminal

---

2    Mr. Rashid also stipulated that he was the "owner/operator" of the D.C. station and that his responsibilities included "marketing and maintaining profitability, merchandising and ordering supplies, hiring and supervising employees, maintaining and generating daily sales reports, operating the computer point of sale system (cash register) and interacting with the customers." (*See* Rashid Stmt. at 1) (Exh. B).

electronically transmitted the dollar amount of the transaction and the card holder's account information. (*Id.*). For transactions completed at the pump, the equipment registers the dollar amount and transmits debit instructions at the conclusion of the transaction to the VFC's card processing service. (*Id.*). For transactions completed at the register, the station attendant must input the dollar amount, and the debit instructions are then transmitted to the processing service. (*Id.*).

From early 2001 (essentially, when Mr. Rashid began operating the D.C. station) through February 2004, Mr. Rashid engaged in a widespread practice of double-billing employees of the aforementioned D.C. Government agencies through fraudulent use of the VFC cards. (*Id.*; *see also* Criminal Case, Information (Dkt. 1), ¶ 1 (attached hereto as Exhibit D)). Employee-customers would give their VFC cards to Mr. Rashid to initiate a transaction. (Rashid Stmt. at 2) (Exh. B). Mr. Rashid would swipe the card and enter an arbitrary dollar amount while the customer was outside. (*Id.*). That card swipe would generate a charge on the VFC account, as well as a sales receipt that the customer never received. (*Id.*). When the customer finished refueling, Mr. Rashid would swipe the VFC card a second time and enter the actual amount for the transaction just completed. (*Id.*). A second sales receipt would be generated, for the customer to sign. (*Id.*). The two transactions would be transmitted to the credit card processing service within minutes of each other. (*Id.* at 2-3).

To circumvent the VFC's security and anti-fraud protections, Mr. Rashid misappropriated a customer's PIN and used that number to initiate the first (fraudulent) transaction.[3] (*Id.* at 3). When the customer would complete the refueling at the pump, Mr. Rashid would have the customer enter his or her own PIN. (*Id.* at 3). As a result, the misappropriated PIN appeared on an inordinate number of transactions (1,789). (*Id.* at 3).

---

[3]    The guilty plea does not identify how Mr. Rashid misappropriated the PIN. When the search warrant was executed at the D.C. station on February 12, 2004, however, agents found a handwritten sign stating "Due to our new system we may need to call for authorization, please put your pin and mileage on the receipt." (See Rashid Stmt. at 4) (Exh. B).

After an audit of the VFC account, officials detected the double-billing scheme and sent undercover agents to the D.C. station to make fuel purchases. (*Id.*). On fourteen occasions, agents made fuel purchases while Mr. Rashid was working. (*Id.*). On every occasion, the agents were billed for two transactions within minutes of each other. (*Id.*). Two receipts would be generated – an unsigned receipt, with an arbitrary dollar amount (entered by Mr. Rashid), that the agent never saw, as well as a signed receipt reflecting the actual price for the fuel purchased. (*Id.* at 3-4). On three other occasions when agents made undercover purchases and Mr. Rashid was **not** at the station, the agents were billed only once, for the legitimate fuel purchase. (*Id.* at 4).

Authorities executed a search warrant for the D.C. station on February 12, 2004. (*Id.*). Agents found both signed and unsigned receipts from double-billed VFC cards, as well as daily sales records that documented the double-billed transactions. (*Id.*). The U.S. Attorney's Office opened its case against Mr. Rashid on July 11, 2005, with the filing of an information. (*See* Criminal Case, Information (Dkt. 1)) (Exh. D). Mr. Rashid entered his guilty plea on January 17, 2006. (*See* Rashid Stmt. at 1) (Exh. B). As part of his plea, Mr. Rashid acknowledged that the D.C. Government agencies he defrauded suffered losses exceeding $120,000. (*Id.* at 4).

### C.    ExxonMobil's Termination Of Rising Micro

On March 14, 2006, ExxonMobil hand-delivered to Rising Micro (Mr. Rashid) written notice that ExxonMobil was terminating Rising Micro's franchise, effective March 29, 2006. (Bednash Decl., ¶ 7 & exh. 4 thereto) (Exh. A). The reason for the termination, as stated in the written notice, was Mr. Rashid's guilty plea to wire fraud. (*Id.*). In terminating Rising Micro's franchise, ExxonMobil specifically invoked §§ 2802(b)(2)(C), 2802(c)(1) and 2802(c)(12) of the PMPA, as well as Section 14.1 of the Franchise Agreement. (*Id.*). ExxonMobil subsequently extended the effective date of termination from March 29 to May 2.

### ARGUMENT

To obtain a preliminary injunction under the PMPA, a terminated franchisee has the burden of showing that: (1) "there exist serious questions going to the merits to make such

questions a fair ground for litigation;" and (2) "on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." PMPA, § 2805(b)(2).  "[S]erious questions" may be found only if the franchisee makes "a **significant showing** of something that would constitute some reasonable chance of success . . . ." *Saad v. Shell Oil Co.,* 460 F. Supp. 114, 116 (E.D. Mich. 1978) (emphasis added); *see also JFC Investors, Ltd. v. Gulf Prods. Div. of BP Oil, Inc.*, 608 F. Supp. 1136, 1140-41 (W.D.N.C. 1985) (PMPA requires "reasonable chance of success" to warrant issuance of preliminary injunction).

