# BEDNASH DECLARATION EXHIBIT 2

Law Offices

## Bynum & Jenkins

*Attorneys At Law*

A Professional Limited Liability Company

300 N Lee Street - Suite 475

Alexandria, VA 22314

703 549 7211 Telephone

703 549 7701 Fax

June 2, 2000

Bill White

Exxon/Mobil, Inc

Union Mill Road

Suite 1044

Clifton, VA  20124

Re· Application of Mahmud Rashid

Dear Mr. White:

Per your request, enclosed please find a certificate from the Commonwealth of Virginia's State Corporation Commission recognizing Rising Micro, LLC  Mr Rashid is the sole shareholder of the firm. Should you have any questions or concerns, do not hesitate to give me a call.

Very truly yours,

Kenneth D  Bynum

Enclosure:  as stated

CC: Mahmud Rashid

# Commonwealth of Virginia

## STATE CORPORATION COMMISSION

*Richmond, March 10, 2000*

*This is to Certify that a certificate of organization of*

## Rising Micro, LLC

*was this day issued and admitted to record in this office and that the said limited liability company is authorized to transact its business subject to all the laws of the State applicable to the company and its business.*



State Corporation Commission
Attest:

Joel H. Peck
*Clerk of the Commission*

CIS0345

# BEDNASH DECLARATION EXHIBIT 3

⎯⎯ BY EXXONMOBIL,          703 815 5406;      JUL-17-00 14:21;          PAGE 2
  06/28/2000 16 29 FAX 703 549 770¹      BYNUM & JENKINS PLLC                        ⧠002

Law Offices

## Bynum & Jenkins

*Attorneys At Law*

A Professional Limited Liability Company
300 N. Lee Street – Suite 475
Alexandria, VA 22314
703 549 7211 Telephone
703 549 7701 Fax

June 28, 2000

Bill White
Exxon/Mobil, Inc.
5746 Union Mill Road
Suite 1044
Clifton, VA  20124

Re: Mahmud Rashid

Dear Mr. White:

Per your request, enclosed please find the Operating Agreement for Rising Micro, LLC, the firm founded by Mr. Rashid that will be purchasing and operating the Exxon station on South Capital Street in Washington, DC

. Should you have any questions or concerns, do not hesitate to give me a call.

Very truly yours,

Kenneth D. Bynum

Enclosure:  as stated
CC·  Mahmud Rashid

SENT BY EXXONMOBIL;
06/28/2000 16 29 FAX 703 549 7707    BYNUM & JENKINS PLLC    703 815 5406;    JUL-17-00 14.21;    PAGE 3
@003

# OPERATING AGREEMENT
## OF
## RISING MICRO, LLC

THIS OPERATING AGREEMENT is made and entered into as of the _____ day of _____, 2000, by Mahmoud Rashid, President, Rising Micro, LLC, a Virginia limited liability company .

## RECITALS

WHEREAS, this Agreement is entered into to govern the relationship among the members of a limited liability company and between such company and its members.

NOW THEREFORE, in consideration of the mutual covenants of the parties hereinafter set forth, and other good and valuable consideration, the receipt of sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1
## FORMATION OF LIMITED LIABILITY COMPANY

1.1    Formation.  The Members have formed the Company as a limited liability company under the provisions of the Virginia Limited Liability Company Act, as amended (the "Act"), and, except as otherwise expressly provided herein or in the Articles of Organization for the Company, the rights and liabilities of the Members shall be as provided in the Act.

2

1.2    Articles of Organization.  On March 10, 2000, Articles of Organization creating the Company were filed with the Virginia State Corporation Commission in accordance with and pursuant to the Act.

## SECTION 2
## NAME

The business of the Company shall be conducted under the name Rising Micro, LLC, or such other name as the Members shall hereafter approve.

## SECTION 3
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

3.1    "Act" has the meaning set forth in Section 1.1.

3.1    "Agreement" means this Operating Agreement, as amended, modified or supplemented from time to time.

3.3    "Articles" means the Articles of Organization of the Company as amended in accordance with the Act.

3.4    "Capital Account," as further described in Section 1.5, means an account maintained for each Member which is equal to such Member's original capital contribution increased by additional capital contributions and such Member's share of Company profits decreased by distributions and such Member's share of Company losses.

3.5    "Capital Contribution" shall means any contribution to the capital of the Company in cash, property or services by a Member whenever made.

3.6    "Code" shall mean the Internal Revenue Services Code of 1986, as amended from time to time or corresponding provisions of subsequent superseding federal revenue laws.

3.7    "Company" has the meaning set forth in the first paragraph of this Agreement.

3.8    "Distributable Funds" shall mean, with respect to any period, all cash (i) derived by the Company from normal business operations, (ii) received as proceeds from any Company financing, refinancing or other extraordinary event (including cash received from the sale of all or substantially all the Company's assets and excluding Capital Contributions and loans from Members) or (iii) withdrawn from reserves during such period, minus (w) all expenses (other than depreciation business, (x) all capital expenditures made during such period, (y) all payments of principal and interest made during such period with respect to Company loads, including Member loans, and (z) such other funds set aside during such period for the creation or addition

3

to an annual working capital reserve as the Members shall deem necessary for the reasonable annual working capital needs and prudent operation of the Company's business.

3.9    "Interest" means a Member's share of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets.

3.10    "Member" means the persons identified in the introductory paragraph hereof and any other Persons who hereafter becomes admitted to the Company as Members pursuant to Section 21 hereof, so long as each such Person continues to be a member of the Company.

3.11    "Percentage Interest" means the percentage assigned to each Member as set forth in Section 14.1 below and as may be amended from time to time.

3.12    "Person" means an individual, a general partnership, a limited partnership, a domestic or foreign limited liability company, a trust, and estate, and association, a corporation or an other legal or community entity.

## SECTION 4
## PURPOSE

4.1    The purpose of the Company shall be to provide healthcare to the public, and the transaction of all lawful business to do any and all things necessary to accomplish these goals.