## I. EXXONMOBIL IS LIKELY TO PREVAIL ON THE MERITS OF RISING MICRO'S CLAIM

A preliminary injunction is not warranted because Rising Micro cannot demonstrate "serious questions" going to the merits of its PMPA claim; indeed, ExxonMobil is likely to prevail on the merits of that claim.  Congress intended the PMPA to establish "protection for franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises."  S. Rep. No. 731, 95th Cong., 2d Sess. 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874.  At the same time, however, Congress recognized "the legitimate needs of a franchisor to terminate a franchise or not renew a franchise relationship," as well as the "importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences. . . ."  *Id.* at 877.  Congress thus established a "set of rules . . . clearly defin[ing] the rights and obligations of the parties to the franchise relationship in the crucial area of termination of a franchise . . . ."  *Id.*  Under this "set of rules," Rising Micro's franchise termination was indisputably proper.

### A. Mr. Rashid's Conviction For Wire Fraud Is Grounds For Termination Of Rising Micro's Franchise Under The PMPA

Section 2802(b)(2)(C) of the PMPA authorizes the termination of a franchise upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable . . . ."  In § 2802(c), Congress gave specific meaning

to the term "an event which is relevant to the franchise relationship," as used in § 2802(b)(2)(C) of the PMPA.  Section 2802(c) provides, in pertinent part:

> (c)    As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable" includes events such as –
>
> > (1)    fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;
>
> > \* \* \*
>
> > (12)    conviction of the franchisee of any felony involving moral turpitude.

PMPA, § 2802(c)(1), (12).  Termination of Rising Micro's franchise was proper as an enumerated event under both of these provisions.

In addition to events expressly enumerated in § 2802(c), Congress made clear that "certain events, unanticipated by Congress, may also provide a reasonable basis for termination [under Section 2802(b)(2)(C)]."  *Portaluppi v. Shell Oil Co.*, 684 F. Supp. 900, 906 (E.D. Va. 1988), *aff'd*, 869 F.2d 245 (4th Cir. 1989); *see also* S. Rep. 731, 95th Cong., 2d Sess. 38, *reprinted in* 1978 U.S.C.C.A.N. 873, 896 ("The enumerated list ***is not exclusive***.  Other events satisfying the statutory standards set forth in section [2802](b)(2)(C), but not enumerated in the list set forth in subsection (c) of section [2802], may nevertheless serve as a ground for termination or nonrenewal under section [2802](b)(2)(C)") (emphasis added).  Termination of plaintiff's franchise also was proper as an ***unenumerated*** event under § 2802(b)(2)(C).

### 1.    Rising Micro Was Convicted Of A Felony Involving Moral Turpitude

There is no dispute that (1) Mr. Rashid is the President and sole owner of Rising Micro, as well as the Key Individual under his Franchise Agreement with ExxonMobil (*see* Bednash Decl., exhs. 2-3 thereto (Exh. A); *see also id.,* exh. 1 thereto, p. 40); (2) Mr. Rashid was convicted of

wire fraud; and (3) wire fraud is a felony involving moral turpitude.[4]  Thus, Mr. Rashid's

conviction is grounds for termination under §§ 2802(b)(2)(C) and 2802(c)(12) of the PMPA.

Courts have uniformly upheld terminations where a franchisee has been convicted of any felony

involving moral turpitude.  *See Humboldt Oil Co. v. Exxon Co., U.S.A.*, 695 F.2d 386, 388-89

(9th Cir. 1982) (mail and wire fraud); *Fayad v. Mobil Oil Corp.*, 1980 U.S. Dist. Lexis 9126, at

*6-7 (D. Mass. Apr. 23, 1980) (mail fraud); *see also Guerami*, 820 F.2d at 282-83 (possession of

heroin); *Lewis v. Exxon Corp.*, 716 F.2d 1398, 1399-1400 (D.C. Cir. 1983) (bribery and

conspiracy); *Alexander*, 949 F. Supp. at 1252-53 (conspiracy to distribute cocaine); *Glenside

West II*, 761 F. Supp. at 1130 (third-degree aggravated assault and unlawful weapons possession);

*Portaluppi v. Shell Oil Co.*, 684 F. Supp. 900, 903-05 (E.D. Va. 1988) (possession of cocaine),

*aff'd*, 869 F.2d 245 (4th Cir. 1989).  Thus, termination of Rising Micro's franchise was proper

under § 2802(c)(12) of the PMPA.

      A termination under § 2802(c)(12) does not require an inquiry into whether the conviction

is "serious" or whether the franchisor's actions are "reasonable" under the circumstances.  The

PMPA expressly provides that a franchisee's conviction for a felony involving moral turpitude ***is*** a

relevant event that makes termination reasonable as a matter of law.  A franchisor exercising its

right to terminate under § 2802(c)(12) need establish only that the statutory prerequisites have

been satisfied.  *See Guerami*, 820 F.2d at 283 ("[W]e are not called upon to determine whether a

violation was serious enough to warrant termination.  Congress has made that decision already in

specifying events as to which termination is proper, among which is a conviction . . ."); *Humboldt

Oil*, 695 F.2d at 389 ("The [PMPA] explicitly provides that a conviction for a felony involving

moral turpitude is the kind of event that is a reasonable cause for termination.  Congressional

---

4    Rising Micro does not appear to dispute that wire fraud is a felony involving "moral turpitude."  Regardless,
wire fraud meets the definition of that term as used in the PMPA.  *See Humboldt Oil Co. v. Exxon Co., U.S.A.*, 695
F.2d 386, 389 (9th Cir. 1982) ("Intent to defraud is an element of . . . fraud by wire. . . .  Crimes in which fraud is
an ingredient involve moral turpitude") (vacating preliminary injunction against termination of franchisee
convicted of wire fraud); *Fayad v. Mobil Oil Co.*, 1980 U.S. Dist. Lexis 9126, at *6 (D. Mass. Apr. 23, 1980) (mail
fraud is felony involving moral turpitude).

intent could not be clearer"); *Alexander*, 949 F. Supp. at 1253 ("Under the statute, conviction of a felony involving moral turpitude by definition is sufficient grounds for termination of a franchise or non-renewal of a franchise relationship"). The requirements of § 2802(c)(12) have been satisfied here.