## SECTION 5
## TERM

5.1    The Company shall have a perpetual duration.

## SECTION 6
## PRINCIPAL PLACE OF BUSINESS

6.1    The principal office and place of business of the Company shall be at:

> 304 Westminister Lane
> Stafford, Virginia 22554

or at such other place as the Members may designate.  The Company may have other offices at any place or places as may be determined by the Members.

4

## SECTION 7

## REGISTERED AGENT AND OFFICE

7.1    The Company's registered agent and registered office in the Commonwealth of Virginia shall be:

BYNUM and JENKINS, PLLC
300 N. Lee Street, Suite 475
Alexandria, VA 22314

or such other person and office as the Members may designate.

## SECTION 8
## MEMBERS

8.1    **Annual Meeting**.  An annual meeting of the Members shall be held on the first Tuesday in May each year or on such other date as may be determined by the Members, for the purpose of transacting such business as may come before the meeting.

8.2    **Special Meetings**.  Special meeting of the Members may be called by the Member or Members with combined holdings of at least Forty Percent (40%) Interest.

8.3    **Place of Meeting**.  The Members may designate any place, either within or without the Commonwealth of Virginia, as the place of meeting for any meeting of the Members, but if no designation is made in time to be included in the notice of the Meeting, the meeting shall be held at the principal place of business of the Company.  Meeting may be held by conference telephone call.

8.4    **Notice of Meetings**.  Except as provided in Section 8.15, written notice to include U.S. mail, email and or fax stating the place, date and hour of the meeting of the Members and the purpose or purposes for which the meeting is called, shall be given to each Member, not less than ten (10) nor more the sixty (60) days before the date of the meeting.  Such notice shall be given by or at the direction of the Member calling the meeting in accordance with Section 23 Notice may be waived in writing by any Member.

8.5    **Meeting of All Members**.  If all the Members shall meet at any time and place, either within or outside of the Commonwealth of Virginia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

8.6    **Quorum**.  Members representing a majority of the total Percentage Interests, present in person or represented by proxy, shall constitute a quorum for transaction of business at any meeting of Members.  If a quorum is not present at any meeting of Members, the Members who are present may adjourn the meeting from time to time without further notice.  At any

703 815 5406;        JUL-17-00 14:22;        PAGE 8
BYNUM & JENKINS PLLC                                    ⑯008

adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted what the original meeting. Withdrawal of Members from a meeting shall not cause failure of a duly constituted quorum at that meeting.

8.7    Manner of Acting. Except as otherwise provided in the Act, the Articles or this Agreement, the affirmation vote of a majority of the Percentage Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members.

8.8    Informal Action by Members. Any action that may be taken at a meting of the Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all of the Members.

## SECTION 9
## MANAGEMENT OF THE COMPANY

9.1    Management by Members. The business and affairs of the Company shall be managed by its Members who shall function as a group like the board of directors of a Company. The Members, at times acting through the officers of the Company, shall direct, manage, and control the business of the Company to the best of their ability and shall have full and complete authority, power, and discretion to make any and all decisions, and to do any and all things which the Members deem necessary or desirable for that purpose, subject to the approval provisions set forth in Section 9.2 below. The Members shall manage the Company without compensation from the Company, except that any Member who serves as an office of the Company may be compensated for services provided in that capacity as determined by the Members or pursuant to an agreement between the Company and such Member-officer.

9.2    Actions Requiring Majority Approval. The following actions shall require majority approval of the Members:

9.2 1    To purchase, sell, own, or lease any real or personal property of the Company.

9.2.2    To borrow money, raise capital or issue additional Interests and to grant security interests in Company property to secure such loans.

9.2.3    To purchase liability and other insurance to protect the Company's property, business, officers or Members.

9.2.4    To open and maintain bank or broker accounts and designate persons with authority to act with respect to such accounts.

9.2.5    To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments.

9.2.6  To execute contracts and documents necessary or deemed advisable to conduct the business of the Company.

9.2.7  To bring, defend and settle actions before any court or governmental, administrative or regulatory agency, body or commission.

9.2.8  To elect, appoint or remove the President and such other officers as they deem advisable with such authority and duties as they may determine.  The Members may delegate any of their powers to any such officer or officers.

9.2.9  To employ or terminate the employment of any persons as may be needed in the business of the Company.

9.2.10  To determine the compensation of officers and other employees of the Company.

9.2.11  To take any other action deemed by them to be necessary or appropriate to conduct the business and operations of the Company.

9.2.12  To amend or modify this Agreement or the Company's Articles of Organization.

9.2.13  To expel a Member for "cause" in which case, the Company and/or the other Members shall directly purchase or arrange for the purchase by a third party of the expelled Member's Interest for Fair Market.  For purposes of this provision, "cause" shall be limited to the following actions:

(a)  if a Member willfully makes a material misstatement or material omission in this Agreement or any other agreement or otherwise commits or omits an act of dishonesty, gross negligence or willful misconduct which adversely affects the business of the Company monetarily or otherwise;

(b)  if a Member is convicted of a crime of moral turpitude or similar felony or convicted of any other crime or offense that the other Members of the Company reasonably believe is likely to have an adverse effect on the Company and the Members' Interests therein;

(c)  if a Member engages in excessive use and/or abuse of alcohol or drugs which, in the reasonable judgment of the Members, could interfere with the performance of the Company's operations.

9.2.14  To file or consent to the filing of a bankruptcy or insolvency petition or otherwise institute insolvency proceedings;

7

U.NT 5  EXXONMOBIL;                 703 815 5406,        JUL-17-00 14:23,        PAGE 10
    00/20/2000 10 54 FHA 703 949 ((((    BYNUM & JENKINS PLLC                        ☺010

9 2.15  To sell or transfer all or substantially all of the assets of the Company;

9.2.16  To acquire all or a portion of the assets or equity of another Person;

9.2. 17  To admit new Members; or

9.2. 18  To alter the terms of the economic agreement among the Members.