Rising Micro's argument that Mr. Rashid's guilty plea is not grounds for termination under § 2802(c)(12) because Rising Micro, and not Mr. Rashid, is nominally the franchisee (*see* Pl.'s Mem. at 10-11) should be rejected. Mr. Rashid is the President of Rising Micro and sole owner of the company. (*See* Bednash Decl., exhs. 2-3 thereto) (Exh. A). Rising Micro can only act through him. He executed the Franchise Agreement and all supplemental agreements on behalf of Rising Micro. (*Id.,* exh. 1 thereto, p. 40). Moreover, Mr. Rashid is the Key Individual under the Franchise Agreement, and the provisions of the Franchise Agreement make clear that the Key Individual is the public face of a corporate franchisee – the individual with "authority and responsibility for the operation and management of the business" and the person "authorized to represent and bind" the franchisee in "all matters" related to the franchise agreement. (*Id.*, exh. 1 thereto, p. 40 & Section 4.3). Mr. Rashid's decision to incorporate his business should not be used to frustrate the purposes of the PMPA, which expressly permits franchisors to make the entirely legitimate and rational business decision not to deal with convicted felons. *See Camina Servs*, 816 F. Supp. at 1537-38 ("'Corporate ownership may not be used to contravene the stated purposes of the PMPA'") (citation omitted).

Indeed, courts have rejected the argument that Rising Micro makes here. In *Atlantic Richfield Co. v. Guerami*, the Ninth Circuit held that an individual franchisee (Guerami) could not escape the consequences of his felony conviction by arguing that a corporation (Apadona Corporation) – of which he was the sole shareholder – was the actual franchisee:

> Even if we agreed that Apadona was the nominal "franchisee," Arco's termination of the franchise would still have been proper. In *Humboldt Oil Co. v. Exxon Co., U.S.A.*, 695 F.2d 386 (9th Cir. 1982), this court affirmed the district court's holding that *a franchise held by a corporation may be terminated under the PMPA when its sole*

> ***shareholder is convicted of a crime involving moral turpitude***.  We
> stated that "good faith belief of the franchisor that the franchisee is
> untrustworthy or engages in fraudulent practices undermines the entire
> franchise relationship. . . ."  [G]uerami was Apadona's sole shareholder
> at all relevant times.  He remained Apadona's president even after he
> went to prison.  Arco had no recourse against any individual other than
> Guerami if problems developed with Apadona.  ***Thus, Guerami's
> conviction undermined the franchise relationship regardless of
> whether he or Apadona was the nominal "franchisee."***

820 F.2d at 283 (emphasis added); *see also Glenside West II*, 761 F. Supp. at 1120, 1128-30

(upholding termination of corporate franchisee where "president and sole shareholder" was

convicted of felony involving moral turpitude); *Humboldt Oil*, 532 F. Supp. 896, 898 (D. Nev.),

*aff'd in relevant part but rev'd on other grounds*, 695 F.2d 386 (9th Cir. 1982).  The rationale of

these cases is fully applicable here.[5]

 Equally erroneous is Rising Micro's claim that a guilty plea is not a "conviction" for

purposes of § 2802(c)(12).  (Pl.'s Mem. at 11-12).  Courts interpreting § 2802(c)(12) of the

PMPA have strongly suggested that a guilty plea is a "conviction" for purposes of that provision.

*See Alexander*, 949 F. Supp. at 1252-53 & n.4 ("A knowing, voluntary, and intelligent guilty plea

to an offense conclusively establishes elements of offense and material facts necessary to support

conviction"); *Boatright*, Bus. Franchise Guide (CCH) ¶ 9535, at 20,792-93 (court implicitly held

that guilty plea, not imposition of sentence, was the "conviction"); *Fayad*, 1980 U.S. Dist. Lexis

9126, at *6-7 (noting that conviction was "based upon [franchisee's] plea of guilty").  One court

has upheld a termination as lawful where the franchisee had been convicted (by jury verdict) but

---

[5] The cases cited by Rising Micro are distinguishable.  *Joy v. BP Products North America, Inc.*, 332 F. Supp. 2d 1084 (N.D. Ill. 2004), involved a station employee who sold marijuana to high school students while the station owner was tending to other stations.  *Id.* at 1085.  Here, however, Mr. Rashid ***admitted to perpetrating the fraud himself.***  Thus, the "evidence of franchisee culpability" that the *Joy* court found lacking, *id.* at 1086-87, is clearly present here.