## SECTION 10
## OFFICERS AND POWERS OF OFFICERS

10.1    Officers.  The officers of the Company shall consist of a President.  The officers shall be elected annually the Members and shall exercise such powers and perform such duties as are prescribed by the Members.  Any number of offices may be held by the same person. Mahmoud Rashid shall be the initial President.  The authority and duties of each of such officers and any other officers of the Company may be modified, augmented or diminished from time to time be action of the Members, and the Members shall have the authority to remove officers of the Company at any time and for any reason.

10.2    Limitations on Powers of Officers.  All decisions with respect to matters outside the ordinary and usual course of the Company's business shall require approval of the Members.

10.3    Accounting Controls.  The Members will put in place such accounting and operating controls as they deem prudent.  The officers of the Company  will assure compliance with all accounting and operating controls instituted by the Members.

10.4    Compensation.

10.4.1  Salaries.  The salaries of the officer shall be fixed from time to time by the Members, and no officer shall be prevented from receiving such salary by reason of the fact that he or she is also a Member of the Company.

10.4.2  Employee Benefit Plans.  For so long, as it is commercially advantageous to the Company, the Company will provide its employees with such employee benefit plans and arrangements as may be determined from time to time by the Members.

## SECTION 11
## ACTIVITIES OF MEMBERS

11 1    The Members shall devote such of their time to the business of the Company as they may, in their sole discretion, deem to be necessary to conduct said business.  Any of the Members may engage in or posses an interest in other business ventures of every nature and description, whether or not in competition with the business with the business of the Company, independently or with others, subject, in all cases to any limitations set forth in the License Agreement; and neither the Company nor the Members shall have any right by virtue of this Agreement in and to such independent venture or to the income or profits derived therefrom.

8

## SECTION 12
## INDEMNIFICATION

12.1    Member-Managers and Officers.  The Company shall, to the fullest extent permitted and in the manner specified under the Act, indemnify, defend and hold harmless its Member-managers and officers and former Member-managers and officers (collectively, the "Indemnified Parties"), from any and all claims, actions, causes of action, suits, proceedings, losses, damages, liability, costs, and expenses (including, without limitation, attorneys' fees and court costs) asserted against or incurred or sustained by them by reason of any act performed by them r any omission on their part while acting for or on behalf of the Company and in furtherance of its interests provided that  the Indemnified Party acted in good faith and in a manner such party reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, such Indemnified Party had no reason to believe that his or her conduct was unlawful.

12.2    Members.  The Company shall indemnify, defend and hold harmless each Member or former Member against expenses actually and reasonably incurred by him, her or it any connection with the defense of an action , suit or proceeding in which such Member or former Member is made a party by reason of being or having been a Member of the Company, except in relation to matters as to which he, she or it shall be adjudged in the action, suit or proceeding to be liable for gross negligence or willful misconduct.

## SECTION 13
## INSURANCE

13.1    The Company shall carry and maintain in force insurance in amounts and coverage as is customarily carried by enterprises with similar assets and business, as determined by the Members.

## SECTION 14
## MEMBER'S INTEREST AND CAPITAL

14.1    Percentage Interests.  Simultaneously with the execution of this Agreement, and in consideration of the mutual agreement of the Members set forth in this Agreement, each Member has received the Percentage Interest set forth opposite his name below·

| Member | Percentage Interest |
|---|---|
| Mahmoud Rashid | 100 |

14.2    Initial Capital.  Each of the Members has initially contributed to the Company $100.00 in cash.  Such contributions are hereby accepted as Initial Capital Contributions  to the Company, and will be, upon contribution, credited to the Capital Accounts of the Members.  No Member shall be entitled to interest on any Capital Contributions.  No Member shall be entitled

9

SENT BY EXXONMOBIL;              703 815 5406;        JUL-17-00 14.24,              PAGE 12
00/20/2000 10.02 FAX 703 569 710          DINUR & JENKINS PLLC                              @012

to withdraw any portion of its Capital Account except through distribution or dissolution in each case as provided herein or in the Act.

14.3    Additional Capital. No Member shall be obligated or permitted to make any additional capital contributions to the Company. Notwithstanding the foregoing, a majority of the Members may approve one or more additional capital contributions from all the Members ("Additional Capital Contributions"), to be made on pro-rata basis, in accordance with each Member's respective Percentage Interest. If any Member does note elect to make an Additional Capital Contribution as provided above, the Member(s) who elect to make an Additional Capital Contribution, shall have the right to make the Additional Capital Contribution and a further Additional Capital Contribution of the unaccepted amount, in direct proportion to their respective Percentage Interests. In the event that less than all of the Members make an Additional Capital Contribution, the Percentage Interests of the respective Members shall be adjusted to reflect the Additional Capital Contributions made.

14.4    Liability of Members. The Members shall have no individual liability whatever by reason of being or having been a Member of the Company, whether to the Company, to any of the other Members or to the creditors of the Company, for the debts of the Company or any of its losses or liabilities, except to the extent specifically set forth in the Act.

SENT BY: EXXONMOBIL;          703 815 5406;          JUL-17-00 14:24;          PAGE 13

## SECTION 15
## CAPITAL ACCOUNTS

15.1    A separate Capital Account will be maintained for each Member in accordance with Section 704(b) of the Code and Treasury Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account will be increased by (1) the amount of money contributed by it to the Company; (2) the fair market value of property contributed by it to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to it of income and gains as set forth in Section 16 hereof. Each Member's Capital Account will be decreased by (1) the amount of money distributed to it by the Company; (2) the fair market value of property distributed to it by the Company (net of liabilities secured by such distributed property that is considered to assume or take subject to under Section 752 of the Code); (3) allocations to its of expenditures described in Section 705(a)(2)(B) of the Code; and (4) allocations to the Member of loss and deduction as set forth in Section 16 hereof.

15.2    In the event of a permitted sale or exchange of a Member's Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it related to the transferred Interest.