 Likewise, *Akparewa v. Amoco Oil Company*, 771 A.2d 508 (Md. Ct. Spec. App. 2001), and *Khan v. State Oil Co.*, 907 F. Supp. 1202 (N.D. Ill. 1995), *rev'd on other grounds*, 522 U.S. 3 (1997), simply stand for the proposition that, in circumstances where a franchisee has executed a franchise agreement in an individual capacity – even if the franchisee also has incorporated – the individual is the proper plaintiff in an action based on the franchise agreement.  Neither decision suggests that a franchisee can use the corporate form to frustrate the purposes of § 2802(c)(12).

had not yet been sentenced.  *See Glenside West II*, 761 F. Supp. at 1123-24 & n.9, 1130.  In other contexts, federal courts have rejected the argument that a guilty plea is not a "conviction." *See United States v. Kahoe*, 1998 U.S. App. Lexis 555, at *3-4 (4th Cir. Jan. 15, 1998) (rejecting argument that statute enhancing punishment for "prior conviction" did not encompass a guilty plea where the defendant had not yet been sentenced:  "We find this argument to be unconvincing and agree instead with the Government's contention that a conviction accrues upon a defendant's plea of guilty"); *United States v. Woods*, 696 F.2d 566, 570 (8th Cir. 1982) ("[O]nce guilt has been established whether by plea or by verdict and nothing remains to be done except pass sentence, the defendant has been convicted within the intendment of Congress").  Rising Micro offers no persuasive rationale for adopting a different definition in this case.[6]

> **2.    Rising Micro Engaged In Fraud Or Criminal Misconduct Relevant to the Operation of the Marketing Premises**

Mr. Rashid's conviction is also grounds for terminating Rising Micro's franchise under §§ 2802(b)(2)(C) and (c)(1) of the PMPA, which authorize termination where the franchisee has engaged in fraud or criminal misconduct involving the operation of the marketing premises. Mr. Rashid admitted that, for ***three years***, he double-billed D.C. Government employees who used VFC cards to purchase motor fuel at the D.C. station, causing losses to the D.C. Government in excess of ***$120,000***.  There is no question that Mr. Rashid's acts were deliberate and intentional:  He misappropriated a customer's PIN (using it to submit over 1,700 charges), and each fraudulent double-charge required a separate swipe of the VFC card by Mr. Rashid, as

---

6    Rising Micro correctly notes (*see* Pl.'s Mem. at 12) that the D.C. Circuit has held that a franchisor invoking § 2802(c)(12) need not wait until a convicted franchisee has exhausted all possible appeals before terminating.  *See Lewis*, 716 F.2d at 1400 ("We hold that the basis for termination in section 2802(c)(12) of the PMPA is not the veracity of the conviction but the fact of conviction").  Although Rising Micro attempts to distinguish *Lewis* as inapposite, the logic of that decision favors ExxonMobil's position here.  Mr. Rashid has admitted and pled guilty to having defrauded, over a period of three years, D.C. Government employees who purchased motor fuel at the D.C. station.  It makes no sense to force ExxonMobil to continue to deal with an admitted felon for months – Mr. Rashid is to be sentenced on June 2 – while the Court determines what punishment is appropriate for his crime, especially since that determination would have ***no*** impact on ExxonMobil's decision.  As in *Lewis*, the basis for termination under § 2802(c)(12) of the PMPA is not the ***punishment*** for the conviction, but the ***fact*** of conviction.

well as entry of a PIN and other information. ***Indeed, Rising Micro does not dispute that Mr. Rashid engaged in fraudulent and criminal misconduct in operating the D.C. station***.[7] Under the circumstances, ExxonMobil's termination of Rising Micro was indisputably proper. *See Beutlich v. Arco Prods. Co.*, 1999 U.S. App. Lexis 9232, at *3 (9th Cir. May 13, 1999) (upholding termination under § 2802(c)(1) where franchisee committed fraud in use of station's point-of-sale system); *Shell Oil Co. v. Swerdloff*, Bus. Franchise Guide (CCH) ¶ 8259, at 14,856 (S.D.N.Y. Nov. 8, 1984) (franchisee's submission to franchisor of credit card invoices reflecting non-bona fide transactions was grounds for termination under § 2802(c)(1)); *Shell Oil Co. v. Zeitounian*, Bus. Franchise Guide (CCH) ¶ 8157, at 14,385 (D. Mass. Mar. 16, 1984) (franchisee's use of stolen credit card "was clearly fraud or criminal misconduct"); *Amos v. Shell Oil Co.*, 617 N.E.2d 353, 408-09 (Ill. App. Ct. 1993) (termination under § 2802(c)(1) upheld where franchisee intentionally paid for fuel loads with bad checks – some of which were altered by franchisee to appear certified).

Moreover, for purposes of § 2802(c)(1), it does not matter whether a guilty plea is a "conviction", as this section does not require a conviction, only fraud or criminal misconduct – both of which are indisputably present here. Nor is Rising Micro's argument about its corporate status relevant; Rising Micro can only "act" through its President and sole owner, Mr. Rashid. As the Key Individual, Mr. Rashid is the person with "authority and responsibility for the operation and management" of the D.C. station. (*See also supra* n.2). Under the circumstances, it would be anomalous to conclude that Mr. Rashid, but not Rising Micro, had engaged in fraud or criminal misconduct in operating the marketing premises.

---

[7]    Rising Micro argues that ExxonMobil (1) waited too long to invoke § 2802(c)(1) of the PMPA, and (2) should be equitably estopped from invoking it. (*See* Pl.'s Mem. at 14-17). ExxonMobil addresses these arguments *infra*.

### 3. Mr. Rashid's Conviction Is A Relevant Unenumerated Event For Which Termination Is Reasonable Under The Circumstances

Finally, Mr. Rashid's conviction is an unenumerated event for which termination of Rising Micro's franchise is reasonable under § 2802(b)(2)(C). Congress and the courts have explicitly stated that the list of events in Section 2802(c) of the PMPA is not exclusive. Here, the Key Individual under Rising Micro's Franchise Agreement has pled guilty to wire fraud and admitted to double-billing, for three years, D.C. Government employees who purchased motor fuel at the D.C. station. Mr. Rashid's actions have irreparably damaged his relationship with ExxonMobil. *See Humboldt*, 695 F.2d at 389 ("Good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise relationship"). When Mr. Rashid's conviction is considered in its totality – *i.e.*, the nature, extent and duration of his crime and the identity of his victim – his conviction is clearly an event for which Rising Micro's franchise was reasonable as a matter of law. *See Glenside West II*, 761 F. Supp. at 1130-31 (conviction of President and sole shareholder of corporate franchisee for third-degree assault and other crimes was relevant unenumerated event); *Portaluppi*, 684 F. Supp. 905-06 (conviction for felony possession of cocaine is relevant unenumerated event).[8]