15.3    The manner in which Capital Accounts are to be maintained pursuant to this section is intended to comply with the requirements of Code Section 704(b) and (c) and the Treasury Regulations promulgated thereunder. If, as determined by the Members, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section should be modified in order to Company with Code Section 704(b) and (c) and the Treasury Regulations thereunder, then the Members, by majority approval, may alter the method in which Capital Accounts are maintained and amend this Agreement if necessary to reflect any such change in the manner in which Capital Accounts are maintained; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between the Members.

## SECTION 16
## ALLOCATIONS OF PROFITS AND LOSSES

16.1    Each item of the Company's income, gain, loss, deduction or credit may be allocated to each of the Members in accordance with their respective Percentage Interests; provided, however, that such allocations shall be made in accordance with Section 7014 of the Code and applicable regulations thereunder.

## SECTION 17
## DISTRIBUTION

The Company shall distribute its Distributable Funds to the Members as follows:

17.1    Distributions to Pay Taxes. First, by not later than March 1 following the end of each fiscal year of the Company, subject to any restrictions contained in the financing agreement

SENT BY: EXXONMOBIL;
06/28/2000 16 33 FAX 703 549 770                    703 815 5406,        JUL-17-00 14:25;           PAGE 14/26
                                                    BYNUM & JENKINS PLLC                             Ø014

to which the Company is a party, the Company shall make distribution of cash ("Tax Distributions") to each Member in an aggregated amount equal to the product obtained by multiplying such Member's allocable share of the Company's net taxable income (reduced by such Member's unused losses previously allocated to such Member by the Company) by a percentage equal to the sum of the maximum marginal federal, state and local income tax rates applicable to any Member without regard to the tax status or any other tax liabilities or credits to which a Member may be subject or entitled.

17.2    Bonus Pool.  Second, the Company shall set aside an amount equal to ten percent (10%) or greater or less depending on the fiscal state of the company, of the Distributable Funds prior to making the Tax Distributions (the "Bonus Pool") and shall distribute the Bonus Pool pursuant to a distribution plan established by the Members.

17.3    Other Distributions.  Third, the Company shall distribute the remaining Distributable Funds to the Members.  Such distributions shall be made in accordance with the Member's Percentage Interests.

## SECTION 18
## DETERMINATION OF CAPITAL ACCOUNTS AND TRANSFERS

18.1    Except as otherwise provided in this Agreement, whenever it is necessary to determine the balance in the Capital Accounts of any Member for purposes of this Agreement, such balance shall be determined after first giving effect to all allocations, for transactions effected prior to the time as of which such determination is made, of profit or loss of the Company and other items allocated pursuant to Section 16, for the current year, and second, after giving effect to all distributions or deemed distributions for such year in respect of transactions effected prior to the date as of which such determination is to be made; and third, after giving effect to all allocations of gains, deductions, profit and loss of the Company for the transaction in question (that is, prior to giving effect to distributions or deemed distributions as a result of such transaction).

## SECTION 19
## ACCOUNTING AND BANK ACCOUNTS

19.1    Status.  The Members agree that the Company shall make the appropriate election under Treasury Regulation Section 301.7701-3, in such form as required by the Internal Revenue Service.

19.2    Tax Returns.  The Company shall cause to be prepared all tax returns and statements, if any, which must filed on behalf of the Company with any taxing authority, and shall submit such returns and statements to the Members for their approval prior to filing.  Upon approval thereof, the Company shall make timely filing thereof.

19.3    Fiscal Year.  The fiscal year of the Company shall be the calendar year.

19.4    Location and Method.  In accordance with Section 13.1-1028 of the Act, the books of account and other records of the Company shall be kept and maintained at all times at the Company's principal office.  The books of account shall be maintained in accordance with generally accepted accounting principles consistently applied  and shall show all items of income and expense.  The accounting method for the books of account shall be determined at the discretion of the Members.

19.5    Financial Statements.  The company shall prepare and furnish to each Member within ninety (90) days after the close of each fiscal year a report showing the operations of the Company for such fiscal year including, without limitation, such information concerning the Company as may be required by any Member for state or federal tax returns and the following financial statements accompanied by the report of the Company's  independent public accountants:

    (i)    a balance sheet of the Company as of the end of such fiscal year;

    (ii)    a statement of profit or loss for such fiscal year; and

    (iii)    a statement of Members' Capital Account for such fiscal year.

19.6    Access to Books of Account and Records.  All Members shall have the right to all reasonable times during usual business hours to inspect and copy all records required to be maintained under Section 13.1-1028 of the Act.  Such right may be exercised through any agent or employee of such Member designated by it or by an independent public account designated by such Member.  Each member shall bear all inspection and copying expenses incurred.

19.7    Bank Account(s).  All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be agreed upon by he Members and checks drawn on such account(s) shall require the signature of those individuals designated by the Members.  All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s).  There shall be no commingling of the funds of the funds of the Company with the funds of any other entity.

## SECTION 20
## RESTRICTION ON TRANSFER OF MEMBERSHIP INTEREST

20.1    Application.  The Members agree that all Interests now or hereafter owned by the Members shall be subject to the restrictions contained in this Agreement.

20.2    Dispositions.

    20.2.1    Except with the written consent of the Company and the other Members or as permitted under Section 20.7 no Member shall dispose of any of his Interest without first giving notice to the Company of his intended disposition of the Interest and offering such Interest to the Company at the lesser of (i) the price as determined under Section 20 5, or (ii) the price at

SENT BY: EXXONMOBIL;              703 815 5406;        JUL-17-00 14:26;        PAGE 16/26
06/26/2000 16 54 FAX 703 549 770¹        BYNUM & JENKINS PLLC                              ☒016

which he proposes to dispose of such Interest. In the case of a proposed gift of an Interest, the purchase price shall be determined under Section 20.5

20.2.2  The notice and offer shall be in writing and shall state the name and address of the proposed transferee, the Percentage Interest to be transferred, the intended manner of disposition, and the proposed disposition price, if any.