In other cases – in which the franchisee's misconduct pales in comparison to Mr. Rashid – courts have held that the franchisee's conduct constituted an event warranting termination. *See, e.g.*, *Rodgers v. Sun Refining & Marketing Co.*, 772 F.2d 1154, 1157 (3d Cir. 1985) (failure to maintain adequate fuel supplies); *Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984) (franchisee's "financial distress"); *Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1430 (9th Cir. 1983) (nonrenewal proper to avoid forfeiture of real estate improvements); *Sun Refining & Marketing v.*

---

[8]    As with § 2802(c)(1), whether or not a guilty plea is a "conviction," and whether or not Mr. Rashid or Rising Micro is nominally the "franchisee" is not relevant to the analysis. Section 2802(b)(2)(C) provides only that the event be relevant to the ***franchise relationship***. Mr. Rashid's conviction clearly satisfies that requirement.

*Brooks-Maupin Carpenters, Inc.*, Bus. Franchise Guide (CCH) ¶ 9325, at 19,768 (E.D. Mich. Sept. 20, 1988) (dealer repeatedly out of fuel).[9]

### B.    ExxonMobil Acted In Accordance With All Pertinent Statutory Notice Requirements

#### 1.    ExxonMobil Acted Within 60 Days Of Mr. Rashid's Conviction

Rising Micro's contention that ExxonMobil's termination is "stale" (*see* Pl.'s Mem. at 14) is baseless.  Section 2802(b)(2)(C)(ii) of the PMPA provides that when the franchisor gives less than 90 days' notice of termination of the franchise – as ExxonMobil did here – the franchisor must have acted within 60 days of acquiring actual or constructive knowledge of the occurrence of the relevant event.  There is no dispute that Mr. Rashid entered his guilty plea on January 17, 2006 or that ExxonMobil's notice of termination was dated March 14, 2006 and hand-delivered to Mr. Rashid.  (*See* Rashid Stmt. at 1 (Exh. B); Bednash Decl., ¶ 7 & exh. 4 thereto (Exh. A)).  Because ExxonMobil terminated Rising Micro's franchise within 60 days of Mr. Rashid's conviction, ExxonMobil complied with the PMPA.

The assertion that ExxonMobil actually acquired knowledge of Mr. Rashid's wrongdoing in February 2004 – by virtue of the alleged presence of an ExxonMobil representative at the D.C. station when government agents executed a search warrant – is offered without evidentiary support.  Rising Micro submitted ***no*** declarations in support of its motion, so there is no evidence in the record indicating (1) the name or position of the individual who allegedly was present when the search warrant was executed; or (2) what that person knew about the search warrant – such as what the executing authorities were empowered to search and/or seize, the nature and strength of the factual application made to obtain the warrant, or the identity and nature of any materials seized from the premises.  Given that ExxonMobil facially complied with the notice requirement

---

9    In addition, the parties' Franchise Agreement expressly provides for termination upon the conviction of the Key Individual of a felony involving moral turpitude (as well as for fraud or criminal misconduct of the Key Individual relevant to the operation of the marketing premises).  (*See* Bednash Decl., exh. 1 thereto, Section 14.1) (Exh. A).

in § 2802(b)(2)(C)(ii), it is Rising Micro's burden to demonstrate that ExxonMobil acquired actual or constructive knowledge more than 60 days before March 14.  Rising Micro has failed to do so.

Even assuming that Rising Micro *could* demonstrate that ExxonMobil was present when the search warrant was executed, that knowledge would not constitute grounds for termination under any of the PMPA provisions ExxonMobil has invoked in this case.  The standard for obtaining a search warrant is probable cause, and the execution of a warrant is not a conviction under § 2802(c)(12); not fraud or criminal misconduct in operating the marketing premises under § 2802(c)(1); and not an unenumerated relevant event under § 2802(b)(2)(C).

Nor does ExxonMobil's alleged knowledge of a criminal investigation into Mr. Rashid constitute actual or constructive knowledge sufficient to trigger the 60-day time limit of § 2802(b)(2)(C)(ii).[10]  *See Nassau Boulevard*, 875 F.2d at 362-63 (franchisor knowledge of allegation concerning criminal misconduct by franchisee and arrest of franchisee did not constitute actual or constructive knowledge).  Indeed, Rising Micro's construction of that provision would frustrate the purpose of the PMPA because it would essentially force franchisors to terminate franchisees based simply on suspicion of wrongdoing.  As the Second Circuit explained in *Nassau Boulevard*:

> The plaintiffs' assertion that the 120 days begin to run as soon as a franchisor hears an allegation against a franchisee is at odds with the congressional intent in promulgating the PMPA. . . .  The 120-day statutory period for effecting terminations . . . was imposed 'to preclude a franchisor from basing termination or non-renewal upon old and long forgotten events. . . .'
>
> As the 120-day termination period was enacted to protect franchisees, it would be ironic if section 2802 subjected franchisees to unfair terminations.  Yet, under plaintiffs' construction, franchisors would be forced to terminate

---

[10]   ExxonMobil did not terminate Rising Micro because Mr. Rashid was subject to a criminal investigation; it terminated Rising Micro because Mr. Rashid pled guilty to wire fraud.  *See Boatright*, Bus. Franchise Guide (CCH) ¶ 9535, at 20,794-95 (rejecting argument that ExxonMobil's alleged knowledge of criminal investigation triggered timing provision of § 2802(b)(2)(C)(ii):  "[I]t was the conviction, not the investigation, upon which Exxon premised the termination, and therefore it is Exxon's knowledge of the conviction which started the running of the 120 day time period").

within 120 days of hearing a rumor about a franchisee. . . . ***An interpretation of section 2802 which fosters termination based on rumor or suspicion surely does not afford the protection from arbitrary and discriminatory terminations that Congress intended.***

875 F.2d at 362 (emphasis added); *see also Nassau Boulevard*, 875 F.2d at 363 ("We believe that Shell took the proper course by trying to confirm its suspicions before effecting a termination. Accordingly, we agree . . . that the notice of termination issued by Shell was timely").