20.2.3  As used in this Agreement, the term "dispose" shall mean the making or effecting of any *inter vivos* gift, transfer, assignment, sale, conveyance, pledge, hypothecation, encumbrance, attachment, seizure and sale by legal procedure, and an other transfer by act of a Member or by operation of law.

20.2.4  Within the thirty (30) day period following the date of the Company's receipt of the written notice and offer, the Company shall give written notice to the disposing Member and to all other Members of the Percentage Interest which the Company elects to purchase, the price applicable to the purchase and the Percentage Interest it does not elect to purchase.

20.2.5  The Members other than the disposing Member shall have the right to purchase at the price applicable to the Company the Percentage Interest proposed for disposition which the Company has not elected to purchase within the applicable thirty day period. The Members shall exercise their right to purchase by giving written notice thereof to the disposing Member and to the Company within the thirty (30) day period following the Members' receipt of the Company's notice pursuant to Section 20.4.4 above. Notwithstanding the foregoing, both the Company's and the other Members' rights under this Section 20.2 shall be null and void and shall be treated as not exercised unless they shall collectively be exercised as to the entire Interest set forth in the notice from the disposing Member.

20.2.6  A Member has the right to purchase the Percentage Interest the Company elects not to purchase based upon the following proportion: (a) the Percentage Interest a purchaser owns on the date of the notice from the Company divided by (b) the total Percentage Interests owned by Members exercising their rights hereunder on the date of the notice from the Company, or in such other proportions and quantities as the Members may otherwise agree. In the event a Member exercises his right hereunder as to less than the total Percentage Interest to which he holds a right to purchase, the Percentage Interest upon which he hold and unexercised right to purchase shall become subject to the purchase rights of the remaining Members who exercise their purchase rights in full. Each such fully exercising Member shall (i) first, have the right to purchase that

Case 1:06-cv-00572-GK     Document 6-3     Filed 04/21/2006     Page 20 of 39

SENT BY: EXXONMOBIL;                    703 815 5406;          JUL-17-00 14:26;        PAGE 17/26
06/29/2000 16:34 FAX 703 549 77??      BYNUM & JENKINS PLLC                            ☒017

Percentage Interest which bears the same ration to the Percentage Interest as to which purchase rights have not been exercised as the Percentage Interests for which each fully exercising Member shall have exercised his purchase rights bear to the total Percentage Interests for which all of the fully exercising Members shall have exercised their purchase rights and (ii) second, shall be offered, in order of size of Percentage Interest on the date of the notice from the Company, the right to purchase any remaining Interest as to which purchase rights have not been exercised. If one or more but less than all of the Members exercise their rights, the exercising Members shall be under no obligation to sell any such Interest to any other Member who did not exercise the option.

20.2.7  Upon the termination of the purchase rights of the Company and the other Members unexercised as to any part of the Interest described in the disposing Member's notice, the disposing Members may dispose of the entire Interest described in such notice, provided such disposition is carried out substantially as outlined in such notice (but in no event for less than the amount of consideration specified therein) and, provided further, that such disposition is carried out ninety (90) days after the other Members' purchase rights have terminated. However, as a condition of such Members' purchase rights have terminated. However, as a condition of such disposition, the purchaser must expressly consent to be subject to the provisions of this Agreement in the manner set forth in Section 20 9.

20.3   <u>Transfer of Interests by Operation of Law.</u>

20.3.1  In the event of a transfer other than to the Company or another Member by operation of law of a Member's Interest during the Member's lifetime, the transferee shall give notice thereof to the Company. The Company shall forward a copy of said notice to all other Members. The Company shall have the right to purchase, and the transferee thereof, upon and to the extent of the Company's exercise of its right to purchase, shall sell to the Company the entire or such lesser percentage of the Interest so transferred as the Company elects to purchase, at the lesser of (i) the transferee's cost thereof and (ii) the price determined under Section 20.5.

20.3.2  Within the thirty (30) day period following the date of the Company's receipt of written notice of transfer, the Company shall give written notice to the transferee and all remaining Members of the Percentage Interest which the Company elects to purchase, the price applicable tot he purchase and the Percentage Interest it does not elect to purchase.

20.3.3  The Members shall have the right to purchase at the price applicable to the Company the Percentage Interest which the Company has not elected to purchase. The Members shall exercise their right to purchase by giving written notice to the transferee and the Company within the thirty (30) day

15

SENT BY EXXONMOBIL;                703 815 5406;        JUL-17-00 14:26;        PAGE 18/26
06/28/2000 16:35 FAX 703 549 77··        BYNUM & JENKINS PLLC                        ⊘018

period following the Member's receipt of the Company's notice pursuant
to Section 20.3.2 above.  Notwithstanding the foregoing, both the
Company's and the other Members' rights under this Section 20.3 shall be
null and void and shall be treated as not exercised unless they shall
collectively be exercised as to the entire Interest held by the transferee
thereof.

20.3.4   The allocation of the Percentage Interest to be purchased hereunder by the
other Members shall be as set forth in Section 20.2.6.

20.3.5   Upon the termination of the purchase rights of the Company and the other
Members unexercised as to any part of the Percentage Interest described in
the transferee's notice, the Interest shall, in the hands of the transferee, no
longer be subject to any purchase rights of the Company or the other
Members hereunder as a result of the transfer thereof to the transferee by
operation of law; provided, however, as a condition of such termination,
the transferee must expressly consent to be subject to the provisions of this
Agreement in the manner set forth in Section 20.9.

20.4   **Transfer to Membership Interests Upon Death of Member.**

20.4.1   Subject to any restrictions contained in any financing agreement to which
the Company is a party, upon the death of a Member who is a natural
person, the executor or administrator of the deceased's estate (the
"Personal Representative") shall, at the Personal Representative's option,
either sell to the Company (the Company being obligated to purchase,
except as provided above), at the price determined under Section 20.5, the
entire Interest that was owned by the deceased at the time of his death or
transfer all of such Interest to the spouse and/or descendants of such
deceased Member.  In the event the Personal Representative elects to sell
such Interest of the deceased Member to the Company, the Personal
Representative shall provide written notice of such election to the
Company within thirty (30) days of the issuance of letters testamentary or
of administration to the Personal Representative.