## 2.    Less Than 90 Days' Notice Was Reasonable Under The Circumstances

Rising Micro's assertion that ExxonMobil violated the notice provisions of the PMPA by giving it less than 90 days' notice (*see* Pl.'s Mem. at 17-18) is baseless.  ExxonMobil's March 14, 2006 notice of termination, which had an effective date of March 29 and therefore gave Rising Micro two weeks' notice, fully complied with the PMPA.  Section 2804(b) expressly gives a franchisor the right to provide a franchisee with less than 90 days' notice "[i]n circumstances where it would not be reasonable for the franchisor" to furnish 90 days' notice.  *Id.*  In situations where, as here, the franchisee has been convicted of a felony involving moral turpitude and/or engaged in fraudulent or criminal misconduct, courts repeatedly have upheld terminations on less than 90 days' notice.  *See Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 60-61 (2d Cir. 1984) (immediate termination where franchisee misbranded gasoline); *Alexander*, 949 F. Supp. at 1253-54 (39 days' notice where franchisee convicted of felony involving moral turpitude); *Glenside West II*, 761 F. Supp. at 1131 (immediate termination where franchisee convicted of felony involving moral turpitude); *Amos*, 617 N.E.2d at 408-09 (immediate termination where franchisee intentionally gave bad checks to franchisor for motor fuel purchases); *Arco Petroleum Prods. Co. v. Williams*, 496 N.E.2d 1098, 1100 (Ill. App. Ct. 1986) ("immediate termination" upheld where franchisee physically attacked franchisor's truck driver).[11]  Here, Mr. Rashid's admission to

---

[11]    Courts also have upheld less than 90 days' notice in circumstances where the franchisee's actions are (arguably) less serious.  *See Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1511, 1513 (3d Cir. 1984) (10 days' notice where franchisee failed to pay amounts owed); *Smoot*, 722 F. Supp. at 854-55 (four weeks' notice where franchisee repeatedly out of fuel); *Cal. Petroleum Distribs. Inc. v. Chevron U.S.A., Inc.*, 589 F. Supp. 282, 289 (E.D.N.Y. 1984) (16 days' notice where franchisee failure to pay amounts due); *Smith v. Amerada Hess Corp.*,

having engaged in fraudulent and criminal misconduct for over three years (almost from the inception of his franchise relationship with ExxonMobil) fully justified the notice Rising Micro was given. *See Wisser*, 730 F.2d at 60-61 (noting that intentional misbranding "had been going on for as long as six months" in upholding immediate termination).

### C.    Rising Micro's Other, Non-Statutory Arguments Fail

Attempting to avoid the consequences of Mr. Rashid's conviction, Rising Micro offers two other arguments, neither of which have any basis in the text of the PMPA provisions at issue here. First, Rising Micro maintains that ExxonMobil should be "equitably estopped" from terminating the franchise based on representations allegedly made by ExxonMobil prior to plaintiff's lease of car wash equipment for the D.C. station. Additionally, Rising Micro suggests that it is entitled to examine whether ExxonMobil's asserted reasons for terminating Rising Micro's franchise are "pretextual." Both of these arguments are unavailing.

### 1.    Rising Micro's Equitable Estoppel Theory Is Preempted Under The PMPA

Rising Micro's contention that ExxonMobil should be equitably estopped from exercising its statutory right to terminate based on ExxonMobil allegedly "requir[ing]" Rising Micro to "purchase" car wash equipment (*see* Pl.'s Mem. at 15-17) fails for two reasons.[12] First, the PMPA preempts inconsistent state law relating to franchise terminations:

---

Bus. Franchise Guide (CCH) ¶ 8177, at 14,467 (D.N.J. 1984) (48 hours' notice where franchisee failed to pay amounts due).

[12]   In its motion, Rising Micro inaccurately claims that ExxonMobil renewed the franchise relationship "after becoming aware of the accusations of criminal wrongdoing at the Station." (Pl.'s Mem. of Law at 15-16). The operative Franchise Agreement was executed by Mr. Rashid on October 29, 2003 and had an effective date of February 1, 2004. (*See* Bednash Decl., exh. 1 thereto) (Exh. A). The search warrant, however, was not executed until February 12, 2004. (*See* Rashid Stmt. at 4) (Exh. B). Thus, even assuming that ExxonMobil "became aware" of Mr. Rashid's fraud and criminal misconduct at the time that the search warrant was executed – which ExxonMobil vigorously disputes (*see supra* § I.B.1) – those events transpired **after** Rising Micro's franchise was renewed. The renewal of Rising Micro's franchise therefore cannot form the basis of an estoppel defense.

Also, Rising Micro's claim that it "purchased" car wash equipment is at odds with its complaint, which appears to indicate that the equipment was leased. (*See* Complaint (Dkt. 1), exh. B thereto).