20.4.2   Within the (30) day period following the date on which the Company
received written notice of the election to sell, the Company shall give
written notice to the Personal Representative of the deceased of the price
applicable to the purchase.

20.4.3   In the event the Personal Representative elects to transfer such Interest of
the deceased Member to the spouse and/or descendants of such deceased
Member, the transferees must expressly consent to the subject to the
provisions of this Agreement in the manner set forth in Section 20.9.

SENT BY: EXXONMOBIL;          703 815 5406;      JUL-17-00 14:27;       PAGE 19/26
00/20/2000 10.35 FAX 703 549 770          BYNUM & JENKINS PLLC                    ☒018

**20.5    Purchase Price.** Except where another price is otherwise agreed upon or provided for hereunder, the purchase price payable with respect to any and all Interests purchased pursuant to this Agreement by the Company or by a Member shall be equal to the "Fair Market Value" of the Interest. "Fair Market Value" shall mean, with respect to any Interest, the value that would be obtained therefor in an arm's length transaction or sale (for cash) between and informed and willing purchaser and an informed and willing seller, neither being under any compulsion to buy or sell, which value shall be as determined by an independent appraiser, selected by the transferor Member and the Company or the transferee Member(s), provided, however, that if such transferor and transferee(s) cannot agree on the selection of an independent appraiser, the transferor and the transferee (or transferees as a group if there are more than one purchaser) shall each select an appraiser. The two appraisers selected shall then select a third appraiser, whose determination of Fair Market Value shall be binding on all parties.

**20.6    Payment of Purchase Price and Closing.**

**20.6.1**   Unless the parties otherwise agree, payment of the purchase price for the Interests shall be made by the purchaser(s) at any time within sixty (60) days following the expiration of the period in which the purchaser is required to give notice of its election to purchase or of the Percentage Interest which it is required to purchase, by tendering the applicable price to the selling party in cash or bank certified check; provided, however, that if more than one party hereto exercises its purchase rights hereunder, payment of the purchase price shall be made on the same day by all purchasers, including the Company, within the payment period applicable to the purchasing Members. If the purchase price applicable to any purchaser exceeds $25,000.00, at the option of such purchaser, payment of the purchase price may be made by tendering to the seller not less than $25,000.00 and, in addition, delivering to him three promissory notes of the purchaser, each in the amount of one-third of the balance of the purchase price applicable to such purchaser, the first note payable twelve months after the closing and the remaining notes payable serially at annual intervals thereafter. Each note shall bear simple interest (payable annually) from the date of closing at a rate equal to eight (8%) percent per annum and shall provide that the maker shall have the right of prepayment without premium or penalty at any time, from time to time following the closing. Each note also shall provide that a default in payment which continues for forty-five (45) days from notice of default shall, at the option of the holder thereof, cause the remaining unpaid balance thereon and on the other notes of the same maker delivered in payment of the balance of the purchase price to become immediately due and payable. As collateral security for any and all such notes of the maker, the maker shall, following the delivery of the purchased Interest, pledge to the seller the Interest so purchased, to be held by the seller until all the notes have been paid in full.

**20.6.2**   Unless otherwise agreed in writing by the seller and purchaser, closing of any purchase of any Interest hereunder shall be at the main business office of the Company on the date that the purchase price or first payment of the purchase price (as the case may be) is due.

SENT BY: EXXONMOBIL;                    703 815 5406;          JUL-17-00 14:27;          PAGE 20/26
06/28/2000 16:36 FAX 703 849 7701          BYNUM & JENKINS PLLC                                    ☒020

20.6.3  Anything contained in this Agreement to the contrary notwithstanding, if the Company shall receive any proceeds from any insurance policy on the life of a deceased Member designated on the books and records of the Company as owned for the purpose of funding the Company's obligations under this Agreement, such proceeds, up to the purchase price, shall be promptly paid by the Company to such decedent's Personal Representative in full or partial payment of the purchase price of the Interest purchased hereunder.  Any insurance company may pay the proceeds of life insurance according to the terms of said policy without reference to any provisions of this Agreement.

20.6.4  Upon tender of payment, the seller shall execute and deliver to the Company or other purchaser hereunder, as appropriate, such instruments and documents as may be necessary and proper to transfer to the purchaser full and complete title to the Interest so purchased, free and clear of all liens and encumbrances, except as provided in Section 20.6.1 above.

20.7  Take Along Rights.

20.7.1  If Members owing in excess of 50% of the total Percentage Interest (the "Majority Members") shall receive a bona fide offer from a potential purchaser or group of purchasers to purchase all of the Interests or all or substantially all of the assets of the Company, on such terms and conditions as the Majority Members are willing to accept, the Majority Members shall promptly give notice to the remaining Members (the "Minority Members") of the terms of the proposed transaction and the identity of the proposed purchaser(s) at least thirty (30) days prior to the closing of such transaction.  The Majority Members shall have the right to require the Minority Members to parties to participate, on the same terms and conditions as are applicable to the Majority Members, in the sale of all the Interests or all or substantially all of the assets of the Company as is specified by the Majority Members in the Drag Along notice.  If the Majority Members wish to exercise such right, such notice shall so state and shall be referred to as the "Take Along Notice."

20.7.2  Each Minority Member shall cooperate with all reasonable requests of the Majority Members and the purchaser(s) for information, documentation and assistance necessary to effect such sale, and shall make such representations and warranties as may reasonably be requested.  Each Minority Member shall deliver to the Majority Members for transfer to the prospective purchaser(s) such documents and instruments as shall be necessary to effect such transfer.