> To the extent that any provision of this title applies to the termination (or the furnishing of notification with respect thereto) of any franchise . . . **no State** or any political subdivision thereof **may adopt, enforce, or continue in effect any provision of any law or regulation** (including any remedy or penalty applicable to any violation thereof) **with respect to termination** (or the furnishing of notification with respect thereto) of any such franchise . . . **unless such provision of such law or regulation is the same as the applicable provision of this title**.

PMPA, § 2806(a)(1) (emphasis added).  Under the PMPA, a franchisor invoking § 2802(b)(2)(C) need not establish **anything** other than the occurrence of an event relevant to the franchise relationship for which termination is reasonable.  Rising Micro would have this Court graft onto the PMPA an estoppel defense to termination that has no basis in the text of the statute.  Such state law is not "the same as the applicable provision" at issue here and is therefore preempted.[13]  Other courts have reached the same conclusion with respect to estoppel claims.  *See Camina Servs.*, 816 F. Supp. at 1538-39 ("On its face the preemption clause preempts a state law claim for promissory estoppel 'with respect to termination. . . .'  Such a claim . . . represents an attempt to limit the ability of the franchisor to avail itself of a ground for termination provided by Congress"); *see also Glenside West Corp. v. Exxon Co., U.S.A. (Glenside West I)*, 761 F. Supp. 1100, 1108 (D.N.J. 1991) (§ 2806 preempts "both statutory and common law involving wrongful franchise terminations"); *cf. Boatright*, Bus. Franchise Guide (CCH) ¶ 9535, at 20,795 n.7 (estoppel claim may be preempted by PMPA).

---

13  ExxonMobil respectfully submits that *Filiaga v. Chevron U.S.A., Inc.*, No. 89-4098, slip op. (10th Cir. 1990) (Pl.'s Mem. at 16-17 & exh. 1), is against the great weight of authorities and was wrongly decided.  Indeed, to the extent the PMPA recognizes estoppel principles, it does so in specific provisions – such as § 2802(b)(2)(C)(ii), which prevents a franchisor from relying on stale grounds for termination.  *See Cal. Petroleum Distribs.*, 589 F. Supp. at 287 ("[A] franchisor is barred from using stale events or violations to which it has acquiesced as later grounds for termination of the franchise.  In this way the PMPA codifies an estoppel principle").  In any event, *Filiaga* involved a completely different factual scenario than exists in this case.  In *Filiaga*, the franchisor allegedly told the franchisee, his wife and a bank officer that the franchisor "would renew the franchise documents [which provided for a three-year term] to accommodate a franchise arrangement of at least ten years." (*Id.* at 6).  Rising Micro offers no evidence – not even a conclusory allegation – that ExxonMobil told Rising Micro anything, at any time, with respect to the renewal of its franchise.  (*See also supra* n.12 (Rising Micro's franchise renewal occurred prior to execution of search warrant)).  Also, as noted *infra*, Rising Micro has presented no evidence regarding statements allegedly made by ExxonMobil with respect to Rising Micro's lease of car wash equipment.

Even if estoppel was recognized under the PMPA, Rising Micro has failed to establish the elements of an estoppel. Rising Micro has submitted **no** declarations from Mr. Rashid, his wife or anyone else setting forth the statements allegedly made by ExxonMobil, whether such statements were oral or written, the name (and position) of the person making such statements and the time and place at which such statements were made.[14] Nor does Rising Micro explain or prove how it relied on any alleged statements to its detriment. At the time the car wash equipment was leased in June 2005, Rising Micro's franchise already had been renewed and was not due to expire for almost two years. More importantly, Mr. Rashid was well-aware in 2005 of his own fraudulent and criminal acts; indeed, his knowledge of his misconduct was, at that time, superior to ExxonMobil. It is inconceivable that he relied to his detriment on anything ExxonMobil said or did. In fact, under the circumstances it would be inequitable to **prevent** ExxonMobil from terminating Rising Micro's franchise.

### 2.    Allegations of Improper Motive For Termination Are Not Actionable Under The PMPA

Equally meritless is Rising Micro's suggestion that ExxonMobil's reasons for terminating the franchise are "pretextual" and that ExxonMobil's decision was driven by the anticipated construction of a new baseball stadium in the vicinity of plaintiff's service station. (Pl.'s Mem. at 13 n.5). Although not disputing that Mr. Rashid pled guilty to one count of wire fraud (and admitted to having engaged in numerous fraudulent acts with respect to the operation of the D.C. station), Rising Micro claims that because ExxonMobil allegedly had other reasons or motives for terminating the franchise, the termination is somehow improper. The franchisor's motive, however, is not relevant where, as here, termination is based on the **franchisee's own misconduct**:

> When termination is predicated on actions by the franchisee, and not by the franchisor, the need to avoid sham justifications for the

---

14    In fact, although the Franchise Agreement **permits** Rising Micro to operate a car wash at the D.C. station, it does not **require** him to do so. (*See* Bednash Decl., exh. 1 thereto, Section 1.2(c)) (Exh. A).

> franchisor's decisions to terminate the franchise is drastically reduced. The franchisee's conduct can be objectively measured against the requirements of 15 U.S.C. § 2802(b)(2).

> Accordingly, the court concludes that Mobil's good faith in terminating Smoot's franchise is not a material fact and any evidence relating to Mobil's motive is irrelevant.

*Smoot*, 722 F. Supp. at 856-57 (quoting *Crown Central*, 515 F. Supp. at 485); *see Glenside West I*, 761 F. Supp. 1109-10 ("[T]he courts which have considered the question have ruled the PMPA imposes no duty of good faith on franchisors in terminations based on conduct by the franchisee . . . . Glenside has pointed to no authority holding otherwise, and it does not appear such authority exists"); *Crown Cent. Petroleum Corp. v. Waldman*, 515 F. Supp. 477, 485 (M.D. Pa. 1981), *aff'd without op.*, 676 F.2d 684 (3d Cir. 1982).