20.7.3  The proceeds of any sale of Interests or assets effected pursuant to this Section 20.7 shall be distributed among the Members participating in such sale pro rata.  Each Member shall bear its proportionate share of any expenses relating to such sale.  If the payment terms contained in the offer made under this Section 20.7 include notes and/or other securities or assets in addition to or in lieu of cash,

SENT BY: EXXONMOBIL,                    703 815 5406,        JUL-17-00 14:28;        PAGE 21/26
06/26/2000 16:36 FAX 703 549 7771    BYNUM & JENKINS PLLC                            @021

each Member shall receive as nearly as possible a pro rata share of each type of consideration (unless otherwise agreed among the Members). The Majority Members shall promptly remit to each participating Minority Members that portion of the proceeds to which such Minority Member is entitled, net of such Minority Member's share of such expenses.

20.8    Restriction Relating to Transfer of Interests. The Company shall not transfer any Interests on its books until said Interests have been offered to the Company and the other Members as required by this Agreement, and no transferee of such Interests shall have any rights with respect thereto or be a Member of the Company unless the requirements of this Agreement shall have been first duly and strictly complied with.

20.9    Consent. Any consent to be subject to this Agreement shall be made in writing by filing with the President of the Company the following "Consent" before the Secretary may transfer ownership of record of any Interest on the books of the Company:

"Consent to Agreement. In consideration of the transfer to me of an Interest in the Company, I do hereby consent to become a party ("Member") to and be governed by all the terms of an agreement between the Company and its Members."

## SECTION 21
## ADDITIONAL MEMBERS

21.1    Issuance of Additional Interests. In the event the Company proposed to sell, in one or more transactions, (i) additional Interests (ii) any security directly or indirectly convertible into or exchangeable for Interests, or (iii) any other securities or financial instruments having one or more features of equity securities (but excluding subordinated indebtedness) (collectively, "Additional Securities"), the Company shall thereafter offer to the Members, on a pro rata basis, the opportunity to purchase all or, at the option of the Members, any part of such Additional Securities by means of a notice ("Additional Issuance Notice") setting forth the terms of the proposed sale. Upon receipt of the Additional Issuance Notice, each Member shall, within thirty (30) days, notify the Company and each other Member in writing of its election to purchase all or any portion of the Additional Securities by the Company. If any Member elects not to exercise its right to purchase some or all of the Additional Securities offered to it pursuant to an Additional Issuance Notice, each other Member providing timely notice may elect to purchase such Additional Securities in the manner provided in this paragraph.

21.2    Admission of New Members. From and after the dated hereof, with the written consent of a super-majority of the Members as set forth in Section 9.3.4 (which consent can be withheld, in the discretion of the Members, for any or no reason), any Person acceptable to the Members may, subject to the terms and conditions of this Agreement, become and additional Member in this Company by the issuance of new Interests for such consideration as the Members shall determine. The terms of admission or issuance shall specify the Percentage Interest applicable thereto. Any such additional Member, and any substitute Member approved pursuant to Section 20 hereof as a transferee of a Member's Interest or any portion thereof, must agree in writing to be bound by the terms of this Agreement prior to becoming a Member.

19

SENT BY: EXXONMOBIL;                    703 815 5406;         JUL-17-00 14:28;         PAGE 22/26
   06/28/2000 16.37 FAX 703 849 77        BYNUM & JENKINS PLLC                              022

21.3   Allocations to New Members.  No additional or substitute Member shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company  The Members may, at their option, at the time an additional or substitute Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to an additional or substitute Member for that portion of the Company's tax year in which an additional or substitute Member was admitted, in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## SECTION 22
## DISSOLUTION AND WINDING UP

22.1   Events Causing Dissolution.  The Company will be dissolved upon the happening of any of the following:

22.1.1  The written agreement of Members holding at least 80% of the Percentage Interest to dissolve the Company,

22.1.2  Upon the occurrence of any other event specified in Section 13.1-1046 of the Act.

22.2   Winding Up.

22.2.1  Winding Up Procedures.  Upon dissolution of the Company, the remaining Members shall proceed to wind up the affairs of the Company.  If any non-cash assets of the Company are sold, the purchasers may be a Member or a group in which any Member or Member may have an interest.  Upon the completion of winding up, the remaining Members shall file a certificate of cancellation in accordance with Section 13.1-1050 of the Act.

22.2.2  Distribution in Liquidation.

(1)    In the event of the dissolution and winding up of the affairs of the Company, the assets thereof shall be liquidated, and the proceeds of liquidation, together with assets distributed in kind to the extent sufficient therefor, shall be applied and distributed in the following order of priority:

(i)     to the payment of all expenses of the dissolution, winding up and liquidation;

(ii)    to the payment of all debts and liabilities of the Company or to which the Company assets are subject in the order of priority as provided by law;

S&:NT BY: EXXONMOBIL;                703 815 5406;        JUL-17-00 14:29;           PAGE 23/26
08/28/2000 18 37 FAX 703 549 7        BYNUM & JENKINS PLLC                              023

(iii)    to the creation of such cash reserves as the remaining Members may deem necessary for any contingencies or any unforeseen liabilities of the Company;

(iv)    to the Members, in proportion to and up to the positive balance in their respective Capital Accounts; and

(v)    to the Members in proportion to their respective Percentage Interest.

Any cash reserve established pursuant to Section 22.2.2(1)(iii) shall be deposited in an appropriate account for such purposes and, when the Members determine that all contingent or unforeseen liabilities have been paid or otherwise satisfied, the balance of such reserve shall be distributed in accordance with the provisions of Section 22.2.2(1)(iv) and (v).

(2)    If there is not a pro rata distribution of each asset, asset distributions in kind shall be appraised, if necessary, so that each Member received his, her or its proportionate share of net Company assets as appraised. If shall not be a requirement that each member receive his, her or its proportionate share of each asset available for distribution to the Members on dissolution. In the event valuation of the assets of the Company cannot be agreed upon, such assets shall be valued at their fair market value as determined by independent appraisers. The accountants last retained by the Company shall, in such event, be required to retain such appraisers and other consultants as may be necessary and advisable, all at the expense of the Company, to advise the Members in charge of the winding-up of the Company affairs of their determinations of such fair market values, which determinations shall be binding upon all parties to such winding-up. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

(3)    A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities as to creditors.