The rationale for these rulings is that "Section 2802 . . . does not expressly impose on a franchisor an obligation to act in good faith if the facts indicate it has grounds to terminate." *Smoot*, 722 F. Supp. at 856-57 (quoting *Crown Central*, 515 F. Supp. at 485). Rather, the PMPA expressly imposes an obligation of good faith on the franchisor only where termination is based on events ***not*** within the franchisee's control. *Smoot*, 722 F. Supp. at 856-57.[15] Here, the termination of Rising Micro's franchise arises under § 2802(b)(2)(C) of the PMPA and is based on Rising Micro's own misconduct – *i.e.*, Mr. Rashid's fraud and criminal misconduct in operating the D.C. station and his conviction for that activity. Thus, the sole issue is whether such misconduct is grounds for termination. ExxonMobil's alleged motive is irrelevant.

---

[15] The *Smoot* court identified four such grounds for termination in which the PMPA expressly requires good faith on the part of the franchisor:  §§ 2802(b)(2)(E), (b)(3)(A)(i), (b)(3)(D) and (c)(6).  722 F. Supp. at 856-57.  None of those provisions were invoked by ExxonMobil in this case.  (*See* Bednash Dec., ¶ 7 & exh. 4 thereto).  For that reason, plaintiffs' citation to *Brownstein v. Arco Petroleum Prods., Co.*, 604 F. Supp. 312 (E.D. Pa. 1985), and *Munno v. Amoco Oil Co.*, 488 F. Supp. 1114 (D. Conn. 1980) (*see* Pl.'s Mem. at 13 n.5), is inapposite. *Brownstein* involved a nonrenewal under § 2802(b)(3)(D), *see* 604 F. Supp. at 314, and *Munno* involved a termination under § 2802(b)(3)(A).  488 F. Supp. at 1117-18.

## II.    INJUNCTIVE RELIEF SHOULD BE DENIED BECAUSE THE BALANCE OF HARDSHIPS FAVORS EXXONMOBIL

This Court should also deny Rising Micro's request for a preliminary injunction because the balance of hardships in this case favors ExxonMobil.[16] Mr. Rashid has now admitted that, for three years, he double-charged employees of D.C. Government agencies for fuel purchases, causing those agencies a collective loss in excess of $120,000. (*See* Rashid Stmt.) (Exh. B). The nature of Mr. Rashid's fraudulent and criminal acts, the fact that the misconduct was not an isolated incident, and the identity of his victim, among other things, have irreparably damaged the franchise relationship. Even the most liberal reading of the PMPA recognizes the legitimate right of a franchisor to choose the individuals with whom it will deal. ExxonMobil no longer trusts Mr. Rashid to own and/or operate one of its Exxon-brand stations, and ExxonMobil should not be forced to do business with him, even on an interim basis. Additionally, both the public at large, as well as ExxonMobil's image, could be harmed if Rising Micro (Mr. Rashid) is permitted to continue operating the D.C. station, due to the potential for additional acts of fraudulent double-billing. On these facts, the balance of hardships favors ExxonMobil, and injunctive relief is not warranted.

### CONCLUSION

For all the foregoing reasons, Rising Micro's motion for a temporary restraining order and preliminary injunction should be denied.

---

[16]    Because Rising Micro cannot demonstrate "serious questions" concerning its PMPA claim, preliminary injunctive relief is not proper, and this Court need not "balance the hardships" under § 2805(b)(2)(B) of the PMPA. *See JFC Investors Ltd. v. Gulf Prods. Div. of BP Oil, Inc.*, 608 F. Supp. 1136, 1143 (W.D.N.C. 1985) (where franchisee seeking preliminary injunction under PMPA made insufficient showing of serious questions going to merits, court did not need to address balance of hardships); *Bellmore v. Mobil Oil Corp.*, 524 F. Supp. 850, 854 (D. Conn. 1981) (same); *Kesselman v. Gulf Oil Corp.*, 479 F. Supp. 800 (E.D. Pa. 1979) (same). Nevertheless, for the reasons explained *infra*, any such balancing favors ExxonMobil.

Dated:  April 21, 2006                         Respectfully submitted,


                                               _____s/Brian A. Howie_____

                                               Brian A. Howie
                                               Bar No.:  459329
                                               HOWREY LLP
                                               1299 Pennsylvania Ave., N.W.
                                               Washington, D.C.  20004
                                               Telephone:  (202) 783-0800
                                               Facsimile:  (202) 383-6610

                                               **Attorney for Defendant Exxon Mobil
                                               Corporation**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RISING MICRO, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:06-cv-00572-GK |
| ) | |
| EXXON MOBIL CORPORATION ) | **[Proposed] ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The Court has before it for consideration: Plaintiff Rising Micro, LLC's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support of same; Defendant Exxon Mobil Corporation's Memorandum of Law In Opposition to Plaintiff's Motion; and (3) Plaintiff's Reply Memorandum in Further Support of its Motion. A hearing on this matter was held on Monday, May 1, 2006. Upon due consideration of the legal memoranda, exhibits to same, pertinent legal authorities and the parties' arguments at the hearing, the Court hereby rules that Plaintiff's Motion for preliminary injunction is **DENIED**.


_____
Hon. Gladys Kessler
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by

using the CM/ECF system, which will send notice of electronic filing to the following:

Harry C. Storm
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD  20814


        s/Brian A. Howie
         Brian A. Howie