(4)    Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and any return of his, her or its Capital Contributions thereto and share of profits or losses thereof, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member.

22.2.3 **Final Reports.** Within ninety (90) days after the complete liquidation of the Company, the remaining Members shall furnish to the Members a financial statement for the period from the first day of the then current fiscal year through the date of such complete liquidation prepared by the Company's accountants. Such statement shall include a Company statement of operations for such period and a Company balance sheet as to the date of such complete liquidation.

SENT BY: EXXONMOBIL;                703 815 5406;        JUL-17-00 14:29;      PAGE 24/26
                                    BYNUM & JENKINS PLLC                                 ⊠024

## SECTION 23
## NOTICES

23.1    All notices and demands required or permitted under this Agreement shall be in writing and may be sent by first class or certified U.S. mail, return receipt requested, postage prepaid; overnight air courier, telecopier, email or personal delivery to the Members at their addresses as shown from time to time on the records of the Company. Any Member may specify a different address by notifying the Company in writing of such different address. Such notices shall be deemed given three days after mailing, the day after deposit with an overnight air courier, when telecopied receipt acknowledged or when delivered in person, as the case may be.

## SECTION 24
## MISCELLANEOUS

24.1    Inurement. This Agreement shall be binding upon, and, inure to the benefit of all parties hereto, their successors and assigns to the extent, but only to the extent, that assignment is made in accordance with, and permitted by, the provisions of this Agreement.

24.2    Entire Agreement. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. It superseded any prior agreement and understandings between them relating to the subject matter hereof, and it may be modified or amended in any manner other than as set forth herein.

24.3    Modification: This Agreement, and all subject matter hereof, may not be modified or amended in any manner other than as set forth herein.

24.3    Governing Law. This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the Commonwealth of Virginia.

24.4    Captions. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

24.5    Severability. If any provisions of this Agreement, or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

24.6    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

24.7    Title to Company Properties. Title to all Company properties shall b held in the name of the Company.

S:NT BY. EXXONMOBIL,                     703 815 5406,         JUL-17-00 14:29;         PAGE 25/26
   06/28/2000 16 38 FAX 703 849 77^1       BYNUM & JENKINS PLLC                          ✄025

24.8   Waiver.  No consent or waiver, express or implied, by any party to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such other party hereunder Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party, of its rights hereunder.

24.9   Company Losses Due to Member's Litigation.  In the event the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with any Member's obligations or liabilities unconnected with Company's business, such Member shall reimburse the Company for all such expenses incurred, including attorney's fees, and the interest of such Member in this Company may be charged therefor.


         WHEREOF, the parties have executed this Agreement as of the day and year first above written.

                        Member(s):


                        _____

                        Mahmoud Rashid




                        Company:

                        By: _____
                        Mahmoud Rashid, President
                        Rising Micro, LLC




23

SENT BY: EXXONMOBIL;                703 815 5406;        JUL-17-00 14:30;        PAGE 26/26
                                    BYNUM & JENKINS PLLC                          Ø026

# SCHEDULE A

## PERCENTAGE INTERESTS

1.      **Mahmoud Rashid**          **100%**

# BEDNASH DECLARATION EXHIBIT 4

**Ex̠̠onMobil**
*Fuels Marketing*

3225 Gallows Road
Fairfax, VA 22037-0001

March 14, 2006

**HAND DELIVERED**

Rising Micro LLC
Exxon Service Station
950 S Capitol Street S E
Washington, DC 20003

LOCATION - **25381**
NOTICE OF TERMINATION:
WIRE FRAUD

Dear Mahmud Rashid.:

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). ExxonMobil is terminating your PMPA Franchise Agreement and franchise relationship with ExxonMobil, effective March 29, 2006 . This decision is based upon your guilty plea to a one count information charge in violation of Title 18, United States Code, Section 1343. Such a plea is a violation of Articles XIV, Section 14.1 of your PMPA Franchise Agreement ("Franchise Agreement"). All of these provisions are reasonable and of material significance to your franchise relationship with ExxonMobil.

Article XIV of the Franchise Agreement provides that ExxonMobil may terminate the Franchise Agreement, franchise, and franchise relationship pursuant to applicable provisions of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et. seq. (the "PMPA").

Your failure to comply with the provisions of the Franchise Agreement set forth above provides grounds for termination of your Franchise Agreement, franchise, and franchise relationship under the PMPA. Pursuant to Article 14.1 of the Franchise Agreement and Sections 2802(b)(2)(c), 2802(c)(1) and 2802(c)(12)of the PMPA, ExxonMobil hereby terminates its Franchise Agreement, franchise, and franchise relationship with you, along with all related supplemental agreements, effective March 29, 2006. This decision is final and irrevocable.

- 2 -

Please remove your personal property from the premises immediately.

A copy of the summary statement of Title I of the PMPA, as prepared by the Department of Energy, is enclosed.

Very truly yours,

*John Bednash /ml*

John Bednash
Area Manager
Mid Atlantic


Enclosure:  PMPA Summary Statement

cc:  R. Alexandrowicz
     E. Beck
     E. Robichaud

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
**Tuesday, June 25, 1996**

**AGENCY:** Department of Energy.
**ACTION:** Notice.

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d) (1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

**I. Reasons for Termination**

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

## A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, for State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

## B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

## C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

## D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. §2802(b) (E).

## E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:
(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
(2) You declare bankruptcy or a court determines that you are insolvent.
(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires

possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I-Definitions and Legal Remedies

## I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

*C. Franchisee*

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel.

*D. Franchisor*

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*E. Marketing Premises*

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

*F. Leased Marketing Premises*

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

*G. Fail to Renew and Nonrenewal*

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

*A. Franchisee's Right to Sue*

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

*B. Equitable Relief*

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
**Marc W. Chupka,**
Acting Assistant Secretary for Policy